IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

UNITED STATES OF AMERICA        (   3:13-CR-131-D
                    Government,   (
                                  (
                                  (
VERSUS                           (   DALLAS, TEXAS
                                  (
                                  (
CALIFCO, LLC; JONATHAN IAASC     (
SHOKRIAN                         (
                    Defendant.    (   FEBURARY 27, 2014


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:


FOR THE GOVERNMENT:        ERRIN MARTIN
                           United States Attorney's Office
                           1100 Commerce Street, Suite 300
                           Dallas, TX 75242
                               214.659.8838




FOR THE DEFENDANT:         RICHARD B. ROPER, III
Califco                    Thompson & Knight LLP
                           1722 Routh Street, Suite 1500
                           Dallas, TX 75201
                               214.969.1210

Jonathan Shokrian          MICHAEL P. GIBSON
                           Burleson Pate & Gibson LLP
                           900 Jackson Street, Suite 330
                           Dallas, TX 75202
                                214.871.4900

COURT REPORTER:            PAMELA J. WILSON, RMR, CRR
                           1100 Commerce Street, Room 1535
                           Dallas, Texas 75242
                                214.662.1557


     Proceedings reported by mechanical stenography,

transcript produced by computer.

SENTENCING - FEBRUARY 27, 2014

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise.

The United States District Court for the Northern District of Texas is now in session, the Honorable Sidney A. Fitzwater presiding.

Let us pray.

God save the United States and this Honorable Court.

THE COURT:  Be seated, please.

The first matter before the court is United States versus Califco, LLC.

MR. JOSEPH:  Morning, Your Honor.  Steven Joseph for both defendants Califco and Shokrian.

MR. ROPER:  Richard Roper, Your Honor.

MR. GIBSON:  And Mike Gibson for Jonathan Shokrian.

THE COURT:  All right.  Counsel may approach the lectern together with any representative of Califco who wishes to address the court.

MR. JOSEPH:  Good morning, Your Honor.

We have a situation, which I guess we ought to start off by apologizing because it's coming up very late in the day.

I guess Your Honor has had an opportunity, of course, to read everything, including our objections, and is aware of the fact that the floor tiles and the ceiling tiles at Fazio's did not contain asbestos.

Last night we had our expert witness, John Lange, come to the airport.  We picked him up, took him over late at night to Fazio's.  We wanted him to take a look around.

We said, John, here you go, this is the area that wasn't cleaned up, this is representative of the entire sales floor, what do you think.

And, Your Honor, he said to me, "Is this a joke?"

I said what do you mean, "Is this a joke?"

He said there's no mastic here.

I said I can see stains.

He said, yeah, stains but it's not mastic.

He said this is not an abatement operation, why am I here?

So I said -- I have provided a photograph to the court of some stains.

He said, yes, but you picked the worse area, that's the only area I can see one, you went and picked the worst area.  There's hardly anything except stains anywhere else.

So we went upstairs, Your Honor, and we found real mastic, thick mastic, but that was not part of the project.  The project area, according to our expert, there was no mastic.

And we also asked him, and this is our proffer, whether or not there was an obligation -- this is an expert in this area -- to file a report with the State of Texas -- State of

Texas or the EPA.  He said no, there's not enough mastic. This was very thinly laid.  The floor tiles were popping up on their own because there was so little mastic.  He said it was a very poor job of putting down the mastic, but there's nothing there.

So we may be in a situation where we have no asbestos in the ceiling tiles, no asbestos in the floor tiles, so little mastic that it amounts to stains, and we have a client who's looking at a two year prison sentence and a corporation that is looking at a $500,000 fine.

Under these circumstances, Your Honor, I don't think we can proceed as is.

The factual resume, for one thing, is wrong.  The factual resume says that there is asbestos in the ceiling and floor tiles.  That's just wrong.  That's just wrong.

The factual resume says many wrong things, things that we didn't know about.

The factual resume, for instance, even talks about Mr. McGinley.  Mr. McGinley was a very, very essential character in this whole case.  He was the one responsible for filing the reports.  He was the one responsible for telling Jonathan about asbestos.  He said Jonathan didn't know what friable asbestos meant.

We were not provided with his witness statements until after the plea was entered.  If we would have known beforehand

what was in those witness statements, what he said he intentionally didn't tell Jonathan about what permits were required at Fazio's, then we would never have entered those pleas.

So at this point I'm bearing my soul or bearing our souls to the court and explaining the predicament we find ourselves in, which has only happened since last night.

And we've explained this to the U.S. Attorney and -- and we're advising the court this is the situation we're in.

MR. GIBSON:  May I speak, Your Honor?

THE COURT:  You may, Mr. Gibson.

MR. GIBSON:  Just briefly, in essence, what we are asking, what for the court we propose, having found and determined this information late, and I'm talking ten, eleven, twelve o'clock last night and this morning, raises issues that may -- may do two things:  One, necessitate the filing of certain things on behalf of Mr. Shokrian and Califco; and two, in order to have some resolution of this in a reasonable period of time whether to go -- ask -- to be sentenced or not, which I know we're here for that, we were going to -- we ask the court if the court would give us at least an opportunity two weeks, three -- or a month to fully develop the evidence about this so that it can be properly presented to the court and present-- and shared with the government and maybe then there may be a different motion filed, maybe a motion to

withdraw the plea or maybe not.

I understand the court -- this is all discretionary, but I think that in essence is what -- in light of what we discovered -- they discovered last night and we have here. And that witness is here by the way, to testify. And I so know that's a huge imposition on the court's time. And we very much appreciate having pulled it back one day so that we would have the full day, but these developments this late I think appropriately have to be raised. We have an ethical obligation to at least raise it. The court can make the decision, obviously. So that is in essence the request we are making of the court.

THE COURT: Well, before I hear from the government I'll ask this of Mr. Gibson, but any of defense counsel can address it.

I -- I suppose a concern I have and a surprise I have is that this matter was presented to the court on an information with a -- with the plea papers filed. There was no rush. It wasn't like you were up against a trial setting. The -- and this was in April of 2013, many, many months ago.

MR. GIBSON: Yes, Your Honor.

THE COURT: Not only that, but the factual resume was admitted in the case of Mr. Shokrian in his plea under oath, to be true and correct in every respect.

MR. GIBSON: Yes, Your Honor.

THE COURT:  And I'm now hearing about this the morning of sentencing, after I've already denied a continuance in another context.  And I -- I'm very surprised by this.

MR. GIBSON:  Yes, Your Honor.

And we're surprised of the development.  And we appreciate it.  But, again, I think ethically we -- we at least have to lay it in front of the court and ask for the court to make a decision.

But Mr. Joseph can address those issues.  And I ask Mr. Roper to also step up.  I wasn't counsel at the time the pleas were entered.

THE COURT:  You are correct.

Let me -- Mr. Roper, do you want to address this before I hear from . . .

MR. ROPER:  Your Honor, the case about the -- the -- this case I think the corpus of the offense, which is there was an asbestos regulation that requires notification and following the EPA regs, there was evidence -- substantial evidence in the record dealing with that.

And I think as you can tell from the pretrial -- the material we submitted for sentencing, that I think even my client, Mr. Shokrian, thought that some items had asbestos, though they always thought it was nonfriable asbestos, in the -- the ceiling tiles and the floor tiles.  Okay.  And, frankly, I thought it did.

But subsequent investigation that was done -- and what happened, there was a report -- the -- the crime scene essentially was done by a contractor that was hired by the defendants to address these issues, and then the EPA simply took some samples that this contractor did and tested them. That's -- that's really the basis for all the case.

And the report is very detailed.  And -- and, frankly, since there wasn't a full crime scene done by EPA or any -- any agency or the fire department or anything like that, you're just really trying to go back in time and reconstitute what happened in this regard.  And I think -- and frankly, it's -- there is no question about it, there was asbestos in that -- there's asbestos mastic, there was asbestos tile in Fazio's, but the question was where and to what quantity.  And that's always been an issue.

And -- and, frankly, I think both the government, counsel for the government and I thought that those ceiling tiles had asbestos.  And we were just wrong.  I was wrong, Your Honor, about thinking the ceiling tiles did, which caused us thinking there was asbestos -- and there's asbestos mastic on the floor.

And frankly, the question that was arisen was:  Was that of a sufficient quantity and quality to first require a reporting under the Clean Air Act and then, of course, whether it would be sufficient to justify the nine point enhancement.

So that's where we're dealing at.

So these issues were raised after sentencing under the idea that Jonathan honestly thought that there was asbestos in there and that's why he pled guilty.

But subsequent investigation after this mainly raising this to try to raise the government's contention that he's good for the nine point enhancement caused us to raise -- to hire this expert. We finally were able to get him down. And, unfortunately he was late, and I apologize, Your Honor, we shouldn't have had it late, but his report runs contrary to what we were understanding, Your Honor.

And -- and -- and, really, we brought him down to try to rebut the nine point enhancement, but when he actually looked at it he has serious concerns, and I think he's prepared to testify, we can put him on, that the -- the amount of mastic was so de minimis that it doesn't meet the threshold for reporting under the Clean Air Act.

Essentially, what the Clean Air Act, as you know, essentially criminalizes the failure to follow the regs. That's really what it does. And it's just a very low threshold or criminal liability, but, nevertheless, it does. And what we're hearing is -- and, again, we -- we were surprised as well that that is his finding. Frankly, I thought it was going to be that -- that it wasn't justify the serious bodily injury, the nine point enhancement. But, no,

he's saying that you can tell from the way that the -- the glue -- the mastic was on the tiles, and there was a little bit, that it wasn't sufficient. And so that's why the tiles buckled when it got -- they got water on it. And that's why -- really caused why Jonathan wanted to pull up the tiles, was because of this -- this buckling of the tiles because of the rain caused by the -- the water caused by the hole in the roof. Okay?

So, Your Honor, we have evidence that shows that there's a serious issue on whether they even had to report it.

And so, Your Honor, we had to bring this to the attention of the court.

We're not trying to -- we'll -- we'll deal with the government on the issue of prejudice to the government. I'm willing to do that. This is not an attempt to try to hoodwink the government to get beyond the statute of limitations.

If we have to do something in that regard to address that, we're willing to do it. Because I don't want to be in a situation to try to prejudice the government where they can't go back. That's not our intent.

THE COURT: All right. Bring hear from Ms. Martin anyone else on this point?

MR. JOSEPH: Your Honor, I actually was brought in after the plea was entered, and I have spent the last six months doing nothing but investigating this case, and really

I'm astonished at what we found out.

I think what happened in this case, Your Honor, was that the government for some reason, and I don't understand this, assumed that the whole building was being abated.  And I look in all the questioning and the interviews of the witnesses and I don't see any indication that anybody from the government asked whether or not the whole building was being abated or not, they just assumed it.  And they actually took samples from parts of the building like on the second floor that have nothing to do with the first floor retail space.

And I have the impression, maybe I'm wrong, that the government was under the impression that this was a full scale abatement of the building.  And that's how we got to the situation of a felony.  This is very hard in a situation like this.  This is normally a $1500 fine as it was in this case by the state.

And then gradually, as we went on, we found out, well, the floor tiles and the ceiling tiles don't contain asbestos. And then we started reading about the government's allegations about asbestos, whether or not, say, for example they're saying that five dumpster loads -- this is a lot --

THE COURT:  Try to focus on just the point --

MR. JOSEPH:  Right.  But I'm saying our investigation has been -- I am afraid it was post plea, but it has revealed that it would be a fundamental injustice to send

Jonathan to prison or to fine Califco based upon facts which are turning out not to be correct.

MR. GIBSON: Again, one other thing, I think as Mr. Roper, I want to reiterate because I visited with my client this morning, again, we do not intend to prejudice the government in any way. So we're prepared to waive or extend or toll any statute of limitations issues the government may think that they have in order to have the opportunity to present whatever we need to present. I want the court to know that.

THE COURT: All right. Thank you.

Y'all may be seated.

Ms. Martin.

MS. MARTIN: Your Honor, unfortunately, based on the way this has progressed in the last two weeks, I'm actually not surprised that they would come in today and try to pull some last-minute let's-throw-this-all-out, you-guys-are-totally-wrong. That's the way the defense has been approaching this as of late.

They're wrong. They're wrong. The measurement is 80,000 -- or excuse me, 160 square feet of facility components with asbestos. This facility was over 80,000 square feet. Whatever they're raising at the last minute to try to delay again or bring questions in the court's mind is just incorrect.

And we don't concede that there was not asbestos in the floor tile, as you probably gathered from the findings.  That is not correct.  That's what they want the court to believe so that their theory goes forward, but it doesn't.  Even with just the mastic it meets the threshold of regulations.  It's not a measurement of how much mastic was used, it's how much it covered.

And these guys are looking at something four years later, after gasoline has been poured over all of it and it has been ground down and pried off and the dumpsters have been hauled off to a dump.

So we don't believe this is valid.  We believe the plea should go forward.  And Mr. Shokrian has signed a factual resume.  He attested to it under oath.

And the government believes this is just one more delaying tactic on the part of the defense.

And they're right, we opposed a continuance in 2013 that pushed -- pushed this off into the new year and the statute of limitations runs on everything today.  There are other charges that could have been brought, not just the single charge.  And it's ironic that the statute of limitations runs today when at the last minute they have some new theory about why Jonathan Shokrian is not guilty.  And so we would ask that the sentencing go forward.

THE COURT:  Let me ask you, Ms. Martin:  My

impression before I heard this was that while there might be a more extensive presentation regarding Mr. Shokrian individually, that there would not be on Califco, but now that it hear this it sounds like there may be on both.

Do you have an impression of what -- what you would be doing as far as your proof on the Califco at sentencing?

Because, for example, if it would be the same then I probably am going to hear all of it simultaneously.

MS. MARTIN:  I believe it would be the same, Your Honor.

MR. ROPER:  Your Honor, let me add one thing.  I -- we want to put the government in the position where they're not prejudiced but I think the fidelity of the defendants in this case that this isn't just some attempt to come in at the last minute and screw the government, so to speak.  They have already paid the $500,000 fine.  I think that shows what their intent was to try to get this behind them.  But this evidence that was raised does raise some serious issues that I would be remiss as counsel to not raise it for the court.

So we want to put the government in a position that they're not prejudice but at the same time try to -- to work through these issues with the government.

Of course, we'll share any of the results.  I offered to let the government talk to Mr. Lange this morning.  Of course, it was the last minute and they wouldn't be able to do it, but

we don't want to put the government in a position of being prejudice.  Whatever we have to do to avoid that, we'll do that.

But I think the payment of the $500,000 fine does show that this isn't some attempt to come in at the last minute and -- and put the government in -- in a prejudicial position.

MS. MARTIN:  Your Honor, if I could just respond to that?

THE COURT:  You may.

MS. MARTIN:  Up until yesterday Mr. Roper represented that his client was not going to be able to pay the fine and was asking for some kind of payment plan because the fine wasn't going to be paid.  It was only when a final demand letter was sent by the U.S. Attorney's Office informing him that he would have to pay the 10 percent surcharge on the amount that suddenly he was able to pay the fine.

So this idea that, you know, we've accepted this, we've paid the fine, we -- is a little bit overstated.  He paid the fine because he was informed that he would owe $50,000 more if he didn't pay the fine.

THE COURT:  All right.  Thank you.

I am going to carry the motion for continuance at this time during the proceeding.

If I determine during the course of the proceeding that in fairness the matter should be continued, I will then grant

a continuance.  However, at this point I have assertions being made about what the evidence may or may not show.  I understand the government's position to contest the assertions of the defendants, and I want to hear the presentations.

I believe the best way to proceed in terms of order would be to conduct the preliminary steps that are necessary under Rule 32 for both the defendants and then to take up the objections that have been presented.

First of all, I'll ask:  Do we have one attorney in particular who -- for the defendants who will take on this role?

What I'm going to be doing is asking the standard questions about whether you've had sufficient opportunity to read the presentence reports and so forth.

Who is going to take that role?

MR. ROPER:  I'll do that, Your Honor.

THE COURT:  Mr. Roper.  All right.

The court at this time has before it the matter for sentencing in United States versus Califco, LLC, and United States versus Jonathan Isaac Shokrian.

The court has received in the Califco matter the presentence report, the government's statement regarding the presentence report, the defendant's objections to the presentence report, the probation officer's addendum, and the government's response to the defendant's objections.

The court also received on February 21 a joint submission of the defendants objecting to the addenda and related factual presentation.

Mr. Roper, are there any other written materials that the court should have received regarding the Califco matter?

MR. ROPER:   No, Your Honor.

THE COURT:   And regarding United States versus Shokrian, the court has received in this matter the presentence report, the government's statement regarding the presentence report and the addendum, the defendant's objections to the presentence report, the probation officer's addendum, the government's response to the defendant's objections, the defendant's joint presentation filed -- I think earlier I said February 21, it's actually February 24, 2014, the government's response to those objections to the presentence report addenda and related factual presentation.

The court has also received two binders as well as a supplemental letter written on behalf of the defendant and has also received a binder designated as the sentencing memorandum.

Mr. Roper, are there any other written materials that the court should have received but has not received?

MR. ROPER:   Yes, Your Honor.   The presentation you referred to was the objections to the addendum and factual presentation combined.   I understand -- Mr. Gibson filed a

sentencing memorandum.

THE COURT:  Yes.  I have referred to that.

MR. ROPER:  I didn't hear that.  I'm sorry.
Yes, Your Honor, that's it.

THE COURT:  Okay.  Mr. Roper, in both sentencings have you had sufficient time to read and discuss the presentence report and the other materials with your client?

MR. ROPER:  Yes, Your Honor.  That goes for both of -- both Califco and Mr. Shokrian.

THE COURT:  All right.  And, Mr. Shokrian, have you had sufficient time to read and discuss the presentence report in your individual case as well as Califco with your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And discuss it with him?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand that --

MR. ROPER:  And, Your Honor, Mr. Shokrian is no longer associated with Califco but I'm counsel for Califco and representing them.

THE COURT:  Yes, I should make that clear for clarification.  That is what is reflected in the materials you sent me.

MR. ROPER:  Thank you.

THE COURT:  Thank you.
All right.  I believe that handles then the preliminary

questions.

I believe the next step would be to address the objections to the presentence report, and that relates to the matter that -- that has been raised this morning by the defendants.  And so I'll ask at this time:  Does the government wish to present any supporting evidence or information in support of its positions regarding the objections?

MS. MARTIN:  Yes, Your Honor.

At this time the government will call Special Agent Tim Townsend.

THE COURT:  Raise your right hand, please.

(Witness sworn.)

THE COURT:  All right.  Be seated, please.

And if you'll adjust the microphone down where you can speak into it.

MS. MARTIN:  Your Honor, may I have a moment?

THE COURT:  You may.

(Pause.)

MS. MARTIN:  Sorry.

DIRECT EXAMINATION

BY MS. MARTIN:

Q.   Please state your name.

A.   Timothy Townsend.

Q.   And where do you work?

A.    I work at the Environmental Protection Agency's Criminal Investigation Division.

Q.    And -- and how long have you been working for the Environmental Protection Agency Criminal Investigation?

A.    Roughly six years.

Q.    And are you the agent on the case of United States of America versus Califco and Jonathan Shokrian?

A.    Yes, I am.

Q.    And when you began investigating this case why were you alerted to what was going on at the Fazio's department store in Plymouth Park?

A.    There was a news report on the television that documented what happened to be tile removal using gasoline at the Fazio's location.

Q.    And did you begin an investigation?

A.    Yes, I did.

Q.    Okay.  What did you do first when you began your investigation?

A.    I spoke to Texas Department of State Health Services investigator about the situation.  He had been out there.  And then started contacting all the first responders, the HazMat team that had responded, the Irving Fire Department, and slowly started talking to other employees and others that had owned the property.

Q.    Okay.  Did you visit the location?

A.    Yes, I did.

Q.    What size is the building that the HazMat was called out to and the fire department was called out to?

A.    I believe it's just under 200,000 square feet, two stories, about a hundred thousand per floor.

Q.    Okay.  And what is the minimum square footage that the regulations for asbestos removal apply to?

A.    I believe it's about 160 square feet.

Q.    So well over -- this building is well over the minimum amount?

A.    Yes.  That's correct.

Q.    Okay.  And did you speak to witnesses who had been inside the building before, during, or after this removal process was happening?

A.    Eventually, yes, I did.

Q.    Okay.  And did those witnesses give you a sense of how much work was being done on the first floor and how much removal was happening?

A.    Yes.  Uh -- sorry.

Q.    And -- and what did -- what did those witnesses say about how much of the floor was being removed?

A.    Darren Bowden from AMX, an abatement company, had said that roughly 80,000 square feet of tile and mastic had been removed.

Q.    Okay.  And why did he know?  Why was AMX involved?

A.   They were hired by Califco to do a survey of the -- the building afterwards.

Q.   Okay.   So the very person hired by California said it was 80,000 square feet?

A.   Yes.   That's correct.

Q.   And, again, your understanding that's well over the 160 square feet?

A.   Yes.   That's correct.

Q.   Okay.   Now, there is some dispute as to the amount of floor material that contained asbestos, and you understand the defense's theory is that none of the floor tile that was removed by the two day laborers, as Mr. Shokrian called them, was asbestos containing.   Is that your understanding?

A.   Yes, ma'am, that's my understanding.

Q.   Based on your investigation; is that correct?

A.   No, that's not correct.

Q.   And what -- why do you say that?   What do you base it on?

A.   The -- the sample report, the only local report of the samples taken indicate there was a few different colors of floor tile, two being white, white with specks, brown specks or black specks, and others I think a gray tile, and maybe one other.

     One of the Califco employees had said that prior to the removal of the floor tile the sales floor was covered with white tile, which was the tile that tested positive for

asbestos.   `

Q.   And that individual's last name was De Feo?

A.   No.  It was Pedro Arriaga.

Q.   Arriaga.  And he was formerly employed with Califco?

A.   I believe he still is.

Q.   Okay.  And so his testimony was the floor was mainly covered with the white tile?

A.   Yes.  That's correct.

Q.   Why can't you go look now and see if the floor was covered with -- with white tile?

A.   It was removed.

Q.   And where was it taken?

A.   Witnesses stated that it was placed into roll-off dumpsters.

     And we talked to the -- the management company for those dumpsters, it was taken to a -- a landfill

Q.   Okay.  Let's talk about that for a minute.

     You said that witnesses said it was placed in dumpsters and hauled off --

A.   Yes --

Q.   -- is that correct?

A.   -- that's correct.

Q.   And what was the -- what were these witnesses, what were their relationship to this Fazio's department store?

A.   One witness was one of the workers removing the tile.

The other witness was from a neighboring business who said he saw men throwing broken tile into dumpsters.

Q.   And did he also say that he saw it being hauled off?

A.   Yes, he did.

Q.   And he remembered approximately about how many times the tile had been hauled off?

A.   He said about four.

Q.   Okay.

MS. MARTIN:   Your Honor, may I approach the witness?

THE COURT:   You may.

BY MS. MARTIN:

Q.   Special Agent Townsend, did you identify what I've just handed you as Government's Exhibit 1?

A.   These are invoices to SEF Properties, which is the owner of Califco from Dallas Recycling.  They were the management company for the dumpsters that were used during the removal.

Q.   Okay.  Is that a receipt reflecting at least four times that the dumpsters were emptied by Dallas Recycling?

A.   Yes, it is.

Q.   Okay.  And did those -- each time those dumpsters are filled and that's when they -- does that constitute release of asbestos containing material into the environment?

A.   It can, yes.

Q.   Okay.  In this case it was dumped outside and then hauled

off to a dump ground?

A.    Yes.   That's correct.

Q.    And we don't what -- we know the dumpsters weren't covered with all the tile in it but we don't know whether it was even covered while it was driving down the road to the landfill?

A.    Correct.

Q.    And was it an approved landfill?

A.    No, it was not.

Q.    Okay.   So could the asbestos be disturbed in a nonapproved landfill?

A.    Yes, it could.

Q.    The defendant's second -- second objection is to the offense resulting in a substantial likelihood of death or serious bodily injury.

And are you familiar with the defendant's assertions?

A.    Yes, I am.

Q.    And you mentioned that there was a news report that called your attention to this incident at Fazio's department store; is that correct?

A.    Yes.

Q.    Okay.   And what happened?  As a result of the fire department being called.

A.    There was a neighborhood that was adjacent to this property that was evacuated.

Q.    Okay.   And did a news report show some of the children that have been evacuated?

A.    Yes.

Q.    And this was in late February?

A.    Yes, it was.

Q.    And it was really cold that day?

A.    Yes.   That's correct.

Q.    Okay.   Do you have any impression of whether the fire department evacuates entire communities if there's no risk to the health and safety of individuals living there?

A.    I wouldn't imagine that they do.

Q.    And costs were incurred by the City of Irving for this operation; is that correct?

A.    Yes, it was.

Q.    And Califco has reimbursed them for that?

A.    Yes, I believe so.

Q.    And does $18,000 sound about right?

A.    I believe so, yes, ma'am.

Q.    Okay.

And I next want to talk to you about the enhancement over the obstructing of justice.

Can you walk us through your initial contact with Defendant Jonathan Shokrian about this asbestos removal project?

A.    Yes.

We had -- another agent had served Mr. Shokrian a subpoena requesting documents that reflected the names of all contractors and employees for the company.

Mr. Shokrian's response to the subpoena did not include the names we believed to be the individuals doing the work.

And after speaking with him and clarifying that we were looking for those names he faxed another list of names that still did not include those specific individuals.

Ultimately, myself and another agent interviewed Mr. Shokrian, asked him for the names of the individuals. He gave us a first name of Jerry and said he could not remember the last name.

Q.   And what specific individuals were you trying to find?

A.   The two individuals that had removed the floor tile and mastic inside the building.

Q.   It's pretty important to your investigation, the people that were actually doing the work?

A.   Very important, yes, ma'am.

Q.   Okay.  And so you've contacted him on two occasions and he's not given you the names of those people?

A.   Correct.

Q.   Did you ask him again to provide the names of those people?

A.   During the interview we did, yes, ma'am.

Q.   Did he tell you he couldn't remember the names?

A.    Yes, ma'am.  That's correct.  The last name.

Q.    Okay.  Did you ask him for pay stubs or any documentation part of the removal project?

A.    In the subpoena, yes, ma'am.

Q.    Was it -- were checks made out to those individuals ever provided?

A.    No, they were not.

Q.    Or --

A.    Well, late, I believe last year they were provided by Mr. Shokrian's attorney.

Q.    Four years later?

A.    Yes.  That's correct.

Q.    But they were not provided at the time of your -- your investigation, was --

A.    Correct.

Q.    -- you were in the thick of your investigation?

A.    Yes, ma'am, that's correct.

Q.    But were some checks provided to people involved with Califco's work?

A.    Yes.  Just not to the individuals responsible for the work.

Q.    So those are the two specific individuals excluded from the production?

A.    Yes.  That's correct.

Q.    And they were also excluded from the list of names of

people that worked there?

A.    Yes.  That's correct.

Q.    And he said he couldn't remember the name of the person working there?

A.    Correct.

Q.    Did you ask him for contact information?

A.    We asked one of his employees for contact information.

Q.    And did that employee provide you with contact information?

A.    He gave us a phone number, yes, ma'am.

Q.    Did you try to reach the individuals through the phone number?

A.    We did.

Q.    And what happened?

A.    It did not work.

Q.    Did you ultimately find those individuals?

A.    We did, yes, ma'am.

Q.    And, specifically, let's talk about Mr. Ruiz.  Did you review Mr. Ruiz?

A.    Yes.  Twice.

Q.    Okay.

      How long did it take you to find him?

A.    Roughly two weeks after we began looking for him.

Q.    And did he confirm that he was a day laborer?

A.    Yes, ma'am.

Q.   How was he paid by Jonathan Shokrian?

A.   Using checks on Califco letterhead.

Q.   He -- had he made a copy of the checks?

A.   Yes, he did.

Q.   Did he also apply for a job, fill out a job application with Califco?

A.   Yes, he did.

Q.   And he had a copy of that as well?

A.   Yes.

Q.   Was that ever provided to you by the defendant?

A.   No, it was not.

Q.   Was Mr. Ruiz aware that what he was doing was removing asbestos from a building?

A.   No, he was not.

Q.   He surprised to learn that?

A.   Yes.

Q.   Was he a little -- a little upset to learn that, appear to be visibly upset to learn that?

A.   I believe so, yes, ma'am.

        MR. ROPER:   Object to leading.

        THE COURT:   This is a proceeding in which the rules of evidence don't even apply.  I can determine if she's leading or not.

        Go ahead.

        Overruled.

BY MS. MARTIN:

Q.    Okay.

Now, Jonathan Shokrian in his most recent filing with the court made representations that they allowed you to go through file cabinets, they opened file cabinets, and that you took them up on that offer and that you went through a filing cabinet in his office.

Tell me about that day and exactly what happened.

A.    Myself and another agent went to speak to Jonathan.  We brought him a letter from the -- from one of the first prosecutors handling this case, stating that he was required to comply with the subpoena, because we had had trouble getting accurate response from him.

As we were leaving, Mr. Shokrian gave us the opportunity to search his office.  Opened a file cabinet.  I believe he may have thumbed through it, picked out a file.

The other agent who was with me said something to the effect of you've been given a subpoena, it's your job to comply with it.  And then we left.

Q.    Is that agent here today?

A.    Yes, he is.

Q.    Did either you or that agent touch that filing cabinet, go through any files, go digging around looking through any of Mr. Shokrian's materials?

A.    No, we did not.

Q.    Mr. Shokrian also objects to possession of a binder and he claimed he never had the binder.  Did he tell you that he at one time had a binder that detailed asbestos -- the asbestos material in that shopping center?

A.    Yes, he did.  In our initial interview he did.

Q.    What did he say?

A.    He said that he had had a binder that was given to him by the former property managers detailing the asbestos work that had been done in that shopping center and that when a tenant wished to do some construction he would give them the binder so that they would know where the asbestos was in their building.

Q.    Is there any other evidence, despite that binder, whether or not the binder ever existed, that Mr. Shokrian knew or had reason to know that that building contained asbestos?

A.    Yes.

Q.    What are some of those reasons?

A.    A former contractor that did management at the property from Construction Resources of America, Dwight Sellers, during my interview had told myself and another agent that he had walked through Fazio's with Jonathan discussing asbestos.  He told us that the majority of the asbestos located in Plymouth Park, which is the name of that shopping center, was located in the floor tile.

Another contractor, Ralph De Feo, Titan Construction, had

said he walked through Fazio's with Jonathan discussing asbestos.  He indicated that he believed the floor tile contained asbestos based on the building's age.  And he said that he floor tile looked to be what's called VCT, or Vinyl Composite Tile, which was commonly to have -- commonly known to have asbestos in it.

Blaise McGinley, who worked for Califco, had said that he had believed that the floor tile contained asbestos based on the building's age, his knowledge, training and experience, and he had indicated the same to Jonathan.

THE COURT:  For the court reporter, McGinley is M-c-G-i-n-l-e-y.

BY MS. MARTIN:

Q.    And the defense's position is that really what happened was none of Jonathan Shokrian's fault, it was Blaise McGinley's fault.  Is that your understanding?

A.    Of their position, yes.

Q.    Currently?

When you interviewed Jonathan did he at any time lay any blame on Blaise McGinley?

A.    No.  In fact, he said that this was not Blaise's project, it was solely his and if Blaise had had his way he would have hired an abatement contractor.

Q.    And Blaise did have a project for Califco where abatement work was done; is that correct?

A.    Yes.   That's correct.

Q.    And they did hired a contractor to do that properly; is that correct?

A.    Yes.   That's correct.

Q.    And Jonathan was the money man and in on discussions about price.  Is that your understanding?

A.    Yes, ma'am.

Q.    And is that based on your interviews with the contractors they -- they took bids from, Mr. McGinley and Mr. Shokrian?

A.    Yes.   Interviews and documents with Mr. Shokrian's signature on it.

Q.    And Mr. Shokrian, is it your understanding that he would come in once a bid was given and try to work that bid down?

A.    Yes.   That's correct.

Q.    And so during those discussions with the asbestos abatement contractors talking to him about what was involved and why the cost was what it was?

A.    Yes.   That's correct.

          MR. JOSEPH:   Objection, Your Honor.

          THE COURT:   Okay.   I'm going to hear from one defense lawyer, so it's either going to be Mr. Roper or you.

          MR. ROPER:   Judge, we understand that -- we'll object.   We understand that hearsay is admissible but we think that there is no indicia of reliability because she's essentially asking the witness to assume.

THE COURT:  I'll overrule the objection.  I'll consider it as a matter of weight.

MS. MARTIN:  Thank you (Coughing.)

Excuse me.

BY MS. MARTIN:

Q.   Let's talk about one of those contractors in mastic. Are you familiar with Mercury Services?

A.   Yes, ma'am.

Q.   And did you interview a representative of Mercury Services?

A.   Yes, I did.

Q.   Did they ultimately do the abatement of the other facility, the Crest Plaza facility?

A.   No, they did not.

Q.   But did they have discussions with Jonathan -- Jonathan Shokrian over price and trying to arrive at a price that was agreeable for abatement?

A.   Yes, they did.

Q.   At one time did Jonathan try to sweeten the deal for Mercury Services to take it?

A.   According to Mr. Droemer for Mercury Services, that's correct.

Q.   And how did he propose to sweeten the deal?

A.   Mr. Droemer said that during the discussion of the abatement of Crest Plaza Mr. Shokrian had indicated that

Fazio's was -- contained asbestos.  I can't remember his exact words, I think "hot" with asbestos.  And that that would be a potential offer after -- if they gave him a price break on Crest Plaza.

Q.    And he then -- did he then make any comments about how expensive it was and what Mr. Shokrian's preferences were?

A.    Yes.  Mr. Droemer said that Jonathan Shokrian had made the comment if it was up to me I would hired some day laborers to remove it.

Q.    Now, whether he was talking about Crest Plaza at the time or the future one at Fazio's, ultimately that's exactly what he did to remove asbestos containing materials from Fazio's; is that correct?

A.    Yes.  That's correct.

Q.    And in your interview with Mr. Ruiz did you learn that he had actually done work with Jonathan -- for Jonathan's company before?

A.    Yes, he had.

Q.    And had Mr. Shokrian even referred Mr. Ruiz to some of this his friends?

A.    Yes.  That's correct.

Q.    And this is backtracking a little bit, but during your interviews with Mr. Ruiz did you learn that at the same time Jonathan was telling you he didn't know him, couldn't remember his last name, Mr. Ruiz was exchanging phone contact with

Jonathan Shokrian?

A.   Yes.   He said that he had called Mr. Shokrian to ask when they could return to work at Fazio's.   Mr. Shokrian told him that it was an ongoing investigation so they could not currently return to work.

Q.   And that was during the same time Jonathan told you he didn't know his last name and wasn't providing you with information?

A.   Yes.   That's correct.

THE COURT:   For the court reporter, is Droemer, D-r-o-e-m-e-r?

THE WITNESS:   Yes, sir.   That's correct.

BY MS. MARTIN:

Q.   Now, with respect to the amounts of dust during the abatement, did you talk to people about what Fazio's seemed like while the workers were removing mastic from the floor?

A.   Yes.   Several people.

Q.   And what was their -- what did they observe?

A.   I believe everyone we spoke to said that it was dusty and moldy.

Q.   Okay.   And did those people actually go in -- inside the building?

A.   Yes, ma'am.

Q.   And were some of the people saying that it was dusty, the workers?

A.    The workers in -- said it was dusty, that the dust was such that it would clog the canisters on their respirators.

A neighboring employee from another building said he had walked in to see what was going on, described it as dusty.

Another Califco employee, Albino Villanueva said that it was dusty.

And Jonathan Shokrian himself said that it was dusty.

Q.    In fact, Jonathan Shokrian said it was dusty in there, that's why I got them the masks?

A.    Yes.    That's correct.

Q.    And let's talk about the masks, because that's a point of contention.

Initially they started this removal project, removal of the tiles, in November of 2008; is that correct?

A.    Yes, I believe so.

Q.    And what kind of masks were they using from November to mid-December?

A.    The first masks they used were the paper doctor type masks.

Q.    Okay.    So they're not grinding up the mastic at this point; is that correct?

A.    Correct.    Yes, ma'am.

Q.    But they're breaking up the tile, popping up the tiles?

A.    Yes.    Breaking up and lifting the tiles.

Q.    So if the tiles contain asbestos they're breaking those

open with just a paper 3-M mask?

A.    Yes.   That's correct.

Q.    And even if the tiles themselves don't contain asbestos they're disturbing that mastic and popping it up?

A.    Yes.   That's correct.

Q.    And some of the mastic would remain on the tiles?

A.    Yes.   That's correct.

Q.    So that's being disturbed?

A.    Yes.

Q.    Okay.

      Now, when they started actually grinding off the asbestos containing mastic, what kind of equipment did they use?

A.    They purchased respirators that had removable canisters. And according to Mr. Ruiz, one of the workers, they used swim goggles to cover their eyes.

Q.    And after one day of grinding and using the paper masks did they actually get to go get a better mask?

A.    Yes.   That's correct.

Q.    Two better masks?

A.    Initially, no.   The first purchase I believe was one mask, and then several days later purchased a second mask.

Q.    About a week later; does that sound right?

A.    Yes, ma'am.   That's correct.

Q.    And so for the -- for the first week only the operator of the grinder had the mask?

A.    Yes.    That's correct.

Q.    And you looked at those masks; is that correct?

A.    Yes, I have.

Q.    And the specifications for that mask you've -- you've reviewed that as well?

A.    Yes, I have.

Q.    And what were some of the regulations for using that mask?

A.    One is that the canisters or cartridges must be changed on every shift.

And according to our witness they were not.

Q.    Were they just wait until they were so clogged they couldn't breathe?

A.    Yes.

Q.    Okay.

Did you learn from the witness whether or not they had any special suits to wear?

A.    Our witness said that they used their -- they just wore street clothing.

Q.    Okay.    And did they go home with that clothing?

A.    Yes, they did.

Q.    Okay.    Got in their cars, didn't do anything with the clothing?

A.    Correct.    Our witness said he would wear it home as usual.

Q.   Okay.  And did the witness also tell you that the windows had been covered?

A.   Yes.

Q.   Did other witnesses tell you the windows were covered?

A.   Yes.  That's correct.

Q.   What about the doors?

A.   The -- different witnesses said that the front doors were closed while the back doors were open.

And other witnesses said the doors were closed.

It was difficult for me to tell which -- which was accurate.

Q.   So they could have been opened?

A.   Yes.

Q.   For at least part of the time?

A.   Yes.  Absolutely.

Q.   If they were open, for at least part of the time while asbestos was being disturbed and stirred up by grinders, would that be releasing asbestos outside of these doors that were open?

A.   I believe it's possible, yes, ma'am.

Q.   And although Mr. Shokrian's statement, actual statement that he signed said the ceiling tiles contained asbestos, that's not actually correct, he believed they contained asbestos; is that correct?

A.   Yes, he believed.

Q.   Okay.  The ceiling tiles did not contain asbestos?

A.   No.  According to the analytical report, they did not.

Q.   Okay.  Let's talk about the analytical report.  Which one are you referring to?

A.   I believe it's Cate's laboratory report.

MS. MARTIN:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MS. MARTIN:

Q.   Special Agent Townsend, is Government's Exhibit 3 a copy of that lab report that you were referring to?

A.   Yes, ma'am.  Partial copy.

Q.   Okay.  And is this the lab report that you were referring to that some of the portions of this -- talks about what was -- what was asbestos containing?

A.   Yes.  That's correct.

Q.   And you understand that in Mr. Shokrian's response he gave just a short little snippet, excerpt, of some samples that didn't contain asbestos?

A.   Yes.  That's correct.

Q.   -- and represented to the court that, look, these didn't contain asbestos?

A.   Yes.  That's correct.

Q.   He didn't give it all, though, did he?

A.   No, ma'am.

Q.   Okay.  Lots of these say that the samples contain

asbestos; is that correct?

A.    Yes, ma'am.

Q.    Okay.   Which ones which -- do you think are particularly significant?

A.    The -- on the first page of the documents you gave me, client field ID, which is the second column on the page, identifies sample 72, 73, 74, as 12 by 12 floor tile that was 3 percent chrysotile asbestos.   The mastic associated with those tiles was 5 percent.

On the second page, field ID sample numbers 104, 105, 106 were 12 by 12 floor tile, white with brown streaks, containing 3 percent chrysotile.   This was all on the first floor, by the way.   Five percent chrysotile for the mastic associated with that floor tile.

And on the fourth page, client ID numbers 55, 56, 57, 12 by 12 floor tile, white with black specks, first floor, 3 percent chrysotile, 5 percent for the mastic associated with those.

And on the fifth page, client ID 127, 128, 129 were debris piles on the first floor, 5 percent chrysotile for the mastic, 3 percent chrysotile for the floor tile.

And on the last page, ID number 256 floor tile debris on the first floor was 3 percent chrysotile for the floor tile and 5 percent chrysotile for the mastic associated with that tile.

Q.     Okay.   On that same page, 251, 252, and 253, that's the gray floor tile?  You were talking about some of the floor tile was gray?

A.     Yes.

Q.     Okay.   And it says that there was no -- none detected on the floor tile --

A.     On the floor tile.   But the mastic associated with that tile contained 5 percent.

Q.     And what's the threshold of the percentage of chrysotile that would make it need to be regulated?

A.     Above 1 percent.

Q.     Okay.   So the 5 percent and the 3 percent are above the minimum standards for that regulation?

A.     Yes.   That's correct.

                MS. MARTIN:   May I have a moment?

                THE COURT:   You may.

                          (Pause.)

                MS. MARTIN:   Your Honor, at this time I move to admit for the sentencing hearing Government's Exhibit 1 and 3.

                THE COURT:   Any objection?

                MR. JOSEPH:   I'm sorry.   I couldn't hear which is which, Your Honor.

                THE COURT:   1 and 3, were the two that were identified.

                MR. ROPER:   No objection, Your Honor.

THE COURT:  Government's Exhibits 1 and 3 are admitted.

MS. MARTIN:  Your Honor, at this time I'll pass the witness.

THE COURT:  Okay.

Cross-examination?

CROSS EXAMINATION

BY MR. JOSEPH:

Q.    Hello.

THE COURT:  Typically the lawyer who's objecting is the one who is examining the witnesses; are you-all changing up?

I'll allow it for this witness, but otherwise you've got to be consistent.

MR. JOSEPH:  Okay.  The problem -- the problem is that on the issue of cooperation that's something that Mr. Roper knows about and I'm the person that knows about the basic facts of the case, and, unfortunately, we've kind of got that dichotomy.  So I hope Your Honor can be -- you know, accept that we have this kind of split in functions.

THE COURT:  No, I cannot.

MR. JOSEPH:  Well, I'll do my best then.

BY MR. JOSEPH:

Q.    You understand, Mr. Townsend, that Mr. Shokrian accepts that he knew that there was asbestos in Fazio's, don't you?

A.    Yes, sir.

Q.    He didn't deny that, did he?

A.    No.

Q.    Okay.  You accept that he knew that there was asbestos in the ceiling tiles, and he admits that he knew there was asbestos in the ceiling tiles, or at least so he thought; is that correct?

A.    Yes, sir.  That's correct.

Q.    Because someone had cracked open a ceiling tile for him to look at and said this main contain asbestos?

A.    Yes, sir.

Q.    Right.  And you accept that he never tried to cover that up, that he knew that there was asbestos in the building?

A.    Correct.

Q.    Okay.

A.    Yes, sir.

Q.    How many witnesses did you interview in the course of your investigation, approximately?

A.    Maybe a dozen or more.

Q.    Dozen or more.

      Can you identify for me the names of any witnesses who said that they discussed with Mr. Shokrian the difference between friable asbestos and nonfriable asbestos?

A.    I believe maybe Blaise McGinley had discussed the issue of friability versus confirmability.

Q. Anybody else?

A. Not that I'm aware of, no, sir.

Q. And Mr. Shokrian told you in his interview, didn't he, that he understood that the asbestos that he was dealing with on the retail sales floor of the first floor of Fazio's was nonfriable; is that right?

A. That's what he believed, yes, sir.

Q. Okay.

And did you hear anyone say anything inconsistent with that?

A. No, sir.

Q. No.

Did anyone suggest to you that when he was sitting down in meetings in regards to the Crest Plaza project --

MR. JOSEPH: Crest Plaza is in South Dallas, Your Honor. It's another shopping center.

BY MR. JOSEPH:

Q. -- that the meetings that were taking place at Califco, did anyone suggest that he was told during those meetings the difference between friable or nonfriable asbestos?

A. Suggested, yes, sir.

Q. Who suggested it?

A. Devon Germer (phonetic) and Darren Bowden from AMX.

Q. What, they told him the difference?

A. They said they discussed in great detail the -- why

abatement was so cost -- costed so much.

Q.   I didn't ask you that.  I asked you whether or not anyone discussed with him the difference between friable and nonfriable asbestos?

A.   Specifically, no, sir.

Q.   No.

Just Blaise McGinley?

A.   Yes, sir.

Q.   Okay.  What was Blaise McGinley's position in Califco when the project started, Jonathan's project?

A.   I believe he was director of construction, or something to that effect.

Q.   And isn't it true that he told you that Jonathan didn't know what "friable" meant and that's why they brought him on?

A.   Yes, sir.  That's correct.

Q.   And that did not mean to you that obviously Jonathan's source of information on what friable was in fact Blaise McGinley?

A.   One of, yes, sir.

Q.   I'm sorry, did you say "one of"?

A.   Yes, sir.  That's correct.

Q.   Was there somebody else?

A.   There were documents that were provided in the subpoena given to him after the Crest abatement that outlined what friable was and nonfriable was, yes, sir.

Q.    I see.

Is it your understanding that friable asbestos is regulated?

A.    Yes, sir.  That's correct.

Q.    And subject to workplace rules?

A.    Yes, sir.  That's correct.

Q.    It's your understanding that nonfriable asbestos is not regulated and not subject to workplace rules?

A.    Yes, sir.

Q.    So I guess I'm having a little trouble here.

You're accepting that this asbestos, which was nonfriable, as I know you accept, was not regulated.

A.    I don't believe your statement is correct, sir.

Q.    Well, was it regulated as to workplace rules?

A.    Not when it was nonfriable.

Q.    Did you say you were an EPA investigator?

A.    Yes, that's correct.

MR. JOSEPH:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. JOSEPH:

Q.    I'm going to show you exhibit 17 to the Defendant's objections.

Now, this is the EPA asbestos information page for the Texas region or the region -- the EPA region that includes Texas.

And I'm going to ask you if you would read out loud this sentence -- by the way, also read out loud any other sentences that you feel you should, you know, read --

A.   Sure.

Q.   -- to give it context, if you feel necessary.

A.   Yes, sir.

Q.   It's a very short document.

A.   This is under Clean -- CAA, Clean Air Act, Asbestos and MISHAP; is that correct?

Q.   Yes.

A.   "Pursuant to the Clean Air Act of 1970 EPA established the asbestos national emissions standard for hazardous air pollutants.  It is intended to minimize the release of asbestos fibers during activities involving the handling of asbestos.  It specifies work practices to be followed during the renovation, demolition, or other abatement activities when friable asbestos is involved."

Q.   Right.  When friable asbestos was involved?

A.   Yes, sir.

Q.   Was any friable asbestos involved in Jonathan's project?

A.   Yes, sir, it was.

Q.   Friable?

A.   Yes, sir.

Q.   Oh, what was that?

A.   The asbestos when it becomes pulverized, rinded, or

otherwise disturbed then becomes friable.

Well, why is it then in this PM report, the Cate's laboratory report, it listed it all as nonfriable, the tiles, the mastic, the ceiling, it had all the other parts of the building as well, some of it is nonfriable, isn't it?

A.    Some of it is listed as nonfriable, yes sir.

Q.    Well, is any of the tile listed as nonfriable, anywhere in the building?

A.    The tile becomes friable when it's broken up.

Q.    I'm asking you in this report is it listed as nonfriable or friable?

A.    From what I've reviewed, some of it is listed as friable and some of it is nonfriable.

Q.    Well, I would like you to point out, if you would, anywhere where it shows ceiling tiles or floor tiles or mastic listed as friable.

Go ahead.

A.    I do not have a complete report, but from what I see it's not listed as friable or nonfriable.

Q.    We know that the pipe insulation for example was friable, don't we?

A.    I believe it was, yes, sir.

Q.    Was that touched as part of this project?

A.    No, sir.

Q.    No.

Q.   So you have no evidence that any asbestos that was friable in its static state was in fact friable?

A.   That's correct.

Q.   It was all nonfriable, wasn't it?

A.   In its static state, yes, sir.

Q.   Right.   And according to the EPA web page as that is written, right, taking what the words we see there, that was not regulated, was it?

A.   In its static stage, that's correct, sir.

Q.   It doesn't say anything about static state on the EPA web page, does it?

A.   I did not read that.

Q.   Read it again.

A.   No, no, I'm saying you're correct.   I did not see that in what I read.

Q.   So isn't it a fact that Jonathan simply believed exactly what the EPA web page says?

A.   It's possible, yes, sir.

Q.   Is the EPA web page wrong?

A.   Not from what I read, no, sir.

Q.   No.

So Jonathan was in fact right, wasn't he?

A.   About?

Q.   About believing what is written here, that the -- the rules specified work practices to be followed only when

friable asbestos is involved?

A.    Yes, sir, he believed that.

Q.    Right.  And if he -- if Mr. McGinley told him that too that would have been -- it would have been reasonable for Jonathan to believe that, wouldn't it?

A.    I believe so.

Q.    Yes.

Now, you have understood from the conversations we've had and the papers that you've read that the scope of the project was only the retail floor where people sold stuff, right, on the first floor of Fazio's?

A.    For the tile removal, yes, sir.

Q.    For the tile removal and the mastic removal?

A.    Yes, sir.

Q.    Were there different tiles throughout the building, floor tiles?

A.    I believe so, yes.

Q.    Right.  Well, you've pointed to all these numbers in this P & L M report showing where there's asbestos in floor tiles -- and I don't know if you have a copy in front of you?

A.    I have a partial one, yes, sir.

Q.    Right.  Would you identify for me those numbers that apply to the sales floor?

A.    From witness statements, the sales --

Q.    I'm not asking you for witness statements.

I'm asking you which numbers on this document apply to the sales floor.

A.   Yes, sir.  That would be -- numbers -- on the second page numbers 104, 105, 106.

Q.   Excuse me.  It says north stockroom hallway.  Does that say sales floor or am I not able to read it correctly?

A.   No, sir, you're correct.

Q.   Right.  Is that the sales floor?

A.   No, sir, it's not.

Q.   No, sir.

Can you point to another one perhaps that you think applies to the sales floor?

A.   I cannot.

Q.   Well, I can.

I'm going to show you --

MR. JOSEPH:  Again may I approach, Your Honor?

THE COURT:  You may.

MR. JOSEPH:  Do I need to keep asking?

I hope not.

THE COURT:  Yes, you do.

MR. JOSEPH:  All right.  Well . . .

BY MR. JOSEPH:

Q.   I'm going to show you Defendant's Exhibit 19 to the objections to the addenda.

Do you see that?

That is an extract from the same report you've been reading from.

I don't think that was provided in this -- oh, yes, it was.

Do you see number 254, location 254?

A.   Yes, sir, I do.

Q.   Would you read that for me, please, just the one -- the middle column, the big column.

A.   Floor tile debris, first floor retail space in front of west entrance.

Q.   And what about 255, would you read that?

A.   Floor tile debris, first floor retail space in front of west entrance.

Q.   So that's part of Jonathan's project, isn't it?

A.   Perhaps.  I believe he was just doing the sales floor, not the entrance.

Q.   Have you looked at where location -- should we go together and look at locations 254 and 255 and see where they are, if you want to do that?  Or would you concede with me that they're on the sales floor and save some time?

A.   I'll -- I'll concede, yes, sir.

Q.   You'll concede.

They are on the sales floor, right?

How would those tiles have gone there if they didn't come from the sales floor?

A.    It's a debris pile, it could have been anywhere.

Q.    Why would they be moved to the west side of the building on the left as you go in when the dumpsters are on the far top right of the chart, you know, the opposite side of the building, why would somebody move debris piles onto the sales floor over there?

A.    I could only speculate.

Q.    Well, go ahead.  I'm fascinated.

A.    Well, people are removing floor tile throughout the building, dumpsters are located in one spot, they must move that floor tile to that spot.

Q.    Pardon?

      That didn't make any sense to me, I'm sorry.

A.    I'm sorry.

Q.    Why would somebody move floor tile across the building, right, and put it in the sales floor against that -- against that western wall?

      This would do that?  It doesn't make any sense.

A.    In transporting broken floor tile which is easier to move than a dumpster, they may have moved it across.  Again, I'm only speculating.

Q.    It's nowhere near the dumpsters.  254 and 255 -- you know what, should we look at the plan together with His Honor?

A.    No, I believe --

Q.    They're nowhere near the dumpsters?

A.     Yes.

Q.     They're the opposite side of the building from the dumpsters.

And the only thing around there is sales floor; is that right?

A.     Yes, sir.

Q.     Yes, sir.  Okay.  Thank you.

I'm not going to talk to you about the binder too much, just ask you a question about the binder, because the binder -- you don't know what was in the binder, do you?

A.     Correct.

Q.     All right.  So you talk -- everyone is talking about this binder, Jonathan had this binder, you have no idea what was in it?

A.     Correct.

Q.     Well, why are you making such a big deal of it?

A.     I'm not.

Q.     Well, it seems to be a big deal in this case.

You said Blaise McGinley said he would have employed an abatement contractor?

A.     That's what Mr. Shokrian told us.

Q.     That's what Mr. Shokrian told you?

A.     Yes, sir.

Q.     That Blaise said he would have employed an abatement contractor?

A.   He said he believed if Mr. McGinley had had his way he would have employed an abatement contractor.

Q.   But he -- we know that McGinley said -- admitted that he intentionally didn't talk to Jonathan about the Fazio's project including any permits necessary.  We know that, don't we?

A.   After the work began, yes, sir.

Q.   Yes.  And we know that he visited Fazio's -- I'm sorry, we know that he visited the work, the grinding and the petroleum and the scraping.  We know that he visited with Jonathan during that period, didn't he?

A.   I believe he did, yes --

Q.   He did.

     And he never said a word to Jonathan about the need for any kind of permit or notice or regulation of any kind?

A.   Not that I'm aware of, no, sir.

Q.   Not that you're aware of.  No.  That's not what I'm looking for.

     He actually said that he didn't discuss it with him, didn't he?

A.   Yes.

Q.   Why didn't he discuss it with him?

A.   He indicated to us that it was not his project --

Q.   No, he didn't.

     He indicated that he was afraid he would be fired --

MS. MARTIN:   Your Honor, I'm going to object that it's continuing argument with the witness.

THE COURT:   The last question was argumentative.

MR. JOSEPH:   Sorry, Your Honor.

BY MR. JOSEPH:

Q.   Isn't it true --

A.   Could you restate the question, please?

Q.   Yes, I will.

Well, I'll rephrase it.

Isn't it true, Mr. Townsend, that McGinley said -- told you that the reason he didn't discuss Fazio's, and the ongoing -- well, that he didn't discuss permitting and legal aspects of the project with Jonathan was because he was afraid he would lose his job?

A.   He did say that, yes, sir.

Q.   Yeah, he did say that.  Do you know who he was afraid of losing his job by, who -- who would fire him?

A.   I believe he indicated it was Jonathan Shokrian's father.

Q.   His father --

A.   Yes, sir --

Q.   -- not Jonathan?

A.   Correct, yes, sir.

Q.   What did he say about Jonathan?  Did he say he was a good kid?

A.   I believe something to that effect, yes, sir.

Q.   Now, you say that in the course of this project Jonathan was disturbing mastic?

A.   Employees under Jonathan's direction were, yes, sir.

Q.   Are you a -- do you have any certifications with respect to whether or not fibers, asbestos fibers, can be released from mastic, anything that would pertain to something like that?

A.   No, sir.  I don't --

Q.   No, sir?

A.   No, sir.

Q.   Isn't it true that the purpose of the Clean Air Act as it applies to asbestos is to regulate fibers, asbestos fires; true or false?

A.   I believe so, yes, sir.

Q.   Do you have any idea, truly, whether or not asbestos fibers can be released from mastic by sanding or grinding or any other means?

A.   Only what I've been told, sir.

Q.   I'm asking whether you know.

A.   No, sir, I do not.

Q.   So let's talk about dumpsters.

A.   Yes, sir.

Q.   How many dumpsters did Dallas Recycling provide to Califco?

A.    Well --

Q.    How many were rented?

A.    I believe four, sir.

Q.    Four?

A.    Yes, sir.

Q.    I believe if you look more closely, correct me if I'm wrong, that they had one which was emptied four times?

A.    That's not the way it was explained to us, sir.

Q.    Well, it kind of doesn't matter, does it, because if it's one that's emptied four times or they replaced the dumpsters, it's still four?

A.    Correct, yes, sir.

Q.    We don't know actually whether or not the dumpster was physically replaced or just emptied?

A.    According to Dallas Recycling they physically replaced it.

Q.    Well, I'm learning that myself today.

A.    Okay.

Q.    Okay.  Now, we have read in this presentence addenda that five dumpster loads worth of asbestos containing material went to the landfill.

      You've read that?

A.    I believe so, yes, sir.

Q.    Did you tell the probation officer to write that?

A.    I can't recall if I did or it was in -- somewhere in the

documentation, sir.

Q.   Is it your contention that five dumpster loads worth of asbestos went to the landfill, yes or no?

A.   No, sir.

Q.   No, sir?

A.   No, sir.

Q.   Well, why do you think it's in the presentence addenda?

A.   It was either discovered in the documentation or it's --

Q.   It was a mistake?

A.   Possibly, yes, sir.

Q.   All right.  Let's assume -- I'm not asking you to agree, I'm asking you to assume:  That the only thing that went to the landfill that contained asbestos was mastic.  All right?

A.   I'll assume that for you, yes, sir.

Q.   Would you say five dumpster loads worth of mastic went to the landfill?

A.   If I assume only one dumpster contained mastic, then, no.

Q.   How much do you think -- can you show me with your hands how much mastic that would be?  Just the mastic?

A.   I -- I could not.

Q.   You could not?

A.   I do not --

Q.   Well, who are we supposed to ask?

You did the investigation.  We're talking about the quantity of asbestos that went to the landfill.  Either you

know or you don't know.  You don't know?

A.    The quantity of mastic was sufficient to cover roughly 80,000 square feet.

Q.    I see.

A.    I could not show you with my hands.

Q.    But you don't know how thick it was, do you?

A.    No, sir, I do not --

Q.    No, sir.  You don't know how thick it was?

A.    No.

Q.    So you have no idea what the quantity was?

A.    Oh, no, sir.

Q.    Did you inspect the retail floor of -- the first floor retail floor of Fazio's?

A.    Visibly, just looking through the window, sir.

Q.    Did you do any kind of analysis on -- did EPA do any kind of analysis of the first floor retail space?

A.    No, sir.

Q.    I'm sorry, the project was about the first floor retail space.  You're telling me the EPA did no sample analysis of the first floor retail space?

A.    They did analysis of samples that were taken by the contractor.

Q.    From where?  Which parts of the building?

A.    From the first floor and the second floor, sir.

Q.    I didn't ask you -- from the first floor retail space,

okay.

A.   From the samples that were taken from the tile that was left.  I don't believe that was the retail --

Q.   I'm going to put to you that EPA did not test the first floor retail space, anything.  That they tested other parts of the building because you believed wrongly that this was an abatement of the whole building and that you never asked the question whether it was or not.

Isn't that true?

A.   No, sir, it's not.

Q.   Well, then why did you have the second floor tiles tested and the offices tested and all other areas of the building tested and not that part of the building?

A.   We could not test that part of the building because the tile was removed.

Q.   I see.

A.   So we tested the surrounding area.

Q.   There was still mastic, wasn't there?

A.   No, sir.  I don't believe so, no, sir.

Q.   Only 75 percent of the mastic was removed before the fire department came.  The job wasn't finished, was it?

A.   Not to my knowledge, no, sir.

Q.   So why didn't you test the mastic that was left?

A.   That was something that the contractor either did or did not sample.

Q.    The contractor did sample it.

We've looked at these two numbers, 254 and 255.  It's right there.  Can't you see where it says floor tile nondetected, 5 percent chrysotile black mastic.

The contractor tested that.  Why didn't you test it?

A.    I -- I couldn't tell you, sir.

Q.    Because your investigation was so faulty that you thought the whole building was being abated, which is why we're here today.  And now that we -- now that you realize it wasn't -- you realize now, don't you, that this is not the case you originally thought it was?

A.    No, sir.

Q.    No, sir?

A.    No, sir.

Q.    When did you first find out that the only parts of the building that was -- parts of Jonathan's project was the first floor retail floor space?

A.    I believe when we first spoke to Albino Villanueva we -- we believed that it was not a full scale abatement.

Q.    When did you speak to him?

A.    He was one of the first people we spoke to, maybe March or April of 2009.

Q.    That was immediately after the fire department came, about a month later?

A.    Yes, sir --

Q.    Yeah.

A.    -- that's correct.

Q.    That was before you did the -- the EPA did its floor samples -- I'm sorry, did -- did its sampling, right?

A.    We never did sampling.  We subpoenaed the samples that were taken and analyzed those.

Q.    You analyzed those.

But the analysis you did, which was after you talked to Mr. Villanueva, never covered -- never included any of the samples that were taken from the first floor retail space, correct?

A.    I would have to concede to that fact --

Q.    Yeah --

A.    -- yes, sir.

Q.    -- because you thought the whole building was being abated?

A.    No, sir.

Q.    Well, then, why on earth would you ask for sampling was what was on the second floor?

A.    To get an indication of the type of material that was throughout the building.

Q.    The -- you could see from the SWG analysis that the material was different throughout the can, couldn't you?

A.    Yes, sir.  That's correct.

Q.    So why would the second floor be relevant but the first

floor where the -- where the project occurred was not relevant?

A.   According to Darren Bowden, the time at which the building was constructed, the floor tile and materials used would likely be consistent.

Q.   But it wasn't, was it?

A.   The mastic was, yes, sir.  Not the floor tile.

Q.   All right.  Let's talk about the dumpsters.

How many loading bases were there at Califco?

A.   Two.

Q.   Two.

Was there a north one and a south one, right?

A.   I believe they were in the same location adjacent to each other.

Q.   Right.  Was one bigger than the other?

A.   Not that I recall.  Potentially.  I -- I can't recall.

Q.   Okay.  The evidence shows and we've said in our documentation that there was a north loading dock and a south loading dock and the north loading dock was where the Dallas Recycling dumpster was located which was changed and so on and there was the south loading dock where there were two green dumpsters.  Does that ring a bell?

A.   Yes, sir, that sounds familiar.

Q.   Did Dallas Recycling empty the -- the two dumpsters in the south loading bay?

A.   No, sir, they did not.

Q.   No, sir.

Why not?

A.   I believe the bay doors were stuck and those dumpsters could not be removed.

Q.   And those dumpsters were not used for the project, were they?

A.   Not that I'm aware of, no, sir.

Q.   Right.  So only one dumpster of the used for the project.

When the project started sequentially it started with the clearing of a massive amount of junk, didn't it?

A.   From what I've been told, yes, sir.

Q.   Left there by a previous tenant?

A.   Yes.

Q.   Dallas Thrift -- I think it was Texas Thrift or something?

A.   Something to that effect?

Q.   In fact, they rented a backhoe to try to get rid of all that stuff, didn't they?

A.   Ultimately, yes, sir.

Q.   Right.  And what did they do with all that junk?

A.   I was told that they placed it into a dumpster.

Q.   A Dallas Recycling dumpster?

A.   Yes, sir.

Q.   Right.  And they put all that into the Dallas Recycling

dumpster.  Did it fill a dumpster?

A.    I don't know, sir.

Q.    You don't know?

A.    No, sir.

Q.    Okay.  Well, that dumpster was emptied on --

        MR. JOSEPH:  May I approach and get my --

        THE COURT:  You may.

BY MR. JOSEPH:

Q.    When did the grinding start?  Do you know the date?

A.    I believe the first grinder was rented December 16-- 17-- or 16th, I'm sorry.

Q.    Right.  I agree with that.

    How many times was the dumpster emptied after the grinder was rented?

A.    Two times, sir.

Q.    What dates?

A.    December 18th and February 27th.

Q.    Right.  By December 18th they would hardly have started the grinding operation; is that right?

A.    I believe that's correct, yes, sir.

Q.    Right.

    So any dust that would have been collected in the dust collector would have been -- and I'm going to talk about the dust collector in a little while.  But any dust collected in the industrial dust collector that they were using would not

have been emptied into the dumpster by that time, because it had only been going on maybe a day?

A.    Probably not, yes, sir.

Q.    Okay.  Because the only time any mastic would have found its way to the dumpster, the Dallas Recycling dumpster, would have been the February 27th load?

A.    Most likely, yes --

Q.    That's one time, right?

A.    Yes, sir.

Q.    Now, if there was any mastic, tiny amounts of mastic or whatever, on the back of any floor tiles that went into an earlier load, that mastic would have remained nonfriable, wouldn't it?

A.    No, sir.

Q.    Why not?

A.    Because it was broken apart when the tile was removed and disturbed.  We were told they used spud bars to remove the tile and that it easily broke apart.  Later Mr. Villanueva, a Califco employee, told us they got an electric scraper to remove the tile and I believe that would have most likely would have disturbed the mastic and the asbestos.

Q.    Now, that's different.  You said disturbed the mastic, and you said disturbed the mastic.  Those are two different things, aren't they?

A.    Yes.

Q.  Yes, sir.

When we're talking about disturbing asbestos, what is asbestos to you?

Is it a powder?  What is it?

A.  It's a small microscopic chrysotile minerals.

Q.  I'm sorry?  Minerals?

A.  Yes, sir.

Q.  You mean like a rock?

A.  Something to that effect, I believe so.

Q.  You actually don't know what chrysotile is, do you?

A.  I know that it's a type of asbestos.

Q.  You didn't know though that it was a fiber.  Did you?

A.  Sure.  Fiber.

Q.  I'm sorry?

A.  I can concede that it's a fiber, sure.

Q.  I'm not asking you to concede.  I'm asking you to tell --
I'm asking you to the truth now.

A.  Okay.

Q.  Until I just told you didn't know it was a fiber, did you?

A.  I've heard that term, yes, sir, I have.

Q.  You've heard that term?

A.  Yes, sir.

Q.  Yeah, but you didn't really know until I just told you, did you?

A.   Truth is I've never seen it and I could not testify as to whether it's a fiber or a mineral.

Q.   And you haven't the remotest idea whether or not fibers can be released from mastic when the mastic is disturbed, do you?

A.   Personal knowledge, no, sir.

Q.   No.

So you're just making this blanket assertion that everybody is supposed to be impressed by that the release of --

MS. MARTIN:   Your Honor, I'll object to argumentative.

THE COURT:   Sustained.

MR. JOSEPH:   I'm sorry, Your Honor.

BY MR. JOSEPH:

Q.   Are you aware that when Albino Villanueva, the maintenance supervisor, testified before the grand jury -- I'm not sure I'm -- he testified that the doors were always open, the front doors and the back doors were always open during the operation.

A.   I -- I believe that's what he testified, yes, sir.

Q.   So it didn't sound like they were trying to conceal the project, did it?

A.   No, I can't say that they were.

Q.   Now, did you ever inspect other parts of the shopping

center?

A.   Visually I looked into the base from the outside and walked around the building, yes, sir.

Q.   What about the vacant spaces, could you see inside those?

A.   Some of them, yes, sir.

Q.   Okay.  But were any of the windows covered with paper?

A.   I believe maybe one.

Q.   Yeah.  Do you know whether it was a standard practice to cover up empty spaces with paper?

A.   I've been told that it was, yes, sir.

Q.   All right.  So it doesn't sound to you really does it that Jonathan was trying to conceal the project by having the windows covered?

A.   No, sir.

Q.   Isn't it standard operating procedure when you're doing construction projects to cover the paper -- to cover windows with paper?

A.   I -- I don't know.

Q.   Well, Mr. Villanueva testified before the grand jury that it was.  Does that help you?

A.   If that's their practice, then I can concede to that.

THE COURT:  Let's -- let's take the morning break at this time, counsel.

At this time we're going to take our morning break for 20 minutes.

We'll resume at 10:50.

THE SECURITY OFFICER:  All rise.

(Recess taken at 10:30.)

(Proceedings resumed at 10:50.)

THE SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

You may proceed, counsel.

MR. JOSEPH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. JOSEPH:

Q.   I'm not sure how well you can see that.

MR. JOSEPH:  This is Exhibit 43, Your Honor, to our addenda -- I'm sorry, to our objections.

BY MR. JOSEPH:

Q.   And if you would like me to bring you over a copy so you can see it more clearly, I will do that.

Do you?

A.   I can --

Q.   As long as you can make it out.

Have you -- have you seen that photograph before?

A.   Yes, sir, I have.

Q.   Could you tell me when?

A.   It was in Califco's or Mr. Shokrian's grand jury response.

Q.   Okay.  So he provided that picture to you?

A.     Yes, sir.

Q.     Jonathan Shokrian?

A.     Yes, sir.

Q.     Do you know what it is, what it portrays?

A.     We asked Mr. Ruiz, one of the workers in there, to describe the picture.

He said that was Armando Rodriguez, another worker, using a floor grinder to move the mastic.

MR. JOSEPH:  Now, I'm hoping Your Honor has the actual photograph rather than the blurry video version that's number 43.

BY MR. JOSEPH:

Q.     Can you tell whether or not the grinder -- is that the grinder -- is that the grinding operation?

A.     It appears to be, yes, sir.

Q.     All right.  Can you tell whether or not the grinder is on?

A.     I cannot.

Q.     You cannot?

A.     No, sir.

Q.     Can you tell -- well, I'm going to bring you the photograph and I'm going to point out a little red light on the photograph and ask you whether or not --

MR. JOSEPH:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. JOSEPH:

Q.   Do you see the red light there on the photograph?

A.   I -- I see a red dot, yes, sir.

Q.   It's a light, isn't it?

A.   I couldn't say.

Q.   Well --

          MS. MARTIN:  Your Honor, could we tell -- I don't know where he's pointing.  There appears to be a shop vac and a grinder and I can't tell where he's pointing to with the light.

          MR. JOSEPH:  I'll be glad to point it out to Ms. Martin.

     Can I approach again, Your Honor?

          THE COURT:  You may.

BY MR. JOSEPH:

Q.   Okay.  So there's two units in this picture, a cylindrical unit and the grinder.

     Now, if you look at the grinder real closely, you can see a little red dot there, can't you?

A.   Are you talking about this (indicating)?

Q.   Yeah.  I'm testing your eyesight here.  Yes.

A.   There appears to be a red dot, yes, sir.

Q.   It's a light, isn't it?

A.   I don't know.

Q.   Well, it's a reasonable assumption, isn't it?

A.   I wouldn't say that, no, sir.

Q.   Okay.  He has his arms in motion, as you can see.  Right?

A.   He's holding the grinder, yes, sir.

Q.   Do you see any dust in the air?

A.   Can I see the photo again?

Q.   Sure.

A.   It appears that there are specks -- I'm sorry.  It appears that there are specks scattered throughout, if you look over here.  These specks here, here, here, here (indicating).

Q.   Could you --

MR. JOSEPH:  I wonder if Your Honor --

BY MR. JOSEPH:

Q.   Could you show Your Honor what you're referring to as dust?

A.   I don't know that that's dust.  I'm saying if that's a light it's possible there's dust.

MR. JOSEPH:  I'd like Your Honor --

THE COURT:  You can just turn it around and point.

THE WITNESS:  Yes, sir.  There's specks scattered throughout here, in this area, in the dark spots of the photograph.

MR. JOSEPH:  Thank you.

BY MR. JOSEPH:

Q.   As long as I'm here I'm going to -- I think it's easier

to see on this version.

Now, this unit here, where I'm pointing that he's holding, what is that unit?

A.    I believe that's a floor grinder.

Q.    Now, there's another blue cylindrical unit here, what's that?

A.    I believe that's a shop vac, shop vacuum.

Q.    What's a shop vacuum?

A.    It's a vacuum commonly used in shops.

Q.    You mean like a vacuum cleaner for a capture?

A.    No, sir.  This one appears to be affixed to a drum with a hose and wheels attached to it.

Q.    Okay.  I didn't see any reference in any of your investigative reports in any of your interviews to that blue unit.  That blue unit is a Blastrac dust collector?

Do you have any reason to believe that I may not be correct about that or would you like to show you some evidence?

A.    I'll take your word for it, sir.

Q.    Well, I tell you what I'll do.  I'm not going to ask you.

Take a look -- take a look at your screen.

Does that look like that blue unit?

A.    Yes, sir, it does.

Q.    That is in fact the kind of unit that's in the picture, isn't it?

A.    I couldn't say.  It appears to be.

Q.    Right.  Tell me, what is the purpose of that unit?

A.    Would you like me to read the description?

Q.    It's written -- yeah, I'm not going to -- you can cheat. You can read it.

A.    It says, "The Blastrac BDC-1216 has been designed --"

Q.    Well, I tell you what I'm not going to ask you to read that.  I shouldn't have done that.

Do you see where it says "The manageable BD-1216"?

Do you see that in the fourth photograph?

A.    Yes, sir.

Q.    Could you read that to the court?

A.    "The manageable DBC-1216 is a economical solution for providing virtually dust-free operation to small and medium surface-prep machines."

Q.    Dust-free operation.

So there wasn't any dust in the area, was there?

A.    According to witnesses there was, sir.

Q.    Well, how could there be?  This was attached.

A.    I couldn't tell you.

Q.    By looking at the equipment -- and I can bring you back to number 43 again.  I'm actually going to do that.

You can see that there's a vacuum hose --

MR. JOSEPH:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. JOSEPH:

Q.    There's a vacuum hose attached to the grinder.  I'm going to ask you whether or not it's reasonable that that vacuum hose was sucking up any fibers that could have been released from the mastic, sucking them up from the tube and putting them into that dust collector.

Does that sound reasonable to you

A.    No, sir, it doesn't.

Q.    It does not?

A.    No, sir.

Q.    Well, tell me why it does not.

A.    Virtually every witness I spoke to said that it was dusty.  And as I indicated, there appears to be dust in the photograph.

Q.    You think there's -- these machines don't work?

A.    I don't know.  I only know what I've been told and what I can see.

Q.    Well, we can't see any dust in the air, really, can we, in that picture?

A.    As I pointed out, there's numerous specks that appear to be dust.

Q.    Um-hum.  This is -- this is -- according to this exhibit that's up there right now, this is a tough industrial-grade vacuum that has -- et cetera, a tough industrial-grade vacuum.

Do you think that asbestos fibers that were released from

the mastic would be sucked up by a tough industrial-strength vacuum?

A.   I don't know.

Q.   You don't know.

You couldn't -- you're an investigator, couldn't you make any kind of remark about it or do you just want to be neutral?

A.   I'm not an expert --

MS. MARTIN:   Your Honor, I'll object to the argumentative nature of the questioning.

THE COURT:   Overruled as to the last question.

THE WITNESS:   I'm not an expert with this machine or with --

BY MR. JOSEPH:

Q.   Exactly?

A.    -- asbestos fibers.

Q.   You don't know anything about these machines, do you?

A.   No, sir, I do not.

Q.   No, sir.

Now, was there a HEPA filter involved?

A.   With this machine?

Q.   Yes.

A.   I don't know, sir.

Q.   What's a HEPA filter?

A.   It's a purifying filter.

Q.   A what?

A.    Air purifying filter.

Q.    What does stand for, H-E-P-A?

A.    I don't know, sir.

Q.    You don't know?  You were the investigator in this case but you don't know --

MS. MARTIN:  I object to argumentative.

THE COURT:  Sustained.

BY MR. JOSEPH:

Q.    Okay.  I'm going to ask you to --

MR. JOSEPH:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. JOSEPH:

Q.    Did you say you don't know what H-E-P-A stands for?

A.    No.

Q.    Have you ever heard the term HEPA or H-E-P-A before?

A.    Yes.

Q.    Where?

A.    I believe it's on the vacuum I have at my house.

MR. JOSEPH:  That is Exhibit 45, Your Honor, that I put up there, but I think you can see it quite well on the video screen.

BY MR. JOSEPH:

Q.    Is -- what is that?

Exhibit 45, what is that?

A.    Before today I've never seen it, so I can't tell you,

sir.

Q. Well, I'm going to tell you that that's the HEPA filter that was in that blue cylinder.

And you didn't know that until today?

A. Correct, yes, sir.

Q. Didn't you ever look at that photograph carefully and wonder what was in it?

A. I asked the witness. He said it was a vacuum. That's all I was aware of.

Q. And you never made any -- any inquiry into the attributes of the vacuum?

A. I was unable to find any documentation showing a rental or purchase of the vacuum, so I could not identify the specific vacuum.

Q. Well, I was able to find it and I'm not a federal investigator. Why wouldn't you?

MS. MARTIN: Objection, argumentative.

THE COURT: Sustained.

MR. JOSEPH: Sorry, Your Honor.

BY MR. JOSEPH:

Q. That was the HEPA filter that was inside the blue cylindrical dust collector attached to the grinder. Do you know what the purpose of the HEPA filter was?

A. No, sir.

Q. Well, I'm going to tell you.

A.    Thank you.

Q.    And I'm sure this isn't disputed.

A HEPA filter is designed to capture all fibers, all asbestos fibers of any kind.  This is a system, an integrated system, the Blastrac system.  It success up any fibers that could possibly get out of the mastic.

MS. MARTIN:  Your Honor, this seems more like argument --

MR. JOSEPH:  I'm asking --

MS. MARTIN:  -- or testimony by counsel rather than questioning the witness.

MR. JOSEPH:  I'm going to ask him if he agrees this is a reasonable conclusion based on what we're seeing.  He's the investigator, Your Honor.

THE COURT:  You may ask him.  If he says no it's not evidence, it's just your assertion.

BY MR. JOSEPH:

Q.    Okay.  So this is the Blastrac system -- I'm putting it to you that it's the Blastrac system.  It's an integrated unit -- or two -- two integrated units attached by a vacuum tube.  And all of the fiber -- any fiber that could possibly be released from the mastic - and I'm not saying it can be released from the mastic, but if it does - is sucked upwards into the tube, which is at the top, and goes into the dust collector and then into that filter.  Does that sound like --

inconsistent with anything you've heard so far in this case?

A.    Yes, sir, it does.

Q.    It's inconsistent?

A.    Yes, sir.

Q.    How is it inconsistent?

A.    As I stated, all the witnesses said that it was dusty.

The workers said that the dust clogged the canisters on their respirators.

And there appears to be dust in the photograph.

So I would say that's inconsistent.

Q.    Does the Clean Air Act regulate dust?

A.    To some extent I believe so, yes, sir.

Q.    No, it doesn't.

Does the Clean Air Act regulate fibers?

A.    To some extent I believe so, yes, sir.

Q.    Right.  So let's say, for example, there was dust in the air.  Isn't it important though for this case where did the fibers go?

A.    Yes, sir.

Q.    Yes, sir.

That's all that's important, because we're here on an asbestos case, right?

A.    Yes, sir.

Q.    Right.  So if the fibers went into the dust collector and into that HEPA high efficiency filter, then they didn't get

into the lungs of the workers, did they?

A.    If that were the case I would agree.

Q.    Yeah.  They wouldn't even need a respirator, would they?

A.    If that were the case.

Q.    If that were the case.

And you have no reason to believe it was not the case, do you?

A.    I do, sir.

Q.    You do?

A.    Yes, sir.

Q.    Why?

A.    Again, as the witnesses stated, there was dust in the air, the canisters were being clogged, and there appears to be dust in your photograph.

Q.    There appears to be dust in the photograph?

A.    Yes, sir.

Q.    Well, fine.  His Honor can decide whether he can see dust in the photograph.

Now, which that witness you interviewed, if any, told you that Jonathan had been briefed about the potential of gasoline in a building to explode?

A.    None that I know of, sir.

Q.    Nobody?

A.    No, sir.

Q.    It was never discussed with him by anybody?

A.   About the potential for explosion?

Q.   Yes.

A.   No, sir.

Q.   Okay.  Now, when -- I'll ask you about the results of your investigation.

When the fire department came and found all that gasoline on the floor, at Fazio's, where was Jonathan?

A.   The witnesses indicated that he was in New York, I believe.

Q.   He was in New York.

A.   Yes, sir.

Q.   How could he know how much gasoline had been put on the floor at that time, if he was in New York?

A.   The witnesses said that they used Califco purchase cards or credit cards, which would give an indication of gallons purchased.

Q.   Okay.  You're saying that if Jonathan -- well, are you saying that Jonathan signed those credit cards?

A.   No, sir.

Q.   Well, I'm talking about Jonathan's knowledge now.

How would Jonathan know?

A.   If as you stated he was the money man --

Q.   He was the money man.

A.   -- he handled the finances for the Califco operation --

Q.   Right.

A.   -- he oversaw the purchases.

Q.   Right.  Including credit cards used by Albino Villanueva for gasoline?

A.   Potentially, yes, sir.

Q.   Potentially.

But do you have any actual knowledge that he knew?

A.   No, sir.

Q.   No, sir.

Okay.  If he's in New York could he see what's going on at Fazio's?

A.   No, sir.

Q.   No.

Do you have any -- any evidence of anyone saying that he saw that much gasoline being put down at Fazio's?

A.   Yes, sir.

Q.   Who?

A.   Albino Villanueva said that Jonathan had seen the gasoline being used.

Jonathan said he had seen the gasoline being used.

Q.   According to the reports of the fire department there was something like 4500 square feet of gasoline spread in one pool and another 900 square feet spread in another pool; is that right?

A.   That sounds accurate.

Q.   That sounds right.

A.    Yes, sir.

Q.    Is there any evidence that you're aware of that you can tell this court that Jonathan had an idea that much gasoline was being used, not being purchased from a gas station, but being put on the floor at one time?

A.    No, sir.

Q.    No, sir.

Now, you've given a little bit of indication that you have some legal knowledge because you've talked about the Clean Air Act.  Which federal law was violated, if you could tell us, by the putting down of the gasoline on the floor at Fazio's?

We're in federal court now so we want to know about federal law.

A.    None that I'm aware of, sir.

Q.    None.

Is this a local fire department issue?

A.    Yes, sir, I believe it is.

Q.    Did the fire department handle it through a citation?

A.    That I'm aware of.

Q.    And didn't Califco repay the fire department all expenses incurred as a result of this incident?

A.    Yes, sir.

Q.    Okay.  Now --

A.    May -- may I correct myself?

The federal government does regulate the use of benzene, benzene is contained in gasoline, so there may be some federal regulation

Q.    You don't know about that, do you?

A.    The federal regulation of benzene?

Q.    If -- if Jonathan puts down gasoline on the floor, forgetting about whether it's mastic or anything else, just those down gasoline, is the federal government going to come and have him arrested?

A.    I don't know, sir.   There's too many variable issues involved to answer that.

Q.    That's a state or local issue, come on.

A.    Potentially.

Q.    Yeah.   Potentially.

You have indicated that Jonathan invited you to -- invited you to look through the filing cabinets?

A.    Yes, sir.   That's correct.

Q.    I don't understand something.   Maybe you could explain to me.

How is that uncooperative?

A.    In and of itself it's not.

Q.    It's not.

Is it an obstruction of justice do you think to say "Please look in my file cabinets"?

A.    That act, no, sir --

Q.   No, sir.

A.   -- I don't believe.

Q.   Does that sound like someone who is cooperating or not cooperating to you?

A.   It sounds like someone who is cooperating.

Q.   Now, you say that he didn't provide you with the phone numbers --

A.   Not the correct phone number, sir.

Q.   Oh, the correct phone numbers?

A.   Yes, sir.

Q.   Oh, did he provide you with -- who?

Jonathan didn't provide you with the correct phone numbers?

A.   Actually, Jonathan did not provide us with any phone numbers.

Q.   Why not?

Why -- do you know why he didn't?

A.   I would -- I don't know, sir.

        MR. JOSEPH:   May I approach, Your Honor?

        THE COURT:   You may.

BY MR. JOSEPH:

Q.   I'm going to show you --

        MR. JOSEPH:   I guess we'll have to have this marked, Your Honor.

                           (Pause.)

BY MR. JOSEPH:

Q.   I'm going to give you the report of the interview of Albino Villanueva, which you conducted on June the 9th, 2009. This was three months after the incident?

A.   Yes, sir.

Q.   Are you familiar with that document?

A.   Yes, sir, I am.

Q.   I'm going to have to just point to something in here.

Would you read to me -- now, this is just three months after the incident.  And you said you didn't have the phone numbers.

A.   Not by Jonathan, sir.

Q.   Okay.  Read to me if you would the first sentence on the second page.  Slowly, so everybody can hear it.

A.   Yes, sir.

"Villanueva said for the second clean up attempt of the Fazio's building Shokrian hired two guys, Jerry - which is in quotations - Gurardo, spelled G-u-r-a-r-d-o, and he provided a phone number, 214-563-4788, and Armando Rodriguez, spelling R-o-d-r-i-g-u-e-z, and he provided a phone number 214-283-9528 to clean the floor."

Q.   So why are you telling this court you didn't have the phone numbers.

A.   You asked if Jonathan provided the numbers, I said no he did not, sir.

Q.    You already had the numbers.

A.    I had a number that did not work, sir.

Q.    Did you tell Jonathan?

A.    No, sir, I don't believe I did.

Q.    Sheee (phonetic).

        MS. MARTIN:  Your Honor, I'll object to the sidebar.

        THE COURT:  I'll overrule the objection.

    I can tell when it's a sidebar.

BY MR. JOSEPH:

Q.    When you were invited to search through the file cabinets did you avert your eyes away from the file cabinet?

A.    No, sir, I did not.

Q.    Did Jonathan leaf through the files in the file cabinet?

A.    Perhaps.  I can't quite recall.

Q.    Well, you're telling us that he didn't cooperate and now you're saying you can't recall?

A.    On this issue, yes, sir, I cannot recall.

Q.    But you've accused him of not allowing you to search the file cabinets and now you're saying you can't recall.  I don't understand.

A.    I've never contested whether he allowed me to search the cabinet or not.

Q.    And you don't remember whether you did search them or not?

A.    I did not search them.

Q.    Did he leaf through the files in front of you?

A.    He may have run his fingers across the top of the files. I -- like I said, I can't recall.

Q.    You can't recall.

You -- you -- you've been accusing him of obstruction of justice and now you're admitting you can't recall.  Is that -- is that it?

Is that your testimony?

A.    This instance, yes, sir.

MR. JOSEPH:    Excuse me, Your Honor, can I just consult with counsel?

(Pause.)

MR. JOSEPH:    That's all I have, Your Honor.

Your Honor, should I put the exhibits in now?

THE COURT:    You may offer.

If they're from the binder they're part of the record already.

MR. JOSEPH:    So I don't need to offer them?

THE COURT:    You are correct.

MR. JOSEPH:    So the only one that isn't, Your Honor, is the interview with Villanueva, which he read from.  He read the first sentence.

Is that sufficient for Your Honor?

THE COURT:    It is if you -- if you are satisfied with that, that's --

MR. JOSEPH:  I'm satisfied, because he read the phone numbers into the record.

Thank you, Your Honor.  Appreciate it.

Let me just get that.

MS. MARTIN:  If you'll leave that one up.

MR. JOSEPH:  Sure.  Just as long as I get it back.

MS. MARTIN:  Absolutely.

THE COURT:  Redirect.

MS. MARTIN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. MARTIN:

Q.   Special Agent Townsend, on the picture that Mr. Joseph showed you, do you see anywhere on there HEPA or HEPA filter?

A.   No, ma'am, I do not.

Q.   Do you see anywhere on there "Approved for asbestos abatement or asbestos removal"?

A.   No, ma'am.

Q.   Thank you.

Special agent Townsend you testified earlier that the removal project began in mid-November; is that correct?

A.   Yes, I believe that's correct.

Q.   When the samples were taken by the contractor hired by Califco, when was that?

A.   Sometime in March, I believe.

Q.   Four months later, after the project began, at least four

months?

A.     Yes.   That's correct.

Q.     And the first thing that went were the floor tiles; is that correct?

A.     Yes, ma'am, that's correct.

Q.     Four trips to the dumpster with floor tiles; is that correct?

A.     Yes, ma'am, that's what I was told.

Q.     Okay.   And the reason they sampled other tiles in the building was because that's all that was left.

A.     Yes, ma'am.

Q.     And they made attempts to sample floor tiles that were similar to the descriptions that they got from other witnesses.

A.     Yes.   That's correct.

Q.     And the white tiles, which were consistent with witness description, were the ones that contained asbestos?

A.     Yes.   That's correct.

Q.     With respect to the dumpsters and whether they were five or four, Mr. Joseph asked you did you tell the U.S. Probation Officer to put that in her report.

       Do you tell the U.S. Probation Officer what to put in her report

A.     No, I do not.

Q.     But you answer her questions if she has questions about

things?

A.    Yes.   That's correct.

Q.    And that recycling invoice is a little bit confusing at a first read?

A.    Yes, it is.

Q.    Because there are other fees associated?

A.    Yes.

Q.    Mr. Joseph asked you several questions about that commercial dust remover.

Are you aware that there are certain vacuums that are for asbestos removal, specifically for asbestos removal?

A.    No, I'm not.

Q.    Would it surprise you with how regulated that abatement is?

A.    I would not be surprised, no, ma'am.

Q.    And did you see anywhere in the specifications or description that it was specifically used and appropriate for asbestos removal?

A.    I did not see that.

Q.    Okay.   Did Jonathan ever tell you when you were interviewing him he didn't understand what was going on because he looked at the EPA web site and he didn't -- he didn't think he did anything wrong?

A.    No, he did not.

Q.    He didn't mention the EPA web site?

A.    No.

Q.    He mentioned that he knew there was asbestos in the building?

A.    Yes, he did.

Q.    And asbestos was correctly abated through a contractor at another property owned by Califco?

A.    Yes.  That's correct.

Q.    And when Blaise McGinley didn't tell him about permitting or anything -- do you remember that testimony?

A.    I do, yes, ma'am.

Q.    Do you also remember when you were interviewing -- interviewing Blaise McGinley that when he first was giving Jonathan advice on the abatement of Fazio's what Jonathan's response was?

A.    I believe Mr. McGinley stated Jonathan stated, "That's all right.  I got it."

            MS. MARTIN:  May I have a minute, Your Honor?

            THE COURT:  You may.

                      (Pause.)

            MS. MARTIN:  That's all.

            THE COURT:  Any recross?

            MR. JOSEPH:  No, Your Honor.

            THE COURT:  You may step down.

      Does the government have any further witnesses at this time?

MS. MARTIN:  Yes, Your Honor.

At this time the government calls assistant fire chief Russell Wilson.

THE COURT:  Will you raise your right hand, please.

(Witness sworn.)

THE COURT:  All right.  Be seated, please, and speak into the microphone.

DIRECT EXAMINATION

BY MS. MARTIN:

Q.    Please state your name.

A.    Russell Wilson.

Q.    And where do you work?

A.    I work with the Irving Fire Department.

Q.    And how long have you been with the Irving Fire Department?

A.    A little over 25 years.

Q.    And what is your current title?

A.    I'm assistant fire chief.

Q.    And over 25 years have you done pretty much everything that a firefighter does?

A.    I can't think of much there wouldn't be.

Q.    Okay.  And you showed me that you brought some of your reports with you.

A.    Correct.

MS. MARTIN:  And just for the court's information,

defense counsel, I told him he could have those reports up there.

BY MS. MARTIN:

Q.   And if the defense counsel wants to look at your reports you'll provide those to him?

MR. JOSEPH:   Are there any copies I could look at while he's testifying, Your Honor?

I haven't seen the report.

BY MS. MARTIN:

Q.   Those are your original reports?

A.   They're -- they're my incident reports, the hazardous material report, things like that.  But there's only one copy.

Q.   And you're just going to use it if you need to refresh your memory?

A.   Yes.

MS. MARTIN:   Is that okay, Your Honor?

THE COURT:   Why -- why don't you show it to opposing counsel.  It may save time.

MS. MARTIN:   May I approach?

THE COURT:   You may.

MS. MARTIN:   Would it be okay if I proceed and if we get to a point where he needs to refresh his memory we'll wait?

THE COURT:   You may.

Also given the nature of the objections I'm not sure how

important some of the details are going to be.  That's really not their -- their arguments.

MS. MARTIN:  Okay.

THE COURT:  So go ahead.

MS. MARTIN:  I'll make it quick, Your Honor.

BY MS. MARTIN:

Q.   Did you respond -- Chief Wilson, did you respond to Fazio's shopping center --

MS. MARTIN:  Your Honor, may I make one clarification?

THE COURT:  You may.

MS. MARTIN:  There is some testimony I think that is relevant to their objection, but Assistant Fire Chief Wilson would also -- it would be appropriate for him to make a victim impact statement at the time that comes up in sentencing, and so in lieu of bringing him back for that would it be okay if some of his is victim impact?

THE COURT:  You may.

MS. MARTIN:  Thank you.

BY MS. MARTIN:

Q.   Chief Wilson, did you respond to a 911 call on February 27th, 2009, at the Fazio's department store of the Plymouth Park shopping center?

A.   Yes, I did.

Q.   Okay.  Can you tell me how that came about that you

responded to the call?

A.    I was on my way home.  I have a mobile radio.  I'm provided a department car and I respond code three, which is lights and siren, to major incidents.

As I was on my way home, my route generally takes me by the intersection there of Story and -- Story Road and Irving Boulevard.  I happened to be sitting at that intersection.  I could tell that there was something going on.

And I heard the battalion chief get dispatched to that location.

Q.    And so what did you do when you heard the battalion chief dispatched to the location?

A.    Well, I knew that this involved a hazardous materials response, I knew that it was escalating, so I notified the other assistant chief.  I happened not to be on call, but I notified the other assistant chief of my location, told him I was right by the parking lot, I would pull in and check it out.

Q.    And did you do that?

A.    Yes, I did.

Q.    What did you discover when you pulled in to check it out?

A.    When I first pulled into the far edge of the parking lot I saw that the command post was set up approximately 75 feet from the entrance of the old Fazio's store.  I could smell strong fumes from gasoline when I got out of my car, so the

first thing I did was start evacuating all my men.

And I had them actually move the command post back to a location which was somewhat more sheltered, toward the -- there's another strip shopping center in that same parking lot but closer to Story Road. So I was trying to protect the personnel. Life safety has to be my number one concern and I was trying to pull everybody back

Q. And why did you determine they were too close?

A. My comment to them when I pulled up was "Get the command post back, I want all the personnel out of there, if this thing goes off it will level three city blocks."

Q. Was that because of your experience with the volatility of gasoline?

A. Oh, absolutely.

Q. And how volatile is gasoline?

A. It's extremely volatile. It will go off like a bomb if it's mixed correctly. The lower explosive limits on gasoline is 1.4 percent. So it takes very few vapors in the atmosphere for it to become extremely volatile.

Q. And is it more volatile in an enclosed space like it was in, in the old Fazio's building?

A. Any time you have anything that's a grade of material that's capable of exploding and you try to compress that in any way, whether it be a big box store or a smaller cat container, yes, it enhances the problem, exacerbates it is

the -- the problem.

Q.    Once you got the command post moved back did you call in any special -- anyone else?

A.    Not immediately.  Eventually I did though, yes.

Q.    And once you -- was HazMat already on-scene?

A.    HazMat as I recall was already on-scene.

Q.    And based on what you determined and what HazMat determined, what actions did you take with respect to the community?

A.    It just so happened that just shortly before that, I mean within really just a few hours before that, the wind direction had changed and a little cool front had blown in from the north, so the wind direction up until that time had been out of the south.  It had fortunately, and I made that comment also to the guys, that fortunately the wind had changed out of the north which made the neighborhood immediately behind the Fazio's actually up wind, but I did go ahead and order the evacuation of that neighborhood.

Q.    And is evacuating an entire neighborhood something you take lightly, something you do as a fire chief every day?

A.    No, absolutely not.  In fact, that's not very good PR to do that, but on extreme occasions you have to order people out of their homes.

Q.    How close to exploding do you think -- based on your observations and your experience how close to that thing

exploding do you think it was?

A.   At the time the reason it had not exploded is in addition to not having yet found an ignition source it was too rich -- it was actually so -- the vapors were so thick in that enclosed box store that it was actually too rich to burn.  It was over the upper explosive limits.

Q.   Okay.  And let's talk about a -- a source.

When you finally enter the building what did you observe?

A.   I never completely entered the building.  I did go up to the building and step just inside the door, where I could observe, and that was well into the incident.

When I first did that it was -- I was very surprised that the workers in there were even able to breathe.  It was -- it was very, very strong.

Q.   Was there gasoline on the floor?

A.   Yes, ma'am, there was.

Q.   And I think defense counsel mentioned that there was 4500 square feet maybe of pooled gasoline on the floor.  Does that sound right?

A.   I don't know -- I don't know what that measurement would have been.  I don't recall the width of the pool.  When I saw it, and there may have been some evaporation that had occurred by that time, I don't know, but at the point that I saw it later in the incident I recall estimating it to be about 70 feet long.  I don't know how wide it was, so I couldn't really

attest to the square footage.

Q.   What about was there anything running through the gasoline pools?

A.   The power cord to the scrubber that they were using was running right through the pool.

Q.   Do you think that's dangerous?

A.   Extremely.

Q.   Okay.  And I think earlier you said if that would have gone off it would have leveled three city blocks?

A.   That was my concern.  Absolutely.

Q.   And was this gasoline incident -- is it uncommon or is this something that happens a lot?

Does this mastic time stand out in your mind?

A.   Yes, it does, very much.  I had never witnessed that before.

Q.   And I think you made the comment to me that you guys still talk about it today.

A.   Yes.

Q.   Okay.  If that building had ignited do you think there's a substantial likelihood that someone would have been killed or seriously injured?

A.   Prior to the evacuation I have no doubt.

Q.   I'm sorry?

A.   Prior to the evacuation I have no doubt that there would have been serious injury and very likely death.

Q.   And as an assistant fire chief and representative of the Irving Fire Department is there anything else you would like this court to know about the people that work for you and your response and what this type of conduct you -- you'd like for him to know about that?

MR. JOSEPH:   Objection.

THE COURT:   I think she's asked to present victim impact testimony at this time.

MR. JOSEPH:   It sounds like that, but if that's what the question is for I have no objection.

THE COURT:   All right.

You may proceed.

THE WITNESS:   Well, just that there was an imminent life threat with that kind of situation.  There were people working in stores on both sides of that abandoned building, all up and down that shopping center.  We had to deploy personnel to each one of those and get those people out.

The -- the big impact, of course, is that you have to involve emergency personnel.  You have to put people in danger in order to mitigate the circumstances.

I did pull personnel out, but then I designated a few personnel to go back in and deal with what had to be dealt with.

We got the -- the workers out of the location.

The problem then became that basically it was like one of

these large commercial buffer units you would rent from a rental place with a grinder type pad being used on the bottom.

What that gasoline did was as they were trying to grind that mastic up is it actually created a slurry, so it was a very thick material, almost like a paste all over that floor.

I ordered a super blower unit, which is a large -- basically a large fan -- it's so large it's on a trailer.  I ordered that out of D/FW airport, had them respond with that blower unit and set it at the -- the north doors, to ventilate the abandoned store.

The problem with that is, obviously, we've got to ventilate the vapors out to mitigate the circumstances.  But that problem -- that problem then is again exacerbated because at a point you have got to realize when we're introducing air into this compartment we're now going to bring that at some point back into the explosive limits.  We have no choice.

It took, and I can't tell you exactly how many, but I can tell you that it took hours, even with that blower going, and it is huge, but even with that blower going it took hours to get that down below the lower explosive limits.  And it was because of the fact that this slurry was actually holding the -- the gasoline and not allowing it to evaporate as gasoline normally would, if you just had a pool of it on concrete.

So it took a long time to get those explosive limits into

a safe zone.

Q.   You had to essentially dry out that slurry?

A.   Correct.  It took a long time to do that.

MS. MARTIN:  Okay.  Thank you.

Pass the witness, Your Honor.

THE COURT:  Cross-examination.

MR. JOSEPH:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. JOSEPH:

Q.   You're the -- I'm sorry, you're the fire chief; is that correct?

A.   I'm the assistant fire chief.

Q.   Okay.

A.   And at the time I was over operations, correct.

Q.   I had a chance -- I had a chance to look through your notes.  I didn't see anything about the quantity of gasoline that you found.

A.   I don't recall seeing anything in there about the quantity.  I know what I saw.

Q.   But was there any you --

A.   I know that -- excuse me?

Q.   I'm sorry.  Was there any measurement done?

A.   I can't tell you that.  I don't know.

Q.   You don't know.

There's no mention of the number of gallons of gasoline

that were found in here either.

A.    Not --

Q.    Any reason for that?

A.    -- not, that I know of.

One of them is the incident report which basically stamps the time from our CAD system, which is your computer aided dispatch 911 system.

Q.    All right.

A.    There is also in there a HazMat report.  And there's also in there a inspection report --

Q.    I was asking about just the number of gallons.

A.    I don't think it's in any of those.

MR. JOSEPH:  Okay.

Can I just hand it back to him, Your Honor?

THE COURT:  You may.

BY MR. JOSEPH:

Q.    Thank you.

A.    Yes, sir.

Q.    Now, did the fire department -- the fire department has jurisdiction to issue citations under the City of Irving fire code; is that correct?

A.    Yes.

Q.    Okay.  Did the fire department issue a citation?

A.    I wouldn't be able to answer that conclusively without consulting with my fire marshal, because that's handled --

handled under the fire marshal's office.

Q.   Okay.  I'm going to tell you that we have -- there was in fact a citation issued by the fire department.  I can show it to you, if you'd like to see it.

But I have a question and then you can look at it, if you would like to.

A.   Okay.

Q.   Is this -- the City of Irving fire code, is that something that's administered in any way by federal enforcement authorities or is it strictly local?

A.   Jurisdictional -- it's noted to be administered by the authority having jurisdiction is the way it says it in the international fire code.

Q.   Which authority is that in the case of the City of Irving?

A.   Well, the -- we adopt our fire code from the international fire code, so it's always with the authority having jurisdiction.

Q.   So does the federal government enforce the Irving fire code?

A.   No, they do not.  It's done, again, through the fire marshal's office within the fire department.

Q.   Well, does the federal government have anything to do with an incident like this when it happens?

A.   Well, certainly they would as far as the Environmental

Protection Agency and other sources we might call in when it escalates to that extent.

Q.   I'm asking you when somebody pours gasoline on the ground and it creates a risk of explosion as we have here.  Would you normally call in the federal government to deal with that or is that deal with locally?

A.   That normally is dealt with locally, yes.

Q.   Do you think that local enforcement powers are sufficient to deal with that?

Do you have enough power to deal with that?

A.   Well, I would say it depends on the circumstances.

Q.   Do you feel like you lacked sufficient enforcement powers to come in and do what had to be done in this case?

A.   Are in this case?  Yes.

Q.   How?

A.   Because it was a hazardous material involvement and so in this case we called in -- we had a contracted hazardous material cleanup company, I believe it was Allied back then. A lot of times -- of course we're a government entity --

Q.   I think you misunderstood.  You didn't call the federal government, did you?

A.   No.

Q.   You didn't need the federal government to help out with this?

A.   Not for what we were -- I was dealing with -- I always

deal with on the suppression side with the emergent issues.

Q. So if it wasn't for the fact there was allegedly asbestos in the building the federal government would have had no involvement in this; is that right?

A. I don't know that I'm the one to answer that, but I would say probably not.

MR. JOSEPH: No further questions, Your Honor.

THE COURT: Anything further?

MS. MARTIN: No more questions, Your Honor.

THE COURT: Any objection to excusing this witness?

All right. You may step down. You're excused.

Ms. Martin, do you have other witnesses?

MS. MARTIN: Yes, Your Honor.

One final witness. Dr. Christopher Weis.

THE COURT: Raise your right hand, please.

(Witness sworn.)

THE COURT: All right. Be seated, please, and speak into the microphone.

DIRECT EXAMINATION

BY MS. MARTIN:

Q. Please state your name.

A. My name is Christopher Weis, W-e-i-s.

Q. Where do you work?

A. I work for the National Institutes of Health, the Institute for Environmental Health Sciences.

Q.   Is that an arm or an agency of the federal government?

A.   Yes.   It's a branch of the Department of Health and Human Services.

Q.   What do you do for the National Institute of Health?

A.   I'm a toxicologist and one of the senior scientist advisors to the director of the Institute.

Q.   Okay.   And is that what the DABT after your name designates, that you're a toxicologist?

A.   Yes.   That's a board certification in general toxicology.

Q.   Okay.   And where did you obtain that?

A.   That certification comes with requirements for experience in toxicology, education in toxicology, and publications in the field, coupled with an exhaustive examination that needs to be passed before certification.

Q.   And how long have you had that certification?

A.   Since 19-- 1992.   And there's a five year recertification.

Q.   Okay.   And where did you graduate from college?

A.   I did my undergraduate degree at a small school in Michigan called Grand Valley State University.   And I then went on to acquire a doctorate in medical physiology and toxicology at Michigan State University.

Q.   And where do you perform your postdoctoral fellowship?

A.   I did two consecutive fellowships at the University of

Virginia at the Medical School in the Department of Biophysics.

Q.   And that's in Charlottesville, Virginia?

A.   Yes.   That's correct.

Q.   Okay.   In your experience throughout -- as a toxicologist and with the National Institute of Health, are you familiar with regulations and asbestos containing material?

A.   I'm familiar with asbestos containing material.   In my present job I don't do regulations.   The National Institutes of Health is not a regulatory body for the federal government but rather a science body.

Q.   Tell me a little bit about that.

A.   Well, we do a number of things.   We fund academic research extramurally.   We have charge intramural or in-house laboratories in North Carolina, including human clinical laboratories where we -- where we do studies.

Our job is to help provide information for the protection of public health, both in this country and -- and worldwide. And some of that information is then used by regulatory agencies, including the Environmental Protection Agency, the Food and Drug Administration, OSHA, et cetera, to help them guide their regulatory process.

Q.   In that -- in that vein do you work with asbestos as far as making sure the public health and safety is looked after?

A.   We have a number of projects in -- in that field going

on.

Q.   And you're -- would you consider yourself an expert in asbestos?

MR. JOSEPH:  I'm sorry, I didn't hear the question, Your Honor.

BY MS. MARTIN:

Q.   Would you consider yourself an expert in asbestos?

MR. JOSEPH:  Objection.

THE WITNESS:  Yes, I do.

THE COURT:  Just a moment.

Would you state the basis?

MR. JOSEPH:  The basis, Your Honor, is that asbestos is a very broad subject with many different aspects and to say an expert in asbestos is not a proper question because it requires too general an answer, what about regulations, what about toxicology, what about, you know, the release of fibers, permissible exposure levels.  These are all different aspects of asbestos.  So to say he's an expert in asbestos is a meaningless answer.

THE COURT:  In the context of a sentencing hearing I can consider the weight of his testimony.

The objection is overruled.

BY MS. MARTIN:

Q.   What areas of asbestos do you have expertise in?

A.   Well, I'm primarily experienced in the health effects of

asbestos and I have extensive experience in exposure assessment and measurement for asbestos exposure.

Q.   And in order to do that do you have to understand the make up of asbestos and what effect it has on the human body?

A.   That's part of what we do, yes.

Q.   You heard the terms "friable" and "nonfriable" a lot here today.  Are you familiar with those terms?

A.   Yes, I am.

Q.   What is nonfriable asbestos?

A.   Nonfriable asbestos is asbestos that is primarily bound to a matrix where it is not easily released.

Q.   Okay.  And what is friable asbestos?

A.   Friable asbestos is asbestos that's available to be released if it's disturbed in any way.

Q.   Is there a way for nonfriable asbestos to become friable asbestos?

A.   Yes.  Absolutely.

Q.   How does that happen?

A.   It happens through normal aging.  Much of the asbestos that we see has been in place for years or decades and as the aging process occurs that -- those fibers that were once nonfriable can become friable.

It's also common to see disturbance of nonfriable asbestos rendering it into a friable form of asbestos

Q.   And when you say it's common for disturbance of asbestos

to render it friable when it previously was nonfriable, what types of disturbance?

A.   Well, almost -- almost anything.  The Environmental Protection Agency has worked for decades to try and determine what it is that causes nonfriable asbestos to become friable, in efforts to improve the efficiency of asbestos removal.  It has been very difficult or impossible for them to do that.

Q.   Okay.  But would prying asbestos containing material, popping it up, would that render it friable?

A.   Yes.  That's been shown through scientific investigation.

Q.   Would pulverizing asbestos containing material render it friable?

A.   Yes, it would.

Q.   Would grinding it with a commercial floor grinder --

A.   Yes.

Q.   -- render it friable?

So even though there are no regulations on friable when it's intact, once it breaks about and breaks apart and is disturbed it's friable and regulated?

A.   That's correct.

Q.   Okay.   Are you familiar with the term "chrysotile"?

A.   Yes.

Q.   What is chrysotile asbestos?

A.   Chrysotile asbestos is a mineral form of elongated fiber that is made up of silica, oxygen, aluminum and other -- other

materials that define it's mineralogy.

Q.   So it's a mineral and a fiber?

A.   It's a mineral, yeah.

Q.   Okay.   Is chrysotile asbestos nonharmful to humans?

A.   Yes.   Chrysotile -- all -- all forms of asbestos have been shown to be harmful or in some cases lethal to humans.

Q.   Okay.   Let me rephrase my question.

So is chrysotile asbestos -- you said it is harmful, I actually said is it not harmful.   But your testimony is it actually is harmful?

A.   Yes.   I'm sorry.

Q.   That's okay.

A.   I misunderstood you.

Q.   That's okay.

A.   Yes, chrysotile asbestos can cause a number of different types of disease.

Q.   All right.   So it's not the safe kind of asbestos?

A.   No.   There's no safe type of asbestos.

Q.   What about handling of asbestos?

Are there certain work practice standards that are invoked or should be adhered to when you're abating asbestos or removing asbestos?

A.   Yeah.   There are common practices that are put into place, requirements that are put into place to safely remove asbestos.

Q.    And what are some of those requirements?

A.    It depends of course upon the removal situation and there are many different types but typically encapsulation of the work area with a tie back or plastic wrapper, if you will. Venting of that facility with an approved HEPA filter, high efficiency particulate filter.  And most importantly training the workers that work in that environment.

Q.    Do workers in that environment need to wear -- are they required to wear any specific clothing or safety glasses or safety masks?

A.    Yes.  Certified asbestos removal specialists are informed, of course, of -- of their -- the environment, the hazardous environment that they're working in.

They're trained to operate in that environment, how to operate the equipment and the procedures, and follow the procedures that are required.

They are also trained in use of personal protective equipment that includes clothing and respiratory protection and goggles to protect the eyes.

And they're also put on a medical monitoring program so they can be monitored regularly throughout the process mask.

Q.    You mentioned a mask, is it just -- should you just go get a mask from Home Depot and assume that you're properly equipped to remove and abate asbestos?

A.    There are -- no.  There are certain special approval --

types of equipment that are commercially available for that purpose.

Q.    Even if you could get an asbestos approved removal mask at Home Depot are you good to go?

MR. JOSEPH:  I'm sorry.  I couldn't hear that question.   It's hard to hear from behind, Your Honor.

MS. MARTIN:  I'm sick and I apologize for my voice.

BY MS. MARTIN:

Q.    If you were just to go get a mask that was good enough from Home Depot are you good to go then or do you need additional training or are there additional requirements about how to wear that mask?

A.    Asbestos workers all hazard materials workers need to be fit-tested for masks.  The mask needs to be sealed carefully around their face.  There are different sized masks for different shaped faces.  And so not -- masks are not one size fits all.

They have to have the right kind of cartridge on them to be successfully able to remove asbestos fibers from the air.

Any facial hair on the -- on the face impedes the efficiency of the mask as asbestos fibers are small enough to go right around that -- through -- through the facial hair and into the respiratory area.

Q.    So they would need to be advised to be clean-shaven even with their tested mask?

A.    Yes.

Q.    And you said special clothing for removal of asbestos. What type of clothing?

A.    Typically Tyvek clothing.  It's a type of disposable plastic type of clothing.  It's zippered.  You may -- you can buy them at Home Depot.  They are often hooded to keep the asbestos out of the hair, gloves to keep asbestos out of the sleeves, et cetera.

Q.    Okay.  When you get done for the day with your asbestos removal do you just wear those suits home?

A.    No.  You would -- you would never want to wear that clothing home, at all.

Q.    Okay.  Why not?

A.    Because asbestos fibers stick to the clothing.  They stick to the hair.  They get in the cuffs of pants and they make their way into vehicles.  They make their way into homes where young children are exposed, family members.  When those clothes are washed with other clothing that those asbestos fibers can be transferred from -- from one article of clothing to another.

Q.    In -- in this case is it your understanding that the workers would just wear their clothing home after they finished work for the day?

A.    That's -- that's -- that's what I've heard.

Q.    Okay.  In fact, that's what Agent Townsend testified

today?

A.    Yes.

Q.    You've also heard some discussion about dust.  Does there have to be dust in the air for the asbestos fibers to be potentially harmful to the people disturbing them?

A.    Well, asbestos fibers are extremely small.  They can range from nanometers to micrometers, billionths of a meter to millionths of a meter in width and they're not necessarily visible in the air.

So you could have a lot of asbestos in this room, for example, right now, and you would not be able to tell.  There would be no -- no visible dust, necessarily.  The presence of visible dust is a good indication that there might be.

Q.    And it's a good indication that it's been disturbed; is that correct?

A.    Yes.

Q.    Okay.  And you're aware that the defendants are going to call an expert to testify that says it's impossible to release asbestos fibers from mastic even with abrasive methods of removal.  Do you agree with that statement?

A.    I don't believe that's what the science says.

Q.    Okay.

A.    I don't agree.

Q.    What does the science say?

A.    Well, the science says any type of disturbance of

asbestos containing material can release that fiber into the air.

As I said, during the early Eighties the EPA tried very hard to identify practices that could be conducted without that type of release happening and over the last -- and more recently over the last 10 or 12 years they've initiated another effort along those lines but have been unsuccessful.

Q.   In finding ways to disturb it without releasing the asbestos?

A.   Yes.

Q.   So grinding it up with a floor grinder would be releasing asbestos --

A.   Yes.

Q.   -- into the atmosphere?

Let's talk about some of the asbestos in this case.  Do you understand that at some point they kind of put the floor grinders aside and started pouring gasoline on the absents to kind of dissolve it?

Or the mastic, I guess, to --

A.   I'm sorry.  Can you repeat that?

Q.   I'm sorry.  At some point did you learn in this case they kind of put the floor grinders aside and started pouring gasoline on the mastic that contained asbestos?

A.   Yes.  As the assistant chief indicated earlier.

Q.   And he talked about it made a slurry.  Did you hear that?

A.    Yes.

Q.    And that they had to dry that slurry out to remove all the fumes?

A.    That's what I heard.

Q.    What happens when that slurry is dried up?

A.    Well, the asbestos fibers are available to be disturbed further either by walking through them or any other -- any other physical mechanical disturbance.

Q.    And how they're like dried up and can be broken apart easily?

A.    Yes.

Q.    You also heard some testimony about a vacuum and a vacuum hose making this safe somehow for the workers.

Would you agree with that characterization?

A.    Well --

MR. JOSEPH:   Objection, Your Honor.

THE COURT:   State the basis.

MR. JOSEPH:   No foundation that he's even familiar with the equipment.

THE COURT:   Okay.   Overruled.

THE WITNESS:   We -- we know that improperly certified vacuum machinery can pick up asbestos and actually blow it right through the filter and into the air.   We see that over and over again.

HEPA filtration, depending upon the type and the quality

of the equipment, might reduce or trap a certain amount of asbestos in the grinding operation.

BY MS. MARTIN:

Q. But you said if you had a certified vacuum that's made for that?

A. It -- it would reduce -- it would reduce to a certain extent the amount of asbestos that -- that made its way into the air in the immediate vicinity of that activity.

Q. Okay. And would workers need to be properly trained on that equipment as well?

A. Yes, they -- they should be, certainly.

Q. And if the vacuum is not certified is it possible that stirring up the dust is more --

A. Yes --

Q. -- what's going on?

A. -- that's possible.

Q. And distributing it more?

A. Yes.

Q. Okay. They also mentioned PEL. What does PEL mean?

A. That's a regulatory limit that -- that is promulgated by the Occupational Safety and Health Administration, OSHA. And it stands for Permissible Exposure Limit.

Q. How do you determine whether or not you've exceeded the permissible -- permissible exposure limit on it?

A. You would have to measure that in air. You would have to

collect an air sample and then take that sample out of the collection device to a laboratory where it's looked at under a microphone called a phase contrast microscope.

Q.    And do you have to -- in order to do that properly do you have to meet all the work practice standards you mentioned encapsulating the environment, proper clothing, and have equipment that's used to measure the amount of asbestos?

A.    Yes, typically that's what's done.

Q.    So if none of the work practice standards are met you really can't determine whether PELs have been exceeded or not?

A.    You would have to make the measure, that's correct.

Q.    You wouldn't have the measurement?

A.    You wouldn't know the measurement.

Q.    The defendant also alerts that only if -- there's only a little bit of asbestos that goes to the landfill that fibers of it can't be released there.  Would you agree with that statement?

A.    Well, fibers -- fibers are released.  If they're friable they are released.  There are, you know, millions -- perhaps tens of millions of fibers in a gram of material.  So it's almost inevitable that they would be released through transport or possibly from wherever disturbance they were disposed of.

Q.    And are there two types of landfills, landfills appropriate for asbestos exposure and just a regular landfill?

A.   Yes, that's my understanding.

Q.   And on those asbestos appropriate landfills would the -- would the landfill itself be charged with assuring the material was not disturbed?

A.   Yes.   I think those landfills are closely regulated.

Q.   As opposed to another landfill where somebody might just go digging through, looking for trash?

A.   Correct.

Q.   Let's talk a little bit about -- you mentioned health risk to the workers and eventually maybe their families or to the public if those asbestos fibers are released.   What kind of health problems can be caused?

A.   Well, there are in very general terms three types of disease that's caused by asbestos or mineral fibers in general.

One is lung cancer.   It's aggravated by smoking.

Another is a very virulent type of lung cancer called mesothelioma, which is invariably lethal.

And the third general type of disease is a non cancer lung disease called asbestosis plural disease.

Q.   And are all these serious injuries, serious bodily illnesses?

A.   They're all potentially life threatening.

Q.   Okay.   And does there have to be a long over years and years exposure for you to -- for it to result in an illness?

A.   The longer the exposure the higher the risk, however, there is data that shows that exposures on the order of weeks or months can certainly cause lethal disease.

Q.   Okay.  Is that why it's important to have the medical monitoring of people that are removing asbestos?

A.   Yes.  That's why all -- all of the -- the regulations are in place, to prevent -- to prevent moving asbestos from one media, solid median into air, water, whatever.

Q.   And we've talked about in this case one of the methods for removal of the asbestos containing mastic was pouring gasoline on it.  You've heard that testimony?

A.   Pouring gasoline on it.  Yes, I heard that.

Q.   Are there other types of hazards that can -- as far as a toxicologist that you can identify with the gasoline?

A.   Well, yes.  Gasoline, as -- as the chief pointed out, is very explosive, very dangerous, acutely.  It also in high concentration has effects on the nervous system, can make one be nauseous, groggy, cause errors in judgment.

It also contains a chemical called benzene which is a known human carcinogen.

So all of those things increase the risk associated with the exposure.

Q.   Okay.  What about using a grinder to grind up mastic on a concrete floor, any other health problems that might occur because of that grinding on a concrete floor?

A.   Well, concrete is very in -- in -- in dust form is very caustic.  It has a very high ph, measure of acidity.  It can be very irritating to the skin, tongue, lips, any membranes around the eyes, et cetera.

A lot of the disease that we see among the first responders to the World Trade Center are as a result of breathing concrete dust.

MS. MARTIN:  Okay.  Your Honor, may I have a moment?

THE COURT:  You may.

BY MS. MARTIN:

Q.   Did you review an analysis made in that case by the contracting lab, the Cates Laboratory, and then also the EPA?

A.   Yes.  I -- I looked through those last night.

Q.   And did those have levels of asbestos that were dangerous?

A.   Yes.  In -- in the percent level certainly asbestos is dangerous.  It's actually dangerous much -- much below that, but that's the regulatory limit.

Q.   And you said 1 percent?

A.   Yeah.  One -- 1 percent is the -- is the regulatory cutoff but we know that disturbance of material far below that level can -- can cause airborne exposures above the PEL, the permissible exposure limit.

MS. MARTIN:  Okay.

Thank you, Your Honor.

I'll pass the witness.

THE COURT:  We're going to take our lunch break at this time.

At this time we're going to recess until 1:15.

We'll resume at that time.

THE SECURITY OFFICER:  All rise.

(Recess taken at 12:02.)

(Proceedings resumed at 1:15.)

THE SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

Cross-examination?

MR. JOSEPH:  No cross, Your Honor.

THE COURT:  All right.  You may step down.

Does the government have anything further to present?

MS. MARTIN:  No, Your Honor.

THE COURT:  Mr. Joseph.

MR. JOSEPH:  I call John Lange.

(Witness sworn.)

THE COURT:  All right.  Be seated, please, and speak into the microphone.

DIRECT EXAMINATION

BY MR. JOSEPH:

Q.   Please state your name for the record.

A.   My name is John Lange, L-a-n-g-e.

Q.   Are you employed?

A.    Yes.

Q.    What is your employment?

A.    I'm employed by the Community College of Allegheny County and I'm also employed by Environ Safe, which is a consulting company, and I also teach for another school, the Art Institute.

Q.    Do you have any experience dealing with -- I'm sorry, do you have any certifications in the field of environmental health?

A.    By the NE -- NEHA I'm a registered sanitarian.

Q.    And what is a registered sanitarian?

A.    That's basically an environmental health specialist.

Q.    What is environmental health?

A.    Environmental health is basically study of the environment, occupational exposure, injury to people, injury to the environment, things of that nature.

Q.    Do you have any other certifications?

A.    I'm certified in food safety as well.

Q.    Okay.  And you have provided your resume to me and it's Exhibit . . .

         MR. ROPER:   26.

         MR. JOSEPH:   Exhibit 26, Your Honor.

BY MR. JOSEPH:

Q.    Now, have you ever served on a state asbestos board?

A.    Yes.

Q.    Which one was that?

A.    Pennsylvania, the asbestos advisory board for the Commonwealth for Pennsylvania.

Q.    And have you had any -- have you ever done any publication -- have you issued any publications regarding asbestos?

A.    Yes.

Q.    Approximately how many?

A.    Totally related to asbestos I'll -- I'll take a wild guess and say 40 or 50.

Q.    Okay.  Have you published anything regarding floor tiles and mastic?

A.    Yes.

Q.    How many publications, approximately?

A.    I'm going to take a wild guess and say between 10 and 15, specifically for floor tile and mastic in some way.

Q.    Have you ever been involved in any kind of measurements of asbestos fibers emanating from floor tiles and mastic?

A.    Yes.  I've published on that specific subject.

Q.    Could you tell me what your experience has been with that?

A.    I've been involved in removal, floor tile removal of mastic.  I've taken exposure measurements during the removal of floor tile and mastic.  I've done a statistical analysis, regulatory analysis, toxicological analysis and have published

that information, as well as a lot of nonpublished information.

Q.   Have you ever taken personal samples yourself of floor tile and mastic abatement in terms of the asbestos fibers that were generated?

A.   Yes, I have.

Q.   About how many times have you done that?

A.   Just for floor tile and mastic alone or --

Q.   How many times have you done asbestos --

A.   I'm going --

Q.   -- measurements?

A.   -- I'm going to take a wild guess and say a thousand.

Q.   A thousand times.

How are those measurements taken?

A.   They are taken by personal air sample measurements or they are taken by area sample measurements.

Q.   Now, what's the difference between a personal sample measurement and an area sample measurement?

A.   Personal sample measurement is taken on the person itself, right in their breathing zone, around their head.  And an area measurement would be like in the middle of this room.

Q.   So have you worn any of these personal measurement devices yourself while testing for asbestos in the environment?

A.    Yes.   I have personally worn the -- the -- the sampling device.

Q.    Have you ever had any experience with the Blastrac grinding and dust collection equipment?

A.    I've used Blastrac equipment previously.

Q.    Okay.   Have you ever taken any measurements around Blastrac equipment while it's in operation?

A.    Yes, I've -- yes, I've taken measurements while the Blastrac was being operated removing mastic from concrete floors.

Q.    Okay.   And did you ever personally operate any of the equipment yourself, any of the Blastrac equipment?

A.    Yes.

MR. JOSEPH:   Your Honor, I would like to ask that Mr. Lange be qualified as an expert in the area of environmental health, especially as it pertains to the measurement of asbestos fibers in the atmosphere generated --

THE COURT:   You may ask him opinion questions and any objection will go to the weight.

MR. JOSEPH:   Thank you, Your Honor.

BY MR. JOSEPH:

Q.    Last night I picked you up at the airport; is that right?

A.    Last night, yes.

Q.    And I -- and I took you to Fazio's?

A.    Yes.

Q.   And when we were at Fazio's there was an area that had been lighted; isn't that right?

A.   I'm sorry?

Q.   Almost like theatre lights had been put up?

A.   Yes.

Q.   Okay.  Now, I'm going to show you a plan of Fazio's and I'm going to represent to you that there are three separate areas shown here.

This is the first floor retail space.

On the top left we have the area where the grinder was used.

On the right we have the area where the gasoline was used.

And on the bottom left we have the area that was never treated at all.  I'm making that representation to you.

Now, last night when I took you to Fazio's, would you tell the court -- would you tell the court what happened?

A.   Well, we entered Fazio's and you brought me in I believe on the right-hand side, which is most likely the never treated area.

And you said to me, "Here is the mastic that we're concerned about."

Q.   Is it the right-hand side or the left-hand side?  I don't understand.

A.   I'm sorry, it would be my left side.

Q.    Right.

A.    And going in I looked at the mastic after we scraped some of the dust away and I said to you -- I asked you if this was a joke or something.

Q.    Now, why did you ask me if it was a joke?

A.    Because the mastic there, if you want to call it mastic, more looked like stains on the floor than actual mastic.  And I thought there would be an area where you would have actually a thick mastic, which it turns out you did on the second floor.

Q.    Right.  Now, did you have an opportunity to look at the entire area that is marked as never treated on this exhibit?

A.    Yes.  I walked through the area, which would be the never treated, the concrete, grind use, and where the gasoline use was, I walked around the entire area of this first floor.

Q.    Did it appear to you that the area that is marked as never treated, in fact, never had been treated?

A.    I thought it had been treated, because all that was on it was -- looked like stains of black material within the concrete.

Q.    But no one had ground out the stains from what you could see?

A.    No.

Q.    Or no one had used gasoline to remove the stains from what you could see?

A.    Not that I could tell.

Q.    No.  So there was no stainage.

A.    There was stains on the floor.

Q.    Right.  Now, I have provided to the court --

MR. JOSEPH:  Your Honor, this is Exhibit 35 in the binder.

BY MR. JOSEPH:

Q.    And I have provided this picture -- have you -- have you seen this picture before --

A.    Yes.

Q.    -- from me?

Did you see this area that is portrayed in this picture last night?

A.    Yes.  I saw the general area.

Q.    And was that in the area that was marked as never treated?

A.    Yes.

Q.    Now, is that representative of how the asbestos -- I'm sorry -- of how the area looked -- the floor looked in the area that was never treated?

A.    No.

Q.    No?

You mean I presented something that is not representative?

A.    You presented the very, very worse place that you could

find for having mastic on the floor.

Q.   Well, what was the rest of it then?

A.   The rest of it was just minor stains going across the floor.  It almost looked like -- some of it almost looked like scuff marks from shoes.

Q.   Now, did you try to feel whether you -- did you touch these things?

A.   Yes.  You couldn't feel any ridges or any material.  It's -- it's a stain in the concrete.

Q.   And you had an opportunity to inspect the entire area that is marked as never treated.  Did you see any of the areas that looked as bad as that?

A.   It was that area and a little bit -- a small -- a real small area in the front had a few markings as you would see here, but it was very small.

Q.   So this is the worst of it?

A.   This is -- this is -- what I observed this is the worst -- probably the worst area there, although I couldn't look at -- there's -- there's dust on the floor.

Q.   But it looks like much of the area that's here is in fact -- there's almost no markings at all, it's just almost nothing?

A.   Correct.

Q.   Now, if there had been a flood in that area would that have removed the mastic?

A.    No.   Mastic is not water soluble.

Q.    Now, we took some photographs last night, didn't we?

A.    Yes.

Q.    And you instructed me -- I had an iPhone and you instructed me where to take photographs?

A.    Yes.   On some of the representative areas of the streaks.

        MR. JOSEPH:   Excuse me, Your Honor.   I just need to confer with counsel.

                        (Pause.)

        MR. JOSEPH:   May I approach, Your Honor?

BY MR. JOSEPH:

Q.    Now, can you just look through these photographs and ask -- I'm going to ask you if you recognize them.   They're not in any particular order.   They just came out like this.

A.    Yes.   There's a picture of me.   These are some of the photographs that we took.

Q.    Now, everything is in the same order for everybody, could we just leaf through and see what we're looking at?

      What is the first picture?

A.    The first picture is what was more representative of the streaks of material on the floor in the building, particularly the area that was not abated.

Q.    So you can see like the black stain and an area that looks like it's been swept with a shoe?

A.    It looks like a shoe print or something.

Q.   Yeah.   Yeah.   Do you see any -- any significant abatable mastic in that picture?

A.   No.

Q.   Okay.   The next picture we see a hand.   Do you recognize that hand?

A.   That's my hand.

Q.   That's your hand.

Okay.   And what are you doing there?

A.   I was looking for the worst places that I could find that had the streaks on them to clear it off so you could get a photograph of it.

Q.   Okay.   Was that one of those streaks?

A.   Yes.

Q.   Is that a stain?

A.   That's a stain, and these are some of the worst stains that I could find.

Q.   Okay.   So this was as bad as it gets?

A.   For the stains, yes.

Q.   Okay.   The next page is showing a bunch of tiles of some kind.   Do you see that?

A.   These are -- these are ceiling tiles that have fallen from the ceiling.

Q.   Okay.   They're not floor tiles?

A.   No.

Q.   And this is in the area -- I'm sorry, the last picture,

was that in the area that was never treated?

The one where your hand is showing?

A.   Yes.  I believe that was in -- I believe that was a --

Q.   I should have asked you.

Okay.  This next picture with all of the floor tiles on it, is that in the area that was never treated?

A.   You mean the ceiling tiles?

Q.   I'm sorry.  Yes.  Correction.  The ceiling tiles.

A.   That was in an area that was I believe nontreated.

Q.   Nontreated?

A.   I -- I think.

Q.   Right.  Do you see any abatable mastic on the floor there?

A.   No.

Q.   Okay.  The next picture is -- there's not much in it, but do you see -- was that taken in the area never treated?

A.   Yes.

Q.   Did we take any pictures in the area that -- areas that were treated?

A.   I don't believe we took any in the areas that were treated.

Q.   Right.  And does this area show any abatable mastic?

A.   No.  It shows a small streak in the right lower corner.

Q.   Now, is this representative at all of how it was generally in the area that was never treated?

A.   This is probably a reasonable representation of what I observed.

Q.   Is that why you said to me, "Is this a joke"?

A.   Yes.   I was wanting to see the real mastic.

Q.   Okay.   Next picture shows -- looks like you, right?

A.   That is me.

Q.   Last night.

Okay.   And is that showing the worst area?

A.   Yes.

Q.   That you could find?

That was it?

It was like that one spot, right?

A.   Yes.

Q.   Okay.   The next picture shows more floor space in the -- does that show more floor space in the same area?

A.   I believe this was in the area that was not treated.

Q.   Right.   Now let's look at the next one.   And we see something dramatically different.

Could you tell us what that is?

A.   This is the material on the second floor.

Q.   The second floor.

And what is that black stuff?

A.   That looks to me to be mastic.

Q.   And those are what floor tiles look like generally in these --

A.   Those are 12 by 12 floor tiles.

Q.   And is that pretty thick?

     I mean, how do you characterize that mastic?

A.   This is -- I'll call it medium thickness mastic.  I've seen much, much thicker.

Q.   This is abatable, right?

A.   Yes, this would be abatable.

Q.   All right.  Now, the next picture shows somebody's hand.

     Do you recognize the hand?

A.   Looks like my hand again.

Q.   Right.  And what do you show?

A.   I show -- you're -- you're seeing some mastic stuck to the bottom of the floor tile and you're seeing the mastic on the floor itself.  I believe this is the second floor.

Q.   Right.  And -- and so when you look at the second floor you see on the previous page thick mastic where the file has been removed --

A.   On the second floor?

Q.   On the second floor?

A.   I wouldn't necessarily call it thick mastic.  This is probably medium thickness --

Q.   But it's abatable?

A.   It's abatable, certainly.

Q.   But on the next picture we see the tile being brought up.

     We don't seem to see as much mastic on the back of the

tile, do we?

A.   No.

Q.   Why not?

A.   The mastic is not going to stick to a tremendous degree on the tiles.  It's more going to be encased or embedded in the matrix of the concrete.

Q.   That's why it stains, isn't it?

A.   Yes.

Q.   Okay.  Now, let's look at the next picture.

We see -- again, I'm -- I'm wondering why this is.

This appears to be the nontreated area, does it?

A.   I believe these are the untreated areas in -- going towards the front of the store.

Q.   Right.  And this is the not treated areas, right?

A.   I believe so.

Q.   Right.  Do you see any abatable mastic there?

A.   No.

Q.   Okay.  If you'd like to look at the final page, do you have any observations about that page?

A.   It appears to be just a duplicate picture of the previous page.

Q.   I'm going to represent to you that under the rules it is required to report the removal of regulated asbestos-containing materials that represent an area more than 160 square feet.  It has to be more than a hundred square --

160 square feet of that material.

Do you have any belief as to whether or not there was 160 square feet of regulated asbestos-containing material on that first floor retail space on the assumption that the part where the asbestos was removed was similar to the part where it wasn't removed?

In other words, that the part where it wasn't removed is representative of the whole of the first floor retail space?

Is that too convoluted or did you get it?

A.   My opinion is that there's -- I'm not sure you get 160 square feet of total abatable mastic.

Q.   Is -- is -- is -- is a stain a regulated asbestos-containing material?

A.   No.   No.   It's unlikely to contain 1 percent -- more than 1 percent when it's mixed in with the concrete and other material and dust and things that are sitting on it.

Q.   But if it was of a certain thickness then the 1 percent would be in the thicker part, right?

A.   It would be -- it would be more easily measurable.

Q.   Right.   But at this level there's no way you could possibly measure?

A.   You're going to have to try to scrape it out, dry it down and try to get some quantitative value to find out whether it's 1 percent or greater.

Q.   So is it your understanding then that there's no need to

report the removal of mastic of this -- well I won't say thickness but mastic stains like this?

A.    Correct.

Q.    Would it be reasonable -- do you think that somebody in good faith could -- is it -- are you -- are you aware of any experiments that have been done or tests that have been done to determine whether or not asbestos fibers can be released from mastic?

A.    Yes.

Q.    Are you familiar with the work that was done at Fort Sill?

A.    Yes.

MR. JOSEPH:   Your Honor, we've provided copies of studies to Ms. Martin, one that we're about to refer to, and I'd like to provide a copy to Your Honor.

THE COURT:   You may.

MR. JOSEPH:   There are two but this is the first.

BY MR. JOSEPH:

Q.    I've given you a study entitled TEM Observations of Airborne Asbestos Structures During the Removal of Vinyl Asbestos Tiles and Mastic Adhesive, and it is authored by U.S. EPA, isn't it?

It's an EPA study?

A.    Yes.   It appears to be sponsored by the EPA.

Q.    Right.   It's a risk reduction engineering laboratory of

the U.S. EPA?

A.    Right.

Q.    Could you tell us what happened in this study, what -- what they did?

A.    Fundamentally, they put mastic in floor tile on a floor and then they wanted to evaluate whether it had sufficient emissions of airborne asbestos from abating the floor tile and grinding the mastic and also whether they did chemical removal of the mastic.

Q.    Now, on the first page we see that they say that the floor tile contained 30 percent chrysotile.  Is that correct?

A.    Yes.

Q.    And you're aware that it also -- can you also see that it says 20 percent chrysotile in the mastic material?

A.    Yes.

Q.    Now, you've seen the -- the analysis of the mastic that was at Fazio's, what percentage of -- of the material at Fazio's was --

A.    I believe it was 5 percent.

Q.    5 percent asbestos in the mastic?

A.    Some may have been 3 percent.  I don't remember the exact numbers.

Q.    So here they're testing four times that amount of asbestos in the mastic.  They're up to 20 percent.

A.    Yes.

Q.   Now, what did they do.  It mentions here there were seven test areas.  What do they do?

A.   They basically build a containment, like a little I'll call it containment area, like a big box.  They put their materials inside that box.  Made sure the box is very clean. Then they would do one of the practices here.

For example, on the one table 2, floor tile removal, number one, they -- it was a dry method.  They basically would scrape and remove and pry off the floor tile from the material, then measure the airborne emissions in the air using phase contrast microscopy.

Q.   Now, what methods did they use to remove the mastic?

A.   The mastic?  The one method they did grinder.  They used the grinder.  And the other method they used, the chemical solvent removal method --

Q.   So the --

A.   -- acid.

Q.   -- so the chemical solvent removal method would be similar to using gasoline?

A.   Yes.  Gasoline is a solvent.

Q.   What were the findings?

A.   By PCM analysis, and they did an additional analysis to look at those fibers, which is what is measured by OSHA for occupational health, fundamentally, they didn't find any fibers.  The fibers are approaching background level.

Q.   When you say, "background level," do you mean there's asbestos in this courtroom?

A.   No, that would be the asbestos concentration you would have in this courtroom, in the hall, on the street, in buildings.

Q.   You mean we're breathing in asbestos right now?

A.   Yes.

Q.   Should we be wearing respirators?

A.   No, because the concentration is at a low level that it's not going to cause health effects.

Q.   So is the key point concentration?

A.   Yes, in the air for --

Q.   So without concentration there's no harm?

A.   Yes.

Q.   Now, what is PEL?

A.   Permissible exposure limit.

Q.   What is that?

A.   That's the definition by OSHA if you exceed it they consider there may be some risks of disease related to that agent.  If you're below that limit you're not required to take measurements to reduce the levels in preventing risks.

Q.   Now, what happened with the PELs, the permissible exposure levels, in this study that they did at Fort Sill?

     Did they ever exceed them?

A.   Well, these -- these -- these values represent -- they

didn't do 'em as a -- as a time-weighted average, but these values would represent there -- there's insufficient exposure to warrant concern for disease in the air from the asbestos.

Q.   But why would that be?

Because we've heard from Dr. Weis that if you mess with that mastic all of the fibers come flying out?

A.   That doesn't happen in real life.

Q.   Well, tell me what happens in real life.

A.   Pardon me?

Q.   What happens in real life?

A.   In real life you take the measurements in the world that you're working, the occupational environment, and you determine whether there is a risk of exposure.  And these samples represent -- are correlated with some of the studies I have done where I found levels to be well below the PEL during actual abatement itself of mastic and floor tile.

So these studies basically confirm my studies.

Q.   Now, it says on page -- I can't see the page number.

But it says in here, "The levels of emission as measured by NIOSH 7400 and 7402 methods were all uniformly low, falling between 0.001 and 0.011 FCM," which is fibers per cubic centimeter cube -- cubic centimeter; is that correct?

A.   Correct.  Or --

Q.   "Regardless of the removal method employed."

Now, what was the level you said was the permissible

exposure level?

A.    The PEL for OSHA is .015 as per CCTWA.

Q.    So 0.001, would I -- would I -- would I be correct in saying that's 1 percent of the permissible exposure level?

Have I got that right with the zeros?

A.    I guess you could say that.  These are the geometrically distributed samples so statistical analysis may not come out, to, quote, represent 1 percent.

I guess in layman's terms you could say that.

Q.    Well, but were they getting above background levels?

A.    Background level is higher in some locations in the world in the United States than .001.

Q.    But they -- but did you see any significant increase in the background levels of these results?

A.    No.  These would all be background levels in certain locations.

Q.    So no matter how they tried to remove the asbestos, Regardless -- did they use sanding as well?

A.    They -- they didn't do sanding here.

Another study performed --

Q.    Yes, sir.

But they used grinding and -- and every method, you know, that we've had in this particular case.

A.    These are probably much more aggressive.

Q.    These are much more aggressive than the study?

A.    Yes.

Q.    Now, we noted before that the mastic was 20 percent of the -- I'm sorry, the asbestos was 20 percent of the mastic, so wouldn't the results of this be four times worse than anything that would happen at Fazio's?

A.    It -- it's hard to say what the magnitude would be.

From my previous investigations this would have a more likelihood of having much higher exposures than you would if you ground at Fazio's.

Q.    Okay.  Now, I'd like to refer you to a second study --

MR. JOSEPH:  Which we've also provided to the government, Your Honor.

Do you have it?

May I approach, Your Honor.

THE COURT:  You may.

BY MR. JOSEPH:

Q.    Now I've given you another study.

Are you familiar with that study?

A.    Yes.

Q.    Would you tell the court what the study was about?

A.    As related to mastic, in particular?

Q.    Yes.

A.    What they primarily did was pick two mastics, one I believe was 8 percent and one 9 percent concentration.  They applied it to a surface.  They left it dry.  And then they

used sanding techniques.  One was a fine -- one was a course sandpaper and one was rough sandpaper.  And then evaluated how many fibers were released into the air as a result of this application method.

Q.    Well, it says here that they did various methods.  They did sanding using 60 grit and 120 grit sandpaper.

A.    Yes.

Q.    How aggressive is that?

A.    A course and a fine sandpaper, that's -- that's about as aggressive, I guess, as you can get.

Q.    Is it more aggressive than grinding?

A.    Yeah.  To release fibers, it would be, yes.

Q.    To try to release fibers, right?

A.    Right.

Q.    They also did sweep cleaning, just sweeping it across the floor, right?

A.    Right.

Q.    Okay.  And they also did cutting it with a knife and scrape it.  Is that correct?

A.    Yes.  I believe.

Q.    Okay.  Now, one of the statements that was made in here is that -- just the introduction on the first page, I'd just like to read to you, because I'm going to ask your opinion on this the second sentence on the first page.  Not the part in the abstract but the part in the introduction.

"Exposure to free fibers occurs when workers handle and process raw asbestos, which can become air-borne when dry. Some products, however, contain so-called encapsulated fibers. This term applies to fibers which are coated with a material or wetted with a binder, resin, or other medium, thereby combining the -- combining the asbestos fibers within a solid matrix and limiting their potential to become airborne."

Then it goes on to say, "The differences between these friable and encapsulated type of products have been known for decades."

Are we talking about an encapsulated fiber when we're talking about mastic?

A.    Yes.

Q.    Is it part of the matrix?

A.    Yes.

Q.    What does that mean?

A.    Basically the fiber gets mixed in with the resin of the material or the matrix of the material, gets chemically -- chemically bound up so it can't be released.  The reason why they want to do that is so it holds the mastic together better.  It's -- it's designed to do that.

Q.    But what if you grind it and sand it, doesn't it get all the fibers flying up?

A.    No.  It's going to be very difficult to -- as -- as you see from the study you don't get fibers coming up.

Q.   Well, let's see what they did in this study.

Oh, well, let's just -- before we do that, let's just go to page 235 of the study.  The first sentence on the top left, the first complete sentence.  Maybe I should have read the previous one, too.  But it's referring to mastics, it says, "This is due to the encapsulation of asbestos fibers in a solid matrix, which limits their potential for airborne release.  This solid matrix serves to coat or saturate the fibers with a bonding agent so that they are not expected to be released during product manipulation."

Now, the next sentence is the one I wanted to pay special attention to.

"If under some condition there is inhalation of some fibers, the presence of their encapsulating medium both inside and outside the fiber may significantly reduce or eliminate its adverse effects."

What does that mean?

A.   Basically if the fiber is encapsulated in these matrices, the mastic, it's not going to be easily respirable.

Q.   And if it does get in there is it still coated?

A.   It's still coated and would just be taken up by the system of the body and eliminated, particularly the chrysotile.

Q.   Now, they did all these various methods, the sanding with the 60 grit and 120 grit sandpaper, the sweeping and all these

kinds of things. What were their findings?

A. They -- the fiber levels did not -- did not -- would not be expected to exceed the PEL.

Q. How far below were they?

A. They're -- they're -- some of them were nondetectable.

The area samples in general were given higher results than the personal samples.

Q. How many fibers are in this room, asbestos fibers?

A. I'm trying to estimate the size of the room. All I can do is take a wild guess and say -- I'm taking a wild guess and saying a hundred thousand fibers to five hundred --

Q. A hundred thousand fibers?

A. Yeah, a hundred thousand. I'd -- I'd have to calculate the actual room.

Q. How many fibers were released from all of these methods that they used -- this aggressive sanding and this sweeping and the 120 grit sandpaper, how many fibers did they find?

A. It depends which study. The CI mastic they released none.

Q. None?

A. Zero. Yes. Their value is zero by TM analysis, but PCM it would be zero also.

The Seal -- Sealfas, whatever that material is, their personal they had a half a fiber of chrysotile, but by PCM it's probably -- probably approaching zero.

Q.   So if it also says on page 250 that -- no asbestos fibers, no asbestos fibers were detected during either the application for removal test --

A.   Right.   Using the PCM technique, I believe.

Q.   So there's A hundred thousand fibers in this room, if they did find one fiber, and let's say there's a hundred thousand because you thought that would be --

A.   I am taking a wild guess.

Q.   Yeah, a wild guess.

But let's -- would you say at least 50 thousand?

A.   I'm guessing by the volume, certainly.

Q.   What would be the health impact of adding one fiber?

A.   Zero.

Q.   What would be the -- I mean, does every fiber kill you?

A.   Well, something -- something is going to eventually kill all of us.

Q.   Yeah.   But I'm talking about the asbestos fibers.

A.   It becomes a -- a risk that we can't calculate.

Q.   It says at the end of this, the last sentence, it says, "Based on the results there is virtually no occupational exposure to the asbestos in these products during the application, spill clean up, sanding, cutting and removal and sweep clean up."

Do you agree with that?

A.   Yes.   That's what I found in my studies, which they cite

some of them in here.

Q.    We've heard from Dr. Weis that this Blastrac system can spread fibers all over the place, asbestos fibers, can spread them all over the room, and disperse them.

Do you have anything to say about that?

A.    From the analysis that I have done and the samples I have collected, we just don't find that.

Q.    And what is the purpose of this system?

I mean, how does it -- I sorry, how does it work in terms of gathering up fibers?

Does it gather up all the dust, or does it gather up the fibers, or both, or what?

What does it do?

A.    It's basically a -- I call it a wheel in the center that will grind or put BBs down that will agitate the surface and break the material up.  It will then suck the material up into a system which usually will have a HEPA filter in it, filter the material out, and exhaust -- have an exhaust that does not have fibers in it.

Q.    And what is a HEPA filter?

A.    A HEPA filter is a high-efficiency particulate air filter.  It's 99.97 percent efficient to monitor disperse particles .3 micrometers in size.

Q.    And does OSHA recognize HEPA filters as being effective to filter out asbestos fibers?

A.   Yes.

Q.   And this equipment that was used in this case, the Blastrac BG-250 and the Blastrac 1216, are those used ever by asbestos professionals?

A.   Yes.  All the time.

Q.   All the time.

So that is the chosen equipment?

A.   Well, depending on what you want to use to remove mastic, there are other choices that you could make.

Q.   Well, for concrete grinding.

A.   Yes.  For concrete grinding I don't know what else -- I don't know what else you're going to use.

Q.   Right.  Well, if you've got one of these HEPA filters, do you need to wear a respirator or a mask?

A.   No.  You're not going to have -- your exposure levels are going to be well below the PEL.

Q.   Now, I asked you to prepare -- no, I'm sorry, that's not right.

You proposed to me, didn't you, that you would prepare negative exposure assessments for this project?

A.   I'm not sure how we came up with it, but that's -- you -- somebody eventually asked me to do a negative exposure assessment.

Q.   Okay.  And did you do any of those assessments?

A.   Yes.

MR. JOSEPH:  And we've provided those to the court, Your Honor.  Those negative exposure assessments are in the exhibits book.

BY MR. JOSEPH:

Q.   And you actually did -- before we move forward, you did three; is that correct?

A.   Yes.

Q.   Why did you do three?

A.   Because you asked me for one or however we come up with it for each one of the possible scenarios they were doing at Fazio's.

Q.   You mean the gasoline and grinding and lift and scrape?

A.   Yes.

Q.   To get the tiles up in the first place?

A.   Yes.

Q.   Okay.  And you determined in those negative exposure assessments that the permissible exposure level, the PEL, would not be exceeded.

A.   Yes.

Q.   By how -- I mean, is there -- is there any possibility, any remote possibility that it would be exceeded?

A.   Define "remote" to me, but -- but the levels that I determined were very, very low.  I'll -- I'll use a number and say possibly 10 percent, 20 percent of the PEL.

Q.   Now, are employers entitled to obtain negative exposure

Q. assessments before beginning work projects such as this?

A. They're not required.

Q. But are they allowed?

A. Yes.

Q. Okay. And if they get them, what does that mean?

A. That means that can eliminate or minimize the air monitoring that would be conducted.

Q. Okay. And does it also mean that they can do the operation in a way without having to comply with all the strictest requirements --

A. Yes. Yes.

Q. -- because the PEL is reduced -- actually the PEL would not be exceeded?

A. Yeah, you're -- what you're doing is you're demonstrating with a reasonable certainty that you will not have an exposure level that will exceed the PEL from historical information.

Q. I agree.

A. But I didn't use "historical information" from the job site. I used historical information from peer-reviewed studies.

Q. In similar situations?

A. Yes.

Q. Okay. And if you would have been asked to prepare a PEL -- I'm sorry, an NEA, negative exposure assessment, before this project started, would you have done so?

A.    If they had paid me, yes.

Q.    Yes.  I understand.

      But you would have done it as a matter of --

A.    Yes.  It wouldn't have been this extensive because I could have used even a small number of samples from a nonpeer-reviewed study.  This went through higher standard.

Q.    Let's take a look at the negative exposure assessments.

      MR. JOSEPH:  Your Honor, those are Exhibits 49, 50 and 51.

BY MR. JOSEPH:

Q.    Do you have the negative exposure assessments with you?

A.    Yes, sir.

Q.    Could I?

A.    Yes, sir.  I have all three.

Q.    Now, let's look at number 49, Exhibit 49 first.  You don't know which one that is, but that is the one for the Blastrac removal.  That's the grinder.

      Would you tell us what your findings were in this particular negative exposure assessment?

A.    You would not likely exceed the PEL.

Q.    In fact, you would be far below it by the look of these numbers; is that right?

A.    Yes.  Yes.  You would be well below it.

Q.    Would you be at more or less background levels?

A.    For area sampling unquestionably you would be at

background level.  At personal sampling maybe a little above background level.

Q.    How far above?

A.    How far above background?

Q.    Yeah.

Anywhere close to the permissible exposure level?

A.    No.  But the permissible exposure level is not a background level.

Q.    Okay.  So it's a -- a totally different thing.

Would you testify that within a reasonable degree of certainty that what you said in this negative exposure assessment, that is, that the PEL would be below the OSHA level of 0.1 fibers per cubic centimeter, would not be exceeded?

A.    You're asking a double negative.

Yes.  The PE -- this -- the exposure using an aggressive technique like this, based on my information that I've collected in peer-reviewed studies, you would be below the PEL.

Q.    Is that -- are you stating that within a reasonable degree of certainty within the --

A.    Yes, it's a reasonable degree of scientific certainty.

MR. JOSEPH:  Exhibit 50, Your Honor, is --

BY MR. JOSEPH:

Q.    -- and Mr. Lange, is for chemical removal.

Why do you use the term chemical removal?

A.    Why do you use chemical removal?

No.    Why do you use term acknowledging chemical removal?

A.    Because you're using some solvent to take up the mastic to put it into a liquid type form to get rid of it.

Q.    So, in other words, you're talking about the gasoline?

A.    Yes.

Q.    And what was your conclusion?

A.    You would be well below the PEL again if you used that method.

Q.    And are you stating that within a reasonable degree of certainties within the field of environmental health?

A.    Yes.

Q.    Exhibit 51, which is the last of the negative environmental assessments is for lift and scrape removal. What does that mean?

A.    That's basically using some type of device where you get under the floor tile and basically pop it up.

Q.    So that was the initial stage when they were removing the floor tiles?

A.    As I understand.

Q.    And what was -- what was your conclusion?

A.    It would be below the PEL.

Q.    And are you stating that within a reasonable degree of certainty within the field of environmental --

A.    Yes.

Q.    -- health?

A.    Yes.

Q.    If you were removing these stains similar to what you saw last night, would you call that an abatement?

A.    No.

Q.    Have any of the states taken action -- all states obviously are subject to the federal Clean Air Act?

A.    Yes.

Q.    Have any other states taken action in interpreting the federal Clean Air Act in terms of any exemptions when it comes to floor tiles and mastic?

A.    Yes.  Ohio, for example, does not require notification or other related practices if you're removing mastic.

            MR. JOSEPH:  May I approach, Your Honor?

            THE COURT:  You may.

BY MR. JOSEPH:

Q.    Do you recognize that document, Mr. Lange?

A.    Yes.  This is a memorandum from the Ohio Department of Health.

Q.    Now, they say in here, "For several years we've been asked to clarify the question when does nonfriable asbestos-containing material become friable."

      Is that a problem that people have had over the years?

A.    Yes.  The big problem people have is floor tile and

mastic don't contain fibers to any significant degree that's a real health hazard so it's regulation for something that really doesn't exist.

Q.   So if someone is told that -- and believes that floor tile and mastic is nonfriable, actually that remains correct, doesn't it?

Actually let's say the mastic.

The mastic doesn't become friable?

A.   Yes.   The mastic just -- just can't get fibers released. That's -- and that's not my opinion, that's based on studies.

Q.   What did the state of Ohio do?

A.   They're -- they're basically moving away that if you can demonstrate you have no exposure from the activity it doesn't become a regulated, I'll use my term, asbestos activity it.

Q.   It says, "If these materials remain nonfriable Office -- Ohio Department of Health rules for removal license and certification do not apply.   No prior notification is required."

Now they're applying federal law, right?

A.   They had to have gotten a waiver from the EPA or something like that.   As I understand it other states have done the same.

Q.   We've heard about how the workers would go home with dust on their clothes.   Is that an asbestos risk?

A.   That was probably concrete dust.

Q.   I'm not talking about concrete dust.  I'm talking about asbestos dust.

A.   Since they used the HEPA filter and they used the chemical, quote, removal, the gasoline, you would have no fiber release.  So they wouldn't have fibers.  They wouldn't be accumulating fibers on their clothes.

MR. JOSEPH:  May I just confer, Your Honor?

THE COURT:  You may.

(Pause.)

MR. JOSEPH:  Nothing further, Your Honor.

THE COURT:  Cross-examination?

MS. MARTIN:  Yes, Your Honor.

MR. JOSEPH:  Your Honor, I have -- I have these exhibits, should I wait until -- should I put them in now, the new one?

THE COURT:  Now would be the time to offer them.

MR. JOSEPH:  Now.  Oh, I'm sorry.  I'm sorry.  Let's do that.

MR. GIBSON:  Your Honor, excuse me, may we mark those packet of pictures as one exhibit?  Would that be . . .?

THE COURT:  You may.

MR. JOSEPH:  Judge, I'll mark them as we go.

MR. GIBSON:  Your Honor, we've marked the packet of pictures as Defendant's Exhibit 64 for purposes of the

sentencing hearing.

We have marked the Ohio Department of Health letter as Defendant's Exhibit 63.

The TEM observation of airborne asbestos report or paper Defendant's Exhibit 62.

And a similar one of the TEM observations, 61, Defendant's Exhibit 61.

And then the last one, Defendant's Exhibit 60 is occupational exposure to airborne asbestos from coatings, mastics and adhesives.

So we will move those into evidence.

THE COURT:   Any objection?

MS. MARTIN:   No, Your Honor.

THE COURT:   Defendant's Exhibits 60 through 64 are admitted.

CROSS EXAMINATION

BY MS. MARTIN:

Q.   Mr. Lange, you're a Ph.D. candidate?

A.   A what?

Q.   Ph.D candidate.

A.   THC?

Q.   Ph.D.

A.   Yes.

Q.   What did you expect to obtain your Ph.D.?

A.   I don't know.  I don't know.

Q.   No expected date on that?

A.   No.   No.

Q.   You said you're certified in asbestos abatement?

A.   I don't know if I'm certified anymore.   I was.

Q.   Walk us through what you would do in an abatement.

What -- What's the first thing you need to do in an abatement?

A.   Do a survey.

Q.   What -- what happens next?

A.   You would determine what was asbestos, what was not asbestos.

You would determine whether it was friable, whether it was nonfriable.

And you determine whether they want to leave it in the structure or not leave it in the structure.

Q.   And if you want to abate it what do you do?

A.   You would set up containment.

Q.   How -- what is a containment and how would you set it up?

A.   A containment would be like in this room putting plastic barriers on different items, depending on where it was and how you would set it up.   If you were removing parts of the wall you wouldn't contain the wall but you may contain the ceiling, you may contain the floor.

You would build a possible decontamination chamber of some type depending on your structural activity.   Usually you

want a three stage.  Some people set up a five stage.  You may put negative air machines in here to draw out exhaust to basically put a negative pressure under the system.

Q.    Okay.  What would you do next?

A.    You would then remove whatever it is you were removing.

Q.    Would you wet it?

A.    Depending on what it is.

Q.    Is it typical that you want to wet asbestos before it's abated?

A.    Yeah.  The friable materials you definitely want to wet.

Q.    Okay.  And can you describe the equipment that you would want workers to be wearing during that?

A.    Depending on what they're doing, they may be wearing just street clothes, they may be wearing their -- an encapsulating suit, such as a Tyvek suit, something of that nature.

Q.    You certainly wouldn't recommend in an asbestos abatement that somebody just wear street clothes, would you?

A.    Well, it depends on what they were doing.  If they were doing a nonfriable material, street clothes may be fine.

Q.    And you would recommend that?

A.    Yeah, if they were -- if they were -- they're not having exposure levels, yes.

Q.    Well, how about if there are exposure levels, would you ever recommend that?

A.    I -- I would recommend they wear a suit then.

Q.    And how do they decontaminate?

A.    They take the suit out.

Q.    Just take it off?

A.    Well, when they were going through the decon they would take it off and put it in a disposal bag.

Q.    Okay.  And if there's an abatement going on that's properly monitored they're taking readings of that every day, aren't they?

A.    Not necessarily every day.  Normally they will take some preliminary readings.  If they find no exposures they may cut back, depending on what the contractor and the owner wants, they may take periodic readings to make sure their original readings were accurate.

Q.    But every day they need to alert the worker that when he comes to work the next day you need to alert the worker to the potential exposure from the day before; is that correct?

A.    I don't understand your question.

Q.    You take a reading of what the exposure is for a particular worker.

A.    Usually it takes several days to get the reading back.

Q.    But you have to notify that worker of what he's been exposed to?

A.    Normally my policy has been in the decon or in the work area or where they're entering I post that information.

Q.    That's your policy?

A.    Yes.

Q.    But there are no regulations that regulate that?

A.    There are regulations you have to notify the worker. That's how I do it.

So if we were doing an abatement here I would post it in the hallway, you know, where they gather and things of that nature, you know, on a board or something of that nature.

Q.    Well, when you went into Fazio's last night were you under the impression that there wasn't any asbestos in there?

A.    There is asbestos in there.

Q.    Were you -- but you didn't wear any kind of protective clothing or anything, did you?

A.    No.

Q.    Okay.  This is one of exhibits that defendant showed.  I believe it's one page of Exhibit 64.

MS. MARTIN:  Is that correct?

MR. GIBSON:  I believe that's correct, 64.

BY MS. MARTIN:

Q.    Do you remember that?

A.    Yes.  I have it here, I believe.

Q.    I believe you referred to that as abatable, that amount was a medium amount of mastic to you but it was abatable.  Do you remember testifying to that?

A.    Yes.  I believe that would be an abatable amount, yes.

Q.    Okay.  And then this was the next picture, the bottom of

the tile.  Do you recall that?

A.    Yes.  I have it right here.

Q.    Okay.  And that's the black mastic that stuck to the tile once it was lifted off?

A.    Yes.

Q.    Okay.

MS. MARTIN:  Your Honor, may I have a moment?

May I show counsel these exhibits, Your Honor?

THE COURT:  You may.

BY MS. MARTIN:

Q.    There's a little bit of a glare on there, but does that look like the picture that we just showed where it said -- where you testified there was an abatable amount of mastic?

A.    It looks to be -- oops.  It looks to be thinner than the pictures -- at least the last picture you showed me.

MS. MARTIN:  Your Honor, may I approach with the actual pictures?

THE COURT:  You may.

THE WITNESS:  Okay.  What was your question again?

BY MS. MARTIN:

Q.    Does that look similar to you?

A.    The one -- the picture that I took last night looks to be thicker mastic than the mastic that you are showing me that you entitled I think Exhibit 7.

Q.    It looks thicker to you?

A.   This one looks thinner -- Exhibit 7 looks thinner than the one that I took last night.

Q.   Okay.   But looking at Exhibit 7 it's quite a bit more mastic than what you showed on the nontreated space; is that correct?

A.   Yes.

Q.   That you looked at last night?

A.   Yes.

Q.   Pretty much covered, isn't it?

It's covered in mastic?

A.   Yeah.   Most of its covered, yes.

Q.   Okay.   And so if I represented to you that that's a picture Mr. Albino took of the floor before it was ground and before the gasoline was poured on it, would you find that -- would that be more consistent with a abatable amount?

A.   Yeah, that would be more abatable.

Q.   Okay.   I want to show you what's been marked as Government's 8.   I -- I'll represent to you that that's a picture taken after the grinder was used.

Do you see the -- the black marks still left?

A.   Yes.

Q.   Okay.   Does that look like mastic to you?

A.   I would call that stains.

Q.   From mastic?

A.   It -- it could be from mastic.   I don't know what it's

from.  It very well could be.

Q.    And I'm going to show you what's been marked as Government's Exhibit 9.  If I represent to you that's what it looked like when they started pouring gasoline on it, can you see where the gasoline stains are spreading over the mastic?

A.    Is that the -- the black material?

Q.    Yes.

A.    Okay.

Q.    Do you see how it's kind of clumps starting to clump up?

A.    Yes.

MR. JOSEPH:  Objection.  I think she's just telling the witness what to testify.  I can't tell what that picture is at all.

MS. MARTIN:  Your Honor, this is cross-examination.

THE COURT:  Well, just a moment.

He can say no if he doesn't agree.

MR. JOSEPH:  Okay.

THE COURT:  Overruled.

BY MS. MARTIN:

Q.    Can you see where it's clumping up in that picture?

A.    Well, I actually don't know whether it's clumping up or not.  I don't know what that is.  It could be just residual material.

Q.    That doesn't -- you just said it was clumping up until the objection, but now you think it's not --

A.    Yeah.   What I'm saying is I'm looking -- I -- I actually can't say if it's truly clumping or not.   I mean, it very well may be, you know what I mean.   I can't tell from the picture.

Q.    Okay.   And then I represent to you that's a picture after the gasoline has been moved.

Do you see quite a bit more stains than what -- the pictures you showed the court of the untreated space?

A.    Yeah, there's -- there's a lot more stains here than I saw before.

Q.    Okay.   And I want to also direct your attention again to this picture where you said it was abatable, abatable amount of asbestos and mastic -- of mastic.

Do you recall that?

A.    Repeat your question.

Q.    I want to direct your attention to this Government's -- excuse me, Defendant's Exhibit 64, you testified it was a abatable amount?

A.    Yes.

Q.    And do you see that there's still glue on the tile?

A.    Yes.

Q.    So the tile has popped up, the glue remains on it?

A.    Yes.   That's -- yes.

MR. JOSEPH:   I'm sorry, I didn't hear the question, Your Honor.   I can't hear so well from back here.

MS. MARTIN:   I said the tile is popped up and the

glue remains on it.

BY MS. MARTIN:

Q.    Correct?

A.    Yes.

MS. MARTIN:  May I have a moment, Your Honor?

THE COURT:  You may.

BY MS. MARTIN:

Q.    And does that photograph look like what you talked about in the untreated space as the most -- as the worst area you saw?

A.    Can you turn it the other way?

Q.    Sure.

A.    I think you have it upside down.

Oh, there it is.  Yes.  I think that -- I think that's the same picture.

Q.    Is it not the same picture?

A.    I think it's the same picture --

Q.    Okay.

A.    -- that -- that we took last night.

Q.    If not, is it very similar to the one you took last night?

A.    Yeah.  If not -- I think -- I think it's the same one.

Q.    Okay.  Does it look like -- you see like the outline of those tiles?

Can you see the outline of those tiles?

A.   Yes.

Q.   Doesn't it look like when the tile was popped up a lot more of the glue stayed on the tile, just based on those patterns?

A.   That I -- I don't know.  I'd have to see the top because I don't know how the mastic was applied.

Q.   Okay.  If it was applied like the other pictures you've seen, would you think most of the glue just stuck on the tile when it was popped up?

A.   Normally that does not occur from my experience.  It really depends on how they applied the material.

Q.   Well, let me go back to another one.

If the glue is applied like in that picture and it's popped up, and the result is that (indicating), is it likely most of the glue is in the tile?

A.   These are two different concentrations.  If you go back, these are totally two different representations of mastic that would be on a floor.

Q.   Okay.  But you would certainly agree that when these tiles are popped up, at least in the ones you inspected and what you've seen, mastic remain on the tile?

A.   Yes.

MS. MARTIN:   Okay.  Your Honor, may I approach the witness?

THE COURT:   You may.

BY MS. MARTIN:

Q.   Mr. Lange, I've handed you what's been marked as Government's Exhibit 5.  And you can see that that was issued by the United States Environmental Protection Agency?

A.   Yes.

Q.   Is that correct?

If you will turn with me to page 5 of 6 -- at the top of the page it says sample descriptions and analytical results, Califco LLC, Irving, Texas.  Is that correct?

A.   Yes.

Q.   And if you will look down on 55, and it says gray floor tile here.  Do you see that?

A.   No.

Q.   If you'll look -- on the far left there are numbers 6, 12, 17, 18, you get down to 55 --

A.   Oh, okay.  I see it now.

Q.   Okay.  And you'll see that the gray floor tile and there are thick spots of black mastic.  Do you see that?

A.   Yes.

Q.   So the EPA in its analysis measures that as one homogenous mixture; is that correct?

The mastic attached to the tile it's measured as one -- one asbestos-containing material?

A.   You mean it's uniformly thick across the tile?

Q.   This is an EPA analysis.  Do you -- do you see that?

A.   Yes.  It -- it -- it's somebody's -- right.  It's analyzed by somebody.  Right.

Okay.  But it doesn't say it's uniformly thick.  It says spots of black mastic, average of three analyses.

Q.   Right.  But it's treated as one -- the tile and the mastic attached to the tile are treated as one asbestos-containing material.  Correct?

A.   What I'm reading here, I think they're just looking at mastic, or maybe they're just looking at tile, but they mention mastic.  I -- I don't know.

Q.   Well, let's read it together.

A.   I would have to read it to see the chain of custody.

Q.   Gray floor tile, 2.51 millimeters thick, spots of black mastic, the average of three analyses is 2.3.  And you will see at the top that's percentage of asbestos.

A.   Right.

Q.   Do you see that?

A.   Yeah, I understand that.

Q.   So it's all measured together, the tile and the mastic.

Do you see that it's 2.3 percent?

A.   I don't know if it's all -- it was all put together, because this is just a description of what they had.

Q.   Okay.

A.   I -- I don't know if the analysis ground up all this and analyzed it.

Q.   Fair enough.

You did hear testimony that the gray tile did not contain asbestos.  Did you hear that earlier today in court?

A.   I believe so.

Q.   And this sample was analyzed to contain 2.3 percent of asbestos, correct?

Based on this, you didn't do it, but based on this report issued by the EPA it's 2.3 percent.

A.   I -- I don't know what they're measuring here.

Are they measuring the tile or are they measuring the mastic or are they measuring both?

Q.   That's my question.  If it's all in one spot they measured it together as one asbestos-containing material, correct?

A.   That's normally not how you report the analysis.  I -- I don't know that.

Q.   It's not how you would report it.

A.   That's not how labs normally report it.  They report for each -- each item.  This -- this would be a nonhomogeneous material.

Q.   But it comes according to the Environmental Protection Agency they have measured it as a homogenous mixture, correct?

A.   No, I don't -- I don't believe they actually did it that way.

Q.   Then the tile contains asbestos?

A.   I don't know what contains asbestos here.

Q.   Mr. Lange, you -- you talked about PEL and the workplace standards and -- and did you say those are health requirements?

A.   The PEL is -- is an exposure requirement to ensure that one does not have health problems.

Q.   So it's not a health requirement, it's more of an engineering requirement --

A.   It's both.

Q.   -- to keep it below a certain level?

A.   No.  It's both.

Q.   And OSHA measures the cancer risk at 3 in a thousand; is that correct?

A.   OSHA measures cancer three --

Q.   The risk of cancer for these standards at -- they measure the risk at 3 in one thousand?

A.   That I don't know.  I'd have to see that.

Q.   You -- you don't know if that's correct?

A.   I don't know what they have reported.  There's different reports from different -- OSHA has reported differently.  You would have to show me the study.

Q.   Okay.  Let's talk about one of the studies that you referred to.

A.   Okay.  Which one?

Q.   The quantification of fiber releases for various floor tile removals.

A.   Okay.  Hang on one second.

Q.   This was done by Crossman, Williams and Dodson.  Those are three of the --

A.   Do I have that study?

MS. MARTIN:  Did you retrieve it from him?

MR. GIBSON:  We didn't retrieve it from him, no. But there's an exhibit right there.

MS. MARTIN:  May I approach?

THE WITNESS:  I have the studies here.

If you will give me the -- what was -- what was the name of the author again?

MS. MARTIN:  May I approach?

THE COURT:  You may.

MS. MARTIN:  Well, I don't see it in theirs.  I apologize.

May I have a moment, Your Honor?

THE COURT:  You may.

BY MS. MARTIN:

Q.   Mr. Lange, in your study -- well, in this -- do you have before you the one authored by Mr. Paustenbach?

A.   Yes.

Q.   Could you tell me who funded that study?

A.   Who what?

Q.   Who funded that study?

A.   I don't know.  It was probably a private agency would be my guess, private organization.

     Does it say in there?

Q.   Well, when it says acknowledgements, looks like AmCam, Incorporated, is that likely --

A.   Yes.

Q.   -- the asbestos industry?

A.   I don't know who -- who AmCam is.  It says who originally manufactures these products, yes.

Q.   What about your studies, who fund those?

A.   I fund them myself.

Q.   You fund them yourself?

     How do you raise the money to fund them?

A.   As part of -- we're doing an -- an environmental abatement job that would be part of the cost they were taking as part of the job.

Q.   So you perform environmental abatement?

A.   Not anymore.  I have.

Q.   Okay.  So you're not doing these studies any longer?

A.   Not really.  I mean, if the opportunity comes up I'd probably do another study.

Q.   Okay.  How much are you being paid today?

A.   You mean per hour or per total?

Q.   Are you being paid by the hour or --

A.    I'm being paid by the hour?

Q.    What's your --

A.    250 -- $250 an hour.

Q.    Okay.  So what is your -- what is your total up to now?

A.    I honestly can't tell you because I'd have to total it up.  But I've worked probably 60, 70 hours I'm guessing.  I'm giving you ballpark guess.

Q.    Have you -- have you testified before?

A.    Yes.

Q.    Who do you typically testify for?

A.    I've testified for both plaintiffs and defendants.

Q.    And who -- what's the majority of it?

A.    I'm going to -- all I'm doing is guessing.  I'm going to say 60 percent for plaintiffs and 40 percent for defendants.  I'm -- I'm taking -- I'm just guessing.

Q.    Just guessing.

       You -- you talked about these studies where mastic didn't release the asbestos contained in it.  Is that correct?

A.    Yes.

Q.    I mean, but you weren't -- there wasn't a study -- you didn't do the abatement at Fazio's, did you?

A.    No.

Q.    No studies were done?

A.    Not that I know of.

Q.    No PEL limits were monitored?

A.     You're confusing -- you mean did they measure the PEL?

Q.     They didn't measure the PEL, so --

A.     Not that I know of.

Q.     Well, in order to do that would they have had to have done an containment?

A.     No.  I can measure the PEL in this room.

Q.     Is that typically how it's done in an asbestos abatement?

A.     No.  Well, actually they do.  You'll -- you'll do outside monitoring as well.

Q.     Well, you described an abatement earlier for the court and I think the first thing you said you did -- would do is contain it; is that correct?

A.     Yes.

Q.     And that's the type of environment that you have when you properly abate asbestos?

A.     Yes.  Normally --

Q.     Okay.

A.     -- normally you set up a containment.

Q.     And that's where you would take those measurements?

A.     Well, sometimes you take premeasurements, you will take samples before to see if there's anything in the air.  So there's a wide variety of things you would do, but traditionally you would put up your containment first.

Q.     And based on these studies you've talked about have any of the regulations changed?

Is there now a rule -- in Ohio has the EPA adopted a rule where there's no regulation of abatement of mastic-containing asbestos

A.   As I understand, if you're doing mastic it's non-notifiable and I would guess you don't have to put up containments.

Q.   In Texas do you know that to be the law?

A.   I don't know about Texas.

Q.   Well, you understand the defendant pled guilty for failure to notify, correct?

A.   That's what I'm told, but I don't --

Q.   And if I told you that in Texas the law says there's -- or there's no exclusion for mastic like Ohio --

A.   I mean, that I don't know.

Q.   How many states do you know of that have that exclusion?

A.   Right.  The only ones that I'm familiar with now is Ohio and Minnesota.

Q.   And you're an asbestos expert, so you kind of stay up on that?

A.   I only really stay up on the local area.  I don't monitor world -- I don't monitor worldwide.

Q.   But you came here to testify in Texas, so you didn't think it was necessary to stay up on the requirements in Texas?

A.   I didn't -- I didn't have enough time to do detailed

analysis of all that information.

MS. MARTIN:  Your Honor, may I have a moment?

THE COURT:  You may.

(Pause.)

BY MS. MARTIN:

Q.   Mr. Lange, I believe you said mastic was not soluble in water; is that correct?

A.   Mastic is not going to -- it's not going to mix with water.

Q.   What about gasoline?

A.   Yeah, it's -- it will mix in gasoline.

Q.   And you heard the fire chief testify that it created a thick slurry all over the floor?

A.   Yes.

Q.   Were the asbestos from the mastic go into that slurry it would be included in that slurry?

A.   Yes.

Q.   Okay.  And what happens when the gas evaporates?

A.   It will dry down and go -- it will probably go back similar to its original concentration.  It may even get a little smaller.

Q.   So asbestos is left behind.  The gas evaporates, the asbestos has been all mixed up with the slurry because it is soluble in gasoline and the asbestos is left behind?

A.   No.

Q.    Where did the asbestos go?

A.    The asbestos would remain with the mastic material, the asphaltic material.

Q.    And how is it that you know that?

A.    From my experience of doing this.  I mean --

Q.    You've -- well, let me stop you right there.

      You've created a slurry of mastic?

A.    Yes.  When you do chemical removal.  I've done that myself personally.

Q.    And -- and it looks like this, what was described?

A.    Looked like what?

Q.    What was described in this case.

A.    I'm not -- I'm not sure I saw.

      Can you show me pictures again of . . .?

Q.    I'm talking about the chief -- did you hear the testimony of the fire chief?

A.    Yes.

Q.    And you heard about the sludge and slurry that was all over the floor?

A.    Yes.

Q.    And that's what you've -- you've done a --

A.    Yes.

Q.    -- something on that scale?

A.    That's how you do chemical removal.  You put your chemical down, you get it get absorbed into the mastic, the

mastic comes up, it becomes a slurry, you use a scraper and you scrape it up.

Q.   And then that's, again, disturbing the material?

A.   You're disturbing it in its -- in a solvent state. There's nothing to be released.

MS. MARTIN:   Okay.  I'll pass the witness, Your Honor.

THE COURT:   Redirect?

REDIRECT EXAMINATION

BY MR. JOSEPH:

Q.   I'm not sure if this is clear enough for you to see.  I'm not going to take a chance.  I'm going to --

MR. JOSEPH:   May I approach, Your Honor?

THE COURT:   You may.

MR. JOSEPH:   This is Exhibit 43, Your Honor.

BY MR. JOSEPH:

Q.   Now, do you see on the --

MR. JOSEPH:   Because I've only got one copy I need to go back.

THE COURT:   You may.

BY MR. JOSEPH:

Q.   Do you see on the front -- at the front of this picture, down at the bottom of this picture, black marks on the ground?

A.   Yes.  It looks like the stains we saw last night.

Q.   And you actually put your fingers in the stains last

night.

A.    I couldn't put my fingers in them.  I -- I tried to see if there was anything there.

Q.    Right.  Could you feel anything?

A.    No.  It appeared to be relatively level with the concrete.

Q.    So it looked the same as these (indicating)?

A.    In the small areas I looked at, yes.

Q.    I mean, the area where it was not --

A.    Abated.

Q.    -- abated.

A.    Yes.

Q.    Well, actually that's not the right word.
      Not treated.

A.    Not treated, yes.

            MR. JOSEPH:  That's all, Your Honor.

            MS. MARTIN:  No more questions, Your Honor.

            THE COURT:  All right.  You may step down.

            THE WITNESS:  Thank you.

            MR. JOSEPH:  Yes.  Yeah, Your Honor.

            MR. GIBSON:  Your Honor, I think we are through as far as witnesses related to objections to the presentence report and the other material that we're going to develop. We still have allocution witnesses and one community service witness that we're going to ask for.  But for purposes of this

portion, the way the court has structured it, we have no other witnesses at this time.

MS. MARTIN:  Your Honor, at this time I would like to tender to the court Exhibits 5, 6, 7, 8, and 9.

6 is the CV or the resume for Dr. Weis, which has been previously provided to the defense.

THE COURT:  Any objection to these exhibits?

MR. JOSEPH:  I'm not -- can I just see what they are?

No objection, Your Honor.

THE COURT:  Government's Exhibits 5 through 9, inclusive, are admitted.

MS. MARTIN:  May I approach, Your Honor?

THE COURT:  You may.

I believe the next step would be to consider any argument to be presented regarding the initial motion for continuance.

Do the defendants wish to be heard further on that motion?

MR. GIBSON:  Thank you, Your Honor.

Could we talk just briefly?

THE COURT:  You may.

(Pause.)

MR. GIBSON:  Your Honor, may I approach?

THE COURT:  You may.

MR. GIBSON:  And we did this morning, of course, ask

the court to consider a motion for continuance in light of the information material that's been developed now that the government -- the court has heard all of the evidence from both sides on the issues of the objections to the presentence report and other material, really it's been a mini-trial. I think the court can appreciate the reason and necessity for why we raised the issue of what Dr. Lange discovered last night and what his testimony would be, and so we would ask the court and reurge the court to give us a continuance of -- of some period of time in order to do a more thorough or detailed examination and development of a report for the court to consider on whether or not -- for the court to consider and then ask an opportunity -- and also opportunity for the defendant, Mr. Shokrian, his family, and lawyers, to evaluate what we've now heard and developed, again, that we just learned about last night.

And I know it's been a -- a -- a long hearing, but I believe that the evidence raises a lot of questions about this prosecution of the case and the stat -- position it's in, so we would reurge our request that the court grant us a continuance, allow us to evaluate, do additional work, and poten -- potentially present material to the court by way of motion.

THE COURT: All right. Thank you, Mr. Gibson.

I'm going to deny the motion for continuance.

The court has before it the factual resume that was filed in this case -- or in the case of Mr. Shokrian, I'll use that as an example, on April 12, 2013, in which there are admissions of the presence of materials containing asbestos. Those admissions are contained in several places in the factual resume.

Additionally, based on the evidence presented today, there is direct and circumstantial evidence of the presence of friable asbestos in the tile and mastic at the Fazio's premises.

Against that is the testimony of Mr. Lange, but that is based upon an examination of a remnant of the abatement activity that was conducted there and his examination was conducted in February of 2014, approximately five years after the work was completed.  Additionally, that was done one day before the sentencing hearing, and I decline to continue the sentencing hearing.

I believe the best course now would be to take a short break, and we'll be breaking in a moment until 3:00 o'clock, and then at that time I'm going to first ask the government to present its allocution and then if there are any other victim witnesses who wish to be heard.

And then after I've heard from the government I'll begin with the defendant.  And the -- each defendant.  And then will hear from the -- the character witnesses you've indicated, as

well as from counsel.

So at this time we'll stand in recess until 3:00.

THE SECURITY OFFICER:  All rise.

(Recess taken at 2:45.)

(Proceedings resumed at 3:00.)

THE SECURITY OFFICER:  All rise.

THE COURT:  Before turning to the government's allocution I think it would be preferable, although I didn't mention it before the break, to go ahead and hear argument on the objections to the advisory guideline range and make rulings on those and then the court can proceed from there.

Arguments in support of a variance can be made as part of the allocution of counsel.

MR. GIBSON:  Yes, Your Honor.

THE COURT:  Let me start with the defendant.

Who wishes to be heard on the objections?

MR. GIBSON:  Mr. Joseph will.

MR. JOSEPH:  Thank you, Your Honor.

There are four points I'm going to address, which is the repetitive discharge issue, the substantial likelihood of death or serious bodily injury issue, the evacuation issue and the obstruction issue.  Those are the sum of the four enhancement areas.

On repetitive discharge, the Clean Air Act is undoubtedly about fibers when it comes to asbestos.  It's not about dust.

It's not about mastic.  It's not about tiles.  It's not about concrete.  It's not about gasoline.  It's about fibers.

And we have established not just by Mr. Lange's testimony but the EPA Research Center study that the fibers cannot get out of the mastic.

Remember, they did everything under the sun to try to do it, sanding and grinding and sweeping, in both of those studies, and they couldn't get the fibers out and they couldn't get the -- the -- the levels of fibers above background.  And the figures they came in -- came in with were minute fractions of the permissible exposure level.

Now, this test of permissible exposure level is the test that the government has been applying in this case from the get-go.  It was in the presentence report and it's in the addendum.  They have said this is the test.  And we agree this is the test.  And if you do not exceed the permissible exposure levels, that's that.

Now, we've had this very fine gentleman come from Washington, Dr. Weis, who unfortunately had nothing in his background about mastics or floor tiles.  He didn't say he had any experience with them.  He didn't say he did any measurements with them.  He didn't know anything about them. He has a general idea of what happens with asbestos, but he has no specific knowledge in this area, he had never taken measurements, he didn't refer to any articles.  He didn't

address the Environmental Protection Agency Research Center article and he didn't address the other one.

But Mr. Lange did address all of those things and has done personal measurements and has published numerous times. And we have his publications. Two of his publications are already exhibits here. And those publications were written long before this case. They weren't written for this case. That's -- THAT'S his general view. And if the fibers are not getting out and increasing the permissible exposure levels above the 0.15 fibers per cubic centimeter then this is a court of law and that is what applies. There is no proof, there is no evidence, not a shred of evidence that the levels go above 0.1.

In fact, Dr. Weis never said they did. He said, oh, well, the -- the permissible exposure level is not that important. They were the ones that put the permissible exposure level test into this case. It's in the presentence report. It's in the addendum. We didn't do that. We're simply agreeing this is the right test.

But if he's saying it doesn't matter, well, then where do you begin to measure health effects? One fiber?

We know one fiber is not going to do anything because this courtroom is full of fibers. So we have to go with permiss -- permissible exposure level. We have three negative exposure assessments by an expert who says that this can --

this operation could not possibly, could not possibly, get to the level of the permissible exposure level.

But just in case there's any doubt, we have the grinding machine with the industrial strength vacuum dust collector with the HEPA filter designed to collect asbestos, which is the machine the professionals use, just to increase the level of protection, and an OSHA certified respirator for the operator and, of course, the mastic was so thin it was really just stains.

As we saw in that final exhibit, the photograph, where they were grinding, that was the area where he was doing the grinding, the stains were just the same in that area as they were in the area we saw last night.

So there may be areas -- you know, it's interesting. I -- I saw the photographs that Ms. Martin put in. I made the same mistake. When I put in a photograph as an exhibit to the objections what I did is -- it's funny, it's a natural thing. When you don't see asbestos you actually take a picture of where you do see asbestos. It's what I did. It was my mistake. I felt like a fool last night, because I realized I had actually taken a picture of the worst area, because you do that. You don't take a picture of nothing. You take a picture of something.

So the worst spotting areas we actually had in that area, one area. Obviously this is an area that had not been touched

because you saw that area with the squares where you could see all the squares and everything.  That area hadn't been touched, no gasoline, no grinding.  That area was the area in that lower left quadrant on the chart.

So you -- you can't really escape Dr. Lange's -- I'm sorry, Mr. Lange's testimony, because he's done permissible exposure level assessment.  And he's qualified to do it.  He's done a thousand measurements.  He knows the measurements.  We haven't heard that Dr. Weis has ever done a single measurement in his life.

As for the dumpsters, whatever entered into the dumpsters was a tiny amount of mastic on the back of floor tiles and a tiny amount of mastic from the floor.  It's hard to say what the volume of it was, but actually doesn't matter because the volume of the mastic is not significant because mastic itself not a controlled substance.  It's not a hazardous substance.  It's the fibers from the mastic that matter.  And If they can't get out, they can't get out.  No matter if you sand them and grind them and pound them, whatever you do, the EPA couldn't get the fibers out.  So they're not going to come out.  There's no evidence they will come out.

Anyway we're talking about such a tiny amount.  It's de minimis.  I mean, nobody is going to be hurt from any of this. It's just too small.  There's just nothing there.

And I think we cannot run away from the science.  I mean

those measurement instruments he has, if they're useless then -- the whole law about permissible exposure levels is useless. It has to mean something. These guys are operating within a regulated environment.

Regarding a substantial likelihood of death or serious bodily harm, let's just talk about the asbestos first. I think I really addressed that. If there's no fibers escaping into their lungs then there's no harm. It's just as simple as that.

Where is it going to come from?

Mastic itself isn't harmful. Floor tiles are not harmful. And this is supposed to be about asbestos. Again, the EPA Research Center published a study, six or -- I'm sorry, seven cells at Fort Sill where they set up controlled tests and couldn't get the mastic to produce asbestos fibers. Couldn't do it. So there's no substantial likelihood of death or serious bodily harm from asbestos.

As for the gasoline, well, pretty bad incident. Those guys -- Jonathan was in New York, but whatever those guys did is -- is so dumb. I mean, it's -- I -- I can't conceive of how dumb it was. I don't think they were there doing this on purpose and thinking we're going to blow the place up.

Anybody in his right mind would think, you know, this -- this is gasoline, this is something you ought to be careful about. They obviously didn't realize it would blow up. Those

guys wouldn't have done it if they thought it was going to blow up.  Jonathan didn't know it was happening.

But they surely really wouldn't have done it if they could foreseen it.  We have to take them as they are.  I mean, maybe they had a low education level.  I don't know -- I don't know what they were thinking.  I wasn't there.  It seems like a dumb action more than anything else.  Not something that Jonathan personally can be responsible for.  It has nothing to do with his state of mind, because he wasn't there.  It's not fair to him.

When we're on a plane we all have our cell phones off.  We don't know what's going on.  All kinds of things could be happening on the ground.  Are we ever responsible for what goes on, on the ground, when we're on a plane?

He was on American Airlines 2467 flying from D/FW to La Guardia.  What could he be responsible up in the air?  It's impossible.  And it still comes back to state of mind.

As for the evacuation, now, was that foreseeable by the people who put the gasoline down?

No.  They wouldn't have done it.  It's obvious they wouldn't have done it.  They didn't foresee it.

Was it foreseeable for someone who was a fire chief?

Oh, Yes.  But we don't have fire chiefs doing this kind of work; we have people who don't have the education about flammable liquids and it's very unfortunate.  They really --

they really messed up.

And -- and as we know Jonathan wasn't involved in the buying of the gasoline.  I mean, he just -- he just was somewhere else.

And, in fact, Ruiz, as we've said - he's one of the -- one of the day laborers, he said in his testimony that Jonathan was too busy to focus on the project.  He was somewhere else.  He said he was too busy to focus on the project.  That's in the -- well, that's the quote of it.  The world's too busy.  He said he was busy.  He was in school.  He was actually a full-time student at SMU studying religion and philosophy, trying to do this at the same time.  I don't think my son could do this at the same time as they seem to be doing exams nonstop.  This is what they do in college now.  They do exams nonstop.  I don't know how you do college and do something like this at the same time.  It seems multitasking which is at an unusual level, but anyway Jonathan was under pressure and he was doing it.

As for the obstruction of justice I think, Your Honor, that that evidence -- well, there was no evidence.  That assertion has disappeared.  Even Mr. Townsend conceded that opening up the file cabinets of someone and letting them look inside is the definition of cooperation.  And he -- Albino had given the phone numbers -- Albino Villanueva, the maintenance supervisor, had given the phone numbers for the day laborers

to Mr. Townsend.  Mr. Townsend's complaint was that one of the numbers was wrong.

I said to him, Did you tell Jonathan?

And He said, no.

How is Jonathan not cooperating?

The man is opening up the file cabinets.  I mean, that is the ultimate in cooperation.  They even gave the -- the study -- the SWG study, the asbestos study to the government to use, to use our survey, use the whole thing.  All of this is paid for and provided by the company.  They didn't have to do that.  They could have said go and do your own study.  The opposite, this is about as much cooperation as you can have.  Open drawer it's called -- open file cabinet.  I mean, it's -- it's absolutely marvelous.

In terms of intent, because I think intent plays into all of these -- and I'll wrap it up with this, Your Honor.  But I think this is the key.  We all know the reason you punish someone is because of their state of mind.  There's nothing else to it.  You punish because of state of mind.

Jonathan's -- Jonathan's state of mind as Mr. Townsend absolutely conceded was that this is nonfriable asbestos and it's not regulated.  That is exactly what the EPA web site says.  How unreasonable could it be?

If you lock up Jonathan you have to lock up the EPA for making exactly the same statement.  It is a very reasonable

thing.

Now, Mr. Townsend said he got that from McGinley.  He said, yes, McGinley told him that.  And that's -- McGinley didn't tell him about the permits and the -- the legal requirements, even though McGinley was hired for that purpose, because Jonathan didn't know what friable meant.

How much more evidence could we have about Jonathan's state of mind?  There seems to be no denying it.  We can't deny Jonathan knew about asbestos.  I don't understand why the government has took such pains to show that he did know there was asbestos in the building.  It's never been denied.  So I don't know why -- we're not trying to disprove that.

The issue is only did he know what -- that -- did he know that friable asbestos if you removed it wrongly could become nonfriable.  There's no evidence, any evidence in this case, in any of the witness statements, that he did.  Nothing.  Not one iota of evidence.  There has to be something.  But there's nothing.

So that's what I would say on the subject, Your Honor.

THE COURT:  Thank you, counsel.

Ms. Martin.

MS. MARTIN:  Sure.

Would you like me to respond to objections and go ahead and allocute or wait until you've ruled on the objections?

THE COURT:  Why don't you respond to the objections

first.

MS. MARTIN:  Okay.  Your Honor, with respect to objection number 1, whether or not there was an ongoing or continuous and repetitive release of hazardous or toxic substance in the -- into the environment, the government's response to this objection sets out the governing case law.

We believe that testimony of Special Agent Townsend with respect to witness -- witnesses who saw the dumpsters full of -- of tile and material that was being removed, as well as the invoice that was an exhibit that showed that it was hauled off four times to a nonapproved landfill for asbestos containing materials, fits the definition, the legal definition, as well as fits under the case law for the repetitive discharge, and so we believe that objection should be overruled.

With respect to whether the offense resulted in a substantial likelihood of death or serious bodily injury, first, with respect to whether asbestos could cause -- there's a substantial likelihood that it could cause health problems to the individuals who abated it, I would proffer to the court that Dr. Weis has actually designed and overseen over 10,000 asbestos collection samples and was qualified to testify about asbestos-containing material and the hazards of it and the dangers, especially in this case where no protective equipment was used, they weren't fit-tested for the mask, and that mask

that did have cartridges wasn't used for the entire time. They started abatement in November and used paper masks when they're popping up the floor tiles and disturbing both mastic and the floor tiles.  They only changed to the cartridge masks when they start using a floor grinder.  And one day they didn't have it.  The second day one of them had it.  And it was another week before there were two masks.  They wore their clothes home and exposed other people to the asbestos fibers.

But beyond that, Your Honor, you heard testimony from the fire chief about -- and I don't think there's a dispute, this was certainly hazardous and there was a substantial likelihood of death or serious bodily injury from the gasoline fumes that were collecting inside Fazio's, and it was essentially a bomb which would have leveled three city blocks causing death and serious bodily injury to anyone in the vicinity, including workers that were working in neighboring businesses, including the first responders, and potentially even the people that lived in the neighborhood.

I believe the defense is trying to argue that this is an -- an asbestos abatement case so gasoline has nothing to do with it.  But even their own expert said that -- when I questioned him about whether or not he had done a test like this using gasoline he said, of course, that's chemical abatement.  That chemical abatement is part and parcel to the violation here, which is failure to notify of asbestos removal

or abatement.  The method that they used to remove it was gas -- was first grinding but then gasoline.  The effects of that were directly related to the offense that this defendant pled guilty and signed a factual resume admitting his conduct.

I don't think it's actually good for him to say he was in New York at the time, how could he have known.  He knew they were using gasoline.  He approved it, told them to continue to use it.

I think it's unfortunate that the person overseeing the program of gas -- pouring gasoline onto the ground in an enclosed space just goes ahead and gets out of town.  I don't think that's a good thing or a mitigating factor.  I think actually it's -- speaks to his level of responsibility for this illegal abatement and how much he actually just didn't care.

With respect to -- and even if the court doesn't believe it is directly related to the conduct, it's certainly relevant conduct.  It's reasonably foreseeable that when you pour gasoline in an enclosed space the fumes are going to build up and be hazardous to the individuals using the gasoline and to other individuals around.

With respect to objection number 3, evacuation of the community, again, their expert said that's chemical abatement. The gasoline is used, because of the use of the gasoline they had to -- the fire chief says he doesn't do that lightly but

he felt for the safety of that community it had to be evacuated. I believe that objection should be overruled.

With respect to the obstruction of justice, Your Honor, agents went to Jonathan Shokrian multiple times. He had multiple opportunities to turn over the names of the two most relevant witnesses. And those are the names and contact information he continued to exclude. They had to spend two weeks looking for the individuals involved in removing the floor tile and the mastic.

And then, in addition to that, opening a file cabinet doesn't suggest that he's still not hiding information. And the agents didn't go through the file cabinet, although it was represented in not only their -- I guess it was the factual representation document that they submitted to the court, but in the attached declaration signed by Jonathan Shokrian under penalty of perjury and submitted before this court, contained a lie. Those agents did not go through that filing cabinet.

With respect to objections 5 and 6, the government believes that the defendant is wrong but doesn't believe it affects the guideline calculation at all with respect to the crime there and whether Mr. Sellers was a manager.

With respect to objection 7, there was testimony from Special Agent Townsend that there was large amounts of dust inside the building and he based that on interviews of Mr. Ruiz who was there day in and day out, and neighbors who

walked over and looked in the building while the operation was going on.

With respect to objection number 8, the characterization of the equipment, you -- I believe you heard from Agent Townsend the progression of the masks used and you heard from Dr. Weis that for those to be properly useful they had to be fit-tested and it's not one size fits all and the individuals using them needs to be trained on it, so the government believes that is incorrect and should be overruled.

With respect to objections 9 and 10, Agent Townsend said on the stand -- there -- there was differing testimony on whether the doors were open, whether they were closed.  When the fire department got there they were closed, but Mr. Albino said in his grand jury testimony that sometimes they were open.  To the extent that they were open that goes to continuous and repetitive discharge.  The doors are wide open and asbestos is being abated, it can leave the building and get into the environment.

With respect to objection 11, the allegation that Mr. Shokrian approved the use of large amounts of gasoline, again, that was in the factual resume, and their -- Mr. Shokrian's approval of the use of gasoline doesn't need to be approval of a certain amount.  He was approving the use of gasoline to -- to abate the asbestos-containing mastic.

With respect to objection number 12, I believe the

testimony shows that there were four dumpsters full that were -- that were dumped in this case, but still doesn't affect the guideline enhancement for continuous, repetitive discharge.

And, again, objection number 13, the government believes it has provided adequate evidence to establish by a preponderance of the evidence that the floor tile that was removed and gone by the time this was discovered did in fact contain asbestos.  And even if it didn't, the mastic used to adhere the tile onto the ground did contain asbestos, and that's not in dispute.  And for those reasons the government believes objection number 13 should be overruled.

Thank you, Your Honor.

THE COURT:  Mr. Joseph, do you wish to reply to any of the argument?

MR. JOSEPH:  Yes, sir.

It's funny that the Assistant U.S. Attorney says that we're to be blamed now because the windows were open.  It started out we were to be blamed because they windows were allegedly shut and therefore they couldn't get ventilation, but now we're to be blamed because they were open and all of this terrible contamination got outside.  I'm not quite sure how you even respond to that except it's just ironic.

Your Honor, the only evidence about the floor tile -- and I recognize what's in the factual resume, and it should never

have been signed.  And I understand it's an admission and more.  I understand about that.  Nevertheless, we're here at a sentencing and I think we need to really -- really in a sense override that and look at really what was happening.

We have the scientific evidence in the form of the SWG report that the floor tiles that were found on the retail floor space in two locations contain no asbestos.  There is not one shred of scientific evidence to the contrary, no study, no -- no -- no scientific testing of any kind.  The EPA analysis did not test any floor tiles from the retail floor space.

It is impossible as a matter of law, impossible to conclude that there is any evidence that would defeat the evidence in the SWG report that the floor tile on the sales floor contained no asbestos.  It's impossible to defeat it. There's no scientific evidence in response.

We've heard someone say, oh, the floor tiles were white. There were all kinds of floor tiles, beige, tan, white, brown in that building.  Everywhere you look in that building it's a different kind of floor tile.  What does it mean that floor tiles are white or were they beige or were they tan? What's -- what's white?

So you -- you can't -- you can't say, oh, they're white, they contain asbestos, when you have a scientific analysis that says, well, we did this, whatever it was for us, I don't

know what kind of scientific test it was, I can't remember, it's EPA approved, they tested and they found no asbestos. How does anything defeat that?

There's nothing.  Mr. Townsend was busy testing the whole building, everywhere but the right place.  I -- I don't understand why the government never asked the obvious question when they did this investigation, what is this case about, is this an abatement of a whole building.  There was never an abatement of a whole building.

This final word.  I -- I didn't hear very much from -- I didn't hear anything really from the government about Jonathan's state of mind.  Nothing.  They can't really deny it.  I mean, I -- I think they accept it.  It's in the factual resume that Jonathan consulted with Blaise McGinley who told him that the floor tiles were nonfriable.  It's written there. The government accepted that.  Nobody denies that. Mr. Townsend said it was true.

Who is responsible in this organization for the legalities, for the filings?

McGinley.

It's a shame that he wasn't prosecuted.  I know the reason he wasn't prosecuted.  I can tell Your Honor the reason he wasn't prosecuted if Your Honor is interested.  The reason is that Jonathan would not testify against a friend.  That's the nature of the man.  We've seen his charitable work, how he

goes out and protects people all the time.  He would not testify against a friend.

He helped put McGinley's love life back together again.  That's the kind of guy he is.  He's the softest, nicest guy in the world.  He wouldn't testify against a friend even though he knew what it was going to cost him.  It's not fair.  It's not fair that he rides free and Jonathan sits here today facing the music.  It's not fair.

THE COURT:  All right.  Thank you, counsel.

The court in making its factual findings is basing the findings upon a preponderance of the evidence that has a sufficient indicia of reliability to support its probable accuracy.  The court's legal conclusions are based upon its legal interpretation of the guidelines and the application notes.

The presentence report and the addendum to the presentence report are considered to be adequate factual bases on which to make factual findings absent some basis, including evidence to conclude that they are not reliable.

The court is basing its factual findings on the presentence report, the addendum to the presentence report, and the evidence that has been presented during today's hearing.

The defendants in -- in the case of Mr. Shokrian made 13 objections and to the extent that these apply to the other

defendant Califco then they apply as well to it.

The first objection is to paragraph 34, which is a six-level increase based upon 2Q1.2(b)(1)(A).  The court overrules the objection.  It finds that the offense resulted in at least a repetitive discharge, release or emission of a hazardous substance, asbestos.  This occurred both within the confines of the Fazio's presence as well as later when the asbestos material was hauled off to the landfill.

The second objection is to paragraph 35, which is a nine level increase under 2Q1.2(b)(2).  The court finds that the offense resulted in a substantial likelihood of serious bodily injury in two respects.

First, the offense, the relevant conduct that is considered chargeable to the defendant under guideline 1B1.3 involved the release, discharge, and emission of asbestos. The evidence in the record supports the finding that asbestos leads to the substantial likelihood of serious bodily injury and that's why it is so extensively regulated in the United States.

Alternatively, the relevant conduct that is chargeable to the defendant, Mr. Shokrian, concerning the use of the gasoline as a -- as an agent for removal of the tiles also resulted in a substantial likelihood of serious bodily injury.

The factual resume itself provides that during the time period February 13 through on or about February 27, 2009,

under the supervision of Mr. Shokrian the day laborers began using large amounts of gasoline to removing the remaining asbestos-containing floor tile mastic in the Fazio's building. This portion of the factual resume, together with the other evidence presented to the court, supports the finding that this conduct is chargeable to the defendant under guideline 1B1.3.

The third objection is to paragraph 36, which is under 2Q1.2(b)(3), whether the offense resulted in evacuation of a community. The court finds that it did. Although, in the alternative, because of the statutory cap, the court's finding on this would not affect sentencing because of the limit of the guideline range due to the statutory cap on the penalty that Mr. Shokrian faces.

The next objection, number 4, is to paragraphs 25 and 39. The court overrules the objection and finds from a preponderance of the evidence that has a sufficient indicia of reliability that Mr. Shokrian in not providing the names and stating that he did not know the names of the day laborers obstructed justice. The court does not find persuasive the argument that he offered to make the file available to the agents when the court considers all of the other evidence in support of this enhancement.

The fifth objection is to paragraph 14. This is to the binder portion. This will not affect sentencing.

The sixth objection is to paragraph 15, regarding the evidence regarding Mr. Sellers.  This will not affect sentencing.

Additionally, the court notes that this objection was accepted in the addendum, at least in part, with an alternative finding by the probation officer.

The seventh objection is to paragraphs 19 and 20.

The court applies its prior rulings in overruling these objections.

The eighth objection is to paragraph 20.  The court overrules this objection finding that the presentence report and the evidence supports the nature of the equipment provided to the day laborers.

The court also notes that it is actually agreed in the factual resume that the masks and respirators that were provided to the day laborers were not adequate to protect them from asbestos fiber, which is a pertinent admission for purposes of this ruling.

The ninth objection is to paragraph 19.  The court will not take that into account in -- in determining the sentence, whether the windows were covered for a particular reason.  And alternatively, the court accepts the defendant's explanation that this was standard procedure because of a concern about theft of property.

The tenth objection is to paragraph 20.  The court will

not take that into account in passing sentence regarding the opening or closing of the doors as -- as set forth in that paragraph.

The 11th objection is to paragraph 20.  The court will overrule the objection to the extent that it is inconsistent with the factual resume; otherwise, it does not affect sentencing.

The 12th objection is also to paragraph 20.  The court sustains the objection regarding the five and instead accepts that there were four dumpster disposals.

The 13th objection is to paragraphs 14 and 24.  The court overrules the objections to the extent that they are consistent with prior objections that the court has overruled; otherwise, they will not affect sentencing.

Mr. Joseph or Mr. Gibson, have I now made rulings on all of the matters that require rulings and the advisory guideline range?

MR. GIBSON:  Yes, Your Honor.

THE COURT:  All right.  Ms. Martin, you may proceed.

MS. MARTIN:  Thank you, Your Honor.

Pardon me.

Your Honor, in this case the defendant pled guilty and signed a factual resume and swore that that factual resume was true and correct before this court.  I think it's unfortunate that at this juncture he's trying to back off of those

statements.

The defense has spent a lot of time talking about how he's really not to blame and he really didn't do anything wrong, but that's inconsistent with his plea of guilty. I think that's an unfortunate position to take. And I understand that in many respects that's a failure to accept responsibility for his actions.

But with respect to Mr. Shokrian I am sure he is a great son, a great brother, and his family and friends love him and he's wonderful with them. And I -- the government doesn't dispute that he had a father that was hard on him and required a lot of him.

But what this case boils down to is what so many cases boil down to that this court has seen way more than I have, and that's greed. The motivation here was to save money and not spend the money to do a proper asbestos abatement. Instead, if it were up to him he would just hire a couple of day laborers to do it, pay them a minimum wage and then not really have to worry about them reporting what happened. For one thing, they didn't even know they were removing asbestos-containing material. And the motivation was to save money. And that makes him the same as so many other defendants, and doesn't mean that he should be -- that is a situation where he should be treated more lenient because he did have -- does have a great family and great friends and has

done charitable work, like hand out water on 183. When it came down to his money, that character and attitude weren't reflected in his actions at all. In fact, it was a callous, cutthroat business type decision that was made here, and it was made in violation of the law.

In this case the guideline range would be way higher if he weren't statutorily capped at 24 months, and so the government argues that the appropriate sentence in this case is a guideline sentence of 24 months.

And also with respect to restitution to the victims, the government would request, based on the testimony here today and the fact that the latency of disease, I mean of the symptoms of diseases or discovery of diseases related to asbestos, would request that the court order medical monitoring of these victims at the expense of the defendants, Califco and Mr. Shokrian.

In this case the defendants have also moved for a downward variance. In looking at the 3553(a) factors the government does not believe it is appropriate in this case.

The nature and circumstance of the offense, as I've said, the motivation was greed, and it resulted in serious risk to someone's health, to at least two to three individuals health but we may not know for ten years, and a risk to a community and a risk to first responders, and based on the hope that Jonathan Shokrian could save some money.

With respect to the need for the sentence imposed to reflect the seriousness of the offense and just punishment, a guideline sentence is appropriate and a variance is not warranted.  Because this is a serious offense I think that people cap -- will believe the government's a little overbearing on asbestos, but it's serious and it's regulated and those regulations need to be adhered to.

Also for adequate deterrence to criminal conduct, because of the high cost of asbestos many people are probably tempted to just hire day laborers or try to get away without doing proper asbestos abatement, and a sentence in the guideline range is necessary to deter further criminal conduct.

I don't necessarily think that there's a risk of this defendant committing further crimes.  I certainly hope not.  I'm a little concerned with his -- with his refusal at this point to accept responsibility for his actions, but I think he's -- I certainly hope he's learned his lesson.

And I think the defendant has had an education and probably won't necessarily benefit from vocational training while incarcerated.

Considering the kinds of sentences available and the sentencing range, I believe this is a zone where a sentence of imprisonment is appropriate and called for.

Any policy statements, I don't believe any of those apply that would warrant a downward variance.

And I think the need to avoid unwarranted sentencing disparity is not at issue. I know in the sentencing memorandum a lot of cases were cited to saying it really wasn't fair how the defendant was treated here. The government would offer to the court that in -- in 2006, while Mr. Roper was the U.S. Attorney, a defendant was sentenced to 15 months for a similar asbestos abatement case, and in that case there was no risk of a building exploding based on the use of the removal.

And finally the need to provide restitution. I think in this case payment of medical monitoring of these victims is necessary, so the court -- the government would request the court not to grant a downward variance in this case.

Thank you.

THE COURT: You may proceed, Mr. Gibson.

MR. GIBSON: Yes, sir.

Your Honor, we have some family members that want to speak, three or four, but I would like to call a witness.

We have presented to the court this morning and given copies to the government of a proposed community service program that we are going to ask to be part of any sentencing for Jonathan, especially in light of our request that we get a variance from the guideline sentence -- or under a guideline sentence.

So I would like to briefly ask Mr. Eugene Tseng to step

forward and -- and explain in a -- a little more clearer language what this program is, if Your Honor would permit.

THE COURT:  All right.  Thank you.

It's spelled T-s-e --

MR. GIBSON:  T-s-e-n-g --

THE COURT:  -- n-g-s.  Yes.

MR. GIBSON:  I'm sorry.  My apologies.

THE COURT:  Good afternoon, sir.

THE WITNESS:  Good afternoon, Your Honor.

My name is Eugene T-s-e-n-g.  I am an environmental law professor and also an environmental engineering professor.  I teach at UCLA, California State University at North Ridge, and also at the University of West Los Angeles School of Law, where I am also the founder of the Environ -- Center for Environmental Justice, which goes into effect the fall semester.

I have known Jonathan for about seven months.  He's been a student in my UCLA engineering class.  And -- and this program is actually initiated by the EPA when I was at the -- a member at the National Advisory Council for Environmental Policy and Technology.  And over the last 30 years I've had over 6,000 enrollments through the UCLA environmental programs, and Jonathan is at the top 5 percent of the students that I have had.

He is passionate about this field.  As you can tell, he

is -- he's very remorseful.  And he has done things way beyond what is required in the class.  He's actually volunteered to set up field trips to areas that we have not been able to get to.  He also volunteered to develop the web site for a -- a nonprofit that another one of the professors actually manages, a nonprofit that was put together by the EPA also.

I have drafted a community service plan for your consideration, which involves multiple universities, the city of Oxnard in southern California, and also the City Corp., which is an at-risk youth program, where we will be doing the risk characterization and also the -- the planning for the management of solid waste for the city for the next 20 years.  I respectfully ask that you please consider this alternative to incarceration and please allow Jonathan to provide -- to contribute positively and constructively.  And I think this is appropriate for the -- and fitting to the circumstances.

Jonathan's community service in this program would be especially beneficial to the universities and to the at-risk youth program.  We are sorely lacking of resources and he has very, very specific skills that I have not seen in very many other students.  He is an absolute whiz at -- at networking and community organizing and also in computer web page building.  So this is something I really, really sorely need through the university.  Our program is designated to go to 60 countries internationally by the end of the year and I'm

sorely behind because we do not have the help that he could provide.

I would be happy to answer any questions that you may have on the community service program which I have put together with multiple schools and a nonprofit and with the city of Oxnard, and to put together any monitoring or oversight requirements that you may have.

And in closing, I would like to mention that in my 22 years working with the -- the environmental enforcement agency for the City of Los Angeles I have -- I have -- I have always sat on the other side.

This is the only time in my 40 years professional environmental career that I have been compelled by my conscience to speak on behalf of the defendant.

Thank you.

THE COURT:  Thank you, sir.

MR. GIBSON:  Judge, may I ask him one question?

THE COURT:  You certainly may?

BY MR. GIBSON:

Q.   The program that you have outlined for Jonathan for him to participate in --

A.   Yes.

Q.   -- it appears from reading it, and the judge has the complete explanation, that it would cover and entail a large number of hours over a large number of years --

A.   Yes.

Q.   -- as far as the commitment.  Is that my -- is that a correct understanding of --

A.   Yeah. It's about a three-year program, what you see before you.

Q.   And that would be the entire program that we would ask the court to consider to impose as a requirement of Jonathan --

A.   Yes.

Q.   -- for a period of -- that period of time and for that commitment of work?

A.   Um-hum.

Q.   And your group and your organization would be responsible for reporting to the probation departments, you would know how to do that, and Jonathan has agreed to pay his cost and expenses for that supervision and management; is that correct?

A.   I'm not asking for any cost for myself.  I am volunteering this on behalf of the school.  But he will have to pay the -- the other monitors who I have asked to oversee his -- his work and do the monthly reporting, if that's what the court requires.

I am -- I do a lot of international work and I represent the federal government, so I am on international travel to about six countries in the next four months.

MR. GIBSON:  That's all I have, Your Honor.

THE COURT:  All right.  Thank you very much.

THE WITNESS:  Thank you.

MR. GIBSON:  Thank you very much.

Your Honor, I don't know if the court noticed this morning, but -- I am compelled to mention it, there was a -- a fine gentleman here this morning who had to leave because of the time, it was Rabbi Sholom Lipskar from Florida and New York City.  He operate -- he operates an institute and a rehabilitation and community service organization nationwide. It is called the Aleph Institute.  And he was here to speak similarly, although in a more normal type of community service I think the court and we would be appreciative of, but they have a -- a location in Los Angeles.  And if the court didn't see fit to require him -- if -- if the court imposes community service to do the environmental matter, the Aleph group, there's a friend of the family, would step up and offer to be involved in developing a traditional community service program there in the Los Angeles area.  But he had to leave and is not available.  So I -- I would urge that for the court's consideration.

I'd like to call now some family members on allocution, if that's fine.

I would like to call his older sister, Alecia.

THE WITNESS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE WITNESS:  I'm Jonathan's older sister and I was working with him at the time of the incident.  I was a manager at our offices in Dallas and I was involved in all aspects of our business.  I was the one who was handling the scheduling of all employees.  I was the one who was handling the payroll for all employees.  I was the one that put all of the files together.  Jonathan was not responsible for any of that.

I had assured Jonathan that I would relieve him of his responsibilities so that he could finish pursuing his degree.  I was present the day of the incident and I was the first person Blaise contacted afterwards.

I would like to make a point that in the last five years I have never been questioned regarding this matter.  Not once during this entire investigation has Mrs. Townshead (phonetic) or -- Agent -- Agent Townsend or the district attorney ever contacted me or questioned regarding my knowledge or my involvement.

I personally have learned a great deal from this case.  For one, I have learned about the intricacies of the law.  But more importantly, I have gotten to know my brother.

I should provide you with some background.

Growing up Jonathan and I always didn't get along.  I was the type A personality, always logical and organized in my mind and with my heart.  As the older sister I always tried to instill my ideals onto my brother.  But Jonathan in contrast

was always guided by his heart.  I figured we were so different that we would never completely understand each other.  You have to understand, he was the exact opposite of me.  Friends always surrounded him.  Everyone adored him.  And he was always generous, not only with his belongings but with his emotions.  I always knew that he was caring and compassionate, but not until this experience did I really understand the depths of his love.  Before I viewed it as his weakness.  Now I know it is his biggest strength.

Your Honor, I can say with absolute conviction that Jonathan would never endanger anybody.  His brain simply does not work that way.  He is someone with so much emotional intelligence that he puts others first, even before he thinks of logistics or practicalities.  Ultimately it is his biggest mistake in trusting the advice of others without question.  He put so much faith in those guiding him that he never thought to think for himself.  Unfortunately, he was naive in his thinking and consequently inexperienced in his actions.  Never though, for one second, was he being criminal in his thoughts.  I even believe that he accepted the plea because he didn't want to compromise those around him.  Accepting the plea without knowledge of the facts and, again, choosing to take responsibility without question, because that's how he was raised.

Your Honor, as a convicted felon Jonathan will be

reminded for the rest of his life to remember this experience. I know that he is extremely remorseful and that he has grown tremendously.  I pray that if there is one positive outcome it is that the knowledge he has gained from this case will protect him from future harm.

Jonathan is a different person today than he was five years ago.  He has grown a lifetime.  He is no longer an innocent child.  He is a man now.  He has knowledge to better equip him for the challenges of life.

I am so proud of my brother.  I am in awe of how he has handled himself in the face of adversity.  I am amazed that every single day that he was worried sick and tormented he managed to stay strong and positive for the sake of his family.  Your Honor, Jonathan is someone that we hope for in our children.  He have is a thoughtful brother, he is a loving uncle, he is a trusted friend, and he is a respected colleague.

I pray from the bottom of my heart that you allow him to return home to his family.  Please consider allowing him to learn from this experience and after five strenuous years move forward in his life.

Thank you.

THE COURT:  Thank you very much.

MR. GIBSON:  His younger sister, Sasha, would like to speak to the court.

THE COURT:  Good afternoon.

THE WITNESS:  Your Honor, my name is Sasha Shokrian.  I'm Jonathan's younger sister.  I stand before you today as both concerned sibling and a future clinician with the best of intention of presenting you with a clear understanding of who Jonathan really is.

The last five years have undoubtedly been the most heart-wrenching years of my life.  Having to watch my older brother struggle so greatly with the repercussions of an honest mistake that he made at the age of 23.

Even through all of the pain and remorse that Jonathan has endured in relation to this case, I am amazed at his ability to push through his emotional turmoil and dedicate himself not only to the process of self-growth but also to the well-being of others.  The level that he is willing to go to others is a beautiful and distinct characteristic that is hard to come by, and I'm aware of this not only on a professional level but also in my day-to-day life.  I have always admired my brother for his wholesome values, his unfaltering generosity, and his enormous heart, but through the unfolding of this case I have come to realize even more than that.

Growing up Jonathan was always altruistic.  He was an overgiving personality and we often faulted him for it.  All the more I received in my own life, all I noticed there were others were taking advantage of Jonathan.  I can now only

recognize that this isn't something he can control.  This is part of his DNA.  It's what makes him whole.  He is an individual who has no threshold when giving back to others.  This is the definition of selfless.

Only now through the unfolding of this case do I fully appreciate Jonathan's innate characteristics.  After looking through hundreds of letters people have written from the heart in support of my brother, I received confirmation that my thoughts about my own brother are true, unbiased, and in fact were repeatedly echoed by the extreme consistency that exists between all the reference letters you received.  Everyone states how good of a person he is, how honest he is, how ultimately he is not at all a malicious person.

My brother has touched the lives of so many people, especially mine, and I am forever grateful for his strong presence in my life.  Anyone that comes in contact with him is taken back both by his warmth and his drive, his thirst for growth and knowledge.  His outlook on every aspect of life is a positive -- positive one and he always seeks out to do good.  You can just feel the gentle nature of him by looking into his eyes.  Your Honor, these words are the words that define a very, very special person.  My brother is truly just that.

Your Honor, to be honest, as my father's only son, Jonathan never had the option to seek out any other business path.  As a woman growing up in a conservative home my sister

and I were never expected to be involved in the family business.  It was Jonathan who had the pressure on him.  It was Jonathan who entered the family business just for the sake of protecting our family's future security, and it was just for the sake of my father's desires, even though I always knew it was not truly what he wanted to do.

I sympathize so deeply with the burden that he must have felt on him.  I am devastated that my brother's biggest asset of selflessness has now become the root of his biggest challenge.

I know that it was through this growth and maturity these last few years that Jonathan choose to remove himself from the family business and create his own path.  From a clinical standpoint, developmentally speaking, a college student at the age of 23 is in the initial stages of adulthood, hoping only to develop a secure identity.  To be thrown into a territory that you are unfamiliar with when you're still so unfamiliar with yourself is very unfortunate, and I believe is he why he stands before you today.  My brother made an honest mistake not out of malintent but simply out of a lack of understanding within the field.  If he remains an active member of society Jonathan's experience can serve as an excellent tool for spreading awareness in hopes of preventing his same actions from being repeated by others in the field and in the future.

Your Honor, I beg of you with everything that I have,

with every bone in my body, please don't take the one person who I admire the most and I cannot live without away from me. I promise you that my morals and my values are extremely ethical. And I'm being completely honest and genuine when I say that even despite being my brother, Jonathan is an amazing human being. If I ever have a son, I hope that he will turn out to be like Jonathan. I love him from the deepest parts of my heart and he is the most important person in my life. I know that is a better person today than he was five years ago and I know that he will only continue to grow and improve. I hope that he will receive the chance to show that growth not only to you but to everyone who loves him so dearly.

Thank you, Your Honor.

THE COURT: Thank you very much.

MR. GIBSON: Your Honor, his mother, Shirley Shokrian would like to speak. And I will point out that Mr. Shokrian, Eli Shokrian, is here and present with his wife and with his family.

MS. MARTIN: Your Honor, may I?

(Ms. Martin leaves the courtroom coughing)

THE COURT: We'll just wait just a moment for Ms. Martin.

(Pause.)

(Ms. Martin returns to the courtroom.)

MS. MARTIN: I apologize, Your Honor.

THE COURT:  All right.

THE WITNESS:  Your Honor, esteemed U.S. Attorney Errin Martin, Special Agent Mr. Tim Townsend, members of Environmental Protection and Agency, and all other parties involved.

I would like to begin by extending my most sincere respect for the court.  And my apologies to all of you.  On behalf of myself, my family, and especially for my son Jonathan, I'm so sorry for the incident that took place five years ago.

And on behalf of my husband and me, I humbly ask for your forgiveness.  It is due to the expectation that we wrongfully imposed on our only son at such a young age that he stands before you today.  We prematurely gave him business responsibilities that exceeded his experience, while placing unreasonable pressures on him as parents.  It was our job to recognize that.  We are to blame for this incident.

Jonathan is extremely remorseful and has been in an overwhelming amount of emotional and psychological pain for his honest mistake.  For the past five years our entire family has been suffering deeply, and this has truly been a tragedy we have all been faced with.

Jonathan and every member of our family has suffered these consequences.  Jonathan plead guilty to this case because he is a completely pure person, an extremely honest

young man.

My son is a kind and most loving -- is a kind and most loving son.  He is a loyal friend, a protective and loving brother, a compassionate and trustworthy businessman, and, most importantly, a solid and responsible human being.  I say this with hundred percent confidence.  I am sure that every single person in this room have made an honest mistake at one time in their lives.  All we can do is to accept responsibility, like Jonathan has, and ask the court to give us a second chance so -- so that we can continue to do better in the future.

Your Honor, all I can do now is to beg for your mercy.  God has given us the opportunity to learn from our experiences and improve on them.  Jonathan will suffer for the rest of his life for having a felony on his record.  He will always carry this weight of this incident with him, not only in his future business but also in his interactions with others.

This felony charge will follow him like a shadow for the first -- for the rest of his life.  He has grown a great -- a great deal as a result of this experience and will continue to do so.  I know that putting him in jail will hinder his growth.  Jonathan is not someone who needs to be removed from society.  Jonathan is not a criminal.

After all, his actions were a result of his youth and lack of experience in the field.  Please consider granting

Jonathan the privilege of remaining in society where he is fully committed to doing good. I beg you, Your Honor, to consider all of the positive things my son has done.

I will never forget the day when Jonathan at the age of only 20 called his father and asked him for permission to donate a space in Dallas to provide shelter and refuge for the victims of Hurricane Katrina. That's just the kind of boy he was and that's just the kind of man he is now.

During the past five years Jonathan's emotional pain has not stopped him from giving to others and it has not stopped him from being a good person.

My intention today is not to justify Jonathan's flaws, it is just to show you who he really is.

I plead for your forgiveness, to have mercy on my son. If you keep Jonathan out of jail he can be a positive example in society. I love him so much. Please don't take my son away from me.

Your Honor, thank you for taking the time to hear what I have to say. Thank you.

THE COURT: Thank you, ma'am.

MR. GIBSON: Judge, we'd like to ask Mr. Jonathan to step up, Mr. Shokrian step up, and let him allocute and speak.

THE COURT: Mr. Shokrian, you have the right to address me personally before I pass sentence upon you.

THE DEFENDANT: Thank you.

Your Honor, the last five years honestly have been an extreme learning experience.  But more importantly, I've learned that, you know, actions have a great affect both in a positive way and in an extremely negative way.  I'm more accustomed to the positive, but realize how one stupid mistake can lead to something happening that could be profoundly negative.  And in my true heart of hearts I never intended to do anything negative or would I ever want to harm a coworker or a community.  It -- it's just not in my DNA.  It's not -- it's not the kind of person I am, and I hope that -- that you can see that.

You know, over the past couple of years, the last two years, I -- I've reflected on -- on my actions and -- and do accept responsibility for what I did.  I don't want to stand here before you and try to blame anybody else.  I accept full responsibility for what happened and for the entire project.  Those people's livelihood were -- were in my hands and something could have happened that -- that really could have gone wrong, and -- and I thank God that that didn't happen.

But over the last two years I've grown as an individual.  I've become drug free, completely drug free.  I go to therapy.  I've done a lot of community service.  I've attended these classes.  And I've made it a priority to -- to grow from this incident and make sure not only does it not happen again but at least I learned a great lesson from it.

And I just -- I stand here before you and not only -- I don't want to apologize but just let you know that I've grown and I'm extremely apologetic and remorseful for what happened and just thankful at the end of the day that nobody got hurt, and to ask you for your mercy.

THE COURT:  All right.  Thank you, sir.

Counsel, if you wish to address both the corporate defendant as well as Mr. Shokrian, then after that is completed then we'll do the sentencings in sequence.

MR. GIBSON:  All right, Your Honor.  I think Mr. Roper -- I'd like Mr. Roper -- he's going to address Califco briefly, but I would like to go over some things myself, Your Honor.

THE COURT:  Certainly.

MR. GIBSON:  The court has been here all day.  First of all, on behalf of the family and the lawyers we appreciate the court giving us our day and pulling this back and giving us an opportunity to develop what we thought the court needed to be.

We're at the time now that now we're talking about a person, a young man's life, and I know this court and I know the court appreciates it.  And in a way it's good, I think the court by hearing this evidence can get a better sense of this case than maybe over the papers that were there.

But I do want to -- I do want to go over a few things.

We did file a sentencing memorandum, and I know the court will review it and look at it.  I do think that two things are very important, and that is I -- I cannot -- I have not the eloquence to talk to you about the kind of person Jonathan is any better or any clearer than those numerous letters, letters I was getting until late last night.  The outpouring of the community support and just people is overwhelming, and I know the court will consider that in the history and characteristics of -- of Jonathan.

The second thing is -- is that they were consistent across the board about his kindness, his integrity, his care and love and the kind of person he is, and they speak better than I can ever speak about that.

I do want to challenge a couple of things.  The history that we outlined about the charitable activities that Jonathan did while he was here in Dallas I think refutes and -- and goes against the government's argument and statement that this event was based on greed.  There's not a greedy bone in this man's body.  And this young man was placed in a position where his father placed him at a very tender age, a very young age to accept responsibility.

And I'm not cast dispersions on the father, but you heard the evidence and testimony even about giving the space to Katrina victims which Jonathan wanted to do, he had to call his father.  And I submit to you that the environment that he

was in, in trying to manage that property, and making the decision, even though Crest Plaza had been properly abated, wasn't about saving money or being greedy, it was about making a very immature, not thoughtful judgment decision that this was the way I hope my father would want me to do it.  And he did.  And that's the mistake that's brought it here.  It's not greed.  It's the immaturity and the lack of training and skills at that time.  Still serious.  Still dangerous.  And I -- I agree, thank God no one was hurt.  But I just don't believe any of those letters and the things we've said would allow this court I think to pull and decide that -- that Jonathan was acting out of greed.  That's just not in here.

The other aspect of this case that's very, very important, and -- and is important is the 3553 factors.  I know the court has to go through them, but I -- I want to say a little bit about each one, only to this part, it kind of goes to the disparity question.

This conviction, the fact that he has a felony conviction that will be with him the rest of his life, from 25 years forward, is a significant deterrent and addresses and reflects the seriousness of the offense, it clearly promotes respect the respect of the law, and it provides a basis by which this court can -- can impose a reasonable and just sentence, which we believe is a nonguideline, noncustodial sentence with some other aspects other than prison.  It is a deterrence.

I -- I urge the court -- I know the court looked at the deterrence section that we talked about, but it is a deterrence, because as -- as Ms. Martin even said about some case that Mr. Roper handled in 2006, this court has been on the -- in this bench a long time, they don't criminally prosecute that many EPA environmental cases for whatever reasons, and most of them are handled regulatory.

So the fact that there's a conviction, a felony conviction on a plea, is a deterrent to the community.  You don't have to send him to jail, Your Honor, to tell the world and the community and business leaders across the Dallas/Fort Worth area that, listen, rules in the environment, the Clean Air Act and RCRA and the other acts, they're serious, they're important, you need to follow them, and if you don't, look what's going to happen.  And so I believe the conviction itself, Your Honor, does speak volumes and speaks about this adequate deterrence.

And I agree that there's no doubt that he won't have any future problems or crimes.  You've seen his family.  These are people (indicating) that came from out of town, across from L.A. and other parts of this country, a rabbi who came from New York.  And it wasn't somebody that his dad called up. It's somebody that knows this young man and knows him as a person who came here.  All of us should be so blessed to have this kind of family support and the kind of people that would

come there.  He is not a threat to this society.  He's not going to be part of any criminal justice system once he completes this thing.

The only thing about the disparity, Your Honor, I want to comment about, it's self-evident in the 270 cases that were handled administratively, one of the cases it's not listing, of course, is Califco, because we had and paid a $1500 fine as a violation of the Texas health state records.  I have the documents, if I can show it to the court, if the court questions that, but we did.

So we handled administrative -- we had an administrative adjudication.  We did pay the city of Irving a fine.  They gave a hazardous material usage ticket to Albino, and Califco paid for it.  We have reimbursed every expense, HazMat, the City of Dallas, every expense that has been incurred by people we know about has been reimbursed by Califco and by Jonathan.  So I think the court, and I urge the court, in doing its consideration, and the law allows it, to consider and give some significance to the disparity of sentencing that might be sitting here because of the -- of the fact that this is an environmental crime.

Last but not -- not the least, is the fact that Jonathan is a first offender.  He is a -- a young man of -- of deep quality.

If the court wants and -- doesn't feel that he should

give a purely probationary sentence, as we all know what probation is, Your Honor, I urge the court to consider imposing one -- that UCLA community service as a condition of probation.  The court, we don't ask for it, but if -- if -- in lieu of any prison sentence if there's a component that is allowed -- and that is allowed because it's -- they're not binding and they're advisory, under the guidelines to impose home confinement or some punishment that the court feels need.

        But a prison sentence, Your Honor, of any consequence is not called for.  And I urge this court not to impose that sentence.  Impose a probation sentence, impose conditions, make it rough, and I will tell you, you will be proud when the end of that sentence is over that he's accomplished more than you can imagine.  He's a fine young man.  I've known him a short period of time, but I will tell you he is worthy of the court's variance from the 2-year sentence down to a noncustody guideline sentence, and I would ask the court to do that.

        THE COURT:  All right.  Thank you.

    Mr. Roper.

        MR. ROPER:  Your Honor, I know you've heard arguments.  And I really haven't made a lot of arguments today, Mr. Joseph, Mr. Gibson has, but I've been with Jonathan for a long time on this case, longer than the other counsels.  And I can tell you in my experience the Jonathan I see now is completely different.

And I think -- you know, I listened to Errin make her argument about essentially a greedy -- you know, like a fat cat guy that doesn't give a darn about anybody but himself, and I don't think -- she didn't -- she hasn't had kids like I have that are in college and see the mistakes college kids make. And I -- I think if she were ever in that position, she probably will some day, she'll -- she'll experience that -- that pain of kids growing up and trying to make it in the world.

And I think this is real important in this case: The culture that Jonathan came from, Your Honor, was a culture where the male heir -- you know, they're Iranian Jews that came from Iran. Mr. Shokrian came from nothing, and made a -- essentially a real estate business very successful, and he wanted Jonathan to follow in his -- his footsteps. And Jonathan grew up in America and he wasn't ready. He was using drugs. He was an immature kid. Alecia, his sister, said that Jonathan couldn't manage himself much less any employees. He was a religion major at -- at SMU and he had no business being hoisted in a position where he had to -- to manage people and make certain important decisions.

His dad recognized that by putting Blaise McGinley, a licensed architect, in charge -- essentially in charge of the construction project. And I think that's significant. He had no business making these decisions. And he made a very stupid

decision by trying to do that, most likely to please his dad. And I think that's tremendously important in this case. He was -- he was hoisted in a position of making very, very important decisions over people's lives and he wasn't able to do it. He just wasn't able to do it.

And I think you have to look at his sentence in those -- in that light, that he really wasn't able to do it.

And -- and look, this -- this -- this is an EPA case. The Clean Air Act essentially criminalizes the failure to follow EPA regulations. I'll be honest, when I got into this case I -- and I've handled -- handled Clean Air Act cases as a prosecutor and as a defense attorney. They're very complicated. It's not just like going out and the difference between whether you shoot a guy or not is a crime, there are very nuance criteria in the law that, frankly, I didn't appreciate even until the time of the guilty plea.

For instance, we all thought, Errin and I, Townsend, we all thought that the ceiling tiles had asbestos. We were wrong. I, frankly, thought that most of the floor tile had asbestos. I don't think a lot of it did that was hauled out to the dump, whether it's a violation of 2Q1.2 or not. I didn't appreciate that. And -- and really the difference between friable and nonfriable were almost foreign terms to me. And I don't think it's fair -- a 23-year-old immature kid, I really don't think he appreciated the nuances of those

laws. And so I would hope the court will take that into consideration.

Now, the gasoline. Look I was a prosecutor for a long time. We all know what's driving this case, and it was what that fire chief testified when he got up there on the stand, that this thing could have blown up and been a disaster. I think, my opinion is that's why this is a federal case. And it's -- and -- and I don't think it's fair to put Jonathan, a 23-year-old immature kid that's trying to make a decision, lay that burden of the -- of a potential conflagration on Jonathan to enhance his sentence all the way up to two years, certainly could have been more.

I -- I've told Errin this story. I was a Boy Scout leader. I know gasoline. I was a scout growing up, and I was in a campout where a bank president got a -- trying to start a fire, got a can of gasoline, poured it on the fire, and lit it up and almost killed a bunch of scouts in my troop. He didn't appreciate the dangers of alcohol. And you know what, I don't think Albino did, the worker, I don't think Reese did, I don't think the other worker did, and certainly Blaise McGinley, a licensed architect, who we know from the testimony of Albino was in the -- that Fazio's at the time of the -- of the work that was going on, they didn't appreciate the significance of it. And -- and I don't think it's unreasonable to assume that a 23-year-old immature kid that's going to college and having

fun and using drugs would appreciate that as well.

And because of that, I really do believe that the fact -- the 3553 factors don't support an imprisonment sentence. And if they do it should involve some kind of confinement, home confinement or something like that, because I don't think you're dealing with a -- what the Clean Air Act was designed to deal with, with owners of corporations that intentionally and willfully violate the Clean Air Act so -- because they just don't want to pay it. I don't think that's his situation. And it's because of his culture that he was hoisted in a position that he had no ability to appreciate, Your Honor. And I think that's -- that's critical.

23-year-old immature kids make stupid mistakes, but it wasn't a murdering somebody, it wasn't selling drugs. It was screwing up with -- not even a full asbestos abatement like the Crest Plaza but cleaning up a floorroom. It was certainly a mistake. I don't think it was willful. I don't think -- based on the information he obtained from Blaise McGinley he didn't intend to hurt anybody, and he certainly didn't appreciate the -- the fact that that gasoline could ignite and hurt the community. I really don't think that. And because of that I -- I think in this unique case it's worthy of a variance, Your Honor. I hope you consider it.

THE COURT: Thank you, Mr. Roper.

And did you want to address Califco before I pass

sentence?

MR. ROPER:  No.  Well, no.  I think he's the only -- well, party that -- that's guilty.  I think the payment of the $500,000 fine before sentencing I think demonstrates their commitment to move on with their life.

I think there's information in the presentence report that they've enacted a compliance program so this kind of conduct will never happen again.  So I don't think there's any further punishment that should be meted out to Califco.

THE COURT:  I'll begin with Califco.

Mr. Roper, do you know of any reason why a sentence cannot lawfully be imposed?

MR. ROPER:  No, Your Honor.

THE COURT:  And is Califco ready for the court to pass sentence?

MR. ROPER:  Yes, Your Honor.

THE COURT:  With regard to Califco the court accepts the plea agreement.  It will embody in the judgment and sentence the disposition provided in the plea agreement.

On count 1 of the information it is adjudged that the defendant is hereby placed on probation for a term of 5 years. It is ordered that the defendant pay a mandatory special assessment of $400.

It is ordered that the defendant pay a fine to the United States in the amount of $500,000, which shall be due

immediately.

It is ordered that the defendant pay interest on the unpaid balance pursuant to Title 18, United States Code, Section 3612(f)(1).

It is ordered that the defendant pay the cost of medical monitoring of Gerardo Ruiz-Castillo, Armando Rodriguez, and Albino Villanueva.

While on probation the defendant shall pursuant to Title 18, United States Code, Section 3563(a)(1) and guideline 8D1.3(a), shall not commit another federal, state or local crime.

Number 2, the defendant shall pay the fine to the United States as previously pronounced as part of this sentence.

Number 3, the defendant shall make annual submissions to the court or a probation officer, reporting on the organization's financial condition and results of business operations and accounting for the disposition of all funds received.

Number 4, the defendant shall develop and submit to the court a program to prevent and detect violations of environmental laws, including a schedule for implementation not later than 180 days after entry of judgment.

Number 5, upon approval of the court of a program to prevent and detect violations of environmental laws the defendant shall notify its employees and shareholders of its

program to prevent and detect violations of environmental laws.  Such notice shall be in a form approved by the court.

Number 6, the defendant shall make periodic reports to the probation officer regarding its progress in implementing the program to prevent and detect violations of environmental laws, as directed by the probation officer.

With regard to Califco, Mr. Roper, do you have anything further?

MR. ROPER:  No, Your Honor.

THE COURT:  With regard now to Mr. Shokrian, Mr. Gibson, do you know of any reason why a sentence cannot lawfully be imposed at this time?

MR. GIBSON:  Your Honor, procedurally I need to make an objection to the court not granting our motion to continue and so for that basis I do object to sentencing being imposed, in order to keep the record consistent and correct.

THE COURT:  All right.  Thank you, Mr. Gibson.

The court will overrule that objection.

Apart from that objection do you have any other grounds to --

MR. GIBSON:  NO.

THE COURT:  -- oppose sentencing?

MR. GIBSON:  No, Your Honor.

THE COURT:  Mr. Shokrian, are you ready for me to pass sentence upon you?

THE DEFENDANT:  Yes, sir.

THE COURT:  The court accepts the plea agreement in this case.  It will provide in the judgment and sentence the disposition provided in the plea agreement.

Mr. Shokrian, in fairness to you I'm going to begin by telling you a summary of the sentence, because I think that that's one way a court is merciful, is to let the defendant know the sentence and then explain the reason, rather than explain the reasoning and have you wonder would you please get to the point of the sentence.

In a moment I'm going to be imposing a variant sentence of 12 months and one day in custody combined with a fine of 25,000, as well as a restitution requirement regarding medical monitoring as well as certain conditions of a term of supervised release.

I am required to state on the record, and so I will begin by stating that the court in determining the sentence has considered all of the factors that are prescribed by Title 18, United States Code, Section 3553(a), and it is -- has considered all of the purposes for sentencing set forth in section 3553(a)(2).

In discussing some of the factors but not others I don't mean to suggest that I have not considered all of the factors.

I want to try to explain the sentence by contrasting two basic areas.  One is a group of -- of considerations under the

statute that I think require some time of custody. The other is a group of factors that I think require and persuade the court that a sentence that is sufficient but not greater than necessary to comply with the purposes is less than what the guideline range would be.

Indeed, to put this in perspective, remember that without the statutory cap the guideline that you were looking at was considerably more than 24 months. With the statutory cap based on your plea agreement it capped it at 24 months. The variance of the court is dropping that even further. In fact, it's actually less than half, because as your lawyers will explain to you, by sentencing you to 12 months and one day I make you eligible for good time credit, where you can serve fewer than 12 months, whereas if I were to give you 12 months you could actually end up doing a longer sentence.

So the sentence of the court is actually less than half of the statutory cap and the guideline range than would otherwise apply.

Let me begin by discussing my reasons for imposing a variance.

I do agree with the arguments of counsel that there are aspects of this case which place it outside the heartland and which when considering all of the factors of Section 3553(a) persuade me that this defendant does not need a sentence of the entire period that would be called for under the guideline

range.

I do look at the nature of the offense, how he committed the offense, his age at the time, his relative sophistication, his motive. There are a number of aspects of this case that make it different from environmental cases that I have handled before as a judge, cases in which it was clear that the defendants didn't care what they were doing to the environment, knew they were injuring the environment, took acts to injure the environment and just didn't care. This case is different, in that while the defendant knew and pleaded guilty to an offense that injures our environment, it was not a case in which he set about to injure the environment like those cases.

I think that there are aspects of the guidelines in this case that are driven by the conduct of someone who's really trying to injure the environment, and I don't think that is the heartland -- I mean don't think he is in the heartland of that.

I certainly don't think there is a need for additional time in custody to protect the public from further crimes of the defendant.

I don't think that there is a need in his case to deter him from future criminal conduct.

So there are various factors that persuade the court that a variant sentence is sufficient but not greater than

necessary.

Now, on the other hand, this is an area where I think it is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment to have some form of custody sentence.

Our environmental laws in this country were passed for the protection of the public. Asbestos is something that is of grave concern to our country. Indeed, it has resulted in billions of dollars in litigation because of people who have been injured by such things as mesothelioma, pleural disease, asbestosis. I mean, these are very seri -- very serious diseases, and as a result the regulation of asbestos has correspondingly been serious.

It is necessary it seems to me in a case such as this one to impose a custody sentence. If I were to impose a straight probation sentence, in my view that would send the wrong message to people who would be thinking about taking a risk and violating our environmental laws.

So what I have done is I have taken these two areas and I've looked at the factors that I think affect each of these areas and come to what I in my judgment believe is a sentence that is sufficient but not greater than necessary to comply with those purposes.

Accordingly, on count 1 of the information it is adjudged that the defendant is hereby committed to the custody of the

Bureau of Prisons for a term of 12 months and one day.

It is ordered that the defendant pay a mandatory special assessment of $100.

It is ordered that the defendant pay the cost of medical monitoring of Gerardo Ruiz-Castillo, Armando Rodriguez, and Albino Villanueva.

It is it is ordered that the defendant pay a fine to the United States in the amount of $25,000 payable to the District Clerk. The fine shall be payable immediately and any remaining balance shall be payable during incarceration.

If upon commencement of the term of supervised release any part of the fine remains unpaid, the defendant shall make payments on such unpaid balance beginning 60 days after release from custody at the rate of at least $50 per month, until the fine is paid in full.

It is ordered that the defendant pay interest on the unpaid balance pursuant to Title 18, United States Code, Section 3612(f)(1).

It is ordered that the defendant serve a term of supervised release of 2 years.

While on supervised release the defendant shall comply with the standard terms and conditions for supervised release recommended by the United States Sentencing Commission and adopted by this court on its judgment form.

These terms and conditions include the following.

Number 1, the defendant shall not commit another federal, state or local crime.

Number 2, the defendant shall not illegally possess controlled substances.

Number 3, the defendant shall cooperate in the collection of DNA, as directed by the probation officer.

Number 4, the defendant shall not possess a firearm, ammunition, destructive device, or any dangerous weapon.

Number 5, the defendant shall report in person to the United States Probation Office in the district to which the defendant is released from the custody of the Federal Bureau of Prisons within 72 hours of release.

Number 6, the defendant shall refrain from any unlawful use of a controlled substance.

The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

Number 7, the defendant shall participate in mental health treatment services as directed by the probation officer until successfully discharged.

The defendant may choose his treatment provider.

The defendant shall provide full payment for services rendered.

Number 8, the defendant shall not contact or correspond with the identified victims, unless such contact is approved

by the probation officer.

Number 9, the defendant shall not be employed by, affiliated with, own or control or otherwise participate directly or indirectly in the business of residential or commercial real estate sales, development, construction or renovation, without the probation officer's approval.

Number 10, the defendant shall provide the probation officer any requested financial information.

It is ordered that the defendant report directly to the designated institution at his own expense on Tuesday, April 15, 2014, no later than 2:00 o'clock p.m.

Mr. Shokrian, in a moment I'll hear from Mr. Gibson or Mr. Roper if they have any requests for the court, but I do want to conclude with these remarks, because I always try if possible to conclude a sentencing where someone has received bad news with some words of encouragement.

This is something that you committed and you now know today the penalty that you face for committing the crime.  But now you have an opportunity to complete your obligation to society and get it behind you.  And you have many years of your life ahead of you.  And I think in many respects, from considering the letters that were written on your behalf as well as your presentation today, that you will use this as something to educate you and to be a constant reminder to live a law-abiding live.  And in these respects you have an

opportunity to be an important contributing member of society. And I hope that you have know that about yourself, that you will continue the good things that you have done in your life, and really -- and really be an example to other people of how they can take something that is adversity and turn it around and turn it into something for good.

Mr. Gibson.

MR. GIBSON:  Your Honor, I just want to ask the court to make a recommendation to the -- it's called the Taft Federal Correctional Institution.  It's in the -- the Western District of the Bureau of Prisons.  If the court could make that recommendation.  I have explained to Mr. Shokrian that that's a recommendation only, that the Bureau of Prisons will make the final determination.

THE COURT:  All right.  And, Mr. Gibson, that's not one I'm familiar with.  What state is it in?

MR. GIBSON:  It's in California.

THE COURT:  All right.  If -- if you don't mind, what I'll do is I'll look at my directory in preparing the judgment and get its actual technical name --

MR. GIBSON:  All right.

THE COURT:  -- but I will make that recommendation in the judgment and commitment order.

MR. GIBSON:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Gibson, do you have

anything further at this time?

MR. GIBSON:  I have nothing further, Your Honor.

THE COURT:  All right.  Mr. Roper, or Mr. Joseph?

MR. ROPER:  No.

THE COURT:  And Mr. Shokrian, -- I'm sorry, Ms. Martin.

MS. MARTIN:  Your Honor, may I approach with language for the judgment with respect to the payment of a fine on behalf of Califco?

THE COURT:  You may.

(Pause.)

THE COURT:  Let me amend something I stated on the record.  I think I inadvertently imposed a term of supervised release of 2 years.

The term of supervised release is one year.

Ms. Martin, would you address the court regarding the request of the government concerning this?

There's a reference here to $100 for each count of conviction.  I think the $100 applies to Mr. Shokrian but not to the govern --

MS. MARTIN:  Yes, Your Honor.

THE COURT:  -- not to the --

MS. MARTIN:  I apologize.  It was $400 for the company with respect to the count information.

THE COURT:  And -- and what you're requesting is

that because the payment has already been made and the court entered an order for payment that it recite this additional language on the record?

MS. MARTIN:  Yes, Your Honor.

THE COURT:  All right.  Mr. Gibson, do you have any objection to my doing that?

MR. GIBSON:  I have no objection.

THE COURT:  All right.  So the record is clear, with regard to Mr. Shokrian the term of supervised release imposed is one year.  The conditions are as previously pronounced.

With regard to the criminal monetary impositions, the court has imposed the mandatory special assessments as requested.  The court has further imposed the fine that's requested in -- in -- of Califco in this addendum.

Further, pursuant to Title 28, United States Code, Section 2041 and this court's order for payment, the clerk of court has already receipted funds in the amount of $500,000. And pursuant to Title 28, United States Code, Section 2042, upon the entry of the criminal justice -- judgment in this case the clerk of court shall withdraw and apply the funds on deposit to the criminal financial obligations imposed against the defendant in accordance with Title 18, United States Code, Section 3612.

And -- and in this respect the court is referring to -- referring to Califco.

Is that correct, Ms. Martin?

MS. MARTIN:  Yes, Your Honor.

Thank you.

THE COURT:  Mr. Gibson, do you have anything further?

MR. GIBSON:  No, Your Honor.  We do not.

THE COURT:  Mr. Shokrian, do you understand that you must report directly for service of sentence as ordered?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  At this time then I continue you on the terms and conditions of your present status.

Mr. Gibson, Mr. Roper, Mr. Joseph, Ms. Martin, if you have nothing further you're excused at this time.

MR. GIBSON:  Thank you, Your Honor.

THE COURT:  At this time the court will stand in recess.

THE SECURITY OFFICER:  All rise.

                    (End of proceedings.)

INDEX – SENTENCING

| WITNESS NAME | Page | Line |
|---|---|---|

**TIMOTHY TOWNSEND**

CROSS EXAMINATION BY MR. JOSEPH.................... 46    7

CROSS EXAMINATION BY MR. JOSEPH.................... 75    9

REDIRECT EXAMINATION BY MS. MARTIN............... 96    10

**RUSSELL WILSON**

DIRECT EXAMINATION BY MS. MARTIN .................. 100    8

CROSS EXAMINATION BY MR. JOSEPH.................... 110    8

**CHRISTOPHER WEIS**

DIRECT EXAMINATION BY MS. MARTIN ................. 114    19

**JOHN LANGE**

DIRECT EXAMINATION BY MR. JOSEPH .................. 132    23

CROSS EXAMINATION BY MS. MARTIN.................... 170    18

REDIRECT EXAMINATION BY MR. JOSEPH............... 192    11

**EUGENE TSENG**

DIRECT EXAMINATION BY NARRATIVE.................... 224    9

DIRECT EXAMINATION BY MR. GIBSON ................. 226    20

**ALECIA SHOKRIAN**

DIRECT EXAMINATION BY NARRATIVE.................... 228    25

**SASHA SHOKRIAN**

DIRECT EXAMINATION BY NARRATIVE.................... 232    2

| Defendant's Allocution | Page | Line |
|---|---|---|
|  | 239 | 1 |

| Imposition of Sentence | | | Page | Line |
|---|---|---|---|---|
| | | | 250 | 18 |
| | | | 253 | 3 |

**GOVERNMENT EXHIBITS**

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 1 | Invoices to SEF ...... 25 | | | |
| 3 | Lab report ........... 43 | | | |
| 6 | Weis CV............... 194 | 194 | | |
| 7 | Unidentified......... 194 | 194 | | |
| 8 | Unidentified......... 194 | 194 | | |
| 9 | Unidentified......... 194 | 194 | | |

**DEFENSE EXHIBITS**

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 35 | Photo ................ 139 | | | |
| 49 | Negative Exposure Assess.... 164 | | | |
| 60 | Occupational Exposure ......... 170 | 170 | | |
| 61 | TEM observation ...... 170 | 170 | | |
| 62 | TEM observation ...... 170 | 170 | | |
| 63 | Ohio letter.......... 170 | 170 | | |
| 64 | Photos ............... 170 | 170 | | |

< Dates >
April 12, 2013 196: 5
April 15, 2014 259: 12
December 16-- 17-- 70: 10
December 18th 70: 17, 70: 18
February 13 217: 2
FEBRUARY 2, 2014 3: 1
February 21 18: 1, 18: 14
February 24, 2014 18: 14
February 27, 2009 217: 2
February 27th 70: 17, 71: 6
February 27th, 2009 102: 21
March, 2014. 266: 6
may. 20: 18, 101: 20
"one 49: 20
$100 261: 20, 261: 21
$100. 257: 5
$1500 12: 15, 244: 9
$18, 000 27: 17
$25, 000 257: 10
$250 187: 5
$400 261: 25
$400. 250: 25
$50 257: 16
$50, 000 16: 19
$500, 000 5: 10, 15: 16, 16: 4, 250: 6, 251: 2
$500, 000. 262: 19
. 001 153: 14
. 015 153: 4
. 3 160: 25
. 3. 217: 9

< 0 >
0. 001 152: 23, 153: 5
0. 011 152: 23
0. 1 165: 15
0. 1. 199: 15
0. 15 199: 12

< 1 >
1 25: 13, 45: 11, 45: 19, 45: 23, 46: 1, 131: 21, 131: 22, 147: 16, 147: 17, 147: 19, 148: 1, 153: 6, 153: 10, 207: 5, 250: 22, 257: 1, 258: 3, 264: 48, 265: 12
1. 4 104: 18
10 16: 15, 125: 6, 134: 17, 163: 1, 211: 12, 259: 9, 264: 10
10, 000 207: 23
104 44: 10, 55: 4
105 44: 10, 55: 4
106 44: 10
106. 55: 4
10: 30. 75: 3
10: 50. 75: 1, 75: 4
11 211: 21, 264: 28
1100 1: 24, 2: 38
11th 219: 6
12 44: 7, 44: 11, 44: 15, 44: 16, 125: 6, 145: 3, 181: 17, 212: 2, 253: 14, 254: 14, 254: 16, 257: 3
120 155: 8, 158: 2, 158: 19
1216 161: 5
127 44: 19
128 44: 19
129 44: 19
12: 02. 132: 9

12th 219: 10
13 212: 7, 212: 14, 216: 1
13-CR-131-D 1: 5
13th 219: 13
14 219: 13
14. 218: 1
15 134: 17, 218: 3, 223: 9, 258: 17
1500 1: 35
1535 2: 38
160 13: 21, 22: 8, 23: 6, 147: 2, 147: 3, 147: 4, 147: 12
16th 70: 11
17 50: 21, 181: 17
170 265: 34, 265: 37, 265: 39, 265: 41, 265: 43
1722 1: 35
18 181: 17, 251: 5, 251: 11, 253: 20, 257: 19, 262: 24, 264: 26, 265: 4
180 251: 24
183. 221: 3
19 55: 23, 218: 9, 264: 20
19-- 115: 17
19. 218: 21
194 265: 16, 265: 18, 265: 20, 265: 22
1970 51: 11
1992 115: 17
1: 15. 132: 6, 132: 10
1B1 217: 9
1B1. 3 216: 16

< 2 >
2 150: 9, 251: 14, 257: 22, 258: 5, 261: 16, 264: 43
2(b) (1) (a 216: 5
2(b) (2 216: 12

2-year 245: 18
2. 3 182: 22, 183: 7, 183: 10
2. 3. 182: 16
2. 51 182: 15
20 74: 24, 149: 16, 150: 1, 154: 4, 154: 5, 163: 1, 225: 14, 238: 7, 264: 34
20. 218: 9, 218: 12, 219: 2, 219: 6, 219: 10
200, 000 22: 4
2006 223: 7, 243: 6
2008 39: 14
2009 93: 3
2009. 66: 22
2013 7: 20, 14: 17
2014 1: 14, 196: 16
2041 262: 18
2042 262: 20
214-283-9528 93: 20
214-563-4788 93: 19
214. 659. 8838 1: 26
214. 662. 1557 2: 40
214. 871. 4900 2: 5
214. 969. 1210 1: 37
22 226: 10
23 234: 17, 264: 24
23-year-old 248: 1, 248: 11, 249: 2, 249: 15
23. 232: 12
235 157: 5
2391 264: 48
24 221: 9, 221: 11, 254: 10, 254: 11
24. 219: 13
2467 203: 17
25 100: 16,

100: 19,  217: 17,
242: 21,  264: 38
25,000  253: 15
250  159: 3,  187: 5
25018  265: 4
251  45: 1
252  45: 1
253  45: 1
2533  265: 6
254  56: 5,  56: 18,
57: 22,  66: 2
255  56: 11,
56: 18,  57: 22
255.  66: 2
256  44: 22
26  133: 24
26.  133: 23
27  1: 14
270  244: 7
28  262: 17,
262: 20
2: 00  259: 13
2: 45.  197: 6
2Q1  216: 5,
216: 12
2Q1. 2  247: 23
2q1. 2(b)(3
217: 11


< 3 >
3  43: 9,  44: 8,
44: 12,  44: 16,
44: 21,  44: 23,
45: 12,  45: 23,
46: 1,  149: 23,
184: 15,  184: 19,
209: 24,  251: 16,
258: 7,  265: 6,
265: 14
3-M  40: 1
3.  45: 19
30  149: 13,
224: 23
300  1: 24
31st  266: 6
32  17: 7
330  2: 3
34  216: 4
35  139: 7,

216: 11,  265: 29
3553  242: 16,
249: 5
3553(a  221: 20,
253: 21,  254: 25
3553(a)(2  253: 23
3563(a)(1  251: 11
36  217: 10
3612(f)(1  251: 6,
257: 20
3612.  262: 25
39.  217: 17
3:  1: 5
3: 00  196: 21
3: 00.  197: 4,
197: 7


< 4 >
4  217: 17,
251: 21,  258: 9
40  134: 12,
187: 16,  226: 14
43  75: 12,  80: 22,
192: 17
43.  76: 11
45  83: 19,  83: 24
4500  89: 21,
106: 17
49  164: 10,
164: 17,  265: 31


< 5 >
5  44: 9,  44: 17,
44: 20,  44: 24,
45: 8,  45: 12,
66: 4,  149: 21,
149: 22,  181: 9,
194: 6,  194: 13,
210: 20,  224: 25,
250: 23,  251: 25,
258: 11
5.  181: 5
50  159: 12,
164: 10,  165: 25
50.  134: 12
51  166: 16
51.  164: 11
55  44: 15,

181: 13,  181: 17
56  44: 15
57  44: 15


< 6 >
6  181: 9,  181: 16,
194: 6,  194: 7,
210: 20,  252: 5,
258: 15,  265: 16
6,000  224: 24
60  155: 8,  158: 2,
170: 10,  170: 16,
187: 8,  187: 16,
226: 1,  257: 15,
265: 34
61  170: 8,  265: 37
61.  170: 9
62  265: 39
62.  170: 7
63  265: 41
63.  170: 5
64  170: 2,
170: 16,  178: 18,
265: 43
64.  174: 17,
174: 19


< 7 >
7  176: 3,  176: 5,
194: 6,  210: 24,
258: 20,  264: 6,
265: 18
7.  176: 1
70  106: 24,  187: 8
72  44: 7,  258: 14
73  44: 7
74  44: 7
7400  152: 22
7402  152: 22
75  65: 20,  103: 23
75201  1: 36
75202  2: 4
75242  1: 25,  2: 39


< 8 >
8  155: 1,  194: 6,
211: 5,  259: 1,

264: 14,  264: 16,
265: 20
8.  176: 20
80,000  13: 21,
13: 22,  22: 23,
23: 4,  64: 3
8d1. 3(a  251: 12


< 9 >
9  155: 1,  194: 13,
211: 12,  259: 4,
264: 8,  264: 32,
265: 22
9.  177: 5,  194: 6
900  2: 3,  89: 22
911  102: 21,
111: 7
99. 97  160: 24
9th  93: 3


< A >
A.  1: 17,  3: 5,
91: 21
abandoned
108: 15,  109: 10
abatable  142: 3,
143: 14,  143: 24,
145: 8,  145: 9,
145: 24,  145: 25,
146: 18,  147: 13,
174: 23,  174: 24,
175: 1,  175: 15,
176: 17,  176: 18,
178: 13,  178: 19
abate  121: 24,
171: 18,  188: 17,
212: 1
Abated  12: 4,
12: 7,  66: 8,
67: 16,  99: 5,
141: 24,  172: 11,
193: 12,  193: 13,
207: 22,  211: 19,
242: 4
abating  120: 21,
149: 9
ability  232: 15,
249: 13

able 10: 8,
15: 25, 16: 11,
16: 16, 55: 6,
84: 15, 106: 13,
111: 24, 122: 19,
124: 11, 225: 5,
247: 6, 247: 7,
247: 9
about. 137: 24
Above 45: 11,
45: 12, 131: 24,
153: 12, 165: 3,
165: 5, 165: 6,
198: 11, 199: 12,
199: 15
abrasive 124: 19
absent 215: 20
absents 125: 17
absolute 225: 23,
230: 12
Absolutely
42: 15, 96: 7,
104: 14, 105: 21,
107: 10, 118: 17,
205: 16, 205: 23
absorbed 192: 2
abstract 156: 2
academic 116: 13
accept 46: 20,
47: 4, 47: 12,
50: 12, 214: 15,
220: 8, 222: 18,
237: 10, 239: 16,
239: 17, 241: 23
accepted 16: 17,
214: 18, 218: 7,
230: 22
Accepting 50: 11,
230: 23
accepts 46: 24,
218: 24, 219: 11,
250: 19, 253: 4
accomplished
245: 15
accordance
262: 24
According 4: 21,
36: 21, 40: 14,
41: 11, 43: 2,
53: 6, 62: 15,

68: 3, 80: 18,
81: 22, 89: 20,
183: 23
Accordingly
257: 1
account 218: 22,
219: 3
accounting
251: 19
accumulating
169: 9
accuracy 215: 15
accurate 32: 13,
42: 11, 89: 24,
173: 15
accused 94: 18
accusing 95: 5
accustomed 239: 7
acid 150: 19
acidity 131: 4
acknowledgements
186: 7
acknowledging
166: 5
acquire 115: 22
across 57: 15,
57: 20, 95: 2,
140: 5, 155: 17,
182: 1, 241: 13,
243: 13, 243: 22
Act 9: 24, 10: 17,
10: 18, 51: 8,
51: 11, 61: 12,
86: 11, 86: 14,
90: 10, 91: 25,
167: 10, 167: 13,
198: 1, 243: 15,
247: 11, 247: 13,
249: 8, 249: 10
acting 242: 14
action 167: 9,
167: 12, 203: 9
actions 105: 8,
220: 9, 221: 5,
222: 18, 230: 20,
234: 25, 238: 1,
239: 5, 239: 15
active 234: 23
activities
51: 14, 51: 16,

241: 17
activity 127: 8,
168: 16, 168: 17,
172: 2, 196: 15
acts 243: 15,
255: 11
actual 42: 21,
76: 10, 89: 6,
138: 9, 152: 18,
158: 16, 175: 19,
260: 22
acutely 130: 18
add 15: 11
addenda 18: 2,
18: 16, 55: 24,
62: 19, 63: 7,
75: 13
addendum 17: 24,
18: 10, 18: 12,
18: 24, 198: 17,
199: 20, 215: 18,
215: 23, 218: 7,
262: 16
adding 159: 14
addition 106: 2,
210: 12
additional
122: 11, 150: 24,
195: 23, 255: 21,
262: 4
Additionally
196: 9, 196: 17,
218: 6
address 3: 18,
7: 15, 8: 9, 8: 13,
9: 4, 11: 17,
20: 2, 197: 21,
199: 3, 199: 4,
199: 5, 239: 1,
240: 9, 240: 13,
250: 2, 261: 18
addressed 202: 9
addresses 242: 22
adequate 212: 8,
215: 19, 218: 18,
222: 10, 243: 19
adhere 212: 12
adhered 120: 21,
222: 9
Adhesive 148: 23

adhesives 170: 12
adjacent 26: 24,
68: 13
adjudged 250: 22,
257: 1
adjudication
244: 14
adjust 20: 15
administered
112: 9, 112: 11
Administration
116: 21, 127: 21
administrative
244: 13
administratively
244: 8
admire 235: 4
admired 232: 20
admissible 35: 23
admission 213: 3,
218: 19
admissions
196: 6, 196: 7
admit 45: 19
admits 47: 5
Admitted 7: 23,
46: 2, 59: 3,
170: 17, 194: 14,
265: 10, 265: 27
admitting 95: 6,
209: 6
adopt 112: 16
adopted 189: 3,
258: 1
adored 230: 6
adulthood 234: 17
advantage 233: 2
adverse 157: 18
adversity
231: 13, 260: 7
advice 99: 13,
230: 17
advised 122: 24
advising 6: 9
advisors 115: 6
Advisory 134: 4,
197: 12, 219: 18,
224: 22, 245: 9
affect 212: 5,
217: 14, 218: 2,

218:4, 219:8,
219:16, 239:5,
256:22
affects 210:22
affiliated 259:5
affixed 79:11
afraid 12:24,
59:25, 60:13,
60:16
afternoon
224:10, 224:11,
229:1, 229:2,
232:3
afterwards 23:2,
229:13
age 34:3, 34:9,
232:12, 234:17,
236:15, 238:6,
241:22, 255:5
agencies 116:20
Agency 9:9,
21:1, 21:4,
113:1, 115:1,
116:20, 119:4,
181:6, 183:24,
186:4, 199:3,
226:11, 236:6
Agent 20:10,
21:6, 25:12,
28:1, 28:9,
32:9, 32:17,
32:20, 32:22,
33:20, 43:9,
96:12, 96:19,
123:25, 151:22,
157:11, 207:9,
210:25, 211:6,
211:12, 216:24,
229:17, 236:5
agents 210:6,
210:14, 210:19,
217:24
aggravated
129:18
aggressive
154:1, 154:2,
155:10, 155:12,
155:13, 158:18,
165:18
aging 118:19,

118:21
agitate 160:17
ago 7:20, 231:9,
235:11, 236:12
agree 63:11,
70:12, 87:2,
124:20, 124:23,
126:14, 128:17,
160:1, 163:19,
177:18, 180:21,
198:17, 242:11,
243:20, 254:23
agreeable 36:17
agreed 218:16,
227:17
agreeing 199:21
agreement
250:20, 250:21,
253:4, 253:6,
254:11
agrees 85:12
ahead 31:24,
52:17, 57:8,
102:4, 105:17,
197:11, 206:25,
209:13, 259:23
aided 111:6
air-borne 156:4
Airborne 131:24,
148:22, 149:9,
150:12, 157:9,
170:6, 170:11
airborne. 156:9
Airlines 203:17
airport 4:2,
109:8, 136:24
Albino 39:5,
66:18, 73:16,
89:2, 89:17,
93:3, 176:15,
204:25, 205:1,
211:15, 244:15,
248:21, 248:23,
251:9, 257:8
alcohol 248:20
ALECIA 228:25,
246:19, 264:36
Aleph 228:12,
228:17
alert 173:16,

173:17
alerted 21:10
alerts 128:15
allegation
211:21
allegations
12:19
allegedly 114:2,
212:22
Allegheny 133:5
Allied 113:18
allocute 207:1,
238:24
Allocution
194:1, 196:23,
197:10, 197:15,
228:23, 264:46
allow 46:13,
195:23, 225:16,
231:20, 242:13
allowed 32:4,
94:21, 163:5,
245:8
allowing 94:18,
109:22, 231:21
allows 244:20
Almost 109:5,
119:3, 128:22,
137:6, 140:6,
140:23, 247:25,
248:19
alone 135:10
already 8:2,
15:16, 94:1,
95:17, 105:5,
105:6, 199:8,
262:3, 262:19
alternative
217:13, 218:8,
225:15
Alternatively
216:22, 218:24
Although 42:21,
140:20, 197:10,
210:14, 217:12,
228:13
altruistic
232:24
aluminum 119:25
amazed 231:13,

232:14
amazing 235:7
Amcam 186:7,
186:11
amend 261:14
America 1:5,
21:7, 33:19,
246:18
American 203:17
ammunition
258:10
among 131:7
amount 10:15,
16:16, 22:10,
23:9, 69:11,
127:1, 127:7,
128:7, 149:25,
174:23, 174:24,
175:1, 175:15,
176:17, 178:13,
178:19, 201:14,
201:15, 201:24,
211:25, 236:21,
251:2, 257:10,
262:19
amounts 5:8,
38:14, 71:10,
210:25, 211:22,
217:4
AMX 22:22,
22:25, 48:23
analyses 182:6,
182:16
analysis 64:15,
64:16, 64:19,
64:21, 67:8,
67:22, 131:13,
135:1, 135:2,
149:18, 150:24,
153:9, 158:23,
160:8, 181:22,
182:2, 183:1,
183:17, 190:3,
213:12, 214:1
analytical 43:2,
43:3, 181:10
analyzed 67:6,
67:7, 182:4,
183:2, 183:7
Angeles 224:15,

226: 12,  228: 15,
228: 20
annual  251: 16
answer  91: 11,
97: 25,  111: 24,
114: 5,  117: 15,
117: 19,  226: 5
Anybody  12: 6,
48: 1,  87: 25,
202: 25,  230: 13,
239: 17,  246: 5,
249: 21
Anyway  201: 24,
204: 19
Apart  71: 16,
71: 18,  119: 18,
126: 9,  252: 21
apologetic  240: 5
apologies  224: 9,
236: 9
apologize  10: 9,
122: 7,  185: 19,
236: 2,  240: 4,
261: 25
apologizing  3: 21
appear  31: 17,
81: 20,  138: 18
appeared  193: 7
appears  76: 15,
77: 8,  77: 22,
78: 7,  78: 8,
79: 11,  80: 1,
81: 13,  86: 9,
87: 13,  87: 15,
146: 13,  146: 22,
149: 1,  226: 25
application
31: 5,  155: 6,
159: 5,  159: 24,
215: 16
applied  155: 2,
180: 8,  180: 9,
180: 13,  180: 15
applies  55: 12,
61: 13,  156: 6,
199: 13,  218: 10,
261: 21
apply  22: 7,
31: 5,  31: 22,
54: 23,  55: 1,

168: 20,  216: 2,
216: 3,  223: 1,
254: 20,  262: 22
applying  168: 22,
198: 15
Appreciate  7: 7,
8: 6,  96: 3,
195: 8,  233: 8,
240: 18,  247: 18,
247: 24,  248: 20,
248: 25,  249: 3,
249: 13,  249: 22
appreciated
248: 2
appreciates
240: 24
appreciative
228: 14
approach  3: 16,
25: 9,  43: 6,
50: 18,  55: 16,
70: 6,  76: 24,
77: 13,  80: 24,
83: 10,  92: 19,
101: 19,  141: 12,
154: 16,  167: 17,
175: 18,  180: 25,
185: 12,  185: 16,
192: 15,  194: 15,
194: 25,  261: 9
approaching
13: 19,  151: 2,
159: 2
appropriate
98: 17,  102: 14,
129: 1,  129: 4,
221: 10,  221: 21,
222: 5,  222: 25,
225: 18
appropriately
7: 9
approval  121: 25,
211: 24,  251: 25,
259: 8
Approved  26: 8,
96: 15,  121: 5,
122: 3,  209: 9,
211: 22,  214: 4,
252: 4,  259: 2
approving  211: 25

Approximately
25: 5,  47: 18,
103: 23,  134: 10,
134: 16,  196: 16
April  7: 20,
66: 22
architect
246: 25,  248: 23
areas  65: 12,
117: 24,  137: 10,
140: 13,  141: 8,
143: 20,  143: 22,
146: 14,  146: 16,
150: 4,  193: 10,
197: 25,  200: 16,
201: 1,  225: 5,
254: 2,  256: 21,
256: 23
argue  208: 21
argues  221: 10
argument  60: 2,
85: 8,  194: 17,
197: 11,  212: 17,
217: 23,  241: 19,
246: 4
argumentative
60: 3,  73: 12,
82: 9,  83: 6,
84: 17
Arguments  102: 2,
197: 14,  245: 23,
254: 23
arisen  9: 22
arm  115: 1
Armando  76: 7,
93: 19,  251: 8,
257: 7
arms  78: 2
around  4: 3,
32: 23,  58: 4,
74: 3,  78: 19,
122: 15,  122: 22,
131: 6,  135: 22,
136: 8,  138: 17,
209: 23,  230: 23,
260: 7
arrested  91: 9
Arriaga  24: 3,
24: 4
arrive  36: 16

Art  133: 7
article  123: 19,
199: 4
articles  199: 2
asbestos-contain
ing  147: 1,
147: 5,  147: 15,
167: 25,  181: 25,
182: 9,  183: 15,
207: 25,  212: 1,
217: 5,  220: 23
asbestosis
129: 22,  256: 13
aside  125: 17,
125: 22
aspect  233: 20,
242: 15
aspects  60: 13,
117: 13,  117: 17,
229: 5,  243: 2,
254: 24,  255: 6,
255: 16
asphaltic  191: 5
assertion  73: 8,
85: 16,  204: 23
assertions  17: 1,
17: 3,  26: 16
Assess  265: 32
assessment
118: 2,  161: 25,
164: 1,  164: 21,
165: 14,  201: 9,
250: 25,  257: 5
assessments
161: 22,  162: 1,
162: 4,  162: 19,
163: 3,  164: 9,
164: 13,  166: 17,
200: 2,  262: 14
asset  234: 10
Assistant  100: 2,
100: 18,  102: 13,
103: 15,  103: 16,
108: 1,  110: 12,
125: 24,  212: 19
associated
19: 18,  44: 8,
44: 13,  44: 17,
44: 24,  45: 7,
98: 6,  130: 23

assume 35:25, 63:11, 63:12, 63:14, 63:17, 121:23, 249:1
assumed 12:4, 12:8
assumption 77:25, 147:6
assured 229:10
assuring 129:5
astonished 12:1
at-risk 225:12, 225:20
atmosphere 104:18, 125:14, 136:19
attached 79:12, 80:19, 81:2, 84:22, 85:20, 181:24, 182:8, 210:17
attempt 11:15, 15:14, 16:5, 93:16
attempts 97:12
attended 239:24
attention 11:11, 26:19, 157:14, 178:12, 178:17
attest 107:1
attested 14:14
attitude 221:4
Attorney 1:23, 6:8, 16:14, 17:9, 29:10, 212:19, 223:8, 229:17, 236:4, 247:14
attributes 84:10
author 185:15
authored 148:23, 185:24
authorities 112:10
authority 112:12, 112:14, 112:17
available 118:13, 122:1, 126:6, 217:23,

222:23, 228:21
average 152:3, 182:6, 182:16
avert 94:11
avoid 16:2, 223:3
aware 3:23, 31:12, 48:2, 59:16, 59:17, 69:8, 73:16, 84:9, 90:2, 90:15, 90:20, 98:10, 124:17, 148:7, 149:15, 232:19
awareness 234:25
away 94:11, 138:5, 168:15, 202:2, 222:12, 235:4, 238:19
awe 231:12


< B >
B. 1:33
back 7:7, 9:10, 11:20, 42:8, 71:11, 73:19, 80:21, 96:6, 102:16, 104:2, 104:7, 104:10, 105:2, 108:22, 109:16, 111:14, 113:18, 121:4, 146:2, 173:13, 173:22, 179:1, 180:14, 180:18, 190:21, 192:21, 201:14, 203:19, 215:5, 220:2, 233:5, 233:19, 240:19
Background 151:2, 151:3, 153:12, 153:13, 153:16, 153:17, 165:1, 165:3, 165:4, 165:6, 165:10, 198:12, 198:22, 229:23

backhoe 69:18
backtracking 37:22
bad 140:14, 142:19, 202:20, 259:18
bag 173:7
balance 251:5, 257:12, 257:15, 257:19
ballpark 187:9
bank 248:17
barriers 171:22
bars 71:17
base 23:17, 74:2
Based 13:1, 13:14, 23:15, 34:3, 34:8, 35:8, 85:13, 105:7, 105:24, 159:22, 165:19, 168:12, 180:5, 183:9, 189:1, 196:9, 196:14, 211:1, 215:15, 216:5, 221:13, 222:1, 223:10, 241:20, 249:20, 254:11
bases 68:9, 215:19
basic 46:18, 254:2
Basically 108:25, 109:7, 111:5, 133:14, 133:16, 150:5, 150:10, 152:19, 156:19, 157:20, 160:16, 166:19, 166:20, 168:15, 172:5
basing 215:12, 215:22
basis 9:6, 117:11, 117:12, 126:17, 215:20, 242:24, 252:17
battalion 103:9, 103:11

bay 68:25, 69:4
Bbs 160:17
BD-1216 80:9
BDC-1216 80:6
bearing 6:5
beautiful 232:18
became 108:25
become 104:19, 118:15, 118:22, 119:5, 156:4, 156:9, 167:25, 168:10, 168:17, 206:16, 234:11, 239:23
becomes 51:25, 52:1, 52:9, 159:20, 192:3
beforehand 5:25
beg 235:2, 237:14, 238:4
began 21:9, 21:17, 30:23, 59:7, 96:20, 96:25, 217:3
begin 21:15, 196:25, 199:23, 236:8, 250:12, 253:7, 253:18, 254:21
beginning 163:3, 257:15
behalf 6:17, 18:18, 226:16, 227:20, 236:10, 236:13, 240:18, 259:24, 261:11
behind 15:17, 105:16, 122:6, 190:24, 191:1, 226:3, 259:22
beige 213:20, 213:23
belief 147:4
believed 28:5, 34:2, 34:8, 42:23, 42:25, 48:7, 53:16, 54:2, 59:1, 65:6, 66:19
believes 14:15,

168: 6, 210: 21, 211: 11, 212: 7, 212: 14
believing 53: 24
bell 68: 22
belongings 230: 7
below 109: 20, 131: 19, 131: 23, 151: 22, 152: 17, 158: 6, 161: 18, 164: 23, 164: 25, 165: 14, 165: 20, 166: 11, 166: 25, 184: 13
bench 243: 7
beneficial 225: 20
benefit 222: 21
benzene 91: 1, 91: 2, 91: 5, 130: 21
best 17: 5, 46: 22, 196: 20, 232: 6
better 40: 17, 40: 19, 156: 23, 231: 10, 235: 11, 237: 12, 240: 25, 241: 7, 241: 14
beyond 11: 16, 208: 11, 225: 3
BG-250 161: 5
bid 35: 13
bids 35: 9
big 56: 8, 58: 16, 58: 18, 104: 24, 108: 18, 150: 6, 168: 2
bigger 68: 15
biggest 230: 11, 230: 16, 234: 10, 234: 11
billions 256: 11
billionths 124: 7
binder 18: 19, 33: 1, 33: 2, 33: 3, 33: 7, 33: 10, 33: 13, 33: 14, 58: 8, 58: 9, 58: 10,

58: 13, 95: 16, 139: 8, 156: 7, 218: 2
binders 18: 17
binding 245: 9
Biophysics 116: 2
bit 11: 3, 16: 18, 37: 22, 90: 8, 98: 3, 116: 12, 128: 16, 129: 11, 140: 15, 175: 13, 176: 5, 178: 8, 242: 18
black 23: 21, 44: 16, 66: 4, 138: 21, 141: 25, 144: 24, 175: 5, 176: 22, 177: 8, 181: 20, 182: 6, 182: 15, 192: 25
Blaise 34: 7, 34: 15, 34: 20, 34: 21, 34: 22, 34: 24, 47: 24, 49: 7, 49: 9, 49: 17, 58: 19, 58: 24, 99: 8, 99: 12, 214: 16, 229: 13, 246: 24, 248: 22, 249: 20
blame 34: 20, 220: 5, 236: 19, 239: 17
blamed 212: 20, 212: 21, 212: 23
blanket 73: 8
Blastrac 79: 15, 80: 6, 85: 5, 85: 18, 85: 19, 136: 5, 136: 7, 136: 9, 136: 11, 136: 14, 160: 4, 161: 5, 164: 19
blessed 244: 1
blocks 107: 9, 208: 16
blocks. 104: 11
blow 126: 23, 202: 24, 203: 2, 203: 4

blower 109: 6, 109: 9, 109: 18, 109: 19
blown 105: 12, 248: 8
blue 79: 5, 79: 14, 79: 15, 79: 22, 84: 3, 84: 21
blurry 76: 10
board 115: 9, 134: 1, 134: 4, 174: 9, 241: 13
bodily 10: 25, 26: 15, 129: 23, 197: 23, 202: 8, 202: 19, 207: 19, 208: 14, 208: 17, 216: 13, 216: 19, 216: 25
body 116: 10, 116: 11, 118: 4, 157: 24, 235: 3, 241: 21
boil 220: 16
boils 220: 15
bomb 104: 16, 208: 15
bonding 157: 11
bone 235: 3, 241: 20
book 162: 5
bottom 109: 2, 137: 16, 145: 15, 175: 2, 192: 25, 231: 20
Boulevard 103: 7
bound 118: 10, 156: 21
Bowden 22: 22, 48: 23, 68: 3
box 104: 24, 106: 5, 150: 6, 150: 7
Boy 238: 9, 248: 15
brain 230: 13
branch 115: 2
break 37: 3, 74: 22, 74: 24,

132: 4, 160: 18, 196: 21, 197: 11
Breaking 39: 23, 39: 24, 39: 25, 196: 21
breaks 119: 18
breathe 41: 13, 106: 13
breathing 131: 9, 135: 22, 151: 8
briefed 87: 20
briefly 6: 12, 194: 22, 224: 2, 240: 14
Bring 11: 11, 11: 21, 13: 24, 75: 15, 76: 21, 80: 21, 109: 15
bringing 102: 16
broad 117: 13
broke 71: 18
broken 25: 2, 52: 9, 57: 19, 71: 16, 126: 9
brother 220: 11, 229: 22, 230: 2, 231: 12, 231: 17, 232: 11, 232: 21, 233: 10, 233: 11, 233: 16, 233: 24, 234: 10, 234: 21, 235: 7, 237: 6
brought 10: 12, 11: 23, 14: 20, 32: 10, 49: 14, 100: 22, 137: 20, 146: 1, 242: 8
brown 23: 20, 44: 11, 213: 20
buckled 11: 4
buckling 11: 6
buffer 109: 1
build 150: 5, 172: 1, 209: 21
buildings 151: 7
bunch 142: 21, 248: 19
burden 234: 9, 248: 12
Bureau 257: 3,

258: 13, 260: 13,
260: 15
Burleson 2: 2
burn 106: 5
business 25: 1,
221: 6, 229: 6,
234: 1, 234: 4,
234: 5, 234: 15,
236: 16, 237: 19,
243: 13, 246: 16,
246: 21, 247: 2,
251: 18, 259: 6
businesses
208: 18
businessman
237: 6
busy 204: 9,
204: 10, 204: 12,
214: 6
buy 123: 6
buying 204: 5

< C >
CAA 51: 8
cabinet 32: 7,
32: 15, 32: 22,
94: 11, 94: 13,
94: 22, 205: 15,
210: 12, 210: 14,
210: 19
cabinets 32: 5,
91: 16, 91: 24,
94: 10, 94: 19,
204: 24, 205: 8
CAD 111: 6
calculate
158: 15, 159: 20
calculation
210: 22
California 23: 3,
224: 14, 225: 11,
260: 19
call 20: 10,
102: 21, 103: 1,
103: 15, 105: 2,
113: 1, 113: 5,
113: 20, 124: 18,
132: 19, 138: 8,
145: 6, 145: 22,

150: 6, 160: 16,
167: 7, 176: 25,
223: 20, 228: 23,
228: 25, 242: 1
called 22: 2,
22: 3, 23: 12,
26: 19, 26: 23,
34: 4, 38: 2,
113: 17, 115: 21,
128: 3, 129: 19,
129: 22, 130: 21,
205: 15, 222: 25,
228: 12, 238: 7,
243: 24, 245: 12,
255: 2, 260: 11
callous 221: 5
calls 100: 2
campout 248: 17
cancer 129: 18,
129: 19, 129: 21,
184: 15, 184: 17,
184: 18
candidate
170: 20, 170: 22
canisters 39: 2,
40: 13, 41: 9,
86: 7, 87: 13
cap 217: 13,
217: 15, 222: 7,
254: 9, 254: 10,
254: 19
capable 104: 23
capped 221: 9,
254: 11
capture 79: 10,
85: 3
car 103: 3,
103: 25
carcinogen
130: 22
cards 88: 14,
88: 15, 88: 18,
89: 2
care 209: 17,
241: 13, 255: 9,
255: 11
career 226: 15
careful 203: 1
carefully 84: 6,
122: 14

caring 230: 8
Carolina 116: 15
carry 16: 22,
237: 17
cars 41: 22
cartridge
122: 18, 208: 6
cartridges 41: 9,
208: 3
cases 120: 6,
220: 15, 223: 5,
243: 8, 244: 7,
244: 8, 247: 13,
255: 7, 255: 8,
255: 15
cast 241: 24
cat 104: 24,
246: 5
Cate 43: 5, 52: 2
Cates 131: 14
cause 120: 15,
130: 5, 130: 20,
131: 24, 151: 12,
207: 20, 207: 21
caused 9: 19,
10: 7, 11: 5,
11: 7, 129: 14,
129: 16
causes 119: 5
causing 208: 16
caustic 131: 4
CCTWA 153: 4
ceiling 3: 24,
5: 7, 5: 14, 8: 24,
9: 17, 9: 19,
12: 18, 42: 22,
43: 1, 47: 5,
47: 6, 47: 9,
52: 4, 52: 15,
142: 23, 142: 24,
143: 9, 143: 10,
171: 24, 247: 20
cell 203: 13
cells 202: 16
Center 33: 4,
33: 9, 33: 23,
48: 16, 74: 1,
102: 8, 102: 23,
104: 4, 108: 16,
131: 8, 160: 16,

198: 6, 199: 3,
202: 15, 224: 16
centimeter
152: 24, 165: 15,
199: 12
certain 6: 17,
98: 10, 120: 20,
121: 25, 127: 1,
127: 6, 147: 19,
153: 17, 184: 13,
211: 25, 246: 23,
253: 16
Certainly
112: 25, 127: 11,
130: 5, 131: 18,
145: 25, 159: 13,
172: 18, 180: 21,
208: 13, 209: 19,
222: 16, 222: 19,
226: 20, 240: 16,
248: 13, 248: 22,
249: 18, 249: 21,
255: 21
certainties
166: 14
certainty
163: 17, 165: 13,
165: 23, 165: 24,
167: 2
certification
115: 9, 115: 12,
115: 15, 115: 16,
168: 20
certifications
61: 5, 133: 10,
133: 19
Certified
121: 11, 126: 22,
127: 4, 127: 12,
133: 20, 171: 5,
171: 6, 200: 9
certify 265: 48,
266: 3
cetera 81: 24,
116: 21, 123: 8,
131: 6
chain 182: 14
challenge
234: 12, 241: 16
challenges

231: 11
chamber 172: 1
chance 110: 15,
192: 14,  235: 13,
237: 12
changed 41: 9,
68: 20,  105: 12,
105: 15,  189: 2,
208: 6
changing 46: 11
character 5: 20,
197: 2,  221: 4
characteristic
232: 18
characteristics
233: 8,  241: 11
characterization
126: 14,  211: 5,
225: 13
characterize
145: 5
charge 14: 20,
116: 14,  237: 20,
246: 25
chargeable
216: 16,  216: 22,
217: 8
charged 129: 5
charges 14: 19
charitable
215: 2,  221: 3,
241: 17
Charlottesville
116: 3
chart 57: 4,
201: 6
cheat 80: 4
check 103: 17,
103: 21
checks 29: 5,
29: 18,  31: 2,
31: 3
chemical 130: 21,
149: 10,  150: 16,
150: 20,  166: 2,
166: 3,  166: 4,
166: 5,  169: 7,
191: 10,  192: 1,
192: 2,  208: 25,
209: 1,  209: 25

chemically
156: 20,  156: 21
Chief 100: 2,
100: 18,  102: 7,
102: 13,  102: 21,
103: 9,  103: 11,
103: 15,  103: 16,
105: 20,  108: 1,
110: 10,  110: 12,
125: 24,  130: 17,
190: 14,  191: 17,
191: 18,  203: 24,
208: 12,  210: 2,
248: 7
chiefs 203: 25
child 231: 10
children 27: 1,
123: 17,  231: 17
choice 109: 16
choices 161: 11
choose 234: 14,
258: 23
choosing 230: 24
chosen 161: 9
CHRISTOPHER
114: 14,  114: 22,
264: 18
Chrysotile 44: 8,
44: 12,  44: 13,
44: 17,  44: 20,
44: 21,  44: 23,
44: 24,  45: 9,
66: 4,  72: 5,
72: 10,  119: 21,
119: 23,  119: 24,
120: 4,  120: 5,
120: 8,  120: 15,
149: 13,  149: 16,
157: 25,  159: 1
CI 158: 20
circumstance
221: 22
circumstances
5: 11,  108: 20,
109: 12,  113: 11,
225: 18
circumstantial
196: 10
citation 90: 19,
111: 23,  112: 3

citations 111: 20
cite 160: 2
cited 223: 5
City 27: 12,
104: 11,  107: 9,
111: 20,  112: 8,
112: 14,  208: 16,
225: 10,  225: 11,
225: 14,  226: 8,
226: 12,  228: 10,
244: 14,  244: 17
claimed 33: 2
clarification
19: 21,  102: 10
clarify 167: 24
clarifying 28: 6
class 224: 20,
225: 4
classes 239: 25
Clean 9: 24,
10: 17,  10: 18,
51: 8,  51: 11,
61: 12,  86: 11,
86: 14,  90: 10,
93: 16,  93: 21,
150: 7,  159: 24,
159: 25,  167: 10,
167: 13,  198: 1,
243: 14,  247: 11,
247: 13,  249: 8,
249: 10
clean-shaven
122: 24
cleaned 4: 5
cleaner 79: 10
cleaning 155: 17,
249: 18
cleanup 113: 18
clear 19: 20,
142: 12,  192: 13,
232: 7,  255: 8,
262: 10
clearer 224: 3,
241: 7
clearing 69: 11
clearly 75: 16,
242: 23
Clerk 257: 11,
262: 18,  262: 22
client 5: 8,

8: 22,  13: 5,
16: 11,  19: 7,
44: 6,  44: 15,
44: 19
clinical 116: 15,
234: 15
clinician 232: 6
clog 39: 2
clogged 41: 12,
86: 7,  87: 13
close 104: 8,
105: 24,  105: 25,
165: 8
closed 42: 8,
42: 9,  211: 14,
211: 15
closely 62: 6,
77: 18,  129: 7
closer 104: 5
closing 219: 4,
226: 10
clothes 123: 18,
169: 2,  169: 9,
172: 16,  172: 19,
172: 21,  208: 10
clothing 41: 19,
41: 20,  41: 23,
121: 9,  121: 18,
123: 2,  123: 3,
123: 4,  123: 5,
123: 12,  123: 14,
123: 18,  123: 19,
123: 22,  128: 6,
174: 14
clump 177: 11
clumping 177: 22,
177: 23,  178: 1,
178: 4
clumps 177: 11
coat 157: 10
coated 156: 6,
157: 22,  157: 23
coatings 170: 11
Code 103: 3,
111: 21,  112: 8,
112: 13,  112: 16,
112: 17,  112: 20,
251: 5,  251: 11,
253: 21,  257: 19,
262: 17,  262: 20,

262:24
cold 27:6
colleague 231:19
collect 128:1,
200:7
collected 70:22,
70:24,  160:9,
165:20
collecting
208:15
collection
128:2,  136:6,
207:24,  258:7
collector 70:23,
70:24,  70:25,
79:15,  81:6,
84:22,  85:25,
86:24,  200:6
College 115:19,
133:5,  204:16,
204:17,  234:16,
246:7,  249:2
colors 23:19
column 44:6,
56:8
combined 18:25,
253:14
combining 156:8
comes 102:15,
115:12,  167:13,
173:17,  183:23,
186:23,  192:3,
198:2,  203:19,
233:18
coming 3:21,
157:2
command 103:23,
104:2,  104:9,
105:2
commencement
257:13
comment 37:8,
104:9,  105:14,
107:16,  244:7
comments 37:5
Commerce 1:24,
2:38
commercial 98:9,
109:1,  119:14,
259:7

commercially
122:1
Commission
257:25
commit 251:12,
258:3
commitment
227:4,  227:13,
250:7,  260:25
committed 238:4,
255:4,  257:2,
259:19
committing
222:16,  259:20
common 118:23,
118:25,  120:23
commonly 34:5,
79:9
Commonwealth
134:5
communities 27:9
Community 105:9,
133:5,  194:1,
209:25,  210:3,
217:12,  221:25,
223:22,  225:9,
225:19,  225:24,
226:6,  228:11,
228:13,  228:16,
228:19,  239:11,
239:24,  241:9,
243:11,  243:13,
245:5,  249:23
company 22:22,
24:15,  25:16,
28:3,  37:16,
113:18,  133:7,
205:12,  262:1
compartment
109:15
compassionate
230:9,  237:6
compelled
226:15,  228:7
complaint 205:3
complete 52:18,
157:6,  227:1,
259:21
completed
196:17,  240:11

completely
106:9,  230:4,
235:6,  237:2,
239:23,  246:2
completes 244:5
compliance 250:9
complicated
247:15
comply 32:12,
32:19,  163:11,
254:6,  256:24,
257:23,  266:3
component 245:7
components 13:21
Composite 34:5
compress 104:23
compromise
230:23
computer 2:47,
111:6,  225:24
conceal 73:22,
74:12
concede 14:1,
56:19,  56:21,
56:22,  67:12,
72:15,  72:16,
74:21
conceded 204:23,
205:23
conceive 202:22
concentration
130:19,  151:5,
151:11,  151:13,
151:15,  155:1,
190:22
concentrations
180:18
concern 7:16,
104:6,  107:10,
152:5,  218:25,
256:10
concerned
137:24,  222:17,
232:6
concerning
216:23,  261:19
concerns 10:14
conclude 213:15,
215:21,  259:16,
259:17

conclusion
85:13,  166:10,
166:24
conclusions
215:15
conclusively
111:24
concrete 109:24,
131:1,  131:2,
131:3,  131:9,
136:11,  138:16,
138:22,  140:11,
146:8,  147:17,
161:12,  161:13,
169:3,  169:4,
193:8,  198:4
condition
157:15,  245:5,
251:18
conditions
245:13,  253:16,
257:24,  258:2,
262:12,  263:13
conduct 17:6,
108:4,  209:6,
209:19,  209:20,
216:15,  216:22,
217:8,  222:10,
222:14,  250:10,
255:17,  255:25
conducted 93:3,
125:4,  163:9,
196:15,  196:16
confer 141:10,
169:10
Conference 266:4
confidence 237:8
confinement
245:10,  249:6,
249:7
confines 216:9
confirm 30:24,
152:19
confirmability
47:25
confirmation
233:10
conflagration
248:12
confusing 98:3,

188: 3
conscience
226: 16
consecutive
115: 25
consequence
245: 11
consequences
237: 1
consequently
230: 20
conservative
234: 2
consider 36: 2,
117: 2,  117: 7,
117: 21,  151: 21,
194: 17,  195: 3,
195: 14,  225: 15,
227: 9,  231: 21,
238: 2,  238: 5,
241: 10,  244: 20,
245: 4,  249: 25
considerably
254: 10
consideration
225: 10,  228: 22,
244: 20,  248: 4
considerations
254: 2
considered
215: 19,  216: 16,
253: 20,  253: 22,
253: 25
Considering
222: 23,  254: 25,
259: 24
considers 217: 24
consistency
233: 12
consistent
46: 14,  68: 5,
97: 16,  176: 17,
219: 15,  241: 12,
252: 18
constant 260: 1
constitute 25: 22
constructed 68: 4
Construction
33: 10,  33: 19,
33: 25,  49: 11,

74: 16,  247: 1,
259: 7
constructively
225: 17
consult 95: 11
consulted 214: 16
consulting
111: 25,  133: 6
contact 27: 22,
30: 6,  30: 7,
30: 8,  37: 25,
210: 8,  233: 18,
259: 1,  259: 2
contacted 28: 19,
229: 13,  229: 18
contacting 21: 21
contain 3: 25,
12: 18,  39: 25,
40: 3,  43: 1,
43: 18,  43: 21,
43: 25,  47: 10,
147: 16,  156: 5,
168: 3,  171: 24,
171: 25,  183: 4,
183: 7,  188: 14,
212: 11,  212: 12,
213: 9,  214: 1
contained 23: 10,
33: 15,  34: 3,
34: 8,  37: 1,
42: 22,  42: 23,
45: 8,  63: 13,
63: 17,  91: 2,
97: 17,  125: 23,
149: 13,  187: 20,
196: 7,  210: 18,
213: 17
container 104: 25
containing
23: 13,  25: 23,
37: 12,  40: 12,
43: 14,  44: 11,
62: 20,  116: 7,
116: 8,  119: 8,
119: 11,  125: 1,
130: 12,  196: 6,
207: 14
containment
150: 5,  150: 6,
171: 19,  171: 20,

171: 21,  188: 7,
188: 20,  188: 25
containments
189: 8
contains 130: 21,
184: 3,  184: 4
contamination
212: 24
contention 10: 6,
39: 12,  63: 2
contest 17: 3
contested 94: 21
context 8: 3,
51: 5,  117: 20
continuance 8: 2,
14: 17,  16: 22,
17: 1,  194: 18,
195: 3,  195: 11,
195: 23,  196: 2
continue 196: 18,
209: 9,  235: 12,
237: 12,  237: 22,
252: 16,  260: 5,
263: 12
continued 16: 25,
210: 9
continuing 60: 2
continuous
207: 6,  211: 18,
212: 5
contracted
113: 17
contracting
131: 14
contractor 9: 3,
9: 5,  33: 18,
33: 25,  34: 23,
35: 2,  58: 20,
58: 25,  59: 2,
64: 22,  65: 24,
66: 1,  66: 5,
96: 22,  99: 5,
173: 13
contractors
28: 3,  35: 8,
35: 16,  36: 6
contrary 10: 10,
213: 10
contrast 128: 3,
150: 13,  230: 2

contrasting
254: 1
contribute
225: 17
contributing
260: 3
control 233: 3,
259: 5
controlled
201: 18,  202: 16,
258: 6,  258: 16
conversations
54: 8
convicted 231: 2
conviction
230: 12,  242: 20,
243: 10,  243: 11,
243: 17,  261: 21
convoluted
147: 11
cool 105: 12
cooperate 94: 15,
258: 7
cooperating
92: 3,  92: 4,
92: 5,  205: 7
cooperation
46: 16,  204: 25,
205: 9,  205: 14
copies 101: 6,
148: 15,  223: 22
copy 31: 3,  31: 8,
43: 10,  43: 11,
54: 20,  75: 15,
101: 12,  148: 17,
192: 20
cord 107: 4
corner 143: 25
Corp.  225: 11
corporate 240: 9
corporation 5: 9
corporations
249: 9
corpus 8: 16
Correction
143: 10
Correctional
260: 12
correctly 55: 6,
99: 5,  104: 17

correlated 152:16
correspond 259:1
correspondingly 256:15
cost 35:17, 49:1, 186:18, 215:8, 222:11, 227:17, 227:19, 251:7, 257:6
costed 49:1
costs 27:12
coughing 235:22
Coughing. 36:3
Council 224:22
Counsel 3:16, 7:14, 8:10, 9:16, 15:19, 19:18, 74:23, 75:7, 85:10, 95:11, 101:1, 101:4, 101:18, 106:17, 141:10, 175:10, 197:3, 197:15, 206:22, 215:11, 240:9, 254:23
counsels 245:25
count 250:22, 257:1, 261:20, 262:1
countries 226:2, 228:1
country 116:18, 243:23, 256:8, 256:10
County 133:5
couple 220:19, 239:14, 241:16
coupled 115:14
course 3:22, 9:24, 15:23, 15:24, 16:24, 47:17, 61:2, 108:18, 113:19, 121:2, 121:12, 155:3, 155:11, 195:2, 196:20, 200:10, 208:25, 244:9

courtroom 151:4, 151:6, 199:25, 235:22
courtroom. 236:1
cover 40:15, 47:12, 64:2, 74:9, 74:16, 227:1
covered 14:7, 23:24, 24:7, 24:10, 26:4, 26:5, 42:2, 42:4, 67:9, 74:6, 74:13, 176:11, 176:12, 176:13, 218:23
coworker 239:10
cracked 47:9
create 234:15
created 109:4, 190:14, 191:9
creates 113:4
credit 88:15, 88:18, 89:2, 254:15
Crest 36:13, 36:25, 37:4, 37:10, 48:14, 48:15, 49:24, 242:4, 249:18
crime 9:2, 9:8, 210:23, 244:23, 247:16, 251:13, 258:4, 259:20
crimes 222:16, 243:21, 255:22
Criminal 10:21, 21:1, 21:4, 222:10, 222:14, 230:21, 237:25, 244:4, 255:25, 262:13, 262:21, 262:23
criminalizes 10:19, 247:11
criminally 243:7
criteria 247:17
critical 249:14
CROSS 46:7, 75:9, 110:8,

132:14, 170:18, 264:6, 264:8, 264:16, 264:26
Cross-examination 46:6, 110:6, 132:13, 169:14, 177:16
Crossman 185:6
CRR 2:37, 266:11
CSR 265:48
cube 152:24
cubic 152:23, 152:24, 165:15, 199:12
cuffs 123:15
culture 246:13, 249:12
current 100:17
Currently 34:18, 38:5
custody 182:14, 253:14, 254:3, 255:22, 256:7, 256:17, 257:2, 257:16, 258:13
cut 173:12
cutoff 131:23
cutthroat 221:6
cutting 155:20, 159:24
CV 194:7, 265:16
CV194 265:16
cylinder 84:3
cylindrical 77:17, 79:5, 84:22


< D >
D-r-o-e-m-e-r 38:11
D/FW 109:8, 203:17
DABT 115:7
dad 243:24, 246:24, 247:3
Dallas 1:3, 1:9, 1:25, 1:36, 2:4, 2:39, 25:15, 25:19, 48:15,

61:24, 62:15, 68:19, 68:24, 69:15, 69:23, 69:25, 71:5, 229:5, 238:8, 241:18, 244:17, 266:14
Dallas/fort 243:13
danger 108:19
dangerous 107:6, 130:18, 131:17, 131:19, 242:10, 258:10
dangers 208:1, 248:20
dark 78:21
darn 246:5
Darren 22:22, 48:23, 68:3
data 130:4
date 70:9, 171:3
dates 70:16
day-to-day 232:20
days 40:21, 173:22, 251:24, 257:15, 258:18
DBC-1216 80:13
De 10:16, 24:2, 33:25, 201:24
deal 11:13, 36:19, 36:23, 58:16, 58:18, 108:22, 113:5, 113:6, 113:9, 113:10, 114:1, 229:20, 237:22, 249:9
dealing 8:19, 10:1, 48:4, 113:25, 133:9, 249:8
dealt 108:22, 113:7
dearly 235:14
death 26:14, 107:25, 197:23, 202:7, 202:18, 207:19, 208:14,

208:16
debris 44:20,
44:22, 56:9,
56:12, 57:1,
57:5
decades 118:20,
119:4
decades. 156:12
decide 87:17,
242:13
decision 7:11,
8:8, 221:6,
242:4, 242:6,
247:3, 248:11
decisions
246:23, 247:2,
247:6
declaration
210:17
decline 196:18
decon 173:6,
173:25
decontaminate
173:3
decontamination
172:1
dedicate 232:15
deep 244:25
deepest 235:9
deeply 234:9,
236:23
defeat 213:15,
213:17, 214:5
defendants 3:13,
9:4, 15:13,
17:4, 17:7,
17:10, 18:2,
20:5, 124:17,
187:13, 187:16,
194:19, 216:1,
220:25, 221:17,
221:19, 255:9
DEFENSE 7:14,
13:18, 14:16,
23:11, 34:14,
35:21, 101:1,
101:4, 106:17,
194:8, 208:21,
220:4, 247:14,
265:25

Define 120:1,
162:24, 233:23
definitely
172:12
definition
151:20, 204:25,
207:14, 207:15,
233:6
degree 115:20,
146:6, 165:12,
165:23, 165:24,
166:13, 167:1,
168:3, 229:11
delay 13:23
delaying 14:16
demand 16:14
demolition 51:16
demonstrate
168:16
demonstrates
250:6
demonstrating
163:16
Denied 8:2,
206:13, 265:10,
265:27
denies 214:18
deny 47:2,
196:2, 206:11,
214:14
denying 206:10
Department 9:9,
21:10, 21:19,
21:22, 22:3,
24:24, 26:19,
26:23, 27:9,
65:21, 66:23,
88:6, 89:20,
90:17, 90:19,
90:21, 100:13,
100:15, 102:22,
103:3, 108:2,
111:19, 111:23,
112:3, 112:22,
115:2, 116:1,
167:21, 168:19,
170:4, 211:15
departments
227:16
Depending

126:25, 161:10,
171:22, 172:2,
172:9, 172:15,
173:13
depends 113:11,
121:2, 158:20,
172:20, 180:13
deploy 108:16
deposit 262:23
Depot 121:23,
122:4, 122:10,
123:6
depths 230:10
describe 76:6,
172:13
described 39:4,
188:12, 191:12,
191:14
Description
80:3, 97:17,
98:17, 182:24,
265:10, 265:27
descriptions
97:13, 181:10
designated
18:19, 108:21,
226:1, 259:12
designates 115:8
designed 80:6,
85:3, 156:23,
200:7, 207:23,
249:8
desires 234:7
despite 33:13,
235:7
destructive
258:10
detail 48:25
detailed 9:7,
33:3, 190:2,
195:12
detailing 33:8
details 102:1
detect 251:22,
252:1, 252:3,
252:7
detected 45:5,
159:4
deter 222:14,
255:24

determination
260:16
determine 16:24,
31:22, 104:8,
119:4, 127:23,
128:10, 148:9,
152:15, 171:12,
171:14, 171:16
determined 6:14,
105:7, 105:8,
162:18, 162:25
determining
218:22, 253:19
deterrence
222:10, 243:2,
243:4, 243:5,
243:19
deterrent
242:22, 243:11
devastated
234:10
develop 6:22,
193:25, 225:6,
234:18, 240:20,
251:21
developed 195:4,
195:17
developing
228:19
development 8:5,
195:13, 259:7
developmentally
234:16
developments 7:8
device 128:2,
136:4, 166:19,
258:10
devices 136:1
Devon 48:23
dichotomy 46:19
difference
47:22, 48:20,
48:24, 49:3,
135:19, 247:15,
247:24
differences
156:10
different 6:25,
23:19, 42:7,
54:15, 67:23,

71: 22, 71: 23,
117: 13, 117: 17,
120: 15, 121: 3,
122: 15, 122: 16,
144: 20, 165: 11,
171: 22, 180: 18,
180: 19, 184: 22,
184: 23, 213: 22,
230: 4, 231: 8,
246: 2, 255: 7,
255: 12
differently
184: 23
differing 211: 13
difficult 42: 10,
119: 7, 157: 1
digging 32: 23,
129: 9
DIRECT 20: 21,
100: 8, 114: 19,
132: 23, 178: 12,
178: 17, 196: 10,
264: 14, 264: 20,
264: 24, 264: 32,
264: 34, 264: 38,
264: 43
directed 252: 8,
258: 8, 258: 19,
258: 21
direction 61: 4,
105: 11, 105: 13
directly 209: 5,
209: 19, 259: 6,
259: 11, 263: 10
director 49: 11,
115: 6
directory 260: 21
disappeared
204: 23
disaster 248: 8
discharge
197: 22, 198: 1,
207: 16, 211: 18,
212: 6, 216: 7,
216: 17
discharged
258: 22
discover 103: 21
discovered 7: 4,
63: 8, 195: 9,

212: 10
discovery 221: 15
discretionary
7: 2
discuss 19: 6,
19: 11, 19: 14,
59: 19, 59: 22,
60: 11, 60: 12
discussed 47: 22,
47: 24, 48: 25,
49: 3, 87: 25
discussing
33: 21, 34: 1,
253: 24, 254: 21
discussion
36: 24, 124: 3
discussions
35: 5, 35: 15,
36: 15
disease 120: 16,
129: 16, 129: 21,
129: 22, 130: 5,
131: 7, 151: 21,
152: 5, 221: 14,
256: 12
diseases 221: 15,
256: 14
disparity 223: 4,
242: 19, 244: 6,
244: 21
dispatch 111: 7
dispatched
103: 9, 103: 12
disperse 160: 6,
160: 24
dispersions
241: 24
disposable 123: 4
disposal 173: 7
disposals 219: 12
disposed 128: 24
disposition
250: 21, 251: 19,
253: 6
disprove 206: 14
dispute 23: 9,
208: 12, 212: 13,
220: 13
disputed 85: 2
dissolve 125: 18

distinct 232: 18
distributed
153: 9
distributing
127: 17
District 1: 1,
1: 2, 1: 18, 3: 4,
3: 5, 229: 17,
257: 10, 258: 12,
260: 13, 266: 13
disturb 125: 8
disturbance
118: 23, 118: 25,
119: 2, 124: 25,
126: 8, 128: 23,
131: 23
disturbed 26: 10,
40: 8, 42: 17,
52: 1, 71: 17,
71: 21, 71: 22,
71: 23, 73: 4,
118: 14, 119: 19,
124: 14, 126: 6,
129: 6
disturbing 40: 4,
61: 3, 72: 2,
124: 5, 192: 5,
192: 6, 208: 5
Division 1: 3,
21: 2, 266: 14
DNA 233: 4,
239: 11, 258: 8
dock 68: 18,
68: 19, 68: 21
doctor 39: 18
doctorate 115: 22
document 51: 7,
55: 1, 93: 6,
167: 20, 210: 16
documentation
29: 2, 63: 1,
63: 8, 68: 18,
84: 12
documented 21: 12
documents 28: 2,
35: 10, 44: 5,
49: 23, 244: 11
Dodson 185: 6
doing 11: 25,
15: 6, 17: 12,

28: 5, 28: 17,
31: 12, 56: 15,
74: 15, 142: 10,
162: 12, 163: 16,
172: 15, 172: 20,
172: 21, 174: 7,
186: 17, 186: 22,
187: 15, 189: 6,
191: 7, 200: 13,
202: 23, 203: 25,
204: 15, 204: 20,
222: 12, 225: 12,
238: 4, 244: 19,
254: 17, 255: 9,
262: 8
dollars 256: 11
donate 238: 8
door 106: 10
doors 42: 6,
42: 7, 42: 8,
42: 9, 42: 18,
69: 4, 73: 18,
73: 19, 109: 9,
211: 14, 211: 18,
219: 4
dot 77: 3, 77: 19,
77: 22
double 165: 17
doubt 107: 22,
107: 24, 200: 5,
243: 20
down 5: 4, 10: 8,
10: 12, 14: 10,
20: 15, 26: 5,
35: 13, 48: 13,
89: 14, 90: 11,
91: 6, 91: 8,
99: 23, 108: 16,
109: 20, 114: 11,
132: 15, 147: 24,
160: 17, 179: 15,
181: 13, 181: 17,
190: 21, 192: 2,
192: 25, 193: 20,
203: 21, 220: 15,
220: 16, 221: 4,
245: 18
downward 221: 20,
223: 2, 223: 15
Dozen 47: 19,

47: 20
drafted 225: 9
dramatically
144: 20
draw 172: 4
drawer 205: 15
dried 126: 5,
126: 9
drive 233: 19
driven 255: 17
driving 26: 5,
248: 6
Droemer 36: 21,
36: 24, 37: 7,
38: 10
dropping 254: 12
Drug 116: 21,
239: 23, 258: 17,
258: 19
drugs 246: 19,
249: 3, 249: 16
drum 79: 11
dry 110: 2,
126: 2, 147: 24,
150: 10, 155: 2,
156: 4, 190: 21
due 157: 8,
217: 15, 236: 14,
251: 2
dumb 202: 22,
202: 23, 203: 9
dump 14: 11,
26: 1, 247: 23
dumped 25: 25,
212: 4
dumpster 12: 21,
57: 20, 62: 13,
62: 20, 63: 2,
63: 15, 63: 17,
68: 20, 69: 9,
69: 22, 69: 23,
70: 1, 70: 5,
70: 13, 71: 1,
71: 5, 97: 6,
219: 12
dumpsters 14: 10,
24: 14, 24: 16,
24: 18, 25: 2,
25: 16, 25: 19,
25: 21, 26: 3,

57: 3, 57: 10,
57: 22, 57: 25,
58: 3, 61: 22,
61: 24, 62: 10,
68: 8, 68: 22,
68: 24, 69: 4,
69: 6, 97: 19,
201: 13, 207: 10,
212: 3
duplicate 146: 22
During 16: 23,
16: 24, 22: 13,
25: 16, 28: 24,
33: 19, 35: 15,
36: 24, 37: 22,
38: 6, 38: 14,
48: 19, 51: 14,
51: 15, 59: 11,
73: 19, 125: 3,
134: 25, 148: 22,
152: 17, 157: 12,
159: 4, 159: 23,
172: 14, 215: 24,
217: 1, 229: 16,
238: 11, 257: 12
Dust-free 80: 14,
80: 16
dusty 38: 19,
38: 24, 39: 1,
39: 4, 39: 6,
39: 7, 39: 8,
81: 13, 86: 6
Dwight 33: 19


< E >
earlier 18: 14,
71: 12, 96: 19,
107: 8, 125: 24,
183: 5, 188: 12
early 125: 3
earth 67: 18
easier 57: 19,
78: 25
easily 71: 18,
118: 11, 126: 10,
147: 21, 157: 21
echoed 233: 12
economical 80: 13
edge 103: 22

educate 260: 1
education
115: 13, 203: 7,
204: 1, 222: 20
effect 32: 18,
49: 12, 61: 1,
69: 17, 72: 9,
118: 4, 224: 17
effective 161: 1
effects 117: 25,
130: 19, 151: 12,
199: 23, 209: 4
effects. 157: 18
efficiency
86: 25, 119: 6,
121: 6, 122: 21
efficient 160: 24
effort 125: 7
efforts 119: 6
eighth 218: 12
Eighties 125: 3
Either 32: 22,
35: 21, 63: 8,
63: 25, 65: 24,
111: 1, 126: 7,
159: 4
electric 71: 19
eleven 6: 14
Eli 235: 19
eligible 254: 15
eliminate
157: 17, 163: 8
eliminated
157: 24
elongated 119: 24
eloquence 241: 6
em 152: 3
emanating 134: 20
embedded 146: 7
embody 250: 20
emergency 108: 19
emergent 114: 1
emission 152: 21,
216: 7, 216: 17
emissions 51: 12,
149: 9, 150: 12
emotional
230: 14, 232: 15,
236: 21, 238: 11
emotions 230: 8

employed 24: 4,
58: 19, 58: 24,
59: 2, 133: 2,
133: 5, 133: 6,
259: 4
employed. 153: 1
employee 30: 8,
39: 3, 39: 5,
71: 19
Employees 21: 23,
23: 23, 28: 3,
30: 7, 61: 4,
229: 7, 229: 8,
246: 20, 252: 2
employers 163: 2
employment 133: 4
emptied 25: 19,
62: 7, 62: 10,
62: 14, 70: 5,
70: 13, 71: 1
empty 68: 24,
74: 9
enacted 250: 9
encapsulated
156: 5, 156: 11,
156: 13, 157: 20
encapsulating
128: 6, 157: 16,
172: 16
encapsulation
121: 3, 157: 8
encased 146: 7
enclosed 104: 20,
106: 5, 209: 13,
209: 21
encouragement
259: 18
End 159: 21,
226: 2, 240: 6,
245: 15, 254: 17,
263: 20
endanger 230: 13
endured 232: 14
enforce 112: 19
enforcement
112: 10, 113: 8,
113: 12, 226: 11
engineering
149: 2, 184: 11,
224: 13, 224: 20

enhance 248:13
enhancement
9:25, 10:7,
10:13, 10:25,
27:20, 197:25,
212:5, 217:25
enhances 104:25
enormous 232:22
enough 5:1,
113:10, 122:9,
122:21, 183:3,
190:2, 192:13
enrollments
224:24
ensure 184:8
entail 227:1
enter 106:8
entered 5:25,
6:3, 8:11,
11:24, 106:9,
137:20, 201:13,
234:5, 262:4
entering 174:1
entire 4:5,
27:9, 105:19,
138:14, 138:17,
140:12, 208:3,
227:8, 229:16,
236:22, 239:18,
255:2
entitled 148:21,
163:2, 176:1,
266:2
entity 113:19
entrance 56:10,
56:13, 56:16,
103:24
entry 251:24,
262:21
Environ 133:6,
224:16
environment
25:23, 121:7,
121:8, 121:12,
121:13, 121:14,
128:6, 133:17,
133:18, 136:2,
152:14, 188:16,
202:6, 207:7,
211:20, 242:2,

243:14, 255:10,
255:11, 255:13,
255:14, 255:18
Environmental
21:1, 21:4,
112:25, 114:25,
116:20, 119:3,
133:10, 133:14,
133:15, 133:16,
136:18, 166:14,
166:17, 167:2,
181:6, 183:23,
186:17, 186:20,
199:3, 224:12,
224:13, 224:17,
224:22, 224:24,
226:11, 226:15,
228:17, 236:6,
243:8, 244:23,
251:23, 252:1,
252:3, 252:7,
255:7, 256:8,
256:20
equip 231:11
equipment 40:12,
80:21, 121:15,
121:18, 122:1,
126:19, 127:1,
127:10, 128:7,
136:6, 136:7,
136:9, 136:14,
161:4, 161:9,
172:13, 208:1,
211:6, 218:14
equipped 121:24
Errin 1:22,
236:5, 246:3,
247:19, 248:15
errors 130:20
escalates 113:2
escalating
103:14
escape 201:7
escaping 202:9
especially
136:18, 208:1,
223:24, 225:20,
233:17, 236:10
essence 6:12,
7:3, 7:11

essential 5:19
Essentially 9:3,
10:18, 10:19,
35:25, 110:2,
208:15, 246:4,
246:16, 246:25,
247:11
establish 212:8
established
51:11, 198:5
estate 246:16,
259:7
esteemed 236:4
estimate 158:11
estimating
106:24
et 81:24,
116:21, 123:8,
131:6
ethical 7:9,
235:6
ethically 8:6
EUGENE 224:2,
224:12, 264:30
evacuated 26:25,
27:2, 210:4
evacuates 27:9
evacuating
104:1, 105:19
evacuation
105:18, 107:22,
107:24, 197:23,
203:20, 209:24,
217:11
evaluate 149:8,
195:16, 195:23
evaluated 155:4
evaporate 109:22
evaporates
190:20, 190:24
evaporation
106:22
event 241:20
Eventually
22:15, 105:4,
129:12, 159:17,
161:24
everybody 73:9,
93:14, 104:7,
141:19

Everyone 38:19,
58:12, 230:6,
233:13, 235:14
everything 3:23,
14:19, 100:19,
141:19, 198:8,
201:4, 235:2
Everywhere
213:21, 214:7
exacerbated
109:13
exacerbates
104:25
exact 37:1,
149:23, 230:5
Exactly 32:8,
37:11, 53:16,
82:14, 109:17,
205:24, 206:2
EXAMINATION
20:21, 46:7,
75:9, 96:10,
100:8, 110:8,
114:19, 115:14,
132:23, 170:18,
192:11, 195:13,
196:14, 196:15,
264:6, 264:8,
264:10, 264:14,
264:16, 264:20,
264:24, 264:26,
264:28, 264:32,
264:34, 264:38,
264:43
examining 46:11
example 12:20,
15:7, 52:20,
86:16, 124:11,
150:9, 167:15,
196:5, 238:17,
260:6
exams 204:16,
204:17
exceed 151:20,
152:1, 158:5,
163:18, 164:22,
198:18
exceeded 127:23,
128:10, 162:20,
162:23, 163:15,

165:16, 236:17
excellent 234:24
except 4:18,
212:25
excerpt 43:17
exchanging 37:25
exclude 210:9
excluded 29:22,
29:25
exclusion
189:15, 189:17
Excuse 13:21,
36:4, 55:5,
95:10, 110:21,
141:9, 169:22,
178:18
excused 114:11,
263:15
excusing 114:10
exemptions
167:13
exhaust 160:20,
172:4
exhaustive
115:14
Exhibit 25:13,
43:9, 45:19,
50:21, 55:23,
75:12, 81:22,
83:19, 83:24,
133:22, 133:24,
138:14, 139:7,
164:17, 165:25,
166:16, 169:23,
170:2, 170:5,
170:7, 170:9,
170:10, 174:17,
176:1, 176:3,
176:5, 177:5,
178:18, 181:5,
185:11, 192:17,
200:12, 200:18,
207:12, 265:10,
265:27
EXHIBITS 46:1,
95:14, 162:5,
164:10, 169:17,
170:16, 174:16,
175:10, 194:6,
194:9, 194:13,

199:8, 265:8,
265:25
exist 168:5
existed 33:14
exists 233:12
expect 171:1
expectation
236:14
expected 157:11,
158:5, 171:3,
234:3
expense 221:17,
244:16, 244:17,
259:12
expenses 90:21,
227:18
expensive 37:6
experience 34:9,
104:12, 105:25,
115:12, 116:5,
118:1, 133:9,
134:22, 136:5,
180:12, 191:7,
198:23, 230:9,
231:3, 231:22,
234:24, 236:17,
237:22, 238:2,
239:4, 246:1,
246:9
experienced
117:25
experiences
237:15
experiments
148:8
expert 4:1,
4:21, 4:24,
10:8, 82:7,
82:11, 117:2,
117:7, 117:14,
117:18, 124:18,
136:17, 189:20,
200:2, 208:23,
209:25
expertise 117:24
explain 91:18,
224:3, 253:10,
253:11, 254:1,
254:14
explained 6:8,

62:8, 260:14
explaining 6:6
explanation
218:24, 227:1
explode 87:21
exploded 106:2
exploding
104:23, 105:24,
106:1, 223:10
explosion 88:1,
113:4
explosive
104:17, 106:6,
109:16, 109:20,
109:25, 130:18
exposed 123:17,
173:24, 208:10
Exposure164
265:31
exposures 130:4,
131:24, 154:10,
173:12
extend 13:6
extending 236:8
extensive 15:2,
118:1, 164:6
extensively
216:20
extent 86:12,
86:15, 113:2,
127:7, 211:17,
216:2, 219:7,
219:14
extract 56:1
extramurally
116:14
extreme 105:22,
233:12, 239:4
Extremely
104:16, 104:19,
107:7, 124:6,
231:4, 235:5,
236:20, 237:2,
239:6, 240:5
eyes 40:15,
94:11, 121:19,
131:6, 233:23
eyesight 77:21

< F >
face 122:15,
122:20, 231:13,
259:20
faced 236:24
faces 122:16,
217:16
facial 122:20,
122:22
facility 13:21,
13:22, 36:13,
121:5
facing 215:10
fact 3:24,
34:21, 39:8,
49:17, 53:2,
53:16, 53:22,
67:12, 69:18,
79:24, 105:21,
109:21, 112:3,
114:2, 123:25,
138:19, 140:23,
164:23, 199:16,
204:7, 212:10,
221:5, 221:14,
233:11, 242:20,
243:10, 244:22,
244:24, 249:4,
249:22, 254:12
factor 209:14
factors 221:20,
242:16, 249:5,
253:20, 253:24,
253:25, 254:4,
254:25, 256:1,
256:22
facts 13:1,
46:18, 230:24
factual 5:13,
5:16, 5:18,
7:22, 14:13,
18:2, 18:16,
18:24, 196:3,
196:8, 209:6,
210:15, 211:23,
213:2, 214:15,
215:12, 215:19,
215:20, 215:22,
217:1, 217:6,
218:17, 219:8,

219: 25
failure 10: 19,
189: 12,  209: 2,
220: 8,  247: 11
Fair 183: 3,
203: 12,  215: 8,
215: 9,  215: 10,
223: 6,  248: 1,
248: 10
fairness 16: 25,
253: 7
faith 148: 7,
230: 18
fall 224: 17
fallen 142: 23
falling 152: 22
false 61: 14
familiar 26: 16,
36: 7,  68: 23,
93: 6,  116: 6,
116: 8,  118: 7,
119: 21,  126: 18,
148: 12,  154: 20,
189: 18,  260: 18
families 129: 12
family 123: 17,
195: 16,  220: 11,
221: 2,  223: 19,
228: 18,  228: 23,
231: 16,  231: 21,
234: 3,  234: 5,
234: 6,  234: 15,
235: 20,  236: 10,
236: 22,  236: 25,
240: 18,  243: 21,
244: 2
fan 109: 7
far 15: 6,  57: 3,
86: 1,  103: 22,
112: 25,  116: 23,
130: 15,  131: 23,
158: 6,  164: 23,
165: 5,  165: 6,
181: 16,  193: 24,
227: 4
fascinated 57: 8
fat 246: 4
father 60: 19,
60: 20,  220: 13,
233: 25,  234: 7,

238: 7,  241: 22,
241: 24,  242: 2,
242: 7
fault 34: 15,
34: 16
faulted 232: 25
faulty 66: 7
faxed 28: 7
FCM 152: 23
February 27: 4,
196: 16
FEBURARY 1: 14
Federal 84: 15,
90: 10,  90: 13,
90: 14,  91: 1,
91: 2,  91: 5,
91: 8,  112: 9,
112: 19,  112: 23,
113: 5,  113: 20,
113: 23,  114: 3,
115: 1,  116: 10,
167: 10,  167: 13,
168: 22,  227: 25,
248: 9,  251: 12,
258: 3,  258: 13,
260: 12
feel 51: 3,  51: 5,
113: 12,  140: 8,
140: 10,  193: 6,
233: 22,  245: 2
feels 245: 10
fees 98: 6,  266: 3
feet 13: 21,
13: 22,  22: 4,
22: 8,  22: 23,
23: 4,  23: 7,
64: 3,  89: 21,
89: 22,  103: 23,
106: 18,  106: 25,
147: 2,  147: 3,
147: 5,  147: 13
fellowship
115: 24
fellowships
115: 25
felon 231: 2
felony 12: 14,
237: 17,  237: 20,
242: 20,  243: 10
felt 200: 22,

210: 3,  234: 10
Feo 24: 2,  33: 25
few 23: 19,
104: 18,  105: 11,
108: 21,  140: 16,
234: 14,  241: 2
fewer 254: 16
Fiber 72: 12,
72: 13,  72: 15,
72: 19,  73: 2,
85: 21,  119: 24,
120: 2,  125: 1,
156: 13,  156: 19,
157: 17,  157: 20,
158: 4,  159: 1,
159: 8,  159: 14,
159: 16,  169: 8,
185: 3,  199: 23,
199: 24,  218: 19
fidelity 15: 13
field 44: 6,
44: 10,  115: 14,
116: 25,  133: 10,
166: 14,  167: 2,
225: 2,  225: 5,
234: 23,  235: 1,
238: 2
fifth 44: 19,
218: 1
figured 230: 3
figures 198: 12
file 4: 25,  32: 5,
32: 15,  32: 16,
91: 24,  94: 10,
94: 11,  94: 13,
94: 19,  145: 18,
204: 24,  205: 8,
205: 15,  210: 12,
210: 14,  217: 23,
241: 3
filed 6: 25,
7: 18,  18: 13,
18: 25,  196: 3
files 32: 23,
94: 13,  95: 1,
95: 2,  229: 8
filing 5: 21,
6: 16,  32: 3,
32: 6,  32: 22,
91: 16,  210: 19

filings 214: 21
fill 31: 5,  70: 1
filled 25: 22
filter 82: 19,
82: 23,  82: 24,
83: 1,  84: 2,
84: 21,  84: 23,
85: 3,  85: 25,
86: 25,  96: 13,
121: 5,  121: 6,
126: 23,  160: 19,
160: 22,  160: 23,
160: 24,  161: 2,
169: 6,  200: 7
filters 161: 1,
161: 15
filtration
126: 25
final 16: 13,
114: 14,  146: 20,
200: 12,  214: 12,
260: 16
finally 10: 8,
106: 8,  223: 12
finances 88: 24
financial
251: 18,  259: 10,
262: 23
find 6: 6,  28: 13,
30: 16,  30: 22,
66: 15,  84: 12,
84: 15,  140: 3,
142: 11,  142: 18,
144: 12,  147: 25,
151: 1,  158: 19,
159: 8,  160: 9,
173: 12,  176: 16,
217: 22
finding 10: 23,
125: 8,  216: 18,
217: 7,  217: 13,
218: 8,  218: 13
findings 14: 2,
150: 23,  158: 3,
164: 20,  215: 12,
215: 13,  215: 20,
215: 22
finds 216: 6,
216: 12,  217: 12,
217: 18

fine 5:10, 12:15, 13:1, 15:16, 16:4, 16:12, 16:13, 16:16, 16:18, 16:19, 16:20, 87:17, 155:3, 155:11, 172:21, 198:20, 228:8, 228:24, 244:9, 244:14, 245:16, 250:6, 251:1, 251:14, 253:14, 257:9, 257:11, 257:14, 257:17, 261:11, 262:15
fingers 95:2, 193:2, 193:4
finish 229:11
finished 65:21, 123:23
firearm 258:9
fired 59:25
firefighter 100:20
fires 61:13
fit 228:16
fit-tested 122:14, 208:2, 211:9
fits 122:17, 207:14, 207:15, 211:9
fitting 225:18
Fitzwater 1:17, 3:6
Five 12:21, 44:13, 62:20, 63:2, 63:15, 97:19, 115:17, 158:13, 172:3, 196:16, 219:11, 229:14, 231:8, 231:22, 232:9, 235:11, 236:11, 236:22, 238:11, 239:3
flammable 204:2
flaws 238:14
flood 141:1

floor. 93:21
floorroom 249:18
floors 136:12
Florida 228:9
flying 152:8, 156:25, 203:17
focus 12:22, 204:9, 204:10
follow 10:19, 121:15, 237:20, 243:16, 246:17, 247:12
followed 51:15, 53:25
following 8:18, 258:2
Food 116:21, 133:20
fool 200:22
footage 22:6, 107:1
footsteps 246:17
foregoing 265:48, 266:1
foreign 247:25
foresee 203:23
foreseeable 203:20, 203:24, 209:20
foreseen 203:6
forever 233:17
forget 238:6
forgetting 91:7
forgiveness 236:14, 238:16
form 118:24, 119:24, 131:3, 166:7, 213:7, 252:4, 256:7, 258:1
format 266:3
former 33:8, 33:18
formerly 24:4
forms 120:5
Fort 148:12, 151:25, 202:16
forth 17:14, 219:4, 253:22
fortunately

105:14, 105:15
forward 14:4, 14:13, 14:24, 162:7, 224:3, 231:23, 242:22
found 4:19, 6:13, 12:1, 12:17, 71:4, 88:6, 106:3, 110:17, 111:1, 152:17, 160:2, 213:8, 214:4
foundation 126:18
founder 224:16
Four 14:8, 25:7, 25:18, 29:11, 62:3, 62:4, 62:7, 62:10, 62:11, 96:25, 97:6, 97:20, 149:25, 154:6, 197:21, 197:24, 207:13, 212:3, 219:12, 223:20, 228:1
fourth 44:15, 80:10
fractions 198:13
Frankly 8:25, 9:7, 9:11, 9:16, 9:22, 10:23, 247:17, 247:21
free 156:3, 215:9, 239:23
friability 47:25
friable. 167:25
friend 215:1, 215:4, 215:7, 228:18, 231:18, 237:5
Friends 37:20, 220:11, 221:2, 230:6
front 8:7, 42:7, 54:20, 56:9, 56:12, 73:19, 95:1, 105:12, 140:16, 146:15, 192:24

full 7:8, 9:8, 12:12, 66:19, 199:25, 207:10, 212:3, 239:17, 249:17, 257:17, 258:24
full-time 204:13
fully 6:22, 233:7, 238:4
fumes 103:25, 126:3, 208:14, 209:21
fun 249:3
functions 46:20
fund 116:13, 186:13, 186:14, 186:15, 186:16
fundamental 12:25
Fundamentally 149:7, 151:1
funded 186:1, 186:3
funds 251:19, 262:19, 262:22
funny 200:19, 212:19
future 37:11, 231:7, 232:6, 234:6, 235:1, 237:13, 237:18, 243:21, 255:25

< G >
G-u-r-a-r-d-o 93:18
gained 231:6
gallons 88:15, 110:25, 111:11
gas 90:4, 190:20, 190:24, 209:4, 209:12
gather 160:13, 174:8
gathered 14:2
gathering 160:12
gave 28:11, 30:10, 32:14, 37:3, 43:17,

44: 5, 205: 9, 236: 16, 244: 15
general 115: 9, 117: 15, 129: 15, 129: 17, 129: 21, 139: 16, 158: 8, 198: 25, 199: 10
generally 103: 5, 144: 2, 145: 1
generated 135: 7, 136: 19
generosity 232: 22
generous 230: 7
gentle 233: 22
gentleman 198: 20, 228: 8
genuine 235: 6
geometrically 153: 8
Gerardo 251: 8, 257: 7
Germer 48: 23
get-go 198: 16
gets 142: 19, 156: 19, 156: 20, 209: 13
getting 32: 13, 153: 12, 199: 11, 241: 8
GIBSON 2: 1, 2: 2, 3: 15, 6: 10, 6: 11, 6: 12, 7: 14, 7: 21, 7: 25, 8: 4, 13: 3, 18: 25, 196: 1, 219: 17, 223: 17, 245: 24, 252: 13, 252: 19, 259: 14, 260: 9, 260: 17, 261: 2, 262: 7, 263: 6, 263: 14, 264: 34
GIBSON226 264: 34
give 6: 21, 22: 16, 33: 10, 43: 23, 51: 5, 88: 15, 93: 2, 185: 14, 195: 11, 237: 11, 244: 20,

245: 3, 246: 5, 254: 16
given 28: 20, 32: 18, 33: 7, 35: 13, 49: 24, 90: 8, 101: 25, 148: 21, 154: 19, 158: 8, 205: 1, 205: 2, 223: 21, 237: 15
giving 99: 12, 187: 9, 233: 5, 238: 12, 240: 19, 241: 25
glad 77: 11
glare 175: 13
glasses 121: 9
gloves 123: 7
glue 11: 2, 178: 21, 178: 23, 179: 3, 180: 5, 180: 10, 180: 15, 180: 17
God 3: 8, 237: 15, 239: 21, 242: 11
goggles 40: 15, 121: 19
gotten 168: 23, 229: 22
govern 261: 22
governing 207: 8
grade 104: 22
gradually 12: 17
graduate 115: 19
gram 128: 21
Grand 73: 17, 74: 19, 75: 23, 115: 21, 211: 16
grant 16: 25, 195: 22, 223: 15
granting 238: 2, 252: 16
grateful 233: 17
grave 256: 10
Gray 23: 21, 45: 2, 45: 3, 181: 13, 181: 19, 182: 15, 183: 4
great 48: 25, 220: 10, 220: 11,

221: 2, 229: 20, 237: 21, 237: 22, 239: 5, 240: 2
greater 148: 1, 254: 5, 256: 2, 256: 24
greatly 232: 11
greed 220: 17, 221: 23, 241: 20, 242: 9, 242: 14
greedy 241: 20, 242: 5, 246: 4
green 68: 21
grew 246: 18
grind 109: 3, 130: 25, 138: 16, 156: 24, 160: 17, 201: 21
grinder 40: 25, 70: 10, 70: 13, 76: 8, 76: 13, 76: 14, 76: 16, 77: 9, 77: 17, 77: 18, 78: 3, 79: 4, 81: 2, 84: 22, 109: 2, 119: 14, 125: 11, 130: 25, 137: 12, 150: 15, 150: 16, 164: 19, 176: 21, 208: 7
grinders 42: 17, 125: 17, 125: 22
grinding 39: 20, 40: 11, 40: 16, 59: 9, 61: 17, 70: 9, 70: 19, 76: 14, 119: 14, 125: 11, 127: 2, 131: 2, 136: 6, 149: 10, 153: 24, 155: 13, 161: 12, 161: 13, 162: 14, 198: 9, 200: 5, 200: 13, 200: 14, 201: 5, 209: 4
grit 155: 8, 158: 2, 158: 19
groggy 130: 20
ground 14: 10,

26: 1, 113: 3, 138: 23, 154: 11, 176: 15, 183: 1, 192: 25, 203: 15, 203: 16, 209: 12, 212: 12
grounds 252: 21
group 227: 15, 228: 17, 254: 2, 254: 4
grow 235: 12, 239: 25
Growing 229: 24, 232: 24, 234: 2, 246: 10, 248: 16
grown 231: 4, 231: 9, 237: 21, 239: 22, 240: 4
growth 233: 20, 234: 13, 235: 13, 237: 24
Guardia 203: 18
guess 3: 20, 3: 22, 50: 10, 92: 23, 125: 19, 134: 12, 134: 17, 135: 14, 153: 8, 153: 11, 155: 12, 158: 12, 159: 10, 159: 11, 186: 5, 187: 9, 189: 7, 210: 15
guessing 159: 13, 187: 8, 187: 15, 187: 17, 187: 18
guide 116: 22
guided 230: 3
guideline 197: 12, 210: 22, 212: 5, 216: 16, 217: 8, 217: 15, 219: 18, 221: 8, 221: 11, 222: 5, 222: 13, 223: 25, 245: 19, 251: 11, 254: 7, 254: 9, 254: 19, 255: 2
guidelines 215: 16, 245: 9, 255: 16

guiding 230: 18
guilty 10: 4,
14: 23,  189: 11,
209: 6,  219: 24,
220: 6,  237: 1,
247: 18,  250: 5,
255: 13
Gurardo 93: 18
guy 215: 6,
246: 5,  247: 16
guys 14: 8,
93: 17,  105: 15,
107: 16,  202: 5,
202: 21,  203: 3

< H >
H-E-P-A 83: 2,
83: 13,  83: 15
hair 122: 20,
122: 22,  123: 7,
123: 15
half 159: 1,
254: 13,  254: 18
hall 151: 6
hallway 55: 5,
174: 8
hand 20: 12,
100: 4,  111: 14,
114: 15,  142: 6,
142: 7,  142: 8,
142: 9,  143: 4,
145: 10,  145: 11,
145: 12,  221: 3,
256: 4
handed 25: 13,
181: 4
handle 90: 19,
156: 3
handled 88: 24,
111: 25,  112: 1,
231: 13,  243: 6,
243: 9,  244: 8,
244: 13,  247: 13,
255: 7
handles 19: 25
handling 32: 11,
51: 14,  120: 19,
229: 6,  229: 7
hands 63: 18,

64: 5,  239: 19
Hang 185: 5
happen 118: 18,
152: 9,  154: 7,
239: 21,  240: 1,
243: 17,  250: 10
happened 6: 7,
9: 2,  9: 11,  12: 2,
21: 13,  26: 22,
30: 14,  32: 8,
34: 14,  103: 7,
103: 15,  105: 10,
137: 19,  149: 5,
151: 24,  220: 21,
239: 18,  239: 20,
240: 5
happening 22: 14,
22: 18,  125: 5,
203: 4,  203: 15,
213: 6,  239: 8
happens 107: 12,
112: 24,  118: 19,
126: 5,  152: 10,
152: 12,  171: 11,
190: 20,  198: 25
happy 226: 5
hard 12: 14,
122: 6,  125: 4,
154: 8,  201: 15,
220: 13,  232: 18
hardly 4: 18,
70: 18
harm 151: 15,
202: 8,  202: 10,
202: 19,  231: 7,
239: 10
harmful 120: 6,
120: 8,  120: 9,
120: 10,  124: 5,
202: 13,  202: 14
hauled 14: 10,
24: 19,  25: 3,
25: 6,  25: 25,
207: 12,  216: 10,
247: 22
hazard 122: 13,
168: 4
hazardous 51: 12,
101: 11,  103: 13,
113: 16,  113: 17,

121: 13,  201: 18,
207: 6,  208: 13,
209: 22,  216: 8,
244: 15
hazards 130: 15,
207: 25
Hazmat 21: 21,
22: 2,  105: 5,
105: 6,  105: 7,
111: 9,  244: 16
head 135: 22
Health 21: 19,
27: 10,  114: 24,
114: 25,  115: 2,
115: 4,  116: 6,
116: 10,  116: 18,
116: 24,  117: 25,
127: 21,  129: 11,
129: 14,  131: 1,
133: 11,  133: 14,
133: 15,  133: 16,
136: 18,  151: 1,
151: 12,  159: 14,
166: 14,  167: 4,
167: 22,  168: 4,
168: 19,  170: 4,
184: 6,  184: 9,
184: 10,  199: 23,
207: 21,  221: 24,
244: 10,  258: 21
hear 7: 13,  8: 14,
11: 21,  15: 4,
15: 8,  17: 4,
19: 3,  35: 20,
45: 21,  48: 9,
93: 14,  117: 4,
122: 5,  122: 6,
125: 25,  178: 25,
179: 1,  183: 4,
183: 5,  191: 17,
197: 2,  197: 11,
214: 12,  214: 13,
238: 20,  259: 14
heard 15: 1,
72: 21,  72: 22,
83: 15,  86: 1,
103: 9,  103: 11,
118: 6,  123: 24,
124: 3,  126: 4,
126: 12,  130: 13,

130: 14,  152: 7,
160: 4,  169: 1,
190: 14,  191: 20,
194: 19,  195: 5,
195: 17,  196: 24,
196: 25,  197: 18,
201: 11,  208: 11,
211: 6,  211: 7,
213: 19,  241: 24,
245: 22
hearing 8: 1,
10: 22,  45: 19,
117: 20,  170: 3,
195: 19,  196: 18,
196: 19,  215: 25,
240: 25
hearsay 35: 23
heart 230: 1,
230: 3,  231: 20,
232: 22,  233: 9,
235: 10,  239: 9
heart-wrenching
232: 10
heartland
254: 24,  255: 19
hearts 239: 9
heir 246: 14
Hello 46: 9
help 74: 20,
113: 23,  116: 17,
116: 21,  226: 3
helped 215: 5
HEPA 82: 19,
82: 23,  83: 15,
84: 2,  84: 21,
84: 23,  85: 3,
86: 25,  96: 13,
121: 5,  126: 25,
160: 19,  160: 22,
160: 23,  161: 1,
161: 15,  169: 6,
200: 7
hereby 250: 23,
257: 2
hiding 210: 13
high 86: 25,
121: 5,  130: 18,
131: 4,  222: 11
high-efficiency
160: 23

higher 130: 3, 153: 13, 154: 10, 158: 8, 164: 8, 221: 8
hinder 237: 23
hire 10: 8, 220: 19, 222: 12
hired 9: 3, 23: 1, 23: 3, 34: 23, 35: 2, 37: 8, 93: 17, 96: 22, 206: 7
historical 163: 18, 163: 20, 163: 21
history 241: 10, 241: 16
hoisted 246: 22, 247: 5, 249: 13
holding 78: 3, 79: 3, 109: 21
holds 156: 22
hole 11: 7
Home 41: 20, 41: 24, 103: 2, 103: 5, 121: 23, 122: 4, 122: 10, 123: 6, 123: 10, 123: 12, 123: 22, 169: 1, 208: 10, 231: 21, 234: 2, 245: 10, 249: 6
homes 105: 23, 123: 16
homogenous 181: 23, 183: 24
honest 232: 12, 233: 14, 233: 25, 234: 21, 235: 6, 236: 22, 237: 2, 237: 9, 247: 12
honestly 10: 3, 187: 7, 239: 3
Honorable 1: 17, 3: 5, 3: 8
hooded 123: 6
hoodwink 11: 15
hope 46: 19, 55: 19, 222: 1, 222: 16, 222: 19,

231: 16, 235: 8, 235: 13, 239: 12, 242: 7, 248: 3, 249: 25, 260: 4
hopes 234: 25
hoping 76: 9, 234: 17
hose 79: 12, 80: 23, 81: 2, 81: 4, 126: 13
hot 37: 2
hour 187: 1, 187: 2, 187: 3, 187: 5
hours 105: 11, 109: 18, 109: 19, 187: 8, 227: 2, 258: 14
house 83: 18
huge 7: 6, 109: 19
Human 115: 2, 116: 15, 118: 4, 130: 22, 235: 8, 237: 7
humans 120: 4, 120: 6
humbly 236: 13
hundred 22: 5, 147: 2, 158: 13, 158: 14, 158: 15, 159: 7, 159: 8, 237: 8
hundreds 233: 9
Hurricane 238: 9
hurt 201: 25, 240: 6, 242: 11, 249: 21, 249: 23
husband 236: 13


< I >
IAASC 1: 12
ID 44: 6, 44: 10, 44: 15, 44: 19, 44: 22
idea 10: 3, 16: 17, 58: 13, 61: 16, 64: 10, 73: 3, 90: 3, 198: 25

ideals 230: 2
Identified 45: 24, 259: 2, 265: 10, 265: 27
identifies 44: 7
identify 25: 12, 47: 21, 54: 22, 84: 13, 125: 4, 130: 16
identity 234: 18
ignite 249: 22
ignited 107: 19
ignition 106: 3
III 1: 33
illegal 209: 16
illegally 258: 5
illness 130: 2
illnesses 129: 24
imagine 27: 11, 245: 16
immature 242: 6, 246: 19, 248: 1, 248: 11, 249: 2, 249: 15
immaturity 242: 9
immediate 127: 8
immediately 66: 23, 105: 4, 105: 16, 251: 3, 257: 11
imminent 108: 13
impact 102: 15, 102: 17, 108: 8, 108: 18, 159: 14
impedes 122: 20
implementation 251: 23
implementing 252: 6
important 28: 16, 28: 18, 86: 17, 86: 21, 102: 1, 130: 6, 199: 18, 235: 10, 241: 5, 242: 16, 243: 16, 246: 12, 246: 23, 247: 4, 247: 6, 260: 3
importantly 121: 6, 229: 22,

237: 7, 239: 4
Impose 227: 9, 242: 25, 245: 9, 245: 12, 245: 13, 256: 17
imposed 222: 3, 236: 15, 250: 14, 252: 14, 252: 17, 261: 15, 262: 11, 262: 14, 262: 15, 262: 23
imposes 228: 16
imposing 245: 5, 253: 13, 254: 21
Imposition 7: 6, 265: 2
impositions 262: 13
impossible 119: 7, 124: 18, 203: 19, 213: 14, 213: 17
impressed 73: 9
impression 12: 11, 12: 12, 15: 1, 15: 5, 27: 8, 174: 11
imprisonment 222: 25, 249: 5, 258: 18
improperly 126: 21
improve 119: 6, 235: 12, 237: 16
in-house 116: 14
in. 6: 9, 121: 13, 200: 17
inadvertently 261: 15
incarcerated 222: 22
incarceration 225: 16, 257: 12
incident 26: 19, 90: 22, 93: 4, 93: 10, 101: 11, 106: 11, 106: 24, 107: 11, 111: 5, 112: 24, 202: 20, 229: 4, 229: 12,

236: 11, 236: 19,
237: 18, 240: 1
incidents 103: 4
include 28: 4,
28: 8, 258: 2
included 67: 9,
190: 18
includes 50: 24,
121: 18
Including 3: 23,
59: 5, 89: 2,
116: 15, 116: 20,
208: 17, 208: 18,
215: 20, 251: 23
inclusive 194: 14
inconsistent
48: 9, 86: 1,
86: 3, 86: 5,
86: 10, 219: 7,
220: 6
Incorporated
186: 8
incorrect 13: 25,
211: 11
increase 130: 23,
153: 15, 200: 8,
216: 5, 216: 12
increasing
199: 11
incurred 27: 12,
90: 22, 244: 17
INDEX 263: 21
indicate 23: 19
indicated 34: 2,
34: 10, 36: 25,
59: 23, 59: 25,
60: 18, 81: 13,
88: 8, 91: 15,
125: 24, 197: 2
indicating
77: 20, 78: 10,
180: 16, 193: 9,
243: 22
indication 12: 6,
67: 20, 88: 15,
90: 8, 124: 13,
124: 14
indicia 35: 24,
215: 14, 217: 19
indirectly 259: 6

individual
19: 12, 24: 2,
233: 5, 239: 22
individually
15: 3
individuals
27: 10, 28: 5,
28: 8, 28: 10,
28: 13, 28: 14,
29: 5, 29: 20,
29: 22, 30: 11,
30: 16, 207: 22,
209: 22, 209: 23,
210: 10, 211: 9,
221: 24
industrial
70: 25, 200: 6
industrial-grade
81: 23, 81: 24
industrial-stren
gth 82: 1
industry 186: 10
inevitable
128: 22
inexperienced
230: 20
information
6: 14, 7: 17,
20: 7, 30: 6,
30: 7, 30: 9,
38: 8, 49: 17,
50: 23, 100: 25,
116: 17, 116: 19,
135: 3, 135: 4,
163: 18, 163: 20,
163: 21, 165: 19,
174: 1, 190: 3,
195: 4, 210: 9,
210: 13, 249: 20,
250: 8, 250: 22,
257: 1, 259: 10,
262: 1
informed 16: 19,
121: 12
informing 16: 14
inhalation
157: 15
initial 27: 22,
33: 5, 166: 21,
194: 18, 234: 17

Initially 39: 13,
40: 20
initiated 125: 6,
224: 21
injure 255: 11,
255: 14, 255: 18
injured 107: 21,
256: 12
injures 255: 13
injuries 129: 23
injuring 255: 10
injury 10: 25,
26: 15, 107: 25,
133: 17, 197: 23,
207: 19, 208: 14,
208: 17, 216: 14,
216: 19, 216: 25
injustice 12: 25
innate 233: 8
innocent 231: 10
inquiry 84: 10
inside 22: 12,
28: 15, 38: 21,
74: 4, 84: 21,
106: 10, 150: 7,
157: 16, 204: 25,
208: 15, 211: 1
inspect 64: 12,
73: 25, 140: 12
inspected 180: 22
inspection
111: 10
instance 5: 18,
95: 9, 247: 19
Instead 219: 11,
220: 19
instill 230: 2
Institute
114: 25, 115: 4,
115: 6, 116: 6,
133: 8, 228: 10,
228: 12
Institutes
114: 24, 116: 9
Institution
259: 12, 260: 12
instructed
141: 6, 141: 7
instruments
202: 3

insufficient
152: 4
insulation 52: 20
intact 119: 18
integrated 85: 4,
85: 19, 85: 20
integrity 241: 13
intelligence
230: 15
intend 13: 5,
249: 21
intended 51: 13,
239: 9
intent 11: 20,
15: 17, 205: 17
intention 232: 7,
238: 14
intentionally
6: 2, 59: 4, 249: 9
interactions
237: 19
interest 251: 4,
257: 18
interested
214: 25
interesting
200: 16
international
112: 13, 112: 17,
227: 24, 227: 25
internationally
226: 2
interpretation
215: 16
interpreting
167: 12
intersection
103: 6, 103: 7
interview 28: 24,
33: 5, 33: 20,
36: 9, 37: 15,
47: 17, 48: 3,
93: 2, 95: 21
interviewed
28: 9, 34: 19,
87: 19
interviewing
98: 21, 99: 11,
99: 12
Interviews 12: 5,

35:8, 35:10, 37:23, 79:14, 211:1
intramural 116:14
intricacies 229:21
introducing 109:14
introduction 155:24, 156:2
invariably 129:20
investigating 11:25, 21:9
Investigation 9:1, 10:5, 12:24, 21:2, 21:4, 21:15, 21:18, 23:15, 28:16, 29:14, 29:16, 38:4, 47:18, 63:24, 66:7, 88:5, 119:10, 214:9, 229:16
investigations 154:9
investigative 79:14
investigator 21:20, 50:16, 82:5, 83:4, 84:16, 85:14
invited 91:15, 91:16, 94:10
invoice 98:3, 207:12
Invoices 25:14, 265:12
invoked 120:21
involve 108:19, 249:6
involved 22:25, 29:18, 35:16, 51:18, 51:20, 54:1, 82:19, 91:11, 103:13, 134:19, 134:24, 204:4, 210:10,

216:17, 228:19, 229:5, 234:3, 236:7
involved. 51:17
involvement 113:16, 114:4, 229:19
involves 225:10
involving 51:14
iota 206:19
iphone 141:6
Iran 246:15
Iranian 246:14
ironic 14:21, 212:25
irritating 131:5
Irving 21:22, 27:12, 100:13, 100:14, 103:6, 108:2, 111:20, 112:8, 112:15, 112:19, 181:11, 244:14
Isaac 17:20
issue 9:15, 11:10, 11:14, 46:16, 47:24, 90:17, 91:12, 94:17, 111:20, 111:23, 195:9, 197:22, 197:23, 197:24, 206:15, 223:4
issued 112:3, 134:7, 181:5, 183:10
issues 6:15, 8:9, 9:4, 10:2, 13:7, 15:18, 15:22, 91:10, 114:1, 195:6
it. 99:16
item 183:21
items 8:22, 171:22
itself 91:21, 129:5, 135:22, 145:16, 152:18, 201:17, 202:13, 217:1, 243:18

< J >
J. 2:37, 265:48, 266:10, 266:11
Jackson 2:3
jail 237:23, 238:17, 243:12
Jerry 28:11, 93:17
Jews 246:14
job 5:4, 31:5, 32:18, 60:14, 60:17, 65:21, 116:9, 116:17, 163:20, 186:18, 186:19, 236:18
JOHN 4:1, 4:4, 132:19, 133:1, 264:22
joint 18:1, 18:13
joke 4:7, 4:8, 138:6, 138:7, 144:5
JOSEPH 3:12, 3:19, 8:9, 11:23, 12:23, 48:15, 92:23, 96:12, 97:20, 98:8, 132:18, 197:19, 212:16, 219:17, 245:24, 261:5, 263:14, 264:6, 264:8, 264:16, 264:24, 264:28
JOSEPH110 264:16
JOSEPH132 264:24
JOSEPH192 264:28
JOSEPH46 264:6
JOSEPH75 264:8
Judge 1:18, 35:22, 169:25, 226:19, 226:25, 238:23, 255:8
judgment 130:20, 242:6, 250:20, 251:24, 253:5, 256:23, 258:1,

260:22, 260:25, 261:10, 262:21
Judicial 266:4
juncture 220:2
June 93:3
junk 69:11, 69:21
jurisdiction 111:20, 112:12, 112:18
Jurisdictional 112:11
jury 73:17, 74:19, 75:23, 211:16
Justice 27:21, 91:23, 95:6, 204:21, 210:5, 217:22, 224:17, 244:4, 262:21
justify 9:25, 10:24, 238:14

< K >
Katrina 238:9, 242:1
keep 55:18, 123:6, 123:7, 184:13, 238:17, 252:18
key 151:13, 205:19
kid 60:25, 246:19, 248:2, 248:11, 249:2
kids 246:6, 246:7, 246:10, 249:15
kill 159:16, 159:17
killed 107:20, 248:19
kind 16:12, 39:16, 40:12, 46:18, 46:20, 59:15, 62:9, 64:15, 79:24, 82:6, 85:4, 108:14, 120:17,

122: 18, 125: 16,
125: 18, 125: 22,
129: 13, 134: 19,
142: 22, 174: 13,
177: 11, 189: 20,
203: 25, 213: 11,
213: 22, 214: 3,
215: 6, 237: 4,
238: 9, 238: 10,
239: 12, 241: 6,
241: 14, 242: 18,
244: 2, 249: 6,
250: 9
kindness 241: 13
kinds 158: 3,
203: 14, 213: 20,
222: 23
knife 155: 20
Knight 1: 34
knowledge 34: 9,
65: 22, 73: 6,
88: 20, 89: 6,
90: 9, 199: 1,
229: 18, 230: 24,
231: 6, 231: 10,
233: 20
known 5: 25,
34: 5, 130: 22,
156: 11, 209: 8,
224: 19, 245: 16
knows 46: 17,
201: 10, 243: 25


< L >
L-a-n-g-e 133: 1
La 203: 17
Lab 43: 10,
43: 12, 131: 14,
265: 14
laboratories
116: 15, 116: 16
Laboratory 43: 5,
52: 3, 128: 2,
131: 14, 149: 2
laborer 30: 24
laborers 23: 12,
37: 8, 204: 8,
205: 2, 217: 3,
217: 21, 218: 15,

218: 18, 220: 20,
222: 12
labs 183: 20
lack 234: 22,
238: 2, 242: 9
lacked 113: 12
lacking 225: 21
laid 5: 2
landfill 24: 16,
26: 6, 26: 8,
26: 11, 62: 21,
63: 3, 63: 13,
63: 16, 63: 25,
128: 16, 129: 2,
129: 5, 129: 8,
207: 13, 216: 10
landfills
128: 25, 129: 4,
129: 7
LANGE 4: 1,
15: 24, 132: 19,
133: 1, 136: 17,
166: 2, 167: 20,
170: 20, 181: 4,
184: 5, 185: 23,
190: 8, 195: 9,
196: 13, 198: 5,
199: 5, 201: 7,
201: 8, 264: 22
language 224: 4,
261: 10, 262: 5
large 109: 1,
109: 6, 109: 7,
210: 25, 211: 22,
217: 4, 227: 1,
227: 2
last-minute
13: 17
late 3: 21, 4: 2,
6: 14, 7: 8, 10: 9,
10: 10, 13: 19,
27: 4, 29: 9,
241: 8
latency 221: 14
Later 14: 8,
29: 11, 40: 21,
40: 22, 66: 24,
71: 18, 96: 25,
106: 24, 216: 9,
251: 24, 259: 13

Law 90: 10,
90: 14, 168: 22,
189: 9, 189: 14,
199: 13, 202: 4,
207: 8, 207: 15,
213: 14, 221: 7,
224: 12, 224: 15,
229: 21, 242: 24,
244: 20, 247: 17,
256: 6
law-abiding
260: 2
lawfully 250: 14,
252: 14
laws 248: 3,
251: 23, 252: 1,
252: 4, 252: 8,
256: 8, 256: 20
lawyer 19: 12,
35: 21, 46: 10
lawyers 195: 16,
240: 18, 254: 13
lay 8: 7, 34: 19,
248: 11
layman 153: 11
lead 239: 8
leader 248: 16
leaders 243: 13
leading 31: 20,
31: 23
leads 216: 19
leaf 94: 13,
95: 1, 141: 20
learn 31: 15,
31: 17, 31: 18,
37: 15, 37: 23,
41: 16, 125: 21,
231: 22, 237: 15
learned 195: 18,
222: 19, 229: 20,
229: 21, 239: 5,
240: 2
learning 62: 17,
239: 4
least 6: 21,
7: 10, 8: 7,
25: 18, 42: 14,
42: 16, 47: 6,
96: 25, 159: 12,
175: 17, 180: 22,

216: 7, 218: 7,
221: 24, 240: 2,
244: 24, 257: 16,
258: 18
leave 96: 5,
171: 16, 171: 17,
211: 19, 228: 8,
228: 20
leaves 235: 22
leaving 32: 14
lectern 3: 17
Left 32: 19,
57: 3, 65: 3,
65: 23, 69: 13,
97: 10, 137: 12,
137: 16, 138: 2,
155: 2, 157: 5,
176: 22, 181: 16,
190: 24, 191: 1,
201: 6
left-hand 137: 25
legal 60: 12,
90: 9, 206: 6,
207: 14, 215: 15,
215: 16
legalities
214: 21
lenient 221: 1
less 165: 1,
246: 20, 254: 6,
254: 13, 254: 18
lesson 222: 19,
240: 2
let's-throw-this
-all-out 13: 17
lethal 120: 6,
129: 20, 130: 5
letter 16: 14,
18: 18, 32: 10,
170: 4, 265: 41
letter170 265: 41
letterhead 31: 2
letters 233: 9,
233: 13, 241: 7,
242: 12, 259: 24
letting 204: 24
level 104: 11,
131: 18, 131: 24,
147: 22, 151: 2,
151: 3, 151: 11,

153: 2,  153: 3,
153: 6,  153: 13,
162: 19,  163: 18,
165: 3,  165: 4,
165: 8,  165: 9,
165: 10,  165: 15,
184: 13,  193: 7,
198: 13,  198: 14,
199: 17,  199: 19,
200: 1,  200: 4,
200: 8,  201: 9,
203: 7,  204: 19,
209: 15,  216: 12,
232: 17,  232: 20
leveled 107: 9,
208: 16
levels 117: 17,
131: 16,  151: 23,
151: 25,  152: 17,
152: 21,  153: 12,
153: 16,  153: 17,
158: 4,  161: 17,
162: 24,  165: 1,
172: 24,  172: 25,
198: 11,  198: 19,
199: 11,  199: 14,
202: 4
liability 10: 21
license 168: 19
licensed 246: 25,
248: 23
lie 210: 19
lieu 102: 16,
245: 7
Life 104: 6,
108: 14,  129: 25,
152: 9,  152: 10,
152: 12,  152: 13,
201: 12,  215: 5,
231: 3,  231: 11,
231: 23,  232: 10,
232: 20,  233: 1,
233: 18,  233: 20,
235: 10,  237: 17,
237: 21,  240: 23,
242: 21,  250: 7,
259: 23,  260: 5
lifetime 231: 9
lift 162: 14,
166: 17

lifted 175: 6
lifting 39: 24
light 7: 3,
76: 22,  77: 2,
77: 4,  77: 10,
77: 23,  78: 17,
195: 3,  223: 24,
247: 9
lighted 137: 4
lightly 105: 20,
210: 2
lights 103: 4,
137: 6
likelihood
26: 14,  107: 20,
154: 10,  197: 22,
202: 7,  202: 18,
207: 19,  207: 21,
208: 13,  216: 13,
216: 19,  216: 25
likely 68: 5,
71: 7,  71: 20,
107: 25,  137: 21,
164: 22,  180: 16,
186: 8,  247: 3
Limit 127: 20,
127: 22,  127: 24,
131: 20,  131: 25,
151: 18,  151: 22,
217: 14
limitations
11: 16,  13: 7,
14: 19,  14: 21
limiting 156: 9
limits 104: 17,
106: 6,  109: 16,
109: 20,  109: 25,
157: 9,  188: 2
Line 264: 2,
264: 46,  265: 2
lines 125: 7
lips 131: 5
Lipskar 228: 9
liquid 166: 7
liquids 204: 2
list 28: 7,  29: 25
listed 52: 3,
52: 6,  52: 7,
52: 10,  52: 12,
52: 16,  52: 19

listen 243: 14
listened 246: 3
listing 244: 8
lit 248: 18
litigation
256: 11
little 5: 3,  5: 7,
11: 2,  16: 18,
31: 17,  37: 22,
43: 17,  50: 10,
70: 24,  76: 22,
77: 19,  90: 8,
98: 3,  100: 16,
105: 12,  116: 12,
128: 16,  129: 11,
140: 15,  150: 5,
165: 3,  175: 13,
190: 23,  222: 7,
222: 17,  224: 3,
242: 18
live 235: 4,
260: 1,  260: 2
lived 208: 20
livelihood
239: 19
lives 233: 16,
237: 10,  247: 6
living 27: 10
LLC 1: 12,  3: 11,
17: 19,  181: 11
LLP 1: 34,  2: 2
load 71: 6,  71: 12
loading 68: 9,
68: 18,  68: 19,
68: 21,  68: 25
loads 12: 21,
62: 20,  63: 2,
63: 15
local 23: 18,
90: 17,  91: 12,
112: 10,  113: 8,
189: 22,  251: 12,
258: 4
locally 113: 6,
113: 7
located 33: 22,
33: 23,  57: 10,
68: 20
location 21: 14,
21: 25,  56: 5,

56: 17,  68: 13,
103: 10,  103: 12,
103: 16,  104: 3,
108: 24,  228: 15
locations 56: 18,
153: 13,  153: 18,
213: 9
lock 206: 1
logical 229: 25
logistics 230: 16
long 21: 3,
30: 22,  75: 19,
78: 25,  96: 6,
100: 14,  106: 25,
109: 25,  110: 3,
115: 16,  130: 1,
195: 19,  199: 9,
243: 7,  245: 25,
248: 5
longer 19: 18,
130: 3,  186: 22,
231: 9,  245: 25,
254: 17
Looked 10: 13,
34: 4,  41: 2,
56: 17,  66: 2,
74: 2,  98: 22,
116: 24,  128: 2,
131: 15,  138: 4,
138: 9,  138: 21,
139: 21,  140: 6,
140: 14,  176: 9,
177: 6,  191: 13,
193: 9,  193: 10,
211: 3,  243: 3,
256: 22
looking 5: 9,
5: 10,  14: 8,
28: 7,  30: 23,
32: 23,  59: 18,
64: 14,  80: 21,
129: 9,  141: 20,
142: 11,  176: 5,
178: 3,  182: 10,
182: 11,  210: 10,
221: 20,  233: 8,
233: 22,  254: 9
Looks 140: 22,
142: 1,  142: 2,
144: 7,  144: 25,

145: 12, 175: 16, 175: 24, 176: 2, 176: 3, 186: 7, 191: 12, 193: 1
Los 224: 15, 226: 12, 228: 15, 228: 20
lose 60: 14
losing 60: 17
lot 12: 21, 103: 17, 103: 22, 104: 4, 107: 12, 113: 19, 118: 6, 124: 10, 131: 7, 135: 3, 178: 10, 180: 4, 195: 20, 220: 4, 220: 14, 223: 5, 227: 24, 239: 24, 245: 23, 247: 22
Lots 43: 25
loud 51: 1, 51: 2
love 215: 5, 220: 11, 230: 10, 235: 9, 238: 18, 241: 14
loves 235: 14
loving 231: 17, 237: 4, 237: 5
low 10: 20, 151: 11, 152: 22, 162: 25, 203: 7
lower 104: 17, 109: 20, 143: 25, 201: 6
loyal 237: 5
lunch 132: 4
lung 129: 18, 129: 19, 129: 22
lungs 87: 1, 202: 10

< M >
M-c-g-i-n-l-e-y 34: 12
ma'am 23: 14, 27: 18, 28: 18, 28: 24, 29: 1, 29: 4, 29: 17,

30: 10, 30: 17, 30: 25, 31: 19, 35: 7, 36: 8, 38: 23, 39: 22, 40: 23, 42: 20, 43: 11, 43: 24, 44: 2, 96: 14, 96: 17, 97: 5, 97: 8, 97: 11, 98: 15, 99: 10, 106: 16, 238: 22
machine 82: 11, 82: 20, 200: 6, 200: 8
machinery 126: 22
machines 81: 15, 82: 16, 172: 4
machines. 80: 15
magnitude 154: 8
main 47: 10
mainly 10: 5, 24: 6
maintenance 73: 17, 205: 1
major 103: 4, 246: 21
majority 33: 22, 187: 14
male 246: 14
malicious 233: 15
malintent 234: 22
man 35: 5, 88: 22, 88: 23, 205: 8, 215: 2, 231: 10, 237: 3, 238: 10, 240: 23, 241: 21, 243: 25, 244: 25, 245: 16
manage 242: 3, 246: 20, 246: 22
manageable 80: 9, 80: 13
managed 231: 15
management 24: 15, 25: 16, 33: 18, 225: 14, 227: 18
manager 210: 23, 229: 4
managers 33: 8

manages 225: 7
mandatory 250: 24, 257: 4, 262: 14
manipulation. 157: 12
manufactures 186: 12
March 66: 21, 96: 24
mark 169: 22, 169: 25
marked 92: 23, 138: 14, 138: 18, 139: 17, 140: 13, 170: 1, 170: 4, 176: 19, 177: 4, 181: 4
markings 140: 16, 140: 23
marks 140: 7, 176: 22, 192: 25
marshal 111: 25, 112: 1, 112: 22
MARTIN 1: 22, 11: 21, 13: 13, 14: 25, 20: 17, 20: 20, 34: 13, 77: 12, 101: 21, 114: 12, 122: 7, 122: 8, 148: 16, 200: 17, 206: 23, 219: 21, 235: 22, 235: 24, 236: 1, 236: 5, 243: 5, 261: 8, 261: 18, 263: 3, 263: 14, 264: 10, 264: 14, 264: 20, 264: 26
MARTIN100 264: 14
MARTIN114 264: 20
MARTIN170 264: 26
MARTIN96 264: 10
marvelous 205: 16
mask 40: 1, 40: 17, 40: 21, 40: 25, 41: 4, 41: 8, 121: 21, 121: 22, 121: 23, 122: 3, 122: 9,

122: 12, 122: 14, 122: 21, 122: 25, 161: 16, 208: 2
masks 39: 9, 39: 11, 39: 16, 39: 18, 39: 19, 40: 16, 40: 19, 41: 2, 121: 10, 122: 14, 122: 15, 122: 16, 208: 4, 208: 6, 208: 9, 211: 7, 218: 17
massive 69: 11
mastic-containing 189: 4
mastics 154: 25, 157: 7, 170: 12, 198: 22
materials 18: 4, 18: 21, 19: 7, 19: 21, 32: 24, 37: 12, 68: 4, 103: 13, 120: 1, 122: 13, 147: 1, 150: 7, 168: 18, 172: 12, 196: 6, 207: 14
matrices 157: 20
matrix 118: 11, 146: 8, 156: 9, 156: 16, 156: 20, 157: 9, 157: 10
matter 3: 10, 7: 17, 16: 25, 17: 18, 17: 21, 18: 5, 18: 8, 20: 4, 36: 2, 62: 9, 153: 19, 164: 5, 199: 22, 201: 16, 201: 19, 201: 20, 213: 14, 228: 17, 229: 15, 266: 2
matters 219: 18
maturity 234: 13
Mcginley 5: 19, 34: 7, 34: 11, 34: 16, 34: 20, 35: 9, 47: 24, 49: 7, 49: 9,

49: 18,  54: 3,
58: 19,  59: 1,
59: 3,  60: 10,
99: 8,  99: 12,
99: 15,  206: 4,
206: 5,  206: 7,
214: 16,  214: 22,
215: 5,  246: 24,
248: 22,  249: 20
meaningless
117: 19
means 61: 18,
163: 8
meant 5: 23,
49: 14,  206: 8
measurable
147: 21
measure 127: 25,
128: 7,  128: 12,
131: 4,  147: 23,
150: 12,  184: 18,
188: 3,  188: 4,
188: 8,  199: 23
measured 150: 25,
152: 21,  181: 24,
182: 21,  183: 15,
183: 24
measurement
13: 20,  14: 6,
106: 20,  110: 22,
118: 2,  128: 13,
128: 14,  135: 20,
135: 21,  135: 23,
135: 25,  136: 19,
201: 11,  202: 3
measurements
134: 19,  134: 25,
135: 13,  135: 16,
135: 17,  135: 18,
136: 8,  136: 10,
151: 23,  152: 13,
188: 21,  198: 24,
199: 2,  199: 6,
201: 10
measures 181: 22,
184: 15,  184: 17
measuring
183: 11,  183: 12,
183: 13
mechanical 2: 46,

126: 8
media 130: 10
median 130: 10
Medical 115: 22,
116: 1,  121: 20,
130: 6,  221: 16,
223: 13,  251: 7,
253: 15,  257: 6
medium 80: 14,
145: 6,  145: 23,
156: 7,  157: 16,
174: 24
meet 10: 16,
128: 5
meetings 48: 14,
48: 18,  48: 19
meets 14: 5
member 224: 22,
234: 23,  236: 25,
260: 3
members 123: 17,
223: 19,  228: 23,
236: 5
membranes 131: 5
memorandum
18: 20,  19: 1,
167: 21,  223: 5,
241: 3
memory 101: 14,
101: 22
men 25: 2,  104: 1
mental 258: 20
mention 98: 25,
110: 25,  182: 12,
197: 11,  226: 10,
228: 7
mentioned 26: 18,
99: 2,  106: 17,
121: 22,  127: 19,
128: 5,  129: 11
mentions 150: 3
merciful 253: 9
Mercury 36: 7,
36: 9,  36: 20,
36: 21
mercy 237: 14,
238: 16,  240: 7
mesothelioma
129: 20,  256: 12
mess 152: 7

message 256: 19
messed 204: 3
met 128: 9
meted 250: 11
meter 124: 7,
124: 8
method 150: 10,
150: 15,  150: 16,
150: 17,  150: 20,
153: 1,  153: 24,
155: 6,  166: 12,
209: 3
methods 124: 19,
130: 11,  150: 14,
152: 22,  155: 7,
158: 1,  158: 17
MICHAEL 2: 1
Michigan 115: 21,
115: 23
micrometers
124: 7,  160: 25
microphone
20: 15,  100: 7,
114: 18,  128: 3,
132: 22
microscope 128: 3
microscopic 72: 5
microscopy
150: 13
mid-december
39: 17
mid-november
96: 20
middle 56: 8,
135: 23
Mike 3: 15
millimeters
182: 15
millions 128: 20,
128: 21
millionths 124: 8
mind 13: 24,
107: 13,  202: 25,
203: 11,  203: 19,
205: 20,  205: 21,
205: 22,  206: 10,
214: 14,  230: 1,
260: 20
mine 233: 17
mineral 73: 2,

119: 24,  120: 2,
120: 3,  129: 16
mineralogy 120: 1
Minerals 72: 5,
72: 6
mini-trial 195: 7
minimis 10: 16,
201: 25
minimize 51: 13,
163: 8
minimum 22: 6,
22: 9,  45: 13,
220: 20
Minnesota 189: 19
minor 140: 5
minute 13: 23,
14: 22,  15: 15,
15: 25,  16: 5,
24: 17,  99: 17,
198: 13
minutes 74: 25
MISHAP 51: 9
mistake 63: 9,
200: 18,  200: 22,
230: 17,  232: 12,
234: 21,  236: 22,
237: 9,  239: 7,
242: 8,  249: 19
mistakes 246: 7,
249: 15
misunderstood
113: 20,  120: 13
mitigate 108: 20,
109: 12
mitigating
209: 14
mix 190: 10,
190: 13
mixed 104: 17,
147: 17,  156: 19,
190: 25
mixture 181: 23,
183: 24
mobile 103: 2
moldy 38: 20
moment 20: 17,
45: 15,  117: 10,
131: 10,  175: 9,
177: 17,  179: 7,
185: 20,  190: 4,

196: 21,  235: 23,
253: 13,  259: 14
monetary 262: 13
money 35: 5,
88: 22,  88: 23,
186: 16,  220: 17,
220: 18,  220: 24,
221: 4,  222: 2,
242: 5
monitor 160: 24,
189: 22,  189: 23
monitored
121: 21,  173: 9,
188: 2
monitoring
121: 20,  130: 7,
163: 9,  188: 11,
221: 17,  223: 13,
226: 8,  251: 8,
253: 16,  257: 7
monitors 227: 21
month 6: 22,
66: 24,  257: 16
monthly 227: 22
months 7: 20,
11: 25,  93: 4,
93: 9,  96: 25,
97: 1,  130: 5,
221: 9,  221: 11,
223: 9,  224: 19,
228: 1,  253: 14,
254: 10,  254: 11,
254: 14,  254: 16,
257: 3
morals 235: 5
Morning 3: 12,
3: 19,  6: 15,  8: 2,
13: 5,  15: 24,
20: 4,  74: 22,
74: 24,  195: 2,
223: 21,  228: 7,
228: 8
mother 235: 17
motion 6: 25,
16: 22,  78: 2,
194: 18,  194: 20,
195: 3,  195: 25,
196: 2,  252: 16
motivation
220: 17,  220: 23,

221: 23
motive 255: 6
move 45: 18,
57: 5,  57: 10,
57: 15,  57: 19,
76: 8,  104: 2,
162: 7,  170: 13,
231: 22,  250: 7
moved 57: 2,
57: 20,  105: 2,
178: 7,  221: 19
moving 130: 9,
168: 15
MR.  GIBSON
169: 22,  170: 1,
174: 19,  185: 10,
193: 23,  194: 21,
194: 25,  195: 2,
197: 16,  197: 19,
219: 20,  223: 18,
224: 7,  224: 9,
226: 19,  226: 21,
228: 2,  228: 5,
232: 1,  235: 17,
238: 23,  240: 12,
240: 17,  252: 15,
252: 23,  252: 25,
260: 10,  260: 19,
260: 23,  261: 1,
261: 4,  262: 9,
263: 8,  263: 16
MR.  ROPER 15: 11,
17: 16,  18: 6,
18: 23,  19: 3,
19: 8,  19: 17,
31: 20,  35: 22,
45: 25,  133: 23,
245: 22,  250: 4,
250: 15,  250: 18,
252: 11
MS 11: 21,  13: 13,
14: 25,  20: 17,
20: 20,  34: 13,
77: 12,  101: 21,
114: 12,  122: 7,
122: 8,  148: 16,
200: 17,  206: 23,
219: 21,  235: 22,
235: 24,  236: 1,
243: 5,  261: 7,

261: 18,  263: 3,
263: 14,  264: 10,
264: 14,  264: 20,
264: 26
multiple 210: 6,
210: 7,  225: 10,
226: 7
multitasking
204: 18
murdering 249: 16
music 215: 10
Myself 28: 9,
32: 9,  33: 20,
62: 17,  90: 25,
186: 14,  191: 11,
227: 19,  236: 10,
240: 15


< N >
n-g-s 224: 8
naive 230: 19
NAME 20: 23,
24: 2,  28: 11,
28: 12,  29: 1,
30: 3,  33: 23,
37: 25,  38: 7,
100: 10,  114: 21,
114: 22,  115: 7,
132: 25,  133: 1,
185: 14,  224: 12,
232: 4,  260: 22,
264: 2
names 28: 2,
28: 5,  28: 7,
28: 10,  28: 20,
28: 22,  28: 25,
29: 25,  47: 21,
210: 7,  210: 8,
217: 20,  217: 21
nanometers 124: 7
NARRATIVE
264: 32,  264: 38,
264: 43
NARRATIVE224
264: 32
NARRATIVE228
264: 38
NARRATIVE232
264: 43

National 51: 12,
114: 24,  115: 4,
116: 6,  116: 9,
224: 22
nationwide
228: 11
natural 200: 19
nature 82: 9,
101: 25,  133: 18,
172: 17,  174: 9,
215: 2,  218: 14,
221: 22,  233: 22,
255: 4
nauseous 130: 20
NE 133: 12
NEA 164: 1
near 57: 22,
57: 25
necessarily
124: 8,  124: 12,
145: 22,  173: 11,
222: 15,  222: 21
necessary 17: 6,
51: 5,  59: 5,
189: 25,  222: 14,
223: 14,  254: 6,
256: 3,  256: 5,
256: 16,  256: 24
necessitate 6: 16
necessity 195: 8
need 13: 9,
45: 10,  55: 18,
59: 14,  87: 3,
95: 18,  101: 13,
113: 23,  121: 8,
122: 10,  122: 13,
122: 24,  127: 9,
141: 9,  148: 2,
161: 16,  171: 8,
173: 16,  173: 17,
192: 20,  211: 24,
213: 5,  222: 3,
222: 9,  223: 3,
223: 12,  225: 25,
243: 16,  245: 10,
252: 15,  255: 1,
255: 21,  255: 24
needed 240: 20
needs 101: 22,
115: 14,  122: 14,

211: 10, 237: 24
Negative 161: 22,
161: 24, 162: 4,
162: 18, 163: 2,
164: 1, 164: 9,
164: 13, 164: 21,
165: 13, 165: 17,
166: 16, 172: 4,
172: 5, 200: 1,
239: 6, 239: 9,
239: 10, 265: 31
NEHA 133: 12
neighborhood
26: 24, 105: 16,
105: 18, 105: 19,
208: 20
neighboring
25: 1, 39: 3,
208: 18
neighbors 211: 2
nervous 130: 19
networking
225: 23
neutral 82: 6
Nevertheless
10: 21, 213: 4
New 14: 18,
14: 22, 88: 8,
88: 10, 88: 13,
89: 9, 169: 18,
202: 21, 209: 8,
228: 9, 243: 24
news 21: 12,
26: 18, 27: 1,
259: 18
Next 20: 2,
27: 20, 142: 6,
142: 21, 143: 7,
143: 17, 144: 7,
144: 16, 144: 19,
145: 10, 146: 1,
146: 11, 157: 13,
171: 11, 172: 6,
173: 17, 175: 2,
194: 17, 217: 17,
225: 14, 228: 1
nicest 215: 6
night 4: 1, 4: 2,
6: 7, 6: 15, 7: 4,
131: 15, 136: 24,

136: 25, 137: 18,
139: 15, 141: 4,
144: 9, 167: 7,
174: 10, 175: 24,
176: 4, 176: 9,
179: 21, 179: 23,
193: 1, 193: 3,
195: 10, 195: 18,
200: 15, 200: 22,
241: 8
nine 9: 25, 10: 7,
10: 13, 10: 25,
216: 11
ninth 218: 21
NIOSH 152: 22
Nobody 87: 23,
201: 25, 214: 18,
240: 6
non 129: 21
non-notifiable
189: 7
nonapproved
26: 11, 207: 13
noncustodial
243: 1
noncustody
245: 18
nondetectable
158: 7
nondetected 66: 4
None 23: 11,
34: 15, 45: 5,
87: 22, 90: 15,
90: 16, 128: 9,
158: 21, 158: 22
Nonfriable 8: 23,
47: 23, 48: 6,
48: 20, 49: 4,
49: 25, 50: 7,
50: 12, 50: 15,
52: 3, 52: 5,
52: 6, 52: 7,
52: 10, 52: 13,
52: 19, 53: 4,
71: 12, 118: 6,
118: 9, 118: 10,
118: 15, 118: 22,
118: 23, 119: 1,
119: 5, 167: 24,
168: 7, 168: 18,

171: 15, 172: 21,
205: 23, 206: 17,
214: 17, 247: 25
nonguideline
243: 1
nonharmful 120: 4
nonhomogeneous
183: 21
nonpeer-reviewed
164: 8
nonprofit 225: 7,
225: 8, 226: 7
nonpublished
135: 3
nonstop 204: 16,
204: 17
Nontreated
143: 11, 143: 12,
146: 13, 176: 6
normal 118: 19,
228: 13
Normally 12: 15,
109: 23, 113: 5,
113: 7, 173: 11,
173: 25, 180: 12,
183: 17, 183: 20,
188: 18, 188: 20
North 55: 5,
68: 12, 68: 18,
68: 19, 105: 13,
105: 16, 109: 9,
116: 15, 224: 14
Northern 1: 2,
3: 4, 266: 13
noted 112: 11,
154: 4
notes 110: 16,
215: 17, 218: 6,
218: 16
Nothing 5: 5,
11: 25, 12: 10,
140: 24, 169: 13,
192: 7, 198: 21,
200: 24, 202: 1,
203: 10, 205: 20,
206: 18, 206: 20,
208: 22, 214: 6,
214: 14, 246: 15,
261: 4, 263: 15
notice 59: 15,

252: 4
noticed 228: 6,
233: 1
notification
8: 17, 167: 15,
168: 20
notified 103: 14,
103: 16
notify 173: 23,
174: 5, 189: 12,
209: 2, 252: 2
November 39: 14,
39: 16, 208: 4
nowhere 57: 22,
57: 25
nuance 247: 17
nuances 248: 2
numbers 44: 10,
44: 15, 54: 18,
54: 22, 55: 1,
55: 3, 55: 4,
66: 2, 92: 7,
92: 9, 92: 13,
92: 15, 93: 11,
93: 23, 93: 24,
94: 1, 96: 2,
149: 24, 164: 24,
181: 16, 205: 1,
205: 2, 205: 4
numerous 81: 20,
199: 6, 241: 7


< O >
o'clock 6: 15,
196: 21, 259: 13
oath 7: 24, 14: 14
Object 31: 20,
35: 23, 60: 1,
73: 11, 82: 8,
83: 6, 94: 6,
252: 17
objecting 18: 2,
46: 10
objections 3: 23,
17: 8, 17: 23,
17: 25, 18: 11,
18: 13, 18: 15,
18: 24, 20: 3,
20: 8, 50: 22,

55: 24,  75: 13,
101: 25,  193: 24,
195: 6,  197: 12,
197: 18,  200: 19,
206: 25,  207: 1,
207: 2,  210: 20,
211: 12,  216: 2,
218: 11,  219: 14,
219: 15
objects 33: 1
obligation 4: 24,
7: 10,  259: 21
obligations
262: 23
observation
170: 6,  265: 37,
265: 39
observation170
265: 37,  265: 39
Observations
105: 25,  146: 21,
148: 21,  170: 8
observe 38: 18,
106: 8,  106: 11
observed 140: 19,
144: 4
obstructed
217: 22
obstructing
27: 21
obstruction
91: 23,  95: 5,
197: 24,  204: 21,
210: 5
obtain 115: 11,
163: 2,  171: 1
obtained 249: 20
obvious 203: 22,
214: 8
Obviously 7: 11,
49: 16,  109: 11,
167: 10,  201: 2,
203: 2
occasions 28: 19,
105: 22
Occupational
127: 21,  133: 17,
151: 1,  152: 14,
159: 22,  170: 11,
265: 34

Occupational 170
265: 34
occur 131: 1,
180: 12
occurred 68: 1,
106: 22,  216: 8
occurs 118: 21,
156: 3
offender 244: 25
offense 8: 16,
26: 14,  207: 18,
209: 5,  216: 6,
216: 13,  216: 15,
217: 11,  221: 22,
222: 4,  222: 6,
242: 23,  255: 4,
255: 5,  255: 13,
256: 5
offer 32: 6,
37: 3,  95: 15,
95: 18,  169: 19,
223: 7,  228: 18
offered 15: 23,
217: 23
Office 1: 23,
16: 14,  32: 7,
32: 15,  112: 1,
112: 22,  168: 18,
258: 12
OFFICER 3: 3,
17: 24,  18: 11,
62: 24,  75: 2,
75: 5,  97: 21,
97: 22,  132: 8,
132: 11,  197: 5,
197: 8,  218: 8,
251: 17,  252: 6,
252: 8,  258: 8,
258: 19,  258: 21,
259: 3,  259: 8,
259: 10,  263: 19
offices 65: 12,
229: 5
Official 266: 12
often 123: 6,
232: 25
Ohio 167: 15,
167: 21,  168: 14,
168: 19,  170: 4,
189: 3,  189: 15,

189: 18,  265: 41
old 103: 24,
104: 21
older 228: 25,
229: 3,  230: 1,
232: 10
on-scene 105: 5,
105: 6
Once 35: 13,
105: 2,  105: 5,
118: 21,  119: 18,
175: 6,  229: 15,
244: 4
one. 144: 19,
179: 24,  180: 14,
199: 4
ones 44: 3,
97: 17,  180: 22,
189: 18,  199: 18
ongoing 38: 4,
60: 12,  207: 5
oops 175: 16
Open 40: 1,  42: 8,
42: 16,  42: 19,
47: 9,  73: 18,
73: 19,  205: 15,
211: 14,  211: 17,
211: 18,  212: 20,
212: 23
Opened 32: 5,
32: 15,  42: 12
opening 204: 24,
205: 8,  210: 12,
219: 4
operate 121: 14,
121: 15,  136: 13,
228: 10
operated 136: 11
operates 228: 10
operating 74: 15,
202: 5
operation 4: 12,
27: 13,  70: 19,
73: 20,  76: 14,
80: 14,  80: 16,
88: 24,  127: 2,
136: 9,  163: 11,
200: 3,  211: 3
operations
110: 14,  251: 19

operator 40: 24,
200: 10
opinion 136: 20,
147: 12,  155: 25,
168: 12,  248: 9
opportunities
210: 7
opportunity
3: 22,  6: 21,
13: 8,  17: 13,
32: 14,  138: 13,
140: 12,  186: 23,
195: 15,  237: 15,
240: 20,  259: 21,
260: 3
oppose 252: 24
opposed 14: 17,
129: 8
opposing 101: 17
opposite 57: 4,
58: 2,  205: 14,
230: 5
option 234: 1
order 6: 18,
13: 8,  17: 5,
105: 17,  105: 22,
108: 20,  118: 3,
128: 4,  130: 4,
141: 16,  141: 19,
188: 6,  195: 12,
221: 16,  252: 18,
260: 25,  262: 4,
262: 18
ordered 109: 6,
109: 8,  250: 24,
251: 1,  251: 4,
251: 7,  257: 4,
257: 6,  257: 9,
257: 18,  257: 21,
259: 11,  263: 10
organization
186: 5,  214: 20,
227: 15,  228: 11,
251: 18
organized 229: 25
organizing
225: 24
original 101: 10,
173: 14,  190: 22
originally

66: 11,  186: 11
OSHA 116: 21,
127: 21,  150: 25,
151: 20,  153: 4,
161: 1,  165: 14,
184: 15,  184: 17,
184: 23,  200: 9
others 21: 23,
23: 21,  230: 15,
230: 17,  232: 17,
232: 18,  233: 2,
233: 5,  235: 1,
237: 19,  238: 12,
253: 24
otherwise 46: 13,
52: 1,  219: 8,
219: 16,  254: 20,
259: 5
ought 3: 20,
203: 1
ourselves 6: 6
outcome 231: 5
outline 179: 25,
180: 2
outlined 49: 24,
226: 22,  241: 17
outlook 233: 20
outpouring 241: 8
outside 25: 25,
42: 18,  74: 2,
157: 17,  188: 10,
212: 24,  254: 24
overbearing
222: 8
overgiving
232: 25
override 213: 6
overrule 36: 1,
94: 7,  219: 7,
252: 20
Overruled 31: 25,
82: 10,  117: 22,
126: 20,  177: 20,
207: 17,  210: 4,
211: 11,  212: 14,
219: 15
overrules 216: 6,
217: 18,  218: 13,
219: 14
overruling

218: 10
oversaw 89: 1
oversee 227: 21
overseeing
209: 11
overseen 207: 23
oversight 226: 9
overstated 16: 18
overwhelming
236: 21,  241: 9
owe 16: 19
own 5: 3,  205: 13,
208: 23,  233: 1,
233: 11,  234: 15,
259: 5,  259: 12
owned 21: 24,
99: 6
owner 25: 15,
173: 13
owners 249: 9
Oxnard 225: 11,
226: 8
oxygen 119: 25


< P >
P.  2: 1
p.m.  259: 13
packet 169: 23,
170: 1
pad 109: 2
Page 44: 5,  44: 6,
44: 10,  44: 15,
44: 19,  44: 22,
45: 1,  50: 23,
53: 6,  53: 11,
53: 17,  53: 19,
55: 3,  93: 14,
142: 21,  145: 18,
146: 20,  146: 21,
146: 23,  149: 12,
152: 20,  155: 24,
156: 1,  157: 5,
159: 3,  174: 17,
181: 9,  181: 10,
225: 24,  264: 2,
264: 46,  265: 2
paid 15: 16,
16: 13,  16: 18,
31: 1,  164: 3,

186: 25,  187: 2,
187: 3,  205: 12,
244: 9,  244: 16,
257: 17
pain 232: 13,
236: 21,  238: 11,
246: 10
pains 206: 12
PAMELA 2: 37,
265: 48,  266: 11
pants 123: 15
paper 39: 18,
40: 1,  40: 16,
74: 6,  74: 9,
74: 16,  74: 17,
170: 6,  208: 4
papers 7: 18,
54: 9,  241: 1
paragraph 216: 4,
216: 11,  217: 10,
218: 1,  218: 3,
218: 12,  218: 21,
219: 2,  219: 5,
219: 6,  219: 10
paragraphs
217: 17,  218: 9,
219: 13
parcel 209: 1
Pardon 57: 12,
152: 11,  219: 23
parents 236: 18
Park 21: 11,
33: 23,  102: 23
parking 103: 17,
103: 22,  104: 4
part 4: 20,
14: 16,  29: 3,
42: 14,  42: 16,
52: 23,  56: 14,
65: 13,  65: 14,
95: 16,  118: 5,
147: 6,  147: 7,
147: 9,  147: 20,
156: 1,  156: 2,
156: 16,  186: 17,
186: 18,  186: 19,
197: 14,  209: 1,
218: 7,  223: 23,
233: 4,  242: 18,
244: 4,  251: 15,

257: 14
Partial 43: 11,
54: 21
participate
226: 23,  258: 20,
259: 5
particles 160: 25
particular
17: 10,  141: 16,
153: 25,  154: 23,
164: 21,  173: 21,
218: 23
particularly
44: 3,  141: 23,
157: 24
particulate
121: 6,  160: 23
parties 236: 6
parts 12: 9,
52: 4,  64: 23,
65: 5,  66: 15,
66: 16,  73: 25,
171: 23,  235: 9,
243: 23
party 250: 5
Pass 46: 3,
110: 5,  132: 3,
192: 8,  239: 1,
250: 2,  250: 17,
253: 2
passed 115: 15,
256: 8
passing 219: 3
passionate 225: 2
past 236: 22,
238: 11,  239: 14
paste 109: 5
Pate 2: 2
path 234: 2,
234: 15
patterns 180: 6
Pause.  20: 19,
45: 17,  92: 25,
95: 12,  99: 19,
141: 11,  169: 12,
190: 6,  194: 24,
235: 25,  261: 13
Paustenbach
185: 24
pay 16: 11,

16: 15, 16: 16, 16: 20, 29: 2, 157: 13, 220: 20, 227: 17, 227: 21, 244: 14, 249: 11, 250: 24, 251: 1, 251: 4, 251: 7, 251: 14, 257: 4, 257: 6, 257: 9, 257: 18
payable 257: 10, 257: 11, 257: 12
payment 16: 4, 16: 12, 223: 13, 250: 5, 258: 24, 261: 10, 262: 3, 262: 4, 262: 18
payments 257: 15
payroll 229: 7
PCM 150: 24, 158: 23, 159: 1, 159: 6
PE 165: 18
Pedro 24: 3
peer-reviewed 163: 21, 165: 20
PEL 127: 19, 131: 24, 151: 17, 152: 17, 153: 4, 158: 5, 161: 18, 162: 19, 163: 1, 163: 14, 163: 18, 164: 1, 164: 22, 165: 14, 165: 21, 166: 11, 166: 25, 184: 5, 184: 8, 188: 2, 188: 3, 188: 4, 188: 8
Pels 128: 10, 151: 24
penalty 210: 18, 217: 15, 259: 20
Pennsylvania 134: 4, 134: 5
per 22: 5, 152: 23, 153: 4, 165: 15, 187: 1, 199: 12, 257: 16
percentage 45: 9, 149: 19, 182: 17

perform 115: 24, 186: 20
performed 153: 22
Perhaps 55: 11, 56: 15, 94: 14, 128: 20
period 6: 19, 59: 11, 195: 12, 217: 2, 227: 12, 245: 17, 255: 2
periodic 173: 14, 252: 5, 258: 18
perjury 210: 18
permiss 200: 1
Permissible 117: 17, 127: 22, 127: 24, 131: 25, 151: 18, 151: 24, 153: 2, 153: 6, 162: 19, 165: 8, 165: 9, 198: 13, 198: 14, 198: 18, 199: 11, 199: 17, 199: 18, 200: 1, 200: 4, 201: 8, 202: 4
permission 238: 7
permit 59: 15, 224: 4
permits 6: 2, 59: 5, 206: 6
permitting 60: 12, 99: 8
person 23: 3, 30: 3, 46: 17, 135: 21, 209: 11, 229: 13, 231: 8, 233: 14, 233: 15, 233: 24, 235: 3, 235: 10, 235: 11, 237: 2, 237: 9, 238: 13, 239: 12, 240: 23, 241: 6, 241: 14, 244: 1, 258: 11
Personal 73: 6, 121: 17, 135: 5, 135: 17, 135: 19, 135: 21, 135: 25, 158: 9, 159: 1,

165: 3, 199: 6
personality 229: 25, 232: 25
personally 136: 3, 136: 13, 191: 11, 203: 10, 229: 20, 239: 1
personnel 104: 6, 104: 10, 108: 17, 108: 19, 108: 21, 108: 22
perspective 254: 8
persuade 254: 4, 255: 1, 256: 1
persuasive 217: 22
pertain 61: 7
pertains 136: 18
pertinent 218: 19
petroleum 59: 10
Ph 131: 4, 170: 20, 170: 24, 171: 1
Ph.d 170: 22
phase 128: 3, 150: 13
philosophy 204: 14
phone 30: 10, 30: 11, 37: 25, 92: 6, 92: 8, 92: 9, 92: 12, 92: 14, 93: 10, 93: 19, 93: 20, 93: 23, 96: 2, 205: 1, 205: 2
phones 203: 13
phonetic 48: 23, 94: 5, 229: 16
Photo 78: 5, 265: 29
Photo139 265: 29
photograph 4: 14, 75: 20, 76: 10, 76: 22, 76: 23, 77: 2, 78: 22, 80: 10, 81: 14, 84: 6, 86: 9, 87: 14, 87: 15,

87: 18, 142: 13, 179: 10, 200: 12, 200: 18
photographs 141: 4, 141: 7, 141: 14, 141: 18, 200: 17
Photos 265: 43
Photos170 265: 43
physical 126: 8
physically 62: 14, 62: 15
physiology 115: 22
pick 126: 22, 154: 25
picked 4: 2, 4: 16, 4: 17, 32: 16, 136: 24
pictures 143: 20, 169: 23, 170: 2, 175: 17, 175: 19, 178: 9, 180: 9, 191: 16
pile 57: 1
piles 44: 20, 57: 5
pipe 52: 20
place 48: 18, 109: 2, 118: 20, 120: 24, 130: 9, 140: 2, 160: 5, 162: 16, 202: 24, 214: 7, 236: 11, 254: 24
placed 24: 13, 24: 18, 69: 22, 241: 21, 241: 22, 250: 23
places 142: 11, 196: 7
placing 236: 17
plaintiffs 187: 13, 187: 16
plan 16: 12, 57: 23, 137: 8, 225: 9
plane 203: 13, 203: 16
planning 225: 13

plastic 121:4, 123:5, 171:21
plays 205:17
Plaza 36:13, 36:25, 37:4, 37:10, 48:14, 48:15, 242:4, 249:18
plea 5:25, 7:1, 7:18, 7:23, 11:24, 12:24, 14:12, 220:6, 230:22, 230:23, 243:11, 247:18, 250:20, 250:21, 253:4, 253:6, 254:11
plead 237:1, 238:16
pleaded 255:13
pleas 6:4, 8:11
Please 3:9, 20:12, 20:14, 20:23, 56:7, 60:7, 75:6, 91:24, 100:4, 100:6, 100:10, 114:15, 114:17, 114:21, 132:12, 132:21, 132:25, 225:15, 225:16, 231:21, 235:3, 238:2, 238:18, 247:3, 253:11
pled 10:4, 189:11, 209:6, 219:24
pleural 256:12
plural 129:22
Plymouth 21:11, 33:22, 102:22
PM 52:2
point 6:5, 9:25, 10:7, 10:13, 10:25, 11:22, 12:22, 17:1, 39:11, 39:21, 52:14, 55:11, 76:22, 77:11, 93:8, 101:22,

106:23, 109:14, 109:16, 125:16, 125:21, 151:13, 222:18, 229:14, 235:18, 253:12
point. 78:19
pointed 54:18, 81:20, 130:17
pointing 77:8, 77:9, 79:2
points 197:21
Policy 173:25, 174:2, 223:1, 224:23
pollutants 51:13
pool 89:21, 89:22, 106:21, 107:5, 109:23
pooled 106:18
pools 107:3
poor 5:4
pop 166:20
popped 178:23, 179:2, 180:4, 180:11, 180:16, 180:22
popping 5:2, 39:23, 40:4, 119:9, 208:5
portion 194:3, 217:6, 218:2
portions 43:13
portrayed 139:14
portrays 76:4
position 15:12, 15:20, 16:1, 16:6, 17:3, 34:14, 34:17, 49:9, 195:21, 220:7, 241:21, 246:8, 246:22, 247:5, 249:13
positions 20:7
positive 23:25, 231:5, 231:15, 233:21, 238:5, 238:17, 239:6, 239:7
positively 225:17

possess 258:5, 258:9
possession 33:1
possibility 162:22, 162:23
possible 42:20, 53:18, 78:17, 127:12, 127:16, 162:12, 172:1, 259:17
Possibly 63:10, 85:6, 85:21, 128:23, 147:23, 163:1, 200:3
post 12:24, 103:23, 104:2, 104:10, 105:2, 174:1, 174:7
postdoctoral 115:24
poten 195:24
potential 37:3, 87:20, 88:1, 156:9, 157:9, 173:18, 248:12
Potentially 68:16, 89:4, 89:5, 91:13, 91:14, 124:5, 129:25, 195:24, 208:19
pound 201:21
pour 209:20
poured 14:9, 176:16, 248:18
Pouring 125:17, 125:22, 130:12, 130:14, 177:6, 209:12
pours 113:3
powder 72:4
power 107:4, 113:10
powers 113:8, 113:12
PR 105:21
practicalities 230:16
practice 74:8, 74:21, 120:20,

128:5, 128:9
practices 51:15, 53:25, 120:23, 125:4, 150:8, 167:16
pray 3:7, 231:5, 231:20
predicament 6:6
preferable 197:10
preferences 37:6
prejudice 11:14, 11:19, 13:5, 15:21, 16:2
prejudiced 15:13
prejudicial 16:6
preliminary 17:6, 19:25, 173:12
prematurely 236:16
premeasurements 188:22
premises 196:12
prepare 161:19, 161:21, 163:25
prepared 10:14, 13:6
preparing 260:21
preponderance 212:9, 215:13, 217:19
prescribed 253:20, 266:4
presence 124:12, 157:16, 196:6, 196:10, 216:9, 233:18
present 13:9, 20:6, 108:7, 116:9, 132:16, 195:24, 196:23, 229:12, 235:19, 263:13
present-- 6:24
presentation 15:2, 18:3, 18:13, 18:16, 18:23, 18:25, 259:25

presentations 17:4
presented 6:23, 7:17, 17:8, 139:25, 140:2, 194:18, 196:9, 215:24, 217:7, 223:21
presentence 17:14, 17:22, 17:23, 17:24, 18:9, 18:10, 18:11, 18:16, 19:7, 19:11, 20:3, 62:19, 63:7, 193:24, 195:6, 198:16, 199:19, 215:18, 215:19, 215:23, 218:13, 250:8
presenting 232:7
president 248:17
presiding 3:6
pressure 172:5, 204:20, 234:4
pressures 236:18
pretrial 8:20
Pretty 28:16, 100:19, 145:4, 176:11, 202:20
prevent 130:9, 251:22, 252:1, 252:3, 252:7
preventing 151:23, 234:25
previous 69:13, 145:18, 146:22, 154:9, 157:7
previously 119:1, 136:7, 194:8, 251:15, 262:12
price 35:6, 36:16, 37:3
pried 14:10
primarily 117:25, 118:10, 154:25
print 142:2
Prior 23:23,

107:22, 107:24, 168:20, 218:10, 219:15
priority 239:25
prison 5:9, 13:1, 243:2, 245:7, 245:11
Prisons 257:3, 258:14, 260:13, 260:15
private 186:4, 186:5
privilege 238:3
probable 215:14
Probably 14:2, 15:8, 71:3, 114:6, 140:20, 144:3, 145:23, 154:1, 159:2, 169:3, 186:4, 186:24, 187:8, 190:21, 222:11, 222:21, 246:9
Probation 17:24, 18:11, 62:24, 97:20, 97:22, 218:8, 227:16, 245:4, 245:6, 245:13, 250:23, 251:10, 251:17, 252:6, 252:8, 256:18, 258:8, 258:12, 258:19, 258:21, 259:3, 259:8, 259:9
probationary 245:3
problem 46:15, 104:25, 105:1, 108:25, 109:11, 109:13, 168:1, 168:2
problems 129:14, 131:1, 184:9, 207:21, 243:21
procedurally 252:15
procedure 74:15, 218:25
procedures

121:15, 121:16
proceed 5:12, 17:5, 75:7, 101:21, 108:12, 197:13, 219:21, 223:17
proceeding 16:23, 16:24, 31:21
Proceedings 2:46, 75:4, 132:10, 197:7, 266:1
proceedings. 263:20
process 22:13, 116:22, 118:21, 121:21, 156:4, 232:16
produce 202:17
produced 2:47
product 157:12
production 29:23
products 156:5, 156:11, 159:23, 186:12
professional 226:14, 232:19
professionals 161:6, 200:8
professor 224:13
professors 225:7
proffer 4:23, 207:22
profoundly 239:8
program 121:20, 209:12, 223:23, 224:4, 224:21, 225:12, 225:19, 225:21, 226:1, 226:6, 226:22, 227:6, 227:8, 228:19, 250:9, 251:22, 251:25, 252:3, 252:7
programs 224:25
progress 252:6
progressed 13:15
progression 211:7

project 4:20, 4:21, 27:24, 29:3, 34:21, 34:24, 39:13, 48:14, 49:10, 51:20, 52:23, 54:9, 56:14, 59:5, 59:23, 60:13, 61:2, 64:18, 66:16, 68:1, 69:6, 69:9, 69:10, 73:23, 74:12, 96:20, 96:25, 161:22, 164:2, 204:9, 204:11, 239:18, 247:1
projects 74:16, 116:25, 163:3
promise 235:5
promote 256:6
promotes 242:23
promulgated 127:20
pronounced 251:15, 262:12
proof 15:6, 199:13
proper 117:14, 128:6, 220:18, 222:13
properly 6:23, 35:2, 121:23, 127:9, 128:4, 173:9, 188:17, 211:8, 242:4
Properties 25:14
property 21:24, 26:25, 33:8, 33:18, 99:6, 219:1, 242:3
propose 6:13, 36:23
proposed 161:21, 223:22
prosecute 243:8
prosecuted 214:23, 214:24, 214:25
prosecution

195: 21
prosecutor
247: 14,  248: 5
prosecutors
32: 11
protect 104: 5,
121: 19,  218: 18,
231: 7,  255: 22
protecting 234: 6
Protection 21: 1,
21: 4,  113: 1,
116: 17,  116: 20,
119: 4,  121: 18,
181: 6,  183: 23,
199: 3,  200: 9,
236: 6,  256: 9
protective
121: 17,  174: 13,
208: 1,  237: 5
protects 215: 3
proud 231: 12,
245: 14
provide 28: 22,
30: 8,  61: 24,
92: 6,  92: 11,
92: 12,  92: 14,
101: 5,  116: 17,
148: 17,  223: 12,
225: 16,  226: 4,
229: 23,  238: 8,
253: 5,  256: 6,
258: 24,  259: 9
provided 4: 14,
5: 24,  29: 6,
29: 9,  29: 13,
29: 18,  31: 10,
49: 23,  56: 3,
75: 25,  93: 18,
93: 20,  93: 24,
103: 3,  133: 21,
139: 6,  139: 10,
148: 15,  154: 13,
162: 3,  194: 8,
205: 12,  212: 8,
218: 14,  218: 18,
250: 21,  253: 6
provider 258: 23
provides 217: 1,
242: 24
providing 38: 7,

80: 14,  217: 20
pry 150: 11
prying 119: 8
psychological
236: 21
public 116: 18,
116: 24,  129: 13,
255: 22,  256: 9
publication
134: 7
publications
115: 13,  134: 7,
134: 16,  199: 7,
199: 8
published
134: 13,  134: 21,
135: 2,  199: 6,
202: 15
pull 11: 5,
13: 16,  103: 17,
104: 7,  108: 21,
242: 13
pulled 7: 7,
103: 21,  103: 22,
104: 9
pulling 240: 19
pulverized 51: 25
pulverizing
119: 11
punish 205: 19,
205: 21
punishment
222: 4,  245: 10,
250: 11,  256: 6
purchase 40: 20,
84: 13,  88: 14
purchased 40: 13,
40: 21,  88: 16,
90: 4
purchases 89: 1
pure 237: 2
purely 245: 3
purifying 82: 24,
83: 1
purpose 61: 12,
80: 2,  84: 23,
122: 2,  160: 10,
202: 24,  206: 7
purposes 170: 2,
194: 2,  218: 20,

253: 22,  254: 6,
256: 25
Pursuant 51: 11,
251: 5,  251: 10,
257: 19,  262: 17,
262: 20
pursuing 229: 11
push 232: 15
pushed 14: 18
puts 91: 6,
230: 15
putting 5: 4,
81: 5,  85: 18,
90: 11,  171: 21,
237: 23,  246: 24


< Q >
Q.  178: 21
quadrant 201: 6
qualified
136: 17,  201: 9,
207: 24
quality 9: 23,
126: 25,  245: 1
quantification
185: 3
quantitative
147: 25
quantity 9: 14,
9: 23,  63: 25,
64: 2,  64: 10,
110: 16,  110: 19
question 9: 12,
9: 14,  9: 22,
58: 9,  60: 3,
60: 7,  65: 8,
82: 10,  108: 10,
112: 5,  117: 4,
117: 14,  120: 7,
122: 6,  167: 24,
173: 19,  175: 21,
178: 16,  178: 25,
183: 14,  214: 8,
226: 19,  230: 17,
230: 25,  242: 19
questioned
208: 24,  229: 15,
229: 18
questioning

12: 5,  82: 9,
85: 11
questions 13: 24,
17: 13,  20: 1,
97: 25,  98: 8,
114: 7,  114: 9,
136: 20,  193: 19,
195: 20,  226: 5,
244: 12
quick 102: 5
quite 83: 20,
94: 14,  176: 5,
178: 8,  212: 24
quotations 93: 18
quote 153: 10,
169: 7,  204: 11


< R >
R-o-d-r-i-g-u-e-
z 93: 20
Rabbi  228: 9,
243: 23
radio 103: 2
rain 11: 7
Raise 7: 10,
10: 6,  10: 7,
15: 18,  15: 19,
20: 12,  100: 4,
114: 15,  186: 16
raised 7: 9,
10: 2,  15: 18,
20: 4,  195: 9,
231: 1
raises 6: 15,
195: 20
raising 10: 5,
13: 23
Ralph 33: 25
range 124: 7,
197: 12,  217: 15,
219: 19,  221: 8,
222: 14,  222: 24,
254: 7,  254: 19,
255: 3
rate 257: 16
rather 76: 10,
85: 10,  116: 11,
253: 10
raw 156: 4

RCRA 243:15
reach 30:11
Read 3:23,
17:14, 19:6,
19:11, 51:1,
51:2, 51:3,
53:12, 53:13,
53:15, 53:20,
54:9, 55:6,
56:7, 56:11,
62:19, 62:22,
80:3, 80:5,
80:7, 80:12,
93:9, 93:13,
95:21, 96:1,
98:4, 155:25,
157:6, 182:13,
182:14
reading 12:19,
56:2, 173:20,
173:22, 182:10,
226:25
readings 173:9,
173:12, 173:14,
173:15
ready 246:18,
250:16, 253:1
real 4:19,
77:18, 140:15,
144:6, 152:9,
152:10, 152:12,
152:13, 168:4,
246:12, 246:16,
259:7
realize 66:9,
66:10, 109:14,
203:2, 232:23,
239:7
realized 200:22
reason 12:3,
33:15, 60:11,
79:16, 87:6,
97:9, 106:2,
111:3, 156:21,
195:8, 205:19,
214:24, 214:25,
218:23, 250:13,
252:13, 253:10
reasonable 6:18,
54:4, 77:25,

81:3, 81:7,
85:13, 144:3,
148:6, 163:17,
165:12, 165:22,
165:24, 166:13,
167:1, 206:2,
242:25
reasonably
209:20
reasoning 253:11
reasons 33:17,
212:13, 243:9,
254:21
rebut 10:13
recall 62:25,
68:16, 94:14,
94:16, 94:17,
94:19, 95:3,
95:4, 95:6,
105:6, 106:21,
106:24, 110:18,
175:3, 178:15
receipt 25:18
receipted 262:19
receive 235:13
received 17:21,
18:1, 18:5,
18:8, 18:17,
18:19, 18:22,
233:1, 233:10,
233:13, 251:20,
259:17
recent 32:3
recently 125:6
recertification
115:18
Recess 75:3,
132:6, 132:9,
197:4, 197:6,
263:18
recite 262:4
recognize
141:15, 142:6,
145:11, 161:1,
167:20, 213:2,
233:3, 236:19
recognized
246:24
recommend
172:18, 172:22,

173:1, 173:2
recommendation
260:11, 260:14,
260:15, 260:24
recommended
257:25
reconstitute
9:10
record 8:19,
95:16, 96:2,
132:25, 216:18,
237:17, 252:18,
253:18, 261:15,
262:5, 262:10,
266:1
records 244:10
recross 99:21
Recycling 25:15,
25:19, 61:24,
62:15, 68:20,
68:24, 69:23,
69:25, 71:5,
98:3
red 76:22, 77:2,
77:3, 77:19,
77:22
REDIRECT 96:8,
96:10, 192:10,
192:11, 264:10,
264:28
reduce 127:1,
127:6, 151:23,
157:17
reduced 163:14
reduction 149:2
Reese 248:21
refer 148:16,
154:12, 199:2
reference 79:13,
233:13, 261:20
referred 18:24,
19:2, 37:19,
174:23, 185:1
referring 43:4,
43:10, 43:12,
78:14, 157:7,
263:1, 263:2
reflect 222:4,
256:5
reflected 19:21,

28:2, 221:5,
239:15
reflecting 25:18
reflects 242:22
refrain 258:15
refresh 101:13,
101:22
refuge 238:8
refusal 222:17
refutes 241:18
regard 9:11,
11:17, 250:19,
252:9, 252:12,
262:11, 262:13
Regarding 15:2,
17:22, 18:5,
18:7, 18:9,
20:7, 134:7,
134:13, 194:18,
202:7, 218:3,
218:4, 219:3,
219:11, 229:15,
229:18, 252:6,
253:15, 261:18
Regardless
153:1, 153:20
regards 48:14
region 50:24
registered
133:12, 133:13
regs 8:18, 10:19
regular 129:1
regularly 121:21
regulate 61:13,
86:11, 86:14,
91:1, 174:4
regulated 45:10,
50:3, 50:8,
50:12, 50:14,
53:8, 98:13,
119:19, 129:7,
146:25, 147:5,
147:14, 168:17,
202:6, 205:24,
216:20, 222:8
regulation 8:17,
45:13, 59:15,
91:3, 91:5,
168:4, 189:4,
256:14

regulations
14:5, 22:7,
41:7, 116:7,
116:9, 117:15,
119:17, 130:8,
174:4, 174:5,
189:2, 222:9,
247:12
regulatory
116:10, 116:19,
116:22, 127:20,
131:20, 131:22,
135:2, 243:9
rehabilitation
228:11
reimbursed
27:15, 244:16,
244:18
reiterate 13:4
related 18:2,
18:16, 134:11,
151:21, 154:23,
167:16, 193:24,
209:5, 209:19,
221:15
relates 20:3
relation 232:14
relationship
24:24
relative 255:5
relatively 193:7
release 25:22,
51:13, 73:9,
117:16, 124:18,
125:1, 125:5,
155:14, 155:15,
157:10, 169:8,
187:20, 207:6,
216:7, 216:17,
253:17, 257:13,
257:16, 257:22,
257:23, 257:24,
258:14, 258:18,
261:16, 261:17,
262:11
released 61:6,
61:17, 73:4,
81:4, 81:25,
85:22, 85:23,
118:11, 118:14,

128:17, 128:19,
128:20, 128:22,
129:13, 148:9,
155:5, 156:21,
157:12, 158:17,
158:20, 168:11,
192:7, 258:13
releases 185:3
releasing 42:18,
125:8, 125:11
relevant 67:25,
68:2, 102:13,
209:19, 210:8,
216:15, 216:22
reliability
35:24, 215:14,
217:20
reliable 215:21
relieve 229:10
religion 204:13,
246:21
remain 40:6,
168:18, 180:23,
191:4
remained 71:12
remaining 217:4,
238:3, 257:12
remains 168:7,
178:23, 179:3,
234:23, 257:14
remark 82:6
remarks 259:16
Remember 28:11,
28:25, 30:3,
37:1, 37:24,
94:23, 99:9,
99:11, 149:23,
174:21, 174:25,
198:8, 214:3,
231:3, 254:8
remembered 25:5
reminded 231:3
reminder 260:1
remiss 15:19
remnant 196:14
remorse 232:13
remorseful
225:3, 231:4,
236:20, 240:5
remote 162:23,

162:24
remotest 73:3
removable 40:13
removals 185:4
remove 37:9,
37:12, 71:17,
71:20, 120:24,
121:24, 122:19,
126:2, 139:1,
150:11, 150:14,
153:19, 161:10,
172:7, 209:3,
234:14
removed 22:21,
22:24, 23:12,
24:11, 28:14,
65:15, 65:20,
69:5, 71:16,
141:2, 145:19,
147:7, 147:8,
147:9, 206:16,
207:11, 212:10,
237:24
remover 98:9
removing 24:25,
31:12, 38:16,
57:9, 120:22,
130:7, 136:11,
166:21, 167:6,
167:16, 171:23,
172:7, 210:10,
217:4, 220:22
render 119:1,
119:9, 119:11,
119:16
rendered 258:25
rendering 118:24
renovation
51:16, 259:8
rent 109:1
rental 84:12,
109:2
rented 62:2,
69:18, 70:10,
70:14
repay 90:21
Repeat 125:20,
178:16
repeated 235:1
repeatedly

233:12
repercussions
232:11
repetitive
197:22, 198:1,
207:6, 207:16,
211:18, 212:5,
216:7
rephrase 60:9,
120:7
replaced 62:10,
62:14, 62:15
reply 212:16
report43 265:14
reported 2:46,
184:22, 184:23
Reporter 2:37,
34:11, 38:10,
266:12
reporting 9:24,
10:17, 220:21,
227:16, 227:22,
251:17
reports 5:21,
17:14, 79:14,
89:20, 100:23,
101:1, 101:4,
101:10, 101:11,
184:23, 252:5
represent 137:9,
146:24, 147:1,
152:2, 152:4,
152:16, 153:10,
176:20, 177:5,
178:6, 227:24
representation
137:17, 144:3,
210:16
representations
32:4, 180:19
representative
3:17, 4:5, 36:9,
108:1, 139:20,
140:1, 141:8,
141:22, 144:1,
147:10
represented
16:11, 43:20,
176:14, 210:15
representing

19: 19
request 7: 11, 195: 22, 221: 13, 221: 16, 223: 14, 223: 24, 261: 19
requested 259: 10, 262: 15, 262: 16
requesting 28: 2, 262: 2
requests 259: 15
require 9: 23, 167: 15, 219: 18, 228: 16, 254: 3, 254: 4
required 6: 3, 32: 11, 121: 9, 121: 16, 146: 25, 151: 22, 163: 4, 220: 13, 225: 4, 253: 18
required. 168: 21
requirement 184: 8, 184: 10, 184: 11, 227: 9, 253: 15
requirements 115: 12, 120: 24, 121: 1, 122: 11, 163: 12, 184: 7, 189: 25, 206: 7, 226: 9
requires 8: 17, 117: 15, 227: 23
Research 116: 14, 198: 6, 199: 3, 202: 15
residential 259: 6
residual 177: 24
resin 156: 7, 156: 19
resolution 6: 18
Resources 33: 19, 225: 21
respect 7: 24, 38: 14, 61: 5, 97: 19, 105: 8, 207: 4, 207: 10, 207: 18, 207: 20,

209: 18, 209: 24, 210: 5, 210: 20, 210: 22, 210: 24, 211: 5, 211: 12, 211: 21, 212: 2, 220: 10, 221: 12, 222: 3, 236: 9, 242: 23, 242: 24, 256: 6, 261: 10, 262: 1, 263: 1
respected 231: 18
respectfully 225: 15
respects 216: 14, 220: 8, 259: 23, 260: 2
respirable 157: 21
respirator 87: 3, 161: 16, 200: 9
respirators 39: 2, 40: 13, 86: 8, 151: 10, 218: 17
respiratory 121: 18, 122: 23
respond 16: 7, 102: 7, 102: 21, 103: 3, 109: 8, 206: 25, 207: 2, 212: 25
responded 21: 22, 103: 1
responders 21: 21, 131: 8, 208: 19, 222: 1
response 17: 25, 18: 12, 18: 15, 28: 4, 32: 13, 43: 16, 75: 24, 99: 14, 103: 14, 108: 4, 207: 8, 213: 18
responsibilities 229: 11, 236: 17
responsibility 209: 15, 220: 9, 222: 18, 230: 25, 237: 11, 239: 16, 239: 18, 241: 23

responsible 5: 20, 5: 21, 29: 20, 203: 10, 203: 15, 203: 18, 214: 20, 227: 15, 229: 9, 237: 7
rest 140: 4, 140: 5, 231: 3, 237: 16, 237: 21, 242: 21
restate 60: 7
restitution 221: 12, 223: 12, 253: 15
result 26: 22, 90: 22, 130: 2, 131: 8, 155: 5, 180: 16, 237: 22, 238: 1, 256: 14
resulted 207: 18, 216: 6, 216: 13, 216: 25, 217: 11, 221: 23, 256: 10
resulting 26: 14
results 15: 23, 88: 4, 153: 16, 154: 6, 158: 8, 159: 22, 181: 10, 251: 18
resume 5: 13, 5: 14, 5: 16, 5: 18, 7: 22, 14: 14, 75: 1, 132: 7, 133: 21, 194: 7, 196: 3, 196: 8, 209: 6, 211: 23, 213: 2, 214: 16, 217: 1, 217: 6, 218: 17, 219: 8, 219: 25
resumed 75: 4, 132: 10, 197: 7
retail 12: 10, 48: 5, 54: 10, 56: 9, 56: 12, 64: 12, 64: 13, 64: 16, 64: 18, 64: 20, 64: 25, 65: 3, 65: 5, 66: 17, 67: 10,

137: 11, 147: 6, 147: 10, 213: 8, 213: 12
retrieve 185: 9, 185: 10
return 38: 3, 38: 5, 231: 21
returns 236: 1
reurge 195: 11, 195: 22
revealed 12: 25
review 30: 19, 131: 13, 241: 4
reviewed 41: 5, 52: 12
rich 106: 3, 106: 5
Richard 1: 33, 3: 14
rid 69: 18, 166: 7
rides 215: 9
Ridge 224: 14
ridges 140: 10
right-hand 137: 21, 137: 25
rinded 51: 25
ring 68: 22
rise 3: 3, 75: 2, 75: 5, 132: 8, 132: 11, 197: 5, 197: 8, 263: 19
risk 27: 9, 113: 4, 129: 12, 130: 3, 130: 23, 149: 2, 152: 15, 159: 20, 169: 2, 184: 15, 184: 18, 184: 19, 221: 23, 221: 25, 222: 1, 222: 15, 223: 10, 225: 13, 256: 19
risks 151: 21, 151: 23
RMR 2: 37, 266: 11
Road 26: 5, 103: 6, 104: 5
rock 72: 8
Rodriguez 76: 7, 93: 19, 251: 8, 257: 7

role 17:11, 17:15
roll-off 24:13
roof 11:8
Room 2:38, 124:10, 135:24, 158:10, 158:11, 158:16, 159:7, 160:6, 171:21, 188:8, 237:9
root 234:11
Roper 1:33, 3:14, 8:10, 8:13, 8:15, 13:4, 16:10, 17:17, 18:4, 18:21, 19:5, 19:23, 35:21, 46:17, 223:8, 240:13, 243:6, 245:21, 250:1, 250:13, 252:9, 259:15, 261:5, 261:6, 263:14
rough 155:4, 245:14
Roughly 21:5, 22:23, 30:23, 64:2
route 103:5
Routh 1:35
Ruiz 30:18, 30:19, 31:12, 37:15, 37:19, 37:23, 37:25, 40:14, 76:5, 204:7, 211:2
Ruiz-castillo 251:8, 257:7
Rule 17:7, 189:3
ruled 207:1
rules 31:21, 50:5, 50:8, 50:14, 53:25, 146:24, 168:19, 243:14
ruling 218:20
rulings 197:13, 218:10, 219:17, 219:18

run 95:2, 202:2
running 107:2, 107:5
runs 10:10, 14:19, 14:21
rush 7:18
RUSSELL 100:3, 100:11, 264:12

< S >
s/pamela 266:10
Safe 110:1, 120:17, 120:18, 126:13, 133:6
safely 120:24
Safety 27:10, 104:6, 116:24, 121:9, 121:10, 127:21, 133:20, 210:3
sake 231:15, 234:5, 234:7
sales 4:5, 23:24, 48:5, 54:23, 54:24, 55:2, 55:6, 55:8, 55:12, 56:15, 56:20, 56:23, 56:25, 57:5, 57:16, 58:4, 213:16, 259:7
sample 23:18, 44:7, 44:10, 64:19, 65:25, 66:1, 97:12, 128:1, 135:17, 135:18, 135:19, 135:20, 135:21, 181:10, 183:7
sampled 97:9
samples 9:5, 12:8, 23:19, 43:17, 43:25, 64:21, 65:2, 67:4, 67:5, 67:10, 96:22, 135:5, 152:16, 153:9, 158:8,

158:9, 160:8, 164:7, 188:23, 207:24
sampling 67:4, 67:5, 67:18, 136:3, 165:2, 165:3
sand 156:24, 201:20
sanding 61:17, 153:20, 153:21, 155:3, 155:8, 158:1, 158:18, 159:24, 198:9
sandpaper 155:4, 155:8, 155:11, 158:2, 158:19
sanitarian 133:12, 133:13
SASHA 232:1, 232:4, 264:41
sat 226:13
satisfied 95:24, 96:1
saturate 157:10
save 3:8, 56:20, 101:18, 220:17, 220:23, 222:2
saving 242:5
saw 25:2, 25:3, 89:14, 103:23, 106:21, 106:23, 110:19, 139:16, 167:6, 178:11, 179:12, 191:15, 193:1, 200:12, 200:15, 200:17, 201:3, 207:10
saying 11:1, 12:21, 12:23, 38:24, 53:14, 78:16, 85:22, 88:17, 88:18, 89:13, 94:16, 94:19, 153:6, 158:13, 178:3, 199:22, 223:5
says 5:14, 5:16, 45:5, 53:17, 55:5, 66:3,

80:6, 80:9, 85:15, 112:12, 124:18, 124:21, 124:25, 149:16, 152:20, 152:21, 155:7, 157:7, 159:3, 159:21, 168:18, 181:10, 181:13, 182:5, 186:7, 186:11, 189:14, 200:2, 205:25, 210:2, 212:19, 214:2
scale 12:12, 66:19, 191:25
scattered 78:8, 78:20
scenarios 162:12
scene 9:2, 9:8
schedule 251:23
scheduling 229:6
School 115:20, 116:1, 133:7, 204:12, 224:15, 227:20
schools 226:7
science 116:11, 124:21, 124:24, 124:25, 202:2
Sciences 114:25
scientific 119:10, 165:24, 213:7, 213:10, 213:11, 213:18, 214:1, 214:3
scientist 115:5
scope 54:9
Scout 248:15, 248:16
scouts 248:19
scrape 147:24, 150:11, 155:21, 162:14, 166:17, 192:4
scraped 138:4
scraper 71:19, 192:3
scraping 59:10
screen 79:21, 83:21

screw 15: 15
screwing 249: 17
scrubber 107: 4
scuff 140: 7
Seal 158: 25
sealed 122: 14
Sealfas 158: 25
search 32: 15,
94: 10, 94: 18,
94: 21, 94: 23,
94: 25
seated 3: 9,
13: 12, 20: 14,
75: 6, 100: 6,
114: 17, 132: 12,
132: 21
second 12: 9,
26: 13, 40: 21,
44: 6, 44: 10,
55: 3, 64: 24,
65: 11, 67: 19,
67: 25, 93: 14,
93: 16, 138: 11,
144: 22, 144: 23,
145: 16, 145: 17,
145: 20, 145: 21,
154: 12, 156: 1,
185: 5, 208: 8,
216: 11, 230: 21,
237: 12, 241: 12
Section 243: 4,
251: 6, 251: 11,
253: 21, 253: 23,
254: 25, 257: 20,
262: 18, 262: 20,
262: 25
secure 234: 18
SECURITY 3: 3,
75: 2, 75: 5,
132: 8, 132: 11,
197: 5, 197: 8,
234: 6, 263: 19
seeing 85: 13,
110: 18, 145: 14,
145: 15
seek 234: 1
seeks 233: 21
seem 146: 2,
204: 15
seemed 38: 15

seems 58: 18,
85: 7, 203: 8,
204: 18, 206: 10,
256: 16
seen 73: 1,
75: 20, 83: 25,
89: 17, 89: 19,
101: 8, 139: 11,
145: 7, 149: 18,
180: 10, 180: 23,
215: 2, 220: 16,
225: 22, 243: 21
SEF 25: 14,
265: 12
SEF25 265: 12
self-evident
244: 7
self-growth
232: 16
selfless 233: 6
selflessness
234: 11
Sellers 33: 19,
210: 23, 218: 4
selling 249: 16
semester 224: 18
send 12: 25,
243: 12, 256: 18
senior 115: 5
sense 22: 16,
57: 13, 57: 18,
213: 5, 240: 25
sent 16: 14,
19: 22
sentenced 6: 19,
223: 8
sentences 51: 2,
222: 23
SENTENCING 1: 16,
3: 1, 8: 2, 8: 21,
10: 2, 14: 24,
15: 6, 17: 19,
18: 19, 19: 1,
45: 19, 102: 15,
117: 20, 170: 3,
196: 18, 196: 19,
213: 5, 217: 14,
218: 2, 218: 5,
219: 9, 219: 16,
222: 24, 223: 3,

223: 4, 223: 23,
241: 3, 244: 21,
250: 6, 252: 17,
252: 24, 253: 22,
254: 14, 257: 25,
259: 17, 264: 1
sentencings
19: 5, 240: 11
separate 137: 9
sequence 240: 11
sequentially
69: 10
seri 256: 13
serious 10: 14,
10: 25, 11: 10,
15: 18, 26: 15,
107: 25, 129: 23,
197: 23, 202: 7,
202: 19, 207: 19,
208: 14, 208: 17,
216: 13, 216: 19,
216: 25, 221: 23,
222: 6, 222: 8,
242: 10, 243: 15,
256: 13, 256: 15
seriously 107: 21
seriousness
222: 4, 242: 23,
256: 5
serve 234: 24,
254: 15, 257: 21
served 28: 1,
134: 1
serves 157: 10
service 194: 1,
223: 22, 225: 9,
225: 19, 226: 6,
228: 11, 228: 13,
228: 17, 228: 19,
239: 24, 245: 5,
263: 10
Services 21: 19,
36: 7, 36: 10,
36: 20, 36: 21,
115: 3, 258: 21,
258: 24
session 3: 5
set 103: 23,
109: 9, 171: 19,
171: 20, 171: 23,

172: 3, 188: 20,
202: 16, 219: 4,
225: 5, 253: 22,
255: 14
sets 207: 8
setting 7: 19
seven 150: 3,
202: 16, 224: 19
seventh 218: 9
Several 38: 17,
40: 21, 98: 8,
167: 23, 173: 22,
196: 7
shadow 237: 20
shall 251: 2,
251: 10, 251: 12,
251: 14, 251: 16,
251: 21, 252: 2,
252: 4, 252: 5,
257: 11, 257: 12,
257: 14, 257: 23,
258: 3, 258: 5,
258: 7, 258: 9,
258: 11, 258: 15,
258: 17, 258: 20,
258: 24, 259: 1,
259: 4, 259: 9,
262: 22
shame 214: 23
shaped 122: 16
share 15: 23
shared 6: 24
shareholders
252: 2
she'll 246: 9
Sheee 94: 5
shelter 238: 8
sheltered 104: 3
shift 41: 10
Shirley 235: 17
shoe 142: 1,
142: 2
shoes 140: 7
Sholom 228: 9
shoot 247: 16
shop 77: 8, 79: 7,
79: 8
shopping 33: 4,
33: 9, 33: 23,
48: 16, 73: 25,

| | | | |
|---|---|---|---|
| 102: 8, 102: 23, 104: 4, 108: 16 | sidebar 94: 6, 94: 8 | 244: 22 | sold 54: 10 |
| shops 79: 9 | sides 108: 15, 195: 6 | situation 3: 20, 5: 6, 6: 9, 11: 19, | solely 34: 22 |
| short 43: 17, 51: 7, 196: 20, 245: 17 | Sidney 1: 17, 3: 5 | 12: 14, 21: 20, 108: 14, 121: 2, 221: 1, 249: 12 | solid 130: 10, 156: 8, 157: 9, 157: 10, 225: 14, 237: 7 |
| shortly 105: 10 | signature 35: 11 | situations 163: 23 | soluble 141: 3, 190: 8, 191: 1 |
| shouldn't 10: 10, 80: 8 | signed 14: 13, 42: 22, 88: 18, 209: 6, 210: 17, 213: 3, 219: 25 | six 11: 24, 21: 5, 202: 15, 228: 1 | solution 80: 13 |
| show 16: 4, 17: 2, 27: 1, 50: 21, | significance 244: 21, 248: 25 | six-level 216: 5 | solvent 150: 17, 150: 20, 150: 22, 166: 6, 192: 6 |
| 55: 15, 55: 23, 63: 18, 64: 5, | significant 44: 4, 142: 3, | sixth 218: 3 | somebody 49: 22, 57: 5, 57: 15, |
| 78: 14, 79: 17, 92: 22, 101: 17, | 153: 15, 168: 3, 201: 17, 242: 22, | size 22: 2, 122: 16, 158: 11, | 113: 3, 129: 8, 145: 10, 148: 6, |
| 112: 3, 137: 8, 143: 24, 144: 17, | 247: 1 | 160: 25, 211: 9 | 161: 24, 172: 19, 182: 3, 182: 4, |
| 145: 13, 145: 14, 175: 10, 176: 19, | significantly 157: 17 | sized 122: 15 | 243: 24, 243: 25, 249: 16 |
| 177: 4, 184: 24, 191: 16, 206: 12, | silica 119: 25 | skills 225: 22, 242: 10 | somehow 126: 13 |
| 235: 13, 238: 15, 244: 11 | Sill 148: 13, 151: 25, 202: 16 | skin 131: 5 | someone 47: 9, 92: 3, 92: 5, |
| showed 96: 13, 100: 22, 174: 16, | similar 97: 13, 147: 7, 150: 21, | sleeves 123: 8 | 107: 20, 168: 6, 203: 24, 204: 24, |
| 175: 14, 175: 17, 176: 6, 178: 9, | 163: 23, 167: 6, 170: 8, 175: 23, | Slowly 21: 23, 93: 14 | 205: 20, 213: 19, 221: 24, 230: 14, |
| 207: 12 | 179: 22, 190: 22, 223: 9 | sludge 191: 20 | 231: 16, 237: 24, 255: 17, 259: 17 |
| showing 54: 19, 84: 12, 142: 21, | similarly 228: 13 | slurry 109: 4, 109: 21, 110: 2, | Sometime 96: 24 |
| 143: 4, 144: 10, 175: 25 | simple 202: 10 | 125: 25, 126: 2, 126: 5, 190: 15, | sometimes 188: 22, 211: 16 |
| shown 119: 10, 120: 6, 137: 10 | simply 9: 4, 53: 16, 199: 21, | 190: 17, 190: 18, 190: 25, 191: 9, | somewhat 104: 3 |
| shows 11: 9, 15: 16, 52: 15, | 230: 13, 234: 22 | 191: 20, 192: 3 | somewhere 62: 25, 204: 6, 204: 10 |
| 68: 17, 130: 4, 143: 25, 144: 7, | simultaneously 15: 8 | small 72: 5, 80: 14, 115: 20, 122: 21, 124: 6, | son 204: 15, 220: 11, 233: 25, |
| 144: 16, 145: 10, 212: 3 | sincere 236: 8 | 140: 15, 140: 16, 140: 17, 143: 25, | 235: 8, 236: 10, 236: 15, 237: 4, |
| shred 199: 14, 213: 10 | single 14: 20, 201: 11, 231: 14, 237: 9 | 164: 7, 193: 10, 202: 1 | 237: 5, 238: 5, 238: 16, 238: 18 |
| shut 212: 22 | siren 103: 4 | smaller 104: 24, 190: 23 | sophistication 255: 5 |
| sibling 232: 6 | sister 228: 25, 229: 3, 230: 1, | smell 103: 24 | sorely 225: 21, 225: 25, 226: 3 |
| sick 122: 7, 231: 14 | 232: 1, 232: 5, 234: 2, 246: 19 | smoking 129: 18 | soul 6: 5 |
| side 57: 2, 57: 4, 58: 2, 114: 1, | site 98: 22, 98: 25, 163: 21, | SMU 204: 13, 246: 21 | souls 6: 5 |
| 137: 21, 137: 25, 138: 2, 226: 13 | 205: 24, 225: 6 | snippet 43: 17 | sound 27: 17, 40: 22, 73: 22, |
| | sits 215: 9 | so-called 156: 5 | 74: 11, 81: 7, |
| | sitting 48: 13, 103: 7, 147: 18, | society 234: 23, 237: 25, 238: 3, 238: 18, 244: 3, 259: 22, 260: 3 | |
| | | softest 215: 6 | |

85: 25,  92: 3,
106: 19
sounds 15: 4,
68: 23,  89: 24,
89: 25,  92: 5,
108: 9
source 49: 17,
106: 3,  106: 7
sources 113: 1
South 48: 15,
68: 12,  68: 18,
68: 21,  68: 25,
105: 14
southern 225: 11
space 12: 10,
56: 9,  56: 12,
64: 16,  64: 19,
64: 20,  64: 25,
65: 5,  66: 17,
67: 10,  104: 20,
137: 11,  144: 16,
144: 17,  147: 6,
147: 10,  176: 6,
178: 9,  179: 11,
209: 13,  209: 21,
213: 9,  213: 13,
238: 8,  241: 25
spaces 74: 4,
74: 9
speaking 28: 6,
234: 16
speaks 209: 15,
243: 18
Special  20: 10,
25: 12,  41: 17,
43: 9,  96: 12,
96: 19,  105: 3,
121: 25,  123: 2,
157: 13,  207: 9,
210: 25,  233: 24,
236: 5,  250: 24,
257: 4,  262: 14
specialist
133: 14
specialists
121: 11
specific 28: 8,
28: 13,  29: 22,
84: 14,  121: 9,
134: 21,  199: 1,

225: 22
Specifically
30: 18,  49: 5,
98: 11,  98: 17,
134: 18
specifications
41: 4,  98: 16
specified 53: 25
specifies 51: 15
specks 23: 20,
23: 21,  44: 16,
78: 7,  78: 8,
78: 9,  78: 20,
81: 20
speculate 57: 7
speculating
57: 21
spelled 93: 18,
224: 6
spelling 93: 19
spend 210: 9,
220: 18
spent 11: 24,
220: 4
spill 159: 24
split 46: 20
spoke 21: 19,
38: 19,  66: 18,
66: 21,  81: 12
sponsored 149: 1
spot 57: 10,
57: 11,  144: 14,
183: 14
spots 78: 21,
181: 20,  182: 6,
182: 15
spotting 201: 1
spread 89: 21,
89: 22,  160: 5
spreading 177: 7,
234: 25
spud 71: 17
square 13: 21,
13: 22,  22: 4,
22: 6,  22: 8,
22: 23,  23: 4,
23: 7,  64: 3,
89: 21,  89: 22,
106: 18,  107: 1,
147: 2,  147: 3,

147: 5,  147: 13
squares 201: 3,
201: 4
stage 53: 9,
166: 21,  172: 3
stages 234: 17
stain 140: 11,
141: 25,  142: 16,
142: 17,  147: 14
stainage 139: 4
stains 4: 10,
4: 11,  4: 15,
4: 18,  5: 8,
138: 9,  138: 21,
138: 23,  139: 1,
139: 5,  140: 5,
142: 17,  142: 20,
146: 9,  148: 4,
167: 6,  176: 25,
177: 7,  178: 8,
178: 10,  193: 1,
193: 2,  200: 11,
200: 14
stamps 111: 5
stand 83: 2,
107: 13,  197: 4,
211: 13,  232: 5,
239: 16,  240: 3,
248: 7,  263: 17
standard 17: 12,
51: 12,  74: 8,
74: 15,  164: 8,
218: 25,  257: 24
standards 45: 13,
120: 20,  128: 5,
128: 9,  184: 6,
184: 18
standpoint
234: 16
stands 83: 13,
127: 22,  234: 21,
236: 15
start 3: 20,
70: 9,  104: 1,
197: 17,  208: 7,
248: 17
started 12: 19,
21: 21,  21: 23,
39: 13,  40: 11,
49: 10,  69: 10,

70: 18,  125: 17,
125: 22,  164: 2,
177: 6,  208: 4,
212: 21
starting 177: 11
stat 195: 21
State 4: 25,
12: 16,  20: 23,
21: 19,  53: 2,
53: 5,  53: 10,
91: 12,  100: 10,
114: 21,  115: 21,
115: 23,  117: 11,
126: 17,  132: 25,
134: 1,  168: 14,
192: 6,  203: 11,
203: 19,  205: 20,
205: 21,  205: 22,
206: 10,  214: 14,
224: 14,  244: 10,
251: 12,  253: 18,
258: 4,  260: 18
stated 24: 13,
86: 6,  87: 12,
88: 22,  99: 15,
261: 14
statement 17: 22,
18: 9,  42: 21,
50: 13,  102: 15,
124: 20,  128: 18,
206: 2,  241: 19
statements 5: 24,
6: 1,  54: 24,
54: 25,  155: 23,
206: 18,  220: 3,
223: 1
States 1: 1,  1: 5,
1: 18,  1: 23,  3: 4,
3: 8,  3: 10,
17: 19,  17: 20,
18: 7,  21: 6,
153: 14,  167: 9,
167: 12,  168: 24,
181: 6,  189: 17,
216: 21,  233: 14,
251: 2,  251: 5,
251: 11,  251: 15,
253: 21,  257: 10,
257: 19,  257: 25,
258: 12,  262: 17,

262: 20, 262: 24, 266: 5
static 53: 2, 53: 5, 53: 9, 53: 10
stating 32: 11, 165: 22, 166: 13, 167: 1, 217: 21, 253: 19
station 90: 4
statistical 135: 1, 153: 9
status 263: 13
statute 11: 16, 13: 7, 14: 18, 14: 21, 254: 3
statutorily 221: 9
statutory 217: 13, 217: 15, 254: 9, 254: 10, 254: 19
stay 189: 20, 189: 22, 189: 25, 231: 15
stayed 180: 5
stenography 2: 46
step 8: 10, 20: 2, 99: 23, 106: 10, 114: 11, 132: 15, 193: 20, 194: 17, 224: 2, 228: 18, 238: 24
steps 17: 6
Steven 3: 12
stick 123: 14, 123: 15, 146: 6
stirred 42: 17
stirring 127: 13
stockroom 55: 5
stop 191: 8
stopped 238: 12
store 21: 10, 24: 24, 26: 20, 102: 22, 103: 24, 104: 24, 106: 5, 109: 10, 146: 15
stores 108: 15
stories 22: 5
Story 103: 6,

104: 5, 248: 15
straight 256: 17
streak 143: 25
streaks 44: 11, 141: 8, 141: 23, 142: 12, 142: 14
Street 1: 24, 1: 35, 2: 3, 2: 38, 41: 19, 151: 6, 172: 16, 172: 19, 172: 21
strength 200: 6, 230: 11
strenuous 231: 22
strictest 163: 12
strictly 112: 10
strip 104: 4
strong 103: 25, 106: 14, 231: 15, 233: 17
structural 172: 2
structure 171: 17
structured 194: 3
Structures 148: 22
struggle 232: 11
stubs 29: 2
stuck 69: 4, 145: 14, 175: 5, 180: 10
student 204: 13, 224: 20, 234: 16
students 224: 25, 225: 23
studies 116: 16, 148: 16, 152: 16, 152: 19, 160: 2, 163: 22, 165: 20, 168: 13, 184: 25, 185: 13, 186: 13, 186: 22, 187: 19, 187: 25, 189: 1, 198: 10
study 133: 16, 148: 21, 148: 25, 149: 5, 151: 25, 153: 22, 154: 2, 154: 12, 154: 19, 154: 20, 154: 22, 157: 2, 157: 3,

157: 5, 158: 20, 164: 8, 184: 24, 185: 8, 185: 23, 186: 1, 186: 3, 186: 24, 187: 22, 198: 6, 202: 15, 205: 10, 205: 13, 213: 11
studying 204: 13
stuff 54: 10, 69: 19, 144: 24
stupid 239: 7, 247: 2, 249: 15
subject 50: 5, 50: 8, 117: 13, 134: 21, 167: 10, 206: 21
submission 18: 1
submissions 251: 16
submit 242: 2, 251: 21, 258: 17
submitted 8: 21, 210: 16, 210: 18
subpoena 28: 2, 28: 4, 29: 4, 32: 12, 32: 18, 49: 23
subpoenaed 67: 5
subsequent 9: 1, 10: 5
substance 201: 18, 207: 7, 216: 8, 258: 16
substances 258: 6
substantial 8: 18, 26: 14, 107: 20, 197: 22, 202: 7, 202: 18, 207: 19, 207: 21, 208: 13, 216: 13, 216: 19, 216: 25
success 85: 5
successful 246: 16
successfully 122: 19, 258: 22
suck 160: 18
sucked 82: 1, 85: 23

sucking 81: 4, 81: 5
suddenly 16: 16
suffer 237: 16
suffered 236: 25
suffering 236: 23
sufficient 9: 23, 9: 25, 11: 3, 17: 13, 19: 6, 19: 11, 64: 2, 95: 23, 113: 8, 113: 12, 149: 8, 215: 14, 217: 19, 254: 5, 256: 2, 256: 24
suggest 48: 13, 48: 19, 210: 13, 253: 25
Suggested 48: 21, 48: 22
suit 172: 17, 173: 2, 173: 4
Suite 1: 24, 1: 35, 2: 3
suits 41: 17, 123: 10
sum 197: 24
summary 253: 8
sun 198: 8
super 109: 6
supervised 253: 17, 257: 13, 257: 22, 257: 23, 257: 24, 261: 15, 261: 17, 262: 11
supervision 217: 3, 227: 18
supervisor 73: 17, 205: 2
supplemental 18: 18
support 20: 7, 197: 14, 215: 14, 217: 25, 233: 10, 241: 9, 244: 2, 249: 5
supporting 20: 6
supports 216: 18, 217: 7, 218: 14
suppose 7: 16

supposed 63: 23, 73: 9, 202: 14
suppression 114: 1
surcharge 16: 15
surely 203: 5
surface 155: 2, 160: 17
surface-prep 80: 15
surprise 7: 16, 98: 13
surprised 8: 3, 8: 5, 10: 23, 13: 16, 31: 15, 98: 15, 106: 12
surrounded 230: 6
surrounding 65: 17
survey 23: 1, 171: 10, 205: 11
Sustained 73: 13, 83: 7, 84: 18
sustains 219: 11
sweep 155: 17, 159: 25
sweeping 155: 17, 158: 2, 158: 18, 198: 9
sweeten 36: 19, 36: 23
swept 142: 1
SWG 67: 22, 205: 10, 213: 7, 213: 16
swim 40: 14
swore 219: 25
sworn. 20: 13, 100: 5, 114: 16, 132: 20
sympathize 234: 9
symptoms 221: 15
system 85: 4, 85: 5, 85: 18, 85: 19, 111: 6, 111: 7, 130: 19, 157: 24, 160: 4, 160: 10, 160: 19, 172: 5, 244: 4

< T >
T-s-e 224: 6
T-s-e-n-g 224: 7, 224: 12
table 150: 9
tactic 14: 16
Taft 260: 11
talked 24: 15, 67: 8, 90: 9, 125: 25, 130: 11, 179: 10, 184: 5, 187: 19, 189: 1, 243: 4
talks 5: 18, 43: 13
tan 213: 20, 213: 23
teach 133: 7, 224: 14
team 21: 22
technical 260: 22
technique 159: 6, 165: 19
techniques 155: 3
Technology 224: 23
television 21: 12
TEM 148: 21, 170: 6, 170: 8, 265: 37, 265: 39
tempted 222: 11
ten 6: 14, 221: 25
tenant 33: 9, 69: 13
tender 194: 6, 241: 22
tens 128: 21
tenth 219: 2
term 72: 21, 72: 22, 83: 15, 119: 21, 156: 6, 166: 3, 166: 5, 168: 17, 250: 23, 253: 16, 257: 3, 257: 13, 257: 21, 261: 15, 261: 17, 262: 11
terms 17: 5, 118: 6, 118: 7,

129: 15, 135: 6, 153: 11, 160: 11, 167: 13, 205: 17, 247: 25, 257: 24, 258: 2, 263: 13
terrible 212: 24
territory 234: 18
test 65: 4, 65: 14, 65: 23, 66: 5, 150: 4, 159: 5, 198: 14, 198: 17, 198: 18, 199: 19, 199: 21, 208: 24, 213: 12, 214: 3, 258: 17
tested 9: 5, 23: 25, 65: 5, 65: 11, 65: 12, 65: 13, 65: 17, 66: 5, 122: 25, 214: 4
testified 73: 17, 73: 18, 73: 21, 74: 19, 96: 19, 123: 25, 175: 15, 178: 18, 187: 10, 187: 13, 248: 7
testify 7: 5, 10: 15, 73: 1, 124: 18, 165: 12, 177: 14, 187: 12, 189: 24, 190: 14, 207: 24, 215: 1, 215: 4, 215: 7
testifying 101: 7, 174: 25
testimony 24: 6, 85: 10, 95: 8, 99: 9, 102: 12, 108: 8, 117: 21, 120: 9, 126: 12, 130: 13, 183: 4, 191: 17, 195: 10, 196: 13, 198: 5, 201: 8, 204: 8, 207: 9, 208: 11, 210: 24, 211: 13, 211: 16, 212: 3, 221: 13, 241: 25, 248: 23

testing 77: 21, 136: 1, 149: 25, 213: 11, 214: 6
tests 148: 8, 202: 17, 258: 19
Texas 1: 2, 1: 9, 2: 39, 3: 5, 4: 25, 5: 1, 21: 19, 50: 24, 50: 25, 69: 15, 181: 11, 189: 9, 189: 10, 189: 14, 189: 24, 190: 1, 244: 10, 266: 13
thankful 240: 6
THC 170: 23
theatre 137: 6
theft 219: 1
theirs 185: 18
themselves 40: 3
theory 14: 4, 14: 22, 23: 11
therapy 239: 23
thereafter 258: 19
thereby 156: 7
they've 125: 6, 250: 9
thick 4: 20, 29: 16, 64: 6, 64: 8, 106: 4, 109: 5, 138: 11, 145: 4, 145: 18, 145: 22, 181: 20, 182: 1, 182: 5, 182: 15, 190: 15
thicker 145: 7, 147: 20, 175: 25, 176: 2
thickness 145: 6, 145: 23, 147: 19, 148: 4
thin 200: 10
thinking 9: 19, 202: 24, 203: 8, 230: 20, 256: 19
thinks 230: 15
thinly 5: 2
thinner 175: 16, 176: 3

third 129:21, 217:10
thirst 233:19
Thompson 1:34
thorough 195:12
though 8:23, 43:23, 72:12, 86:17, 105:4, 119:17, 206:7, 215:7, 230:21, 234:7, 242:4
thoughtful 231:17, 242:6
thoughts 230:21, 233:11
thousand 22:5, 135:15, 158:13, 158:14, 158:15, 159:7, 159:9, 159:12, 184:15, 184:19, 201:10
thousand. 135:14
threat 108:14, 244:3
threatening 129:25
three 6:22, 93:4, 93:9, 103:3, 104:11, 107:9, 129:15, 137:9, 162:8, 162:10, 172:3, 182:6, 182:16, 184:17, 185:7, 200:1, 208:16, 221:24, 223:20
three-year 227:6
three. 164:16
threshold 10:16, 10:21, 14:5, 45:9, 233:5
Thrift 69:15
throughout 54:15, 57:9, 67:21, 67:23, 78:8, 78:21, 116:5, 121:21
throwing 25:2
thrown 234:18
thumbed 32:16

ticket 244:15
tie 121:4
Tim 20:10, 236:5
time-weighted 152:3
TIMOTHY 20:24, 264:4
tiny 71:10, 201:14, 201:15, 201:24
Titan 33:25
Title 100:17, 251:5, 251:10, 253:20, 257:19, 262:17, 262:20, 262:24
TM 158:23
today 13:16, 14:19, 14:21, 32:20, 62:17, 66:9, 83:25, 84:4, 107:17, 118:7, 124:1, 183:5, 186:25, 196:9, 215:9, 215:24, 221:13, 231:8, 232:5, 234:21, 235:11, 236:16, 238:14, 245:24, 259:20, 259:25
together 3:17, 56:18, 57:23, 156:22, 182:13, 182:21, 182:23, 183:15, 215:5, 217:6, 225:8, 226:7, 226:8, 229:9
toll 13:7
tongue 131:5
took 4:2, 9:5, 12:8, 32:5, 35:9, 109:17, 109:18, 109:19, 109:25, 110:3, 137:1, 137:18, 141:4, 141:18, 143:22, 175:24, 176:4, 176:15,

179:21, 179:22, 206:12, 236:11, 255:10
tool 234:24
top 57:3, 85:24, 95:2, 137:12, 157:5, 180:7, 181:9, 182:17, 224:25
tormented 231:14
total 147:13, 187:1, 187:6, 187:7
Totally 134:11, 165:11, 180:19
touch 32:22, 140:8
touched 52:23, 201:2, 201:5, 233:16
tough 81:23, 81:24, 82:1
toward 104:3
towards 146:15
town 209:13, 243:22
TOWNSEND 20:11, 20:24, 25:12, 43:9, 46:24, 60:10, 96:12, 96:19, 123:25, 204:23, 205:3, 205:22, 206:4, 207:9, 210:25, 211:7, 211:12, 214:6, 214:19, 229:17, 236:5, 247:19, 264:4
Townshead 229:16
toxic 207:6
toxicological 135:2
toxicologist 115:5, 115:8, 116:5, 130:16
toxicology 115:10, 115:13, 115:23, 117:16
Trade 131:8
traditional

228:19
traditionally 188:25
tragedy 236:23
trailer 109:7
trained 121:14, 121:17, 127:9, 211:10
training 34:9, 121:6, 122:11, 222:21, 242:9
TRANSCRIPT 1:16, 2:47, 266:1, 266:3
transferred 123:19
transport 128:23
transporting 57:19
trap 127:1
trash 129:9
travel 227:25
treated 137:17, 137:21, 138:14, 138:16, 138:19, 138:20, 139:18, 139:22, 140:13, 143:3, 143:8, 143:18, 143:21, 143:23, 144:2, 144:18, 146:16, 182:7, 182:8, 193:16, 193:17, 221:1, 223:6
treatment 258:21, 258:23
tremendous 146:6
tremendously 231:5, 247:4
trial 7:19
tried 47:12, 125:3, 153:19, 193:4, 230:1
trips 97:6, 225:5
troop 248:19
trouble 32:12, 50:10
true 7:24, 49:13, 60:6,

60: 10,   61: 12,
61: 14,   65: 9,
214: 19,   220: 1,
233: 11,   239: 9
truly 61: 16,
178: 4,   233: 24,
234: 8,   236: 23
trusted 231: 18
trusting 230: 17
trustworthy
237: 6
Truth 72: 17,
73: 1
Try 10: 6,   10: 12,
11: 15,   11: 19,
12: 22,   13: 16,
13: 23,   15: 17,
15: 21,   30: 11,
35: 13,   36: 19,
69: 18,   104: 23,
119: 4,   140: 8,
147: 24,   147: 25,
155: 15,   198: 8,
222: 12,   239: 17,
254: 1,   259: 16
trying 9: 10,
11: 13,   28: 13,
36: 16,   73: 22,
74: 12,   104: 5,
104: 7,   109: 3,
158: 11,   204: 14,
206: 14,   208: 21,
220: 2,   242: 3,
246: 10,   247: 3,
248: 11,   248: 17,
255: 18
TSENG 224: 2,
264: 30
tube 81: 5,
85: 21,   85: 24
Tuesday 259: 12
turmoil 232: 15
turn 78: 19,
179: 13,   181: 9,
210: 7,   235: 8,
260: 7,   260: 8
turning 13: 2,
197: 9
turns 138: 11
twelve 6: 15

Twice 30: 20
Two. 68: 10,
68: 11
TX 1: 25,   1: 36,
2: 4
type 39: 18,
67: 20,   72: 11,
108: 4,   109: 2,
120: 18,   123: 3,
123: 4,   123: 5,
124: 25,   125: 5,
126: 25,   129: 19,
129: 21,   156: 11,
166: 7,   166: 19,
172: 2,   188: 16,
221: 6,   228: 13,
229: 25
types 119: 2,
120: 16,   121: 3,
122: 1,   128: 25,
129: 15,   130: 15
typical 172: 10
Typically 46: 10,
121: 3,   123: 4,
128: 8,   187: 12,
188: 9
Tyvek 123: 4,
172: 17


< U >
UCLA 224: 14,
224: 20,   224: 24,
245: 5
ultimate 205: 9
Ultimately 28: 9,
30: 16,   36: 12,
37: 11,   69: 20,
230: 16,   233: 15
Um-hum 81: 22,
227: 14
unable 84: 12
unbiased 233: 11
uncle 231: 18
uncommon 107: 11
uncooperative
91: 20
undergraduate
115: 20
understand 7: 2,

12: 3,   17: 3,
18: 25,   19: 16,
23: 10,   35: 22,
35: 23,   43: 16,
46: 24,   91: 18,
94: 20,   98: 21,
118: 3,   125: 16,
138: 1,   164: 4,
166: 23,   168: 24,
173: 19,   182: 20,
189: 6,   189: 11,
206: 11,   213: 3,
213: 4,   214: 8,
220: 8,   230: 4,
230: 5,   230: 10,
263: 9
understanding
10: 11,   23: 6,
23: 13,   23: 14,
34: 16,   35: 6,
35: 12,   50: 2,
50: 7,   123: 21,
129: 3,   148: 2,
227: 5,   232: 7,
234: 22
understood 48: 4,
54: 8
undoubtedly
198: 1,   232: 9
unfaltering
232: 21
unfamiliar
234: 19
unfolding
232: 22,   233: 7
unfortunate
204: 2,   209: 11,
220: 1,   220: 7,
234: 20
Unfortunately
10: 9,   13: 14,
46: 18,   198: 21,
230: 19
Unidentified
265: 18,   265: 20,
265: 22
Unidentified194
265: 18,   265: 20,
265: 22
uniformly

152: 22,   182: 1,
182: 5
unique 249: 24
unit 77: 17,
79: 2,   79: 3,
79: 5,   79: 15,
79: 22,   79: 24,
80: 2,   85: 20,
109: 6,   109: 9
United 1: 1,   1: 5,
1: 18,   1: 23,   3: 4,
3: 8,   3: 10,
17: 19,   18: 7,
21: 6,   153: 14,
181: 6,   216: 20,
251: 1,   251: 5,
251: 11,   251: 14,
253: 21,   257: 10,
257: 19,   257: 25,
258: 12,   262: 17,
262: 20,   262: 24,
266: 5
units 77: 16,
85: 20,   109: 1
universities
225: 10,   225: 20
University
115: 21,   115: 23,
115: 25,   224: 14,
224: 15,   226: 1
unlawful 258: 15
unless 259: 2
unlikely 147: 16
unpaid 251: 5,
257: 14,   257: 15,
257: 19
unquestionably
165: 2
unreasonable
205: 25,   236: 18,
249: 1
unsuccessful
125: 7
Until 5: 24,
16: 10,   41: 12,
72: 19,   72: 24,
84: 4,   105: 13,
132: 6,   169: 17,
178: 1,   196: 21,
197: 4,   207: 1,

313

230: 9,  241: 8,
247: 18,  257: 17,
258: 22
untreated
146: 14,  178: 9,
179: 11
unusual  204: 19
unwarranted
223: 3
up.  159: 25
upper  106: 6
upset  31: 17,
31: 18
upside  179: 15
upstairs  4: 19
upwards  85: 23
urge  228: 21,
243: 3,  244: 19,
245: 4,  245: 12
usage  244: 15
useful  211: 8
useless  202: 3,
202: 5
Using  21: 13,
31: 2,  39: 16,
40: 16,  41: 7,
70: 25,  76: 7,
107: 4,  130: 25,
150: 12,  150: 21,
155: 8,  159: 6,
165: 18,  166: 6,
166: 19,  208: 7,
208: 25,  209: 9,
209: 22,  211: 10,
217: 4,  246: 18,
249: 3
usual  41: 25


< V >
vac 77: 8,  79: 7
vacant  74: 4
vacuum  79: 7,
79: 8,  79: 9,
79: 10,  80: 23,
81: 2,  81: 3,
81: 24,  82: 2,
83: 18,  84: 8,
84: 11,  84: 13,
84: 14,  85: 20,

126: 12,  126: 22,
127: 4,  127: 12,
200: 6
vacuums 98: 10
valid 14: 12
Valley 115: 21
value 147: 25,
158: 23
values 152: 2,
152: 4,  232: 21,
235: 5
vapors 104: 18,
106: 4,  109: 12
variable 91: 10
variance 197: 14,
221: 20,  222: 5,
223: 2,  223: 15,
223: 25,  245: 18,
249: 25,  254: 12,
254: 22
variant 253: 13,
256: 2
variety 188: 24
various 155: 7,
158: 1,  185: 3,
256: 1
VCT 34: 4
vehicles 123: 16
vein 116: 23
ventilate 109: 9,
109: 12
ventilation
212: 22
Venting 121: 5
version 76: 10,
79: 1
VERSUS 1: 9,
3: 10,  17: 19,
17: 20,  18: 7,
21: 7,  47: 25
vicinity 127: 8,
208: 17
victim 102: 14,
102: 17,  108: 7,
196: 23
victims 221: 12,
221: 17,  223: 13,
238: 9,  242: 1,
259: 2
video 76: 10,

83: 21
view 199: 10,
256: 18
viewed 230: 10
Villanueva 39: 5,
66: 18,  67: 9,
71: 18,  73: 16,
74: 19,  89: 2,
89: 17,  93: 3,
93: 16,  95: 21,
205: 1,  251: 9,
257: 8
Vinyl  34: 4,
148: 22
violate 249: 10
violated 90: 10
violating 256: 20
violation 209: 2,
221: 7,  244: 10,
247: 23
violations
251: 22,  252: 1,
252: 3,  252: 7
Virginia 116: 1,
116: 3
Virtually 80: 14,
81: 12,  159: 22
virulent 129: 19
visible 124: 9,
124: 12,  124: 13
Visibly 31: 18,
64: 14
visit 21: 25
visited 13: 4,
59: 8,  59: 9,
59: 10
Visually 74: 2
vocational
222: 21
voice 122: 7
volatile 104: 15,
104: 16,  104: 19,
104: 20
volatility
104: 12
volume 159: 13,
201: 16,  201: 17
volumes 243: 18
volunteered
225: 4,  225: 6

volunteering
227: 20


< W >
W-e-i-s 114: 22
wage 220: 20
wait 41: 12,
101: 23,  169: 17,
207: 1,  235: 23
waive 13: 6
waiver 168: 23
Walk 27: 22,
171: 7
walked 33: 21,
34: 1,  39: 4,
74: 3,  138: 15,
138: 17,  211: 3
walking 126: 7
wall  57: 17,
171: 23,  171: 24
wanted 4: 3,
11: 5,  149: 8,
157: 13,  234: 8,
242: 1,  246: 17
wanting 144: 6
wants 101: 4,
173: 13,  245: 2
warmth 233: 19
warrant 152: 5,
223: 2
warranted 222: 6
washed 123: 18
Washington
198: 21
waste 225: 14
watch 232: 10
water 11: 4,
11: 7,  130: 10,
141: 3,  190: 9,
190: 11,  221: 3
ways 125: 8
weakness 230: 11
weapon 258: 10
wear 41: 17,
41: 24,  121: 8,
121: 9,  122: 12,
123: 10,  123: 11,
123: 22,  161: 16,
172: 19,  173: 2,

174: 13
wearing 151: 10, 172: 14, 172: 15, 172: 16
web 53: 6, 53: 10, 53: 17, 53: 19, 98: 22, 98: 25, 205: 24, 225: 6, 225: 24
week 40: 22, 40: 24, 208: 9
weeks 6: 22, 13: 15, 30: 23, 130: 4, 210: 10
weight 36: 2, 117: 21, 136: 21, 237: 18
Weis 114: 14, 114: 22, 152: 7, 160: 4, 194: 7, 198: 21, 199: 16, 201: 11, 207: 23, 211: 8, 264: 18, 265: 16
well-being 232: 17
West 56: 10, 56: 13, 57: 2, 224: 15
Western 57: 17, 260: 12
wet 172: 8, 172: 10, 172: 12
wetted 156: 7
Whatever 13: 9, 13: 23, 16: 2, 71: 11, 130: 10, 158: 25, 172: 7, 201: 13, 201: 21, 202: 21, 214: 2, 243: 8
wheel 160: 16
wheels 79: 12
whereas 254: 16
wherever 128: 23
white 23: 20, 23: 25, 24: 7, 24: 10, 44: 11, 44: 16, 97: 16, 213: 19, 213: 20,

213: 23, 213: 24, 213: 25
whiz 225: 23
whole 5: 20, 12: 4, 12: 7, 65: 7, 66: 8, 67: 15, 147: 10, 202: 4, 205: 11, 214: 6, 214: 10, 214: 11, 233: 4
wholesome 232: 21
wide 106: 25, 188: 24, 211: 18
width 106: 21, 124: 8
wife 235: 19
wild 134: 11, 134: 17, 135: 14, 158: 12, 159: 10, 159: 11
willful 249: 19
willfully 249: 10
Williams 185: 6
willing 11: 15, 11: 18, 232: 17
WILSON 2: 37, 100: 3, 100: 11, 102: 7, 102: 13, 102: 21, 264: 12, 265: 48, 266: 10, 266: 11
wind 105: 11, 105: 13, 105: 15, 105: 17
window 64: 14
windows 42: 1, 42: 4, 74: 6, 74: 13, 74: 16, 212: 20, 212: 21, 218: 23
wish 20: 6, 194: 19, 196: 24, 212: 16, 240: 9
wished 33: 10
wishes 3: 17, 197: 18
withdraw 7: 1, 262: 22
within 105: 11, 112: 22, 138: 21,

156: 8, 165: 12, 165: 22, 165: 23, 166: 13, 166: 14, 167: 1, 167: 2, 202: 6, 216: 8, 234: 23, 258: 14, 258: 17
without 111: 24, 125: 4, 125: 8, 151: 15, 163: 11, 222: 12, 230: 17, 230: 24, 230: 25, 235: 4, 254: 8, 259: 8
witnessed 107: 14
Witnesses 12: 5, 22: 12, 22: 16, 22: 20, 24: 13, 24: 18, 24: 23, 42: 4, 42: 7, 42: 9, 46: 11, 47: 17, 47: 21, 80: 18, 86: 6, 87: 12, 88: 8, 88: 14, 97: 14, 99: 24, 114: 12, 193: 24, 194: 1, 194: 4, 196: 24, 197: 2, 207: 10, 210: 8
woman 234: 2
wonder 78: 12, 84: 7, 253: 11
wonderful 220: 12
wondering 146: 12
word 59: 14, 79: 19, 193: 15, 214: 12
words 37: 2, 53: 7, 147: 9, 166: 8, 233: 23, 259: 18
wore 41: 18, 208: 9
worked 30: 1, 34: 7, 119: 4, 187: 8
worker 76: 7, 173: 16, 173: 17, 173: 21, 173: 23,

174: 5, 248: 21, 248: 22
workers 24: 25, 38: 16, 38: 25, 39: 1, 40: 14, 76: 5, 86: 7, 87: 1, 106: 13, 108: 24, 121: 7, 121: 8, 122: 13, 123: 22, 126: 13, 127: 9, 129: 12, 156: 3, 169: 1, 172: 14, 208: 18
working 21: 3, 30: 4, 108: 15, 121: 13, 152: 14, 208: 18, 226: 11, 229: 4
workplace 50: 5, 50: 8, 50: 14, 184: 5
World 131: 8, 152: 13, 153: 13, 189: 23, 204: 12, 215: 7, 243: 12, 246: 11
worldwide 116: 18, 189: 23
worn 135: 25, 136: 3
worried 231: 14
worry 220: 21
worse 4: 16, 140: 2, 154: 6
worst 4: 17, 140: 18, 140: 20, 142: 11, 142: 17, 144: 10, 179: 11, 200: 23, 201: 1
Worth 62: 20, 63: 2, 63: 15, 243: 14
worthy 245: 17, 249: 24
wrap 205: 18
wrapper 121: 4
write 62: 24
written 18: 4, 18: 18, 18: 21, 53: 7, 53: 24,

80: 4,   199: 8,
199: 9,   214: 17,
233: 9,   259: 24
wrongfully
236: 14
wrongly  65: 6,
206: 16


< Y >
Y'all  13: 12
year  5: 9,   14: 18,
29: 9,   115: 17,
226: 2,   261: 17,
262: 12
years  14: 8,
21: 5,   29: 11,
100: 16,   100: 19,
118: 20,   125: 6,
130: 1,   130: 2,
167: 23,   168: 1,
196: 16,   221: 25,
224: 23,   225: 14,
226: 11,   226: 14,
227: 2,   229: 14,
231: 9,   231: 22,
232: 9,   232: 10,
234: 14,   235: 11,
236: 12,   236: 22,
238: 11,   239: 3,
239: 14,   239: 15,
239: 22,   242: 21,
248: 13,   250: 23,
257: 22,   259: 22,
261: 16
yesterday  16: 10
York  88: 8,
88: 10,   88: 13,
89: 9,   202: 21,
209: 8,   228: 10,
243: 24
you-all  46: 11
you-guys-are-tot
ally-wrong  13: 18
young  123: 17,
236: 15,   237: 3,
240: 23,   241: 21,
241: 22,   243: 25,
244: 25,   245: 16
younger  232: 1,

232: 5
yourself  117: 2,
117: 7,   135: 5,
136: 1,   136: 14,
186: 15,   234: 20,
260: 4
youth  225: 12,
225: 21,   238: 1


< Z >
zero  158: 23,
158: 24
Zero.  158: 23,
159: 2,   159: 15
zeros  153: 7
zippered  123: 5
zone  110: 1,
135: 22,   222: 24

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 31st day of March, 2014.


                              s/Pamela J. Wilson
                              PAMELA J. WILSON, RMR, CRR
                              Official Court Reporter
                              The Northern District of Texas
                              Dallas Division